IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION
CASE NO. 5:18-cr-452

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | DEFENDANT'S BRIEF IN SUPPORT |
| ) | OF PRETRIAL RELEASE |
| LEONID TEYF et al., ) | |
| ) | |
| Defendants. ) | |

## FACTS

Leonid Teyf stands accused of engaging in monetary transactions in property derived from specified unlawful activity and conspiring with and aiding and abetting others in furtherance of same,[1] bribery of a public official,[2] murder for hire,[3] aiding and abetting others by possessing a firearm with an obliterated serial number,[4] bringing in and harboring certain aliens and conspiring with and aiding and abetting others in furtherance of same,[5] and visa fraud.[6] Mr. Teyf is currently being detained at the Wake County Detention Center awaiting trial.

The Pre-trial Services Report indicates no personal data was obtained from Mr. Teyf. Counsel for Mr. Teyf was not contacted to provide information. The report includes virtually no development of the evidence-based factors that research indicates provide a reliable indicator of a defendant's risk of pre-trial flight and no discussion of the combinations of requirements that would support a finding that supervised release, GPS monitoring, and periodic reporting would not provide reasonable assurances of Mr. Teyf's appearance. Information regarding Mr. Teyf appears in the accompanying affidavit of counsel and will be presented at the hearing.

---

[1] 18 U.S.C. §§ 2, 1956(h) and 1957 (2018).
[2] *Id*. § 201(b)(1).
[3] *Id*. § 1958.
[4] *Id*. §§ 2, 922(k) and 924(a)(1)(B).
[5] 8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(I) and (v)(II) (2018).
[6] 18 U.S.C. § 1546(a).

# ARGUMENT

Consistent with the Constitutional presumptions, the Bail Reform Act of 1984 established two statutory presumptions *against* pretrial detention. The first is a presumption in favor of pretrial release on personal recognizance or unsecured appearance bond.[7] The second is a presumption in favor of release in conjunction with the imposition of reasonable conditions, but only if the judicial officer determines first that release pursuant to the first presumption will not reasonably ensure the person's appearance as required or would endanger the safety of others.[8] In short, the Court has the Constitutional and statutory obligation to find the means and methods to release an indicted person before trial. This does not mean release only upon conclusion there is an absolute certainty of an appearance—"reasonably" cannot be read out of the statute. In life and under the Constitution and statute absolute certainty is neither required not possible. Further, the Court is required to impose the least restrictive condition(s) necessary to achieve the objective of *reasonably* assuring the accused's return and the safety of other persons and the community.[9]

In spite of the Bail Reform Act's presumptions favoring release, the Government seeks continued pretrial detention for Mr. Teyf. Such detention is only warranted under exceptional circumstances. Specifically, this Court may only impose continued pretrial detention where "the judicial officer finds that **no** condition or combination of conditions will **reasonably** assure the appearance of the person as required and the safety of any other person and the community."[10] The Government's intransigence is unwarranted in this case and conflicts with the framework of the Bail Reform Act and the fundamental Constitutional principles upon which our criminal justice system is built.

The presumption in favor of pre-trial release of a person accused of a crime is a long-established principle of our federal judicial system and a corollary of the presumption of innocence. As the Supreme Court explained in *Stack v. Boyle*:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 9 1, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal law has

---

[7] *See id.* § 3142(b).
[8] *See id.* § 3142(c).
[9] *See id.* § 3142(c)(1)(B).
[10] *See id.* § 3142(e).

> unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 156 U.S. 277, 285 (1895). ***Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.***[11]

In order to defeat this presumption, the Government must prove either: (a) by clear and convincing evidence that Mr. Teyf is so dangerous that this Court is incapable of fashioning conditions sufficient to assure the safety of others; or (b) by a preponderance of the evidence that he is so likely to flee that this Court is incapable of fashioning conditions sufficient to assure his appearance as required.[12] Mr. Teyf's well-established community and business ties, his demonstrated lack of intent to flee, his substantial assets in the United States, and the fact that his three children (two of whom are U.S. citizens) reside in America all demonstrate the Government cannot meet its burden.

The Bail Reform Act directs the Court to consider the following factors when making a determination about an accused's release:

(1) the nature and circumstances of the charges;

(2) the weight of the evidence against the person;

(3) the person's history and characteristics; and

(4) the nature and seriousness of the danger posed by the person's release.[13]

Regarding the person's "history and characteristics," the Court must consider (1):

- the defendant's character,
- physical and mental condition,
- family ties,
- employment,
- financial resources,
- length of residence in the community,
- community ties,
- past conduct,
- history related to substance abuse,

---

[11] *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (emphasis in original).
[12] Notwithstanding the statute's alternative bases for detention, at Mr. Teyf's Rule 5 initial appearance, the Government notified the Court and Mr. Teyf that it was seeking continued pretrial detention solely on the basis that Mr. Teyf was a flight risk.
[13] *See* 18 U.S.C. § 3142(g) (2018).

- criminal history,
- record concerning appearance in court proceedings; and

(2) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

*Id.* at § 3142(g)(3)(A)-(B).

Additionally, when assessing an alien defendant's ties to the community, the Court should also consider several other factors including:

(1) The amount of time the defendant has resided in the community;

(2) the defendant's employment in the community;

(3) whether the defendant owns property in the community; and

(4) whether the defendant has any relatives who are citizens or residents of the United States.[14]

As noted in the Facts, virtually none of these factors or the available means of reasonably assuring Mr. Teyf's appearance are analyzed and evaluated in the Pre-Trial Services Report. This Court may not rely on that report and meet its statutory and Constitutional obligations.

## **LEONID TEYF IS NOT A FLIGHT RISK**

Pre-trial detention is prohibited unless the judicial officer determines that "no condition or combination of conditions will reasonably assure the person's appearance as required and the safety of any other person and the community."[15] The Government bears the burden of proof by a preponderance of the evidence to prove no such conditions exist.[16] First, Mr. Teyf is decidedly not a flight risk:

He is employed in the U.S.;

he is older and has health issues that require treatment that both limit his ability to flee and make incarceration a material health risk;

he has no criminal history;

he has been living in the United States for approximately the past eight years and is a legal resident of the United States;

---

[14] *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).
[15] 18 U.S.C. § 3142(e).
[16] *See United States v. Stewart*, 19 Fed. Appx. 46, 48 (4th Cir. 2001).

he has extensive family and business ties to the District and the United States with extensive ties to the Raleigh community;

he has not history of substance abuse;

he has substantial property in the district; and

he has repeatedly evidenced a lack of intent to flee.

The lack of intention to flee is more informative to the determination of the necessity of pretrial detention than the opportunity to flee. While evidence related to intent is often non-existent, when present, courts have focused on this lack of intent to find that pretrial detention is unwarranted.[17]

Mr. Teyf has been aware of the Government's interest in him. He has been aware of DHS' investigation into his business affairs since at least the spring of 2018. *Id.* McLoughlin Aff. ¶6. Despite this awareness, Mr. Teyf's conduct throughout the pendency of the Government's investigation has evidenced an intention to remain in the United States and to defend against the charges leveled against him. Despite having every opportunity to flee the country, Mr. Teyf did not do so, a reflection of his intention to remain accountable and present. Specifically, he had knowledge that Alexey Timofeev was arrested by the Department of Homeland Security ("DHS") in April of this year, and that Mr. Timofeev cooperated with DHS. *Id.* ¶7. Moreover, Mr. Teyf understood that, the Government agents expressed interest in Mr. Teyf's business activities. *Id.* ¶8. Rather than flee in an attempt to evade law enforcement, Mr. Teyf retained counsel to assist him with the pending investigation into his business affairs, continued his relationship with Mr. Timofeev, and continued to reside at his home in Raleigh. In fact, Mr. Teyf enhanced his ties to the United States. Rather than liquidate his U.S. holdings in anticipation of fleeing the country, in July 2018, he doubled his existing ownership interests in certain Utah-based trucking businesses. *Id.* ¶10.

---

[17] *See United States v. Hanson*, 613 F. Supp. 2d 85, 90 (D.D.C. 2009) (noting that there was "no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States" and permitting the defendant's release subject to conditions); *United States v. Khashoggi*, 717 F. Supp. 1048, 1050-1051 (S.D.N.Y. 1989) (granting pretrial release in conjunction with the imposition of conditions where the defendant "manifest[ed] an intention to remain here and face the charges against him."); *see also Hung v. United States,* 439 U.S. 13, 26 (1978) (concluding that a defendant was entitled to bail pending appeal as the government's evidence "suggest[ed] opportunities for flight, [but] they hardly establish[ed] any inclination on the part of applicant to flee. And other evidence supports the inference that he is not so inclined.")

Further, since becoming aware of the government inquiry into his business affairs, Mr. Teyf has travelled internationally and yet returned to the United States. *Id*. ¶9. Simply put, these actions are not consistent with an intent to flee the country in the face of a government investigation. To the contrary, these are the actions of someone ready and willing to defend against any charges that may be and now have been brought against him.

The business interests that Mr. Teyf has established and grown since his arrival in the United States further compel a finding of pretrial release.[18] Mr. Teyf has been employed as the President of Delta Plus, LLC, a provider of urgent care services in the Raleigh area, since his arrival in the United States. And, as noted above, he maintains substantial ownership interests in multiple trucking companies here. These connections argue persuasively against the need for pretrial detention.

Mr. Teyf's community and family ties further support a finding that he is not a flight risk. He arrived in the United States in 2010[19] and has since become a legal resident of the United States. He has three children in the United States, two of whom are United States citizens, and one is a minor attending school in Raleigh. Mr. Teyf owns real estate in North Carolina, including his home in Raleigh. The strength of these connections weighs heavily against pretrial detention.

Turning to the nature of the charges, it is true that they suggest the possibility of a significant sentence if convicted, but what seems certain is that these complex allegations will result in a protracted pretrial process and trial. However, the extensive anticipated duration of these proceedings weighs against pretrial detention because the burden of prolonged detention in a county jail under contract to hold federal prisoners given Mr. Teyf's age and health is a materially greater burden and health risk.[20] Further, Mr. Teyf's release is especially important given the complexity of the financial transactions and international implications involved in his case to enable him to meet with his attorneys and participate meaningfully in

---

[18] *See Khashoggi*, 717 F. Supp. at 1051 (noting that the negative impact the defendant's flight would have on his United States business interests supported the conclusion that he did not pose a substantial risk of flight.)

[19] The Pretrial Services Report erroneously states on page 2 that Mr. Teyf first entered the U.S. in 2011, but correctly notes on page 4 that he has been president of Cary-based Delta Plus since 2010.

[20] *See Khashoggi,* 717 F. Supp. at 1051 (explaining that "the likelihood of a somewhat prolonged pretrial detention for the defendant weighs in his favor").

his defense. Refusal to grant pretrial release will have a materially negative impact on his ability to defend himself at trial.

The weight of the evidence similarly militates against Mr. Teyf's pretrial detention. While it remains to be seen exactly what the Government will ultimately produce as evidence, what is already clear is that the superseding indictment is plagued by inconsistencies, conclusory statements and questionable legal theories. As an example, the money laundering charges against Mr. Teyf are premised on, what is at best, a decidedly non-intuitive notion of theft, to wit: that an agreement between a government contractor and a subcontractor to receive a portion of the subcontractor's payment, for work that was introduced by the former to the latter, constitutes theft of government funds. There is no allegation of deception of the Russian government, that the Russian government paid more for the goods than it would have otherwise, or that the conduct violated an *identified law*. Further, there is no allegation of any fact that supports the conclusion that a single dollar of the monies Mr. Teyf transferred to or caused to be transferred to the United States is derived from that alleged conduct. These issues are indicative of the Government's tenuous position moving forward and weigh against the Government's request for continued detention while Mr. Teyf tries to defend himself.

**Leonid Teyf Poses No Danger to this Community**

Under the safety prong of the Bail Reform Act analysis, the Government has an even higher burden: to prove by clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of others and the community.[21] The clear and convincing standard requires that the evidence support a conclusion with a high degree of certainty.[22] Mr. Teyf is not a danger to his community. Tellingly, the Government did not raise this consideration as a basis for continued pretrial detention at Mr. Teyf's initial appearance, likely because the Government cannot show that Mr. Teyf poses a threat under the requisite "clear and convincing" evidentiary standard.

---

[21] *U.S. v. Salerno*, 481 U.S. 739, 742 (1987) (citing 18 U.S.C. § 3142).
[22] *U.S. v. Chimurenga*, 760 F.2d 400, 405 (2nd Cir. 1985).

The Government's success is contingent upon its ability to present specific evidence that Mr. Teyf would be a danger to the community. Though the Bail Reform Act does not explicitly define "danger," the legislative history of the Act indicates that Congress intended "danger" to refer specifically to the likelihood that the accused would commit further crimes to the "detriment of the community" while on release.[23]

None of the crimes Mr. Teyf is charged with trigger any presumption under the Bail Reform Act.[24] To the extent the allegations relate to violent activity, they do so in the context of a domestic dispute that has no impact on the larger community. Further, given the nature of these charges—the indictment is devoid of any suggestion that Mr. Teyf personally participated in any violent or threatening behavior—it is unclear how pretrial detention would be relevant to ensuring public safety. Most importantly, Mr. Teyf has lived peacefully in this community for nearly a decade without committing any criminal acts, as evidenced by his lack of criminal record. Such circumstances compel a finding that Mr. Teyf is not a danger to the community.

### THE COURT MUST EMPLOY THE LEAST RESTRICTIVE MEANS FOR MAINTAINING COMMUNITY SAFETY AND ASSURING DEFENDANT'S APPEARANCE AT TRIAL.

Pursuant to 18 United States Code § 3142(f)(2)(B), the Government is required to prove that "no condition or combination of conditions will reasonably assure the safety of any other person and the community . . . by clear and convincing evidence." This standard mandates a "high degree of certainty."[25] The certainty here is on the other side of the ledger—Mr. Teyf poses no significant risk of flight or danger to others and should therefore be released on personal recognizance or unsecured appearance bond. But should this Court determine that one or more conditions are necessary to assure Mr. Teyf's continued participation in these proceedings (or the safety of others) it must select the least restrictive means necessary.[26] The specific language of Section 3142(c) mandates that detention based on "flight" or

---

[23] S. Rep. No. 98-225 at 13, 20 (1984).
[24] *See* 18 U.S.C. § 3142(e)(3).
[25] *Addington v. Jessup*, 441 U.S. 418, 431 (1979).
[26] 18 U.S.C. § 3142(c).

"danger" be limited to those narrow circumstances where "**no condition or combination of conditions will reasonably** assure the appearance." (emphasis added). This Court's obligation under the statute is to impose the "***least restrictive*** further condition or combination of conditions the judicial officer determines that will ***reasonably*** assure the appearance . . . ."[27] The Court may require no more than an objectively reasonable assurance that the defendant will appear at trial. Absolute, one hundred percent certainty, which can be assured only by detention is not the test.[28]

### Conditions the Court May Impose are More than Sufficient to Ensure Mr. Teyf's Appearance

The *Overview of Probation and Supervised Released Conditions,* November 2016, published by the Administrative Office of the United States Courts Probation and Pretrial Services Office enumerates conditions this Court can impose that are more than sufficient to reasonably assure Mr. Teyf's appearance.

> Under 18 U.S.C. § 3563(b)(13), the court may provide that the defendant "reside in a specified place or area, or refrain from residing in a specified place or area."
>
> Under 18 U.S.C. § 3563(b)(14), the court may provide that the defendant "remain within the jurisdiction of the court, unless granted permission to leave by the court or a probation officer."
>
> Under 18 U.S.C. § 3563(b)(19), the court may provide that the defendant "remain at his place of residence during non-working hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices, except that a condition under this paragraph may be imposed only as an alternative to incarceration."[29]

Location monitoring can be ordered by the Court:

> **Voice recognition**: These systems can be used to place or receive random telephone calls to defendants to verify their presence at an approved location, which is typically their home.
>
> **Radio frequency monitoring**: This technology includes monitoring equipment and 24-hour electronic surveillance designed to alert a probation officer when a participant leaves a specific location (usually the home), returns home late (or leaves early) from a pre-approved schedule, or tampers with the electronic monitoring equipment. While subject to electronic

---

[27] 18 U.S.C. § 3142(c)(1)(B).
[28] *United States v. Orta,* 760 F.2d 887, 892 (8th Cir. 1985) (*en banc*) (district court imposition of detention on grounds defendant's appearance could not be "guaranteed" applied the wrong legal standard, which is reasonable assurance).
[29] *Id.* at. 70.

> monitoring, the participant wears a non-removable transmitting device around the wrist or ankle 24 hours a day. This technology only reports when a participant enters or leaves the equipment's range — not where the participant has gone or how far the participant has traveled.
>
> **Global positioning system (GPS) satellite monitoring**: While subject to GPS monitoring, the defendant's location is detected by GPS satellites that transmit signals to location monitoring equipment on the ground. Each GPS satellite transmits data that indicates its location and current time.[30]

Federal courts nationwide have successfully fashioned appropriate conditions to assure trial attendance and community safety when the accused has been deemed a flight risk. The defendant's foreign citizenship or foreign ties do not undermine a court's ability to adopt appropriate conditions in conjunction with pretrial release.

For example, in *United States v. Jones*, the defendant was a citizen of the United Kingdom with no legal status in the United States.[31] The court relied upon Jones' significant role in the criminal operation alleged in the indictment, the fact that he had previously "jumped bail" in the United Kingdom, his prior use of aliases, the potential lengthy sentence, and the strength of the government's case to conclude that he was a flight risk.[32] Still, the court released him in conjunction with the imposition of reasonable conditions including requirements that he provide a $75,000 cash bail, relinquish his passport, and submit to electronic monitoring.[33]

In *United States v. Hanson*, the government argued in favor of pretrial detention noting that, (1) although the defendant was a naturalized citizen, she had closer ties and greater affinity with China, (2) she had minimal family ties in the United States, (3) she potentially faced a significant sentence and the evidence against her was strong, (4) though her passports had been surrendered, she could easily obtain a new one from the Chinese embassy, and (5) she could easily relocate to China given her business interests, family ties and property in China.[34] The court acknowledged these concerns, yet found that there were reasonable conditions of release that, in combination, would reasonably assure her

---

[30] *Id.* at 73 (emphasis added).
[31] 143 F. Supp. 3d 78, 85 (W.D.N.Y. 2015).
[32] *Id.* at 87-88.
[33] *Id.* at 89.
[34] 613 F. Supp. 2d 85, 89 (D.D.C. 2009).

appearance.[35] These conditions included participation in the High Intensity Supervision Program, home confinement and GPS monitoring, agreement not to seek a new passport during the pendency of the matter, and the posting her home as security subject to forfeiture.[36]

In *United States v. Khashoggi*, the defendant was a wealthy Saudi Arabian businessman with minimal ties to the United States beyond financial connections.[37] The government argued that the "defendant's vast resources render it impossible for this Court to fashion conditions of pretrial release which would insure the defendant's presence at trial."[38] Still, the court granted his pretrial release after imposing variety of conditions to "reasonably assure" his appearance at trial including a $10 million bond, electronic monitoring, and relinquishment of his passports.[39]

In *United States v. Moquete*[40], the Government appealed the Magistrate Judge's decision to give Moquete pre-trial release based upon 18 U.S.C. § 3142(f)(1)(2012) and the fact Moquete lived in Florida and grew upon in the Dominican Republic, "which is geographically close to the United States, reachable by boat, and may be entered without a passport."[41] Moquete offered to post bonds forfeiting his Florida properties, including his family's home.[42] The court found he had strong family ties to the United States where he had lived for 26 years, including his wife and children in the U.S. Moquete's former employer had offered to re-hire him, and he had no relevant criminal history.[43] The district court affirmed pre-trial release despite the fact the court found the evidence against him to be strong and the fact he traveled often to the Dominican Republic.[44]

Evidence based analysis demonstrates that supervised release and electronic monitoring effectively manage pretrial activities of even higher-risk defendants:

---

[35] *Id.* at 90.
[36] *Id.* at 91.
[37] 717 F. Supp. 1048, 1050-51 (S.D.N.Y. 1989).
[38] *Id.* at 1049.
[39] *Id.* at 1052.
[40] 2014 U.S. Dist. LEXIS 175555; 2014 WL 7336476 (D. Md. December 19, 2014)(attached).
[41] *Id.* at *5.
[42] *Id.*
[43] *Id.* at *5-*6.
[44] *Id.* at *10.

> A growing number of studies validate the effectiveness of flexible pretrial supervision programs in achieving the same purposes for which bail is intended, even as to higher-risk individuals. Samuel R. Wiseman, Pretrial Detention and the Right to Be Monitored, 123 Yale L.J. 1118, 1348, 1363 (2014); Christopher T. Lowenkamp & Marie VanNostrand, Exploring the Impact of Supervision on Pretrial Outcomes 3, 13 (Arnold Found. Nov. 2013).

\*\*\*

> [I]n Virginia, which pioneered one of the first evidence-based risk assessment approaches to pretrial decision-making in the country, reported that in 2012, 96.3% of defendants released into alternative conditions of supervision appeared in court as scheduled. Kenneth Rose, A "New Norm" for Pretrial Justice in the Commonwealth of Virginia 3, 6 (Va. Dep't of Crim. Just. Servs. Dec. 2013).[45]

To the extent this Court is unwilling to grant an unconditional release, Mr. Teyf's circumstances similarly warrant release upon appropriate conditions. If this Court determines that Mr. Teyf presents some appreciable risk of flight or danger to the community, it must fashion the least restrictive combination of fourteen statutory conditions specified in 18 U.S.C.§ 3142(c). Those fourteen conditions include limitations on personal associations; limitations of travel, telephone calls, contacts, and use of firearms and narcotics, as well as other monitoring restrictions implemented and administered through Pretrial Services that will "reasonably assure" defendant's appearance. Imposition of such conditions will reduce any concerns related to the defendant's propensity for flight or dangerous activity.[46] Here, Mr. Teyf's accounts have already been frozen, and he is amenable to the imposition of any reasonably necessary condition to ensure his appearance at future preceding. Under these circumstances, it is incumbent upon the Court to employ the least restrictive set of restrictions to permit Mr. Teyf to return home and participate in the preparation of his defense.

This 14th day of December, 2018.

/s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.

---

[45] BRIEF OF AMICUS THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, *Hernandez v. Sessions*, No.16-56829 (9th Cir. March 8, 2017) U.S. 9th Cir. Briefs LEXIS 760 (Author, Peter Kang *et al.* Sidley Austin LLP).

[46] *See, e.g. United States v. Giorando,* 370 F. Supp. 2d 1256, 1271 (S.D. Fla. 2005) (explaining that "monetary conditions [] would ameliorate the flight risk that exists" as a result of the defendant's significant financial resources).

N.C. State Bar No. 13795  
Nathan A. White  
N.C. State Bar No. 48684  
Benjamin F. Leighton  
N.C. State Bar No. 50835  
MOORE & VAN ALLEN PLLC  
100 North Tryon Street, Suite 4700  
Charlotte, NC 28202-4003  
Phone: (704) 331- 1054  
Facsimile: (704) 378-2054  
Email: jimmcloughlin@mvalaw.com  
       nathanwhite@mvalaw.com  
       benleighton@mvalaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2018, I caused to be filed electronically with the Clerk of Court through the CM/ECF system the foregoing **DEFENDANT'S BRIEF IN SUPPORT OF PRETRIAL RELEASE,** and that service will be accomplished by the CM/ECF system sending notification of such filing to the following counsel of record:

>Jason Kellhofer
>U.S. Attorney's Office
>310 New Bern Avenue
>Federal Building, Suite 800
>Raleigh, North Carolina 27601-1461
>Jason.kellhofer@usdoj.gov
>
>Barbara Kocher
>310 New Bern Avenue
>Federal Building, Suite 800
>Raleigh, North Carolina 27601-1461
>Barb.kocher@usdoj.gov
>
>Attorneys for the United States of America

/s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.

# United States v. Moquete

United States District Court for the District of Maryland, Northern Division

December 19, 2014, Decided; December 19, 2014, Filed

CRIMINAL NO.: WDQ-13-0419

**Reporter**
2014 U.S. Dist. LEXIS 175555 *; 2014 WL 7336476

UNITED STATES OF AMERICA, Plaintiff, v. LINCOLN NORMANDO MOQUETE, Defendant.

**Subsequent History:** Motion denied by *United States v. Moquete, 2015 U.S. Dist. LEXIS 123293 (D. Md., Sept. 15, 2015)*

**Counsel:** [*1] For Randy De La Cruz, Defendant: Steven Edward Amster, LEAD ATTORNEY, Law Office of Steven E. Amster, Miami, FL; Thomas J Maronick, Jr, LEAD ATTORNEY, Law Office of Thomas J Maronick Jr LLC, Baltimore, MD.

For Lincoln Normando Moquete, Defendant: C Justin Brown, LEAD ATTORNEY, Law Office of C Justin Brown LLC, Baltimore, MD; Christopher Carlos Nieto, LEAD ATTORNEY, The Law Office of Christopher C Nieto LLC, Baltimore, MD.

For USA, Plaintiff: Christopher J Romano, LEAD ATTORNEY, Office of the United States Attorney, Baltimore, MD; Rod J Rosenstein, Seema Mittal, Office of the United States Attorney, Baltimore, MD.

**Judges:** William D. Quarles, Jr., United States District Judge.

**Opinion by:** William D. Quarles, Jr.

# Opinion

MEMORANDUM OPINION

Lincoln Moquete is charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. ECF No. 26. Pending is the government's appeal of Magistrate Judge Stephanie A. Gallagher's December 17, 2014 Order setting conditions of release. A hearing was held on December 18, 2014. For the following reasons, Judge Gallagher's Order setting conditions of release was affirmed.

I . Background

A. Facts

In March 2010, an alleged co-conspirator of the defendant [*2] was stopped by police officers on I-95 in Maryland. A canine alerted to the presence of narcotics. Officers found 13 kilograms of cocaine in the car. The cocaine was packaged into bricks and placed in bags. Moquete's fingerprints were found on the packages. The government alleges that Moquete arranged for the cocaine to be brought into the United States from the Dominican Republic; from Florida, the cocaine was transported to New York for distribution.

Moquete grew up in the Dominican Republic but is now a U.S. citizen living in Florida. Moquete has lived in the United States for 26 years. He and his wife have been married for 24 years, and have three children who are all U.S. citizens living in the United States.[1] Moquete has family living in Florida, New Jersey, and Rhode Island. Moquete owns a family home[2] in Florida. Moquete's sole criminal history involves a 1998 vehicle title fraud charge that was resolved through a diversion program. Pretrial Services Report ("PSR") at 1.

Moquete has held two jobs for about the past ten years. In addition to working for an air-conditioning business, Moquete is a "scout" or "agent" for young baseball players in the Dominican Republic; he helps bring them to the United States to play in the minor--and, occasionally, in the major--leagues. According to Moquete, working with young athletes accounts for his frequent trips to the Dominican Republic. From 2010 to his November 19, 2014 arrest, Moquete visited the Dominican Republic about 45-50 times; 16 of those visits occurred in 2014.

B. Procedural History

On August 19, 2014, a federal grand jury indicted Moquete for conspiracy to distribute cocaine, in violation of *21 U.S.C. § 846*, and for possession with intent to distribute cocaine, in violation of *21 U.S.C. § 841(a)(2)*.[3] ECF No. 26. On November 19, 2014, Moquete was arrested. ECF No. 35. That same day, Moquete was detained by consent. ECF No. 36. On December 17, 2014, Judge Gallagher issued an Order setting conditions of release, but stayed the Order pending the government's appeal.[4] On December 18, 2014, the Court held a hearing on the government's appeal.

II. Analysis

---

[1] Moquete also has two children from other relationships; one lives in Florida, and one lives in the Dominican Republic, where Moquete also has a sibling. Pretrial Services Report ("PSR") at 4.

[2] The home has a market [*3] value of about $130,000; $90,000 remains owing on the mortgage. PSR at 4.

[3] The government alleges that--from June [*4] 2009 to March 2010--Moquete, and two co-conspirators, transported cocaine from the Dominican Republic to Florida, and then to New York. If convicted, Moquete's sentence carries a minimum ten-year penalty, and a maximum of life in prison.

[4] Pretrial Services in New York and Maryland also recommended conditions of release. PSR at 2.

A. Standard of Review

Magistrate Judges in the District of Maryland "are specifically designated . . . to perform such . . . duties as are not inconsistent with the Constitution and laws of the United States," including the "[i]ssuance of orders concerning release or detention of defendants . . . pursuant to 18 U.S.C. § 3141 et seq., and Fed. R. Crim. P. 32.1, 40 and 46." Local Rule 301(6)(j) (D. Md. 2014). When a defendant is released, the government "may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1)(2012). The district court reviews the magistrate judge's pretrial detention order *de novo*. *United States v. Clark, 865 F.2d 1433, 1436 (4th Cir. 1989)*.

B. The Government's Appeal

The government seeks Moquete's pretrial detention under 18 U.S.C. § 3142(f)(1)(2012), which permits detention when the defendant is charged with "an offense for which the maximum sentence is life imprisonment or death," or "an offense [*5] for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)." The government asserts that detention is necessary because Moquete is a danger to the community, and a flight risk. The government relied on Moquete's ties to the Dominican Republic, which is geographically close to the United States, reachable by boat, and may be entered without a passport.

Under 18 U.S.C. § 3142(e), there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of [Moquete] as required and the safety of the community" because Moquete has been indicted for an offense for "which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.) . . ." 18 U.S.C. § 3142(e)(3); *see also United States v. Williams, 753 F.2d 329, 332 (4th Cir. 1985)*; *United States v. Marcantoni, No. RWT 10-CR-777-15, 2012 U.S. Dist. LEXIS 24029, 2012 WL 612494, at \*1 (D. Md. Feb. 23, 2012)*.

The rebuttable presumption shifts to the defendant the burden of producing "some evidence"; "however, the mere production of evidence does not completely rebut the presumption." *United States v. Rueben, 974 F.2d 580, 586 (5th Cir. 1992)*; *United States v. Jessup, 757 F.2d 378, 381 (1st Cir. 1985)*. "The burden of production is not a heavy one." *United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986)*.

To rebut the presumption, Moquete offered to post bonds forfeiting his Florida properties, including his family's home. Moquete has strong family [*6] ties to the United States, where he has lived for 26 years. Moquete's former employer has offered to re-hire him, and he has no relevant criminal history. Moquete has produced sufficient evidence to rebut the presumption. *See Dominguez, 783 F.2d at 706-07* (presumption rebutted when defendant in

narcotics trafficking case was a Cuban immigrant who had lived in the United States for five years, had no criminal record, was employed as a mechanic, and had family in Florida and Nevada); United States v. O'Brien, 895 F.2d 810, 816-17 (1st Cir. 1990) (presumption rebutted when defendant had electronic monitoring and posted home as surety).[5]

Once rebutted, the presumption "operate[s] as one factor to be considered [*7] by the court in determining whether the defendant must be detained." United States v. Portes, 786 F.2d 758, 764 (7th Cir. 1985); O'Brien, 895 F.2d at 815. In determining whether there are appropriate conditions or a combination of conditions of release, the Court must consider: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).[6]

1. Nature and Circumstances of the Offense

Moquete is charged with conspiracy to distribute, and possession with intent to distribute, five kilograms of more of cocaine. ECF No. 26. According to the government, the conspiracy may have involved more than 50 kilograms of cocaine. However, the indictment alleges no criminal activity since 2010. ECF No. 26.

2. Weight of the Evidence

The government has evidence of Moquete's fingerprints on the bricks of cocaine; thus, its case is strong.

3. History and Characteristics of the Person

---

[5] Compare Portes, 786 F.2d at 765 (presumption not rebutted when defendant had a job and immigration papers, and lived with his girlfriend and their two children); Rueben, 974 F.2d at 586-87 (presumption not rebutted when defendant offered evidence of family ties, which was "hardly more than a reflection of the drug conspiracy itself," and house, which "was not compelling as a tie to the community when its loss through forfeiture is a possibility because of its use in drug trafficking," and employment, which was "meaningless as an indicator of future appearances before the court when it is directly connected to drug trafficking").

[6] The government bears the burden of proving, by a preponderance of the evidence, that "no condition or combination of conditions will reasonably assure the appearance of the person as required," or, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. §§ 3142(e), (f); United States v. Stewart, 19 F. App'x 46, 48-49 (4th Cir. 2001) (unpublished) (citing United States v. Medina, 775 F.2d 1398, 1402 (11th Cir. 1985) for the proposition that the clear and convincing evidence standard applies only to the determination that "no condition or combination of conditions will reasonably assure the safety of any other person and the community"); United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986)("The United States Courts of Appeals for several other circuits have decided that the government's burden [*8] in demonstrating risk of flight is the preponderance of the evidence standard. . . . We assume that Congress acted deliberately in setting forth the burden for a danger to the community determination while remaining silent as to the burden for a risk of flight inquiry.").

As noted, Moquete often travels to the Dominican Republic, and has family there. However, Moquete's wife--to whom he has been married 24 years--and four of his children, live in the United States. If Moquete flees, his wife and children will be without a home in which to live.

4. Nature and Seriousness of the Danger to Any Person or the Community

Dangerousness under *§ 3142(e)*, which is relevant to *§ 3142(g)(4)*, considers [*9] the "safety of any other person or the community." *United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988)* (*quoting* S. Rep. No. 98-225, 98th Cong., 2d Sess. (1984) U.S. Code Cong. & Admin. News 3182, 3195-96). Further,

> [t]he reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.

*Id*. Congress intended "that the concern about safety be given a broader construction than merely danger of harm involving physical violence." *Id*.

Here, there is no indication that Moquete is violent; thus, the danger inquiry must focus on whether Moquete is likely to engage in criminal activity. The government has not alleged that Moquete has engaged in criminal activity since March 2010. Accordingly, the government has not met its burden of proving that Moquete is a danger to the community.

Taken together, the government has not met its burden of showing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of [*10] any other person and the community." *18 U.S.C. § 3142(e)*(emphasis added). Accordingly, the Court affirmed Judge Gallagher's Order setting conditions of release.

III. Conclusion

For the reasons stated above, the Court affirmed the conditions of release set by Judge Gallagher.

December 19, 2014

Date

/s/ William D. Quarles, Jr.

United States District Judge

**End of Document**