1       **UNITED STATES DISTRICT COURT**

2      **EASTERN DISTRICT OF NORTH CAROLINA**

3                                    )
    **UNITED STATES OF AMERICA,**    )
4                                    )   **DOCKET NO. 5:18-CR-452-FL**
                    **Plaintiff,**   )
5                                    )
    **vs.**                          )
6                                    )
    **LEONID ISAAKOVICH TEYF,**      )
7                                    )
                    **Defendant.**   )
8   _____

9              **TRANSCRIPT OF DETENTION HEARING**
        **BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II**
10          **TUESDAY, DECEMBER 18, 2018; 10:01 AM**
                  **RALEIGH, NORTH CAROLINA**
11

12   **FOR THE PLAINTIFF:**
         The United States Attorney's Office, Eastern District of
13       North Carolina
         By:  Barbara Kocher, AUSA
14            Jason Kellhoffer, AUSA
         310 New Bern Avenue
15       Federal Building, Suite 800
         Raleigh, NC 27601
16

17   **FOR THE DEFENDANT:**
         Moore & Van Allen PLLC
18       By:  Benjamin F. Leighton, Esq.
              Nathan White, Esq.
19       100 North Tryon Street, Suite 4700
         Charlotte, NC 28202
20

21   **ALSO PRESENT:**
         Chris Cagel
22       US Probation

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20              eScribers, LLC
                7227 N. 16th Street
21                  Suite 207
                Phoenix, AZ 85020
22              973-406-2250
                www.escribers.net
23

     Proceedings recorded by electronic sound recording; transcript
24              produced by transcription service.

25

1                        I N D E X

|                                                    |        |       |          |         | VOIR |
| WITNESSES:                                         | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
| For the Plaintiff:                                 |        |       |          |         |      |
| Dennis Kinney                                      | 5      | 33    |          |         |      |
|                                                    |        |       |          |         |      |
| For the Defendants:                                |        |       |          |         |      |
| Grigory Teyf                                       | 47     | 49    |          |         |      |

| EXHIBITS | DESCRIPTION                         | ID. | EVID. |
| For the Plaintiff: |                         |     |       |
| P-1      | Document of Limited Liability      | 12  | 13    |
| P-2      | Quit Claim Deed                    | 12  | 13    |
| P-3      | Department of Homeland Security Form | 6 | 13    |
| P-4      | ICE Form                           | 10  | 13    |
| P-6      | Google Map                         | 17  | 24    |
| P-7      | Photograph of Gun                  | 18  | 24    |
| P-10     | Photograph of Money                | 19  | 24    |
| P-8      | Photograph of Gun Unwrapped        | 18  | 24    |
| P-9      | Photograph of Recovered Pistol     | 18  | 24    |
| P-11     | Receipt of Property                | 22  | 24    |
| P-12     | ICE Summary of Records             | 29  | 32    |
| P-13     | Photograph of Tracking Device      | 26  | 27    |
| P-14     | Photograph of Living Room          | 27  | 28    |
| P-15     | Photograph of Interior of Apartment | 27 | 28    |
| P-16     | Photograph of Interior of Apartment 2 | 28 | 28 |
| P-17     | Photograph of Kitchen of Apartment | 28  | 28    |
| P-18     | Photograph of Master Bedroom of Apartment | 28 | 28 |
| For the Defendant: |                         |     |       |
| D-1      | Purchase deed                      | 44  | 44    |
| D-2      | 2018 deed of transfer              | 44  | 44    |

| CLOSING ARGUMENTS:   | PAGE |
| For the Plaintiff    | 35   |
| For the Defendant    | 60   |

| SENTENCING:                              | PAGE | LINE |
| Government's motion for detention granted | 69  | 3    |

Colloquy

1                  P R O C E E D I N G S

2           THE COURT:  All right.  The remaining matter on the

3      Court's docket is United States of America v. Leonid

4      Isaakovich Teyf, case number 5:18-cr-00452.

5           For the record, I'd ask counsel to identify

6      themselves beginning with counsel for the Government.

7           MS. KOCHER:  Thank you, Your Honor.  Barbara Kocher,

8      Assistant United States Attorney.  And with me today is Jason

9      Kellhoffer, also an Assistant United States Attorney.

10          THE COURT:  Good morning.

11          MR. WHITE:  Good morning, Your Honor.  Nathan White

12     with Moore & Van Allen, representing Leonid Teyf.  Along with

13     me is co-counsel Ben Leighton.

14          THE COURT:  I'm sorry, your co-counsel's name?

15          MR. WHITE:  Benjamin Leighton.

16          THE COURT:  Good morning, gentlemen.

17          All right.  We're here for a detention hearing.  This

18     does not appear to be a case in which the rebuttable

19     presumption favor of detention applies.

20          MS. KOCHER:  Only, Your Honor, I see another person

21     sitting at counsel table.

22          THE COURT:  All right.

23          MR. WHITE:  Yes, Your Honor.  This is Mr. Manvel

24     Vasilyev.  He is a member of the defense team.  He has not

25     appeared in this matter, but he is assisting us both with

Dennis Kinney - Direct

1    legal counsel and translation services as well.

2         THE COURT:  All right.  Good morning, sir.

3         MR. VASILLIOF:  Good morning.

4         THE COURT:  All right.  Ms. Kocher, does the

5    Government wish to present any evidence this morning?

6         MS. KOCHER:  The Government does, Your Honor.

7         THE COURT:  All right.  You may call your first

8    witness.

9         MS. KOCHER:  Thank you, sir.  We would call Special

10   Agent Dennis Kinney.

11        THE CLERK:  Raise your right hand.

12         PLAINTIFF'S WITNESS, DENNIS KINNEY, SWORN

13        THE CLERK:  Have a seat.  State your name for the

14   record.

15        THE WITNESS:  Good morning.  My name is Dennis,

16   D-E-N-N-I-S, Kinney, K-I-N-N-E-Y.

17                    DIRECT EXAMINATION

18   BY MS. KOCHER:

19   Q.   If you would, tell the Court how you're employed.

20   A.   I'm a special agent with the Federal Bureau of

21   Investigation.

22   Q.   And how long have you been with the FBI?

23   A.   Over twenty-one years.

24   Q.   All right.  Sir, have you had any role in the

25   investigation of Leonid Teyf?

Dennis Kinney - Direct

1    A.   No, ma'am.  I have not.

2    Q.   Did you have any role in the execution of the various

3    search or seizure warrants in this case?

4    A.   No, ma'am.  I have not.

5    Q.   Yet, you have information relevant to the factors the

6    Court will be considering today in regard to the Government's

7    motion to detain; is that right?

8    A.   Yes, ma'am.

9    Q.   How did you prepare for today's hearing?

10   A.   I prepared by reading over various documents to include

11   indictment, informant statements, reports, things of that

12   nature.

13   Q.   All right.  Did you speak with others in preparation as

14   well?

15   A.   I spoke with the case agents as well.  Yes, ma'am.

16   Q.   All right.

17             MS. KOCHER:  Your Honor, may I approach?

18             THE COURT:  You may.

19             MS. KOCHER:  Your Honor, for the ease of the Court, I

20   just wanted to hand the witness the folder of exhibits, which

21   I can hand to yourself as well.

22             THE COURT:  Thank you.

23             MS. KOCHER:  And if I could ask the witness to turn

24   to what's been marked as Government Exhibit 3.

25             THE WITNESS:  I have it.

Dennis Kinney - Direct

1   BY MS. KOCHER:

2   Q.   Thank you, sir.  Do you recognize that?

3   A.   Yes, ma'am.  I do.

4   Q.   And what is it?

5   A.   This is a Department of Homeland Security form.  It's a

6   premium possessing service form for citizenship and

7   immigration.

8   Q.   All right.  And if I can have you turn to the third to

9   the last page, it bears a signature?

10  A.   Yes, ma'am.

11  Q.   All right.  And whose signature purports to be on this

12  form?

13  A.   Mr. Kotter (ph.).

14  Q.   All right.  And the first name?

15  A.   John (ph.).

16  Q.   All right.  And did someone prepare this form?

17  A.   Yes.

18  Q.   All right.  And is that name also noted on this same

19  page?

20  A.   Yes, ma'am.  It is.

21  Q.   And who prepared this form?

22  A.   It's going to be an attorney.

23  Q.   And the name?

24  A.   You're going to challenge me.

25  Q.   I know.

Dennis Kinney - Direct

1    A.    Vasilyev.

2    Q.    All right.  And the first name of Manuel (sic)?

3    A.    Manvel.  Yes.

4    Q.    Turning back then to the first page of Government's

5    Exhibit 3, what is the gist of this form?

6    A.    So this form is to obtain a worker's access for Mr. Teyf

7    to be employed within the United States --

8    Q.    All right.  So --

9    A.    -- as a nonimmigrant worker, ma'am.

10   Q.    All right.  So the name of the document is actual

11   "Petition for a Nonimmigrant Worker"; is that right?

12   A.    Yes, ma'am.

13   Q.    All right.  Was this application approved?

14   A.    Yes, ma'am.  It was.

15   Q.    And how do we know that?

16   A.    It has a stamp of approval and received date.

17   Q.    They are on the first page?

18   A.    Yes, ma'am.

19   Q.    Are you able to read that date that it was approved?

20   A.    Yes, ma'am.  It appears that April 30th, 2010.

21   Q.    On Government Exhibit 3?

22   A.    Yes, ma'am.

23         MS. KOCHER:  If I may approach, Your Honor?

24         THE COURT:  You may.

25   BY MS. KOCHER:

Dennis Kinney - Direct

1   Q.   I see there is -- if I could have you turn to the third

2   page.  And I apologize for that.  Is this form then what you

3   have described a petition for a nonimmigrant worker?

4   A.   Yes.

5   Q.   And does it a bear a stamp of approval?

6   A.   Yes.  There is a stamp of approval on that of May 5th,

7   2010.

8   Q.   Very good.  And in comparison then, what was the first

9   page that I originally had misdirected you to?

10  A.   This is a petition for applicant relating to the case.  I

11  believe this is going to be for his -- so he may work in the

12  United States as a noncitizen.

13  Q.   All right.  If I can have you turn to part five of

14  Exhibit 3.

15  A.   Yes, ma'am.

16  Q.   What type of information is found there?

17  A.   Part five more or less advises what his job title would

18  be while working within the United States, and also what his

19  wages would be per year.

20  Q.   All right.  And is there a wage completed in Exhibit 3?

21  A.   Yes, ma'am.  There is.

22  Q.   And what forecast as Mr. Teyf's wages?

23  A.   So wages from May 9th, 2010 to May 9th, 2011, would be

24  110,000 dollars per year.

25  Q.   Thank you, sir.  If I can turn your attention now to

Dennis Kinney - Direct

1   Exhibit 4.  And what is this?

2   A.   Again, this is another Homeland Security ICE form.  It's

3   an immigrant petition for alien worker.

4   Q.   And if I can have you look at the last page.  Does it

5   bear a signature?

6   A.   Yes, ma'am.  It does.

7   Q.   And whose signature is found there?

8   A.   It has the petitioner's signature as John Kotter.

9   Q.   And the date of the signature?

10  A.   The date of the signature is 12/28/2010.

11  Q.   And does this form also reflect a preparer of the form?

12  A.   Yes, ma'am.

13  Q.   And who would that be?

14  A.   It'd be the same individual as previously stated, Manvel

15  Vasilyev.

16  Q.   And now turning back to the front of the form, exactly

17  what is this form?

18  A.   Again, petitioner for alien worker.

19  Q.   And was this one approved?

20  A.   Yes, ma'am.  It has an approval stamp date of August

21  17th, 2011.

22  Q.   And if I can turn your attention to part six of this

23  form.

24  A.   Yes, ma'am.

25  Q.   What type of information does part six contain?

Dennis Kinney - Direct

1    A.    Again, it gives the basic information for his proposed

2    employment.

3    Q.    And does it also reflect wages?

4    A.    Yes, ma'am.  It does.

5    Q.    And what wages are reflected there?

6    A.    Again, per year, 110,000 dollars.

7    Q.    And does it reflect the term of this employment or

8    anticipated wage?

9    A.    It just says per year.

10   Q.    All right.  And does question seven reflect any

11   information in that regard?

12   A.    Part seven, did you say, ma'am?

13   Q.    Question seven.

14   A.    Question seven.  It's a permanent position in other

15   words, so there wouldn't be a timeframe as to reflect on this.

16   It would be a permanent position.

17   Q.    All right.  And turning back to the first page of this

18   form, where was Mr. Teyf supposed to be working as a result of

19   this approved form?

20   A.    The company was Delta Plus, LLC.

21   Q.    Thank you, Agent Kinney.  Do you know, sir, where Mr.

22   Teyf was living at the time of his arrest?

23   A.    I believe that he was living at 6510 New Market Way in

24   Raleigh.

25   Q.    All right.  Do you know the circumstances of the original

Dennis Kinney - Direct

1    purchase of that house by Mr. Teyf?

2    A.    The house was originally purchased in an LLC.

3    Specifically, New Market Way, LLC.

4    Q.    Let me have you turn to Government's Exhibit 1.

5    A.    Yes, ma'am.

6    Q.    Do you recognize that?

7    A.    Yes, ma'am.

8    Q.    And what is that?

9    A.    It's a document of limited liability filed with the

10   Department of Secretary of State North Carolina.

11   Q.    And for what LLC is this document?

12   A.    New Market Way, LLC.

13   Q.    And so this is the LLC that originally purchased the 6510

14   New Market Way property?

15   A.    Yes, ma'am.  Now, do you see -- as you look over

16   Government's Exhibit 1, do you see Mr. Teyf's name on this

17   document anywhere?

18   A.    No, ma'am.  I do not.

19   Q.    Do you see Mrs. Teyf's name anywhere on this document?

20   A.    No, ma'am.

21   Q.    Let me turn your attention then to Government Exhibit 2.

22   Do you recognize this?

23   A.    Yes, ma'am.

24   Q.    And what is this?

25   A.    It's a quit claim deed.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1    Q.   Pertaining to what property?

2    A.   Pertaining to the same property, 6510 New Market Way,

3    Raleigh.

4    Q.   And do you know the purpose of a quit claim deed?

5    A.   It's my understand that that then converts a property

6    back into another name.

7    Q.   All right.  And who is the grantor of this quit claim

8    deed?

9    A.   So the property is getting put back into the name of Mr.

10   Teyf and Mrs. Teyf.

11   Q.   All right.  So on page 2, who is signing the quit claim

12   deed?

13   A.   So New Market Way, LLC grantor, which would be Mr. Teyf.

14   Q.   All right.  And then underneath his signature is another

15   signature?

16   A.   Yes.  And that'd be Mrs. Teyf, Tatiana (ph.).

17   Q.   So on the 9th day of June of 2014, Mr. and Mrs. Teyf, as

18   members of New Market Way, LLC, signed a quit claim of 6510

19   New Market Way over into their own names; is that correct?

20   A.   That's what this document reflects.  Yes, ma'am.

21       MS. KOCHER:  Your Honor, at this time, the Government

22   would move into evidence Exhibits 1 through 4.

23       THE COURT:  Any objection?

24       MR. WHITE:  No objection, Your Honor.

25       THE COURT:  So admitted.

Dennis Kinney - Direct

1    BY MS. KOCHER:

2    Q.   Do you know, Agent Kinney, anything of Mr. and Mrs.

3    Teyf's relationship?

4    A.   Yes, ma'am.  I understand it was volatile.  There were

5    accusations of domestic violence.  And in fact, Mrs. Teyf had

6    shown agents scars that she had on her head that she said she

7    received from Mr. Teyf during beatings that she had received.

8    And in fact, the one instance she described were --

9              MR. WHITE:  Your Honor, if I may?

10             THE COURT:  Yes, sir.

11             MR. WHITE:  Did I hear that -- was it Special Agency

12   Kinney or Special Agent Kane?  I'm sorry, I didn't catch it.

13             THE WITNESS:  Kinney.

14             MR. WHITE:  What is it?  King?

15             THE WITNESS:  Kinney.

16             MR. WHITE:  K-I-N-G?

17             THE WITNESS:  K-I-N-N-E-Y.

18             MR. WHITE:  Kinney.  Okay.  Did I hear correctly

19   there was no role in no searches, no seizures -- that you had

20   no role whatsoever in this case?

21             THE WITNESS:  That's correct.  Yes, sir.

22             MR. WHITE:  So is he testifying to what other agents

23   have told him?  I'm trying to figure out where -- is he the

24   agent that heard this information from Ms. Teyf, or were there

25   other agents that heard this information?  That's not

Dennis Kinney - Direct

1    apparent.

2            THE COURT:  I don't know that that question has been

3    asked yet.

4            MR. WHITE:  Okay.

5            THE COURT:  I presume you're familiar with the

6    procedure for detention hearings, in which the Rules of

7    Evidence do not apply.  So if it was hearsay, that wouldn't

8    really be an objection.  Although, you certainly could elicit

9    questions on cross that would reduce the credibility of those

10   statements.

11           MR. WHITE:  Certainly, Your Honor.  And I understand

12   the rules of evidence are relaxed.  But I'm just not hearing a

13   lot of foundational questions.  I just want to be clear about

14   that.  So thank you, Your Honor.

15   BY MS. KOCHER:

16   Q.   I believe you were interrupted, Agent Kinney.  You were

17   saying on one occasion.

18   A.   Yes, ma'am.  At least on one occasion it was understood

19   that Mr. Teyf had actually ignited clothing that Mrs. Teyf was

20   wearing, causing it to light on fire.

21   Q.   All right.  Let's turn to the charge against Mr. Teyf for

22   murder for hire.  Can you tell the Court your understanding of

23   the basis of Mr. Teyf's actions in that regard?

24   A.   Yes, ma'am.  So in February of 2018, Mr. Teyf had

25   elicited a meeting with confidential human source number 1,

Dennis Kinney - Direct

1   who we'll refer to as CHS 1.  During the course of this

2   meeting, Mr. Teyf requested that he look into allegations that

3   his wife had had an affair with a subject by the initials A.G.

4   He tasked the informant, CHS 1, to find out and confirm that

5   the actual affair had taken place, and then to do whatever

6   means necessary to do away with A.G.

7   Q.   Are you aware of in what way the CHS 1 was to confirm the

8   affair had occurred?

9   A.   By -- by getting a confession from A.G. before killing

10  him.

11  Q.   All right.  And was -- did the investigation reveal that

12  that conduct was solely to occur here in the United States?

13  A.   Yes.  Well, yes, ma'am.  Mr. Teyf did make the -- the

14  comment to CHS 1 that if they were in Russia, A.G. would

15  already be buried.

16  Q.   All right.  So this conversation with CHS 1, the fact

17  that Mr. Teyf approached him and wanted him to confirm of the

18  affair and then have A.G. killed, is that based solely on the

19  reporting of that source?

20  A.   Yes, ma'am.  Based on that, and the fact that the source

21  meetings that subsequently occurred were videotaped and

22  audiotaped.

23  Q.   So these parts of your testimony that reference any

24  comments or information by the source for the most part were

25  audio or video recorded?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1   A.   Yes, ma'am.  For the most part, they were.

2   Q.   All right.  Well, let me put you -- you said that was in

3   February of '18.  Let me put you up to the summer of June of

4   2018, this summer.  Did CHS 1 receive anything from Mr. Teyf

5   in regard to this murder for hire plot?

6   A.   Yes, ma'am.  On June 20th of this year, Mr. Teyf reached

7   out to CHS 1 and informed him that he had his people --

8   arranged to have his people drop a firearm off to be used to

9   kill A.G.  The weapon was dropped in the proximity of an Auto

10  Express carwash off Strickland Road in Raleigh.

11  Q.   All right.  If I can turn your attention to Government

12  Exhibit 6.  Do you recognize this?

13  A.   Yes, ma'am.  This is an overview of the -- like a Google

14  Map overview of the Autowash Express car wash off of

15  Strickland Road.

16  Q.   And I see up at the upper right-hand corner, the name of

17  that crossroad is not fully visible on the photo.  Is that Six

18  Forks?

19  A.   Yes, ma'am.

20  Q.   And what was to happen here near the corner of Six Forks

21  and Strickland Roads?

22  A.   So Mr. Teyf had arranged for CHS 1 to pick up a firearm

23  that his "people" had dropped off at that site.  CHS 1 made

24  several attempts to try to locate that firearm after having

25  telephonic communications with Mr. Teyf.  Those attempts were

Dennis Kinney - Direct

1    unsuccessful until they met in person.  Then after meeting in

2    person, CHS 1 went back and was informed by Mr. Teyf that the

3    weapon had been dropped off, and the reason why it hadn't been

4    dropped off earlier is that his people had been scared to drop

5    it off at that time.  On that last attempt, CHS 1 did retrieve

6    a firearm.  It was a pistol, a .40 caliber pistol that was

7    located between the Auto Express car wash and the NTB,

8    National Tire and Battery store.  It was under a bush next to

9    a light pole.

10   Q.   Let me have you look at Government Exhibits 7, 8, and 9.

11   First, turning your attention to Exhibit 7.

12   A.   Yes, ma'am.

13   Q.   Do you recognize that?

14   A.   Yes, ma'am.  That was the firearm that was recovered in

15   its state.  It was wrapped in plastic tape.  You can see

16   actually remnants of the ground clutter that was stuck to the

17   plastic.

18   Q.   And where was this located?

19   A.   It was under a bush.

20   Q.   In the public space between the businesses?

21   A.   Yes, ma'am.

22   Q.   Let me turn your attention then to Government's Exhibit

23   8.  Do you recognize this?

24   A.   That is the pistol removed from the wrapping.

25   Q.   So do I view correctly that the gun was tightly wrapped

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1  in that plastic and the package retained its gun-like shape as

2  it were?

3  A.   Yes, ma'am.

4  Q.   And let me turn your attention then to Government's

5  Exhibit 9.

6  A.   Yes, ma'am.

7  Q.   Are you able to tell Agent Kinney what kind of gun this

8  was?

9  A.   So this is a .40 caliber pistol.  You -- the thing that's

10  most unique about it is if you notice in this picture, and it

11  depicts it very well, is that the serial number was ground

12  down off of it, to the point that our lab was unable to

13  actually raise it.

14  Q.   And do you know if -- what the purpose of that grounding

15  down the serial number is?

16  A.   So to make the weapon untraceable.

17  Q.   Now, was the weapon the only thing that CHS number 1

18  received from Mr. Teyf in regard to the murder for hire?

19  A.   No, ma'am.  He also received payments from Mr. Teyf.

20  Q.   Payments of what nature?

21  A.   Cash.

22  Q.   All right.  Let me turn your attention to November 27th

23  of 2018 and Government's Exhibit 10.  Do you recognize that?

24  A.   Yes.  These were monies that were received from -- from

25  Mr. Teyf to CHS 1.

Dennis Kinney - Direct

1    Q.    Beginning -- this is a photograph of three different

2    stacks of currency; is that correct?

3    A.    Yes, ma'am.

4    Q.    Beginning on the right, to your right of the photo, do

5    you have information as to how much money is in that

6    particular stack?

7    A.    That is a stack of 5,000 dollars.

8    Q.    And do you know its origin?

9    A.    So Mr. Teyf had directed CHS 1 to retrieve this money

10   from the interior of his vehicle, specifically on the interior

11   of his vehicle's door as payment.

12   Q.    Of whose vehicle?

13   A.    Mr. Teyf's.

14   Q.    Mr. Teyf directed CHS 1 to retrieve this money?

15   A.    Right.

16   Q.    All right.

17   A.    From his vehicle.

18   Q.    And how about the other two stacks of currency to the

19   center and left of the photo?

20   A.    That's 20,000 dollars in cash that Mr. Teyf gave to CHS

21   1.  That was after they visited 510 Glenwood Avenue in

22   Raleigh.  That was an apartment that Mr. Teyf owns.

23   Q.    All right.  What can you tell us about that visit to 510

24   Glenwood Avenue?

25   A.    Mr. Teyf and CHS 1 went up to the apartment, went inside.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1  And CHS 1 accompanied Mr. Teyf to the master bedroom closet in

2  which there was a safe.  Mr. Teyf then just retrieved the

3  20,000 dollars and paid him there the cash from the safe.  And

4  this was for the purpose of killing A.G.  Mr. Teyf

5  specifically requested that A.G. be killed after the holidays.

6  And he further gave direction to CHS 1 advising him that if he

7  happens to be caught or questioned by authorities, that he was

8  to put the blame for the contract on Mr. -- on A.G. on Mrs.

9  Teyf, Tatiana.

10 Q.   And do you have any information as to why Mr. Teyf

11 requested this go down after the holidays?

12 A.   So it's my understanding that Mr. Teyf had made flight

13 arrangements to go travel back with his family to Russia.  And

14 these arrangements were changed to December 15th.  So one

15 would assume that he wanted the killings to take place after

16 the holidays when he was back in Russia on the 15th of

17 December.

18 Q.   Now, do you have any other information about that planned

19 trip of Mr. Teyf's to Russia that had been set for December

20 15th?

21 A.   So it was our understanding that upon arrival, Mrs. Teyf

22 would be arrested.  Mr. Teyf had made arrangements for the

23 local authorities to arrest her upon her arrival.  And that he

24 had already secured employment in Russia.  So one would think

25 logically that he wouldn't be returning back to the United

Dennis Kinney - Direct

1   States.  He'd stay in Russia.

2   Q.   Now, ultimately, a search warrant was executed at 510

3   Glenwood Avenue; is that correct?

4   A.   Yes, ma'am.

5   Q.   If I can turn your attention to Government's Exhibit 11.

6   A.   Yes, ma'am.

7   Q.   Do you recognize that?

8   A.   Yes.  This is a receipt of property, or what we refer to

9   in the FBI as an FD597.

10  Q.   All right.  And where did this particular property come

11  from for which this receipt is written?

12  A.   So it's a list of items that were seized from 510

13  Glenwood Avenue, apartment 505.

14  Q.   And that is an apartment of Mr. Teyf?

15  A.   Yes.  And that was the same apartment that I previously

16  described, where CHS 1 went and got the 20,000 dollars from

17  the safe.

18  Q.   All right.  And what are the bulk of the items listed on

19  Government's Exhibit 11?

20  A.   The bulk of the -- bulk of the items have -- are either

21  firearms or firearm related items.

22  Q.   All right.  Are there any in particular that strike you

23  as an FBI agent, as unusual in nature or --

24  A.   I wouldn't say unusual, but there are some heavy firearms

25  there, what we'd refer to as assault type rifles.

Dennis Kinney - Direct

1    Q.    Okay.  Could you point out which ones those are?

2    A.    Looking back specifically at the .223.

3    Q.    What line item, sir?

4    A.    Let me go back.  I'm sorry, it's item number 27, which is

5    an AK-47 -- or 74 -- AK-74.  Item number 30, which is a Soviet

6    Brown steel rifle with a beignet.  Item 31, which is an SKS

7    7.62x39 Russian rifle.  As I said, the .223 of 5.56 model J-15

8    rifle, which is number 32.  And the Saiga 7.62 rifle, which is

9    listed as number 33.

10   Q.    All right.  And in addition to these, was there

11   ammunition?

12   A.    I'll also point out the Russian made 7.72x38 pistol,

13   that's number 21.

14   Q.    All right.  And was there ammunition for the weapons

15   found in the same location?

16   A.    Yes.  There were hundreds of rounds of ammunition that

17   were located in that safe.

18   Q.    All right.  And then a number of hand guns as well; is

19   that right?

20   A.    Yes, ma'am.

21   Q.    I see at item number 5, there were rifle magazines, and

22   among other things, a bi-pod.  What is a bi-pod?

23   A.    A bi-pod is a device that's mounted to the front of a

24   rifle to stabilize the rifle while firing it.

25   Q.    And in what circumstances does one use a bi-pod?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1    A.    You could use that if you want to increase your accuracy.

2    It stabilizes a rifle, especially when you have a rifle that

3    has a lot of recoil.  But you could --

4    Q.    And do the -- I'm sorry, go ahead.

5    A.    -- I mean, you could use that for various reasons, target

6    practice, or if you're actually shooting someone.

7    Q.    And do the rifles that you pointed out have significant

8    recoil?

9    A.    Some of them do.  Yes, ma'am.

10         MS. KOCHER:  Your Honor, at this time, the Government

11   would move into evidence Exhibits 6 through 11.

12         THE COURT:  Any objection?

13         MR. WHITE:  No objection at this time, Your Honor.

14         THE COURT:  So admitted.

15   BY MS. KOCHER:

16   Q.    Now, was CHS number 1 the only source who made recordings

17   with Mr. Teyf?

18   A.    No.  There was also another informant, confidential human

19   source number 2, or CHS 2.

20   Q.    And what was his or her role?

21   A.    So there was a relationship between Mr. Teyf and CHS 2.

22   And at one point, Mr. Teyf had reached out to CHS 2 to located

23   A.G.

24   Q.    A.G. didn't live here locally?

25   A.    What occurred was, sometime during the course of this

Dennis Kinney - Direct

1     incident, A.G. was threatened by Mr. Teyf and by his son, and

2     so he fled the area of Raleigh.

3     Q.   Now, do you know, Agent Kinney, the son's name?

4     A.   I don't.

5     Q.   Okay.  I'm sorry, so A.G. fled Raleigh.  And the purpose

6     of Mr. Teyf talking with CHS 2 was what?

7     A.   Well, he asked him to locate A.G.  And then, he wanted --

8     he came up with an idea of having him deported back to Russia.

9     CHS 2 then elicited the assistance of an ICE agent, referred

10    to as Mack (ph.).  And there were several recorded meetings

11    amongst them in which they formulated a plan to have him

12    deported to Russia if he was found.

13    Q.   All right.  And what can you tell us about that plan?

14    A.   Part of the plan was, he actually paid -- Mr. Teyf

15    actually paid CHS 2, 5,000 dollars in the hope of trying to

16    locate A.G. and have him deported.  And then in addition, he

17    gave 10,000 dollars to the special agent with ICE to have him

18    located and deported back to Russia.

19    Q.   All right.  And those interactions, just to be clear,

20    were also recorded, and in some occasions video recorded?

21    A.   That is correct.  Yes, ma'am.

22    Q.   And the ICE agent was working with the Government the

23    entire time?

24    A.   Yes, ma'am.  He was.

25    Q.   So you said something to the effect of he was assisting

Dennis Kinney - Direct

1    in plans to get A.G. deported.  Do you have any information

2    about what some of those plans might have included?

3    A.   One plan Mr. Teyf had relayed to CHS 2 and to Mack, that

4    he had arranged for 1,500 dollars of narcotics to be planted

5    in A.G.'s vehicle in the hopes that if he was stopped and the

6    drugs were located, that it would further him being deported

7    out of the United States after being charged.

8    Q.   And ultimately, was A.G. located by Mr. Teyf or any of

9    these people that you've described?

10   A.   Yes.

11   Q.   Let me turn your attention, if I can, to Exhibit 13.  Do

12   you recognize that, Agent Kinney?

13   A.   Yes, ma'am.  That is a tracking device that was located

14   on A.G.'s vehicle.

15   Q.   Is that something that the FBI put there as a result of

16   its investigation?

17   A.   No, ma'am.  It is not.

18   Q.   Do you know how it got there?

19   A.   We believe Mr. Teyf had it placed on A.G.'s vehicle so he

20   could keep track of him.

21   Q.   And is there any other information that would connect

22   this tracker with Mr. Teyf?

23   A.   Yes, ma'am.  So Mr. Teyf's phone was found to have an

24   application on it, which would correspond with tracking --

25   keeping track of a tracker.

Dennis Kinney - Direct

1        MS. KOCHER:  The Government moves into evidence

2   Exhibit 13.

3        THE COURT:  Any objection?

4        MR. WHITE:  No objection at this time, Your Honor.

5        THE COURT:  So admitted.

6   BY MS. KOCHER:

7   Q.   I want to turn your attention, Agent Kinney, back to 510

8   Glenwood for a moment.  What is your understanding of the

9   setup, if you would, of that living space?

10  A.   From the information relayed to me at the time of the

11  execution of the search warrant at 510, the apartment was

12  scarcely furnished.  It only had a couple of sofas and a

13  couple of chairs and that was it.  It didn't appear that

14  anybody was actually living there.  In addition, of course the

15  safe that we discussed was in the master bedroom closet.

16  Q.   All right.  If I can have you look at Exhibit 14 first.

17  A.   Yes, ma'am.

18  Q.   Do you recognize that?

19  A.   Yes, ma'am.  That's the living room area with the two

20  couches that I described, and a couple of chairs -- or I'm

21  sorry, a couple of tables.

22  Q.   And this was a photo taken during the execution of the

23  search?

24  A.   Yes, ma'am.

25  Q.   All right.  And Government's Exhibit 15?

Dennis Kinney - Direct

1  A.   Again, the interior of the apartment.

2  Q.   And again --

3         THE INTERPRETER:  Your Honor, if the witness can

4  speak up.

5         THE COURT:  Sure.  Can you please speak up so the

6  interpreter can hear you?

7         THE WITNESS:  Sorry.  I have a cold.

8  BY MS. KOCHER:

9  Q.   And again, that's the interior of 510 Glenwood, apartment

10  6?

11  A.   Yes, interior.

12  Q.   Yeah.  And Government's Exhibit 16?

13  A.   Again, another picture depicting the interior of the

14  apartment.

15  Q.   And Exhibit 17, sir?

16  A.   The kitchen area of the apartment.

17  Q.   And finally, sir, Government's Exhibit 18?

18  A.   18 is the safe that was located in the master bedroom

19  closet.

20         MS. KOCHER:  The Government moves in Exhibits 14

21  through 18.

22         THE COURT:  Any objection?

23         MR. WHITE:  No objection at this time, Your Honor.

24         THE COURT:  So admitted.

25  BY MS. KOCHER:

Dennis Kinney - Direct

1    Q.    You mentioned, Agent Kinney, that Mr. Teyf had spoken to

2    I believe CHS 1, that he would be returning to Russia December

3    15th; do I recall that correctly?

4    A.    Yes, ma'am.  That's correct.

5    Q.    And did the investigation confirm whether or not Mr. Teyf

6    in fact had tickets to Russia for the 15th?

7    A.    Yes.  There were reservations that were confirmed.

8    Q.    Let me turn your attention to Government Exhibit 12.  Do

9    you recognize that?

10   A.    Yes, ma'am.  I do.

11   Q.    And what is it?

12   A.    This is a summary of records retrieved from ICE, from

13   Immigrations and Customs, of travel of Mr. Teyf --

14   Q.    All right.

15   A.    -- from 2018 to 20 -- from 2014 to 2018.

16   Q.    All right.  So just looking at the top of the first page

17   of Government Exhibit 12, if you could just explain what's

18   contained in the document?

19   A.    So it shows the date, the name of the passenger, Mr.

20   Teyf, the citizenship or the papers in which he was traveling

21   under.  And if you look over to the right to the legend,

22   you'll see that Mr. Teyf utilized five different countries of

23   citizenship to travel, that being Belarus, Israel, Serbia,

24   Russia, and the United States.  Then the document number to

25   which he traveled, the from and to destination, the direction,

Dennis Kinney - Direct

1  either inbound or outbound, the status, whether the travel

2  actually took place or not, the carrier, and the flight

3  number.

4  Q.  All right.  So just looking at status briefly, that OBD

5  that's reflected in the first row, there is a legend to the

6  right.

7  A.  Right.

8  Q.  I think that explains that that means onboard?

9  A.  Onboard.  Yes, ma'am.

10  Q.  And conversely, the third line, the third row reflects

11  NBD, which would be did not board flight; is that right?

12  A.  Did not board.  Yes, ma'am.

13  Q.  All right.  So let's look at that third column from the

14  left.  It's marked citizenship, but does not necessarily

15  denote citizenship; is that right?

16  A.  Right.  Correct.

17  Q.  So these are -- it's basically what country the travel

18  papers originated from?

19  A.  Right.  Right.  The documents.

20  Q.  All right.  And I see the -- from March to August of

21  2018, the travel was pursuant to documents obtained from what

22  country?

23  A.  That would be Israel.

24  Q.  And in February of '18, into early March -- no, I'm

25  sorry, all in February of '18, which countries' documents did

Dennis Kinney - Direct

1    Mr. Teyf use in his travels?

2    A.    It appears to be Belarus.

3    Q.    And for one particular trip in February, it appears he

4    used a different travel papers.  What country did they

5    originate from, for February 5th of 2017?  I'm sorry, did --

6    A.    Those would be Russia.

7    Q.    Okay.

8    A.    Yes.

9    Q.    That might be December.  I'm not -- December 5th of 2017.

10   A.    It looks like 12.  Yes, ma'am.

11   Q.    Yes.

12   A.    December 5th, 2017.

13   Q.    Thank you.  And then finally, Agent Kinney, I would draw

14   your attention to travel October 3rd of 2017.  What country's

15   paper did he use to travel on that date?

16   A.    That would be the United States.

17   Q.    Now, I notice this does not contain anything more recent

18   than August of 2018; is that correct?

19   A.    Yes, ma'am.

20   Q.    So the December planned trip is not reflected on here?

21   A.    That is correct.

22         MS. KOCHER:  The Government moves into evidence

23   Exhibit 12, Your Honor.

24         THE COURT:  Any objection?

25         MR. WHITE:  Not at this time, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Dennis Kinney - Direct

1          THE COURT:  So admitted.

2    BY MS. KOCHER:

3    Q.   All right.  Finally, Agent Kinney, in regard to Mr.

4    Teyf's access to funds, do you have any information relevant

5    to his bank accounts?

6    A.   So during the course of the investigation, there was

7    found to be seventy some LLCs that were related to Mr. Teyf.

8    And out of those seventy, there were over 300 different

9    transactions between those accounts.  And at one point

10   originally, it was totaling over thirty-nine million dollars.

11   Q.   All right.  Now, I notice you said seventy LLCs.  You

12   meant financial accounts?

13   A.   Accounts.  Yes, ma'am.

14   Q.   Yes.

15   A.   I'm sorry.

16   Q.   Okay.  And that information is that information contained

17   in the indictment; is that correct?

18   A.   That is correct.  Yes, ma'am.

19   Q.   All right.  You didn't research or otherwise have

20   information in regard to his monetary --

21   A.   Just from what I saw in the indictment.  Yes, ma'am.

22        MS. KOCHER:  All right.  Very good, sir.  Thank you.

23        No further questions, Your Honor.

24        THE COURT:  Cross-examination?

25        MR. WHITE:  Yes, Your Honor.  Thank you.

Dennis Kinney - Cross

1                    CROSS-EXAMINATION

2    BY MR. WHITE:

3    Q.   All right.  Special Agent Kinney, I just want to confirm

4    kind of when I stood up earlier.  You have taken no

5    investigative steps in this case?

6    A.   That's correct, sir.

7    Q.   And you have not participated in any searches or seizures

8    of any kind?

9    A.   That is correct.

10        THE COURT:  Mr. White, we're a seated questioning

11   jurisdiction.

12        MR. WHITE:  Sure.  Okay.

13        THE COURT:  So unless you're approaching the witness,

14   please remain seated.

15        MR. WHITE:  Sure.  That's fine, Your Honor.

16   BY MR. WHITE:

17   Q.   So let me just go through with you, have you seen any of

18   these documents before today, these Government exhibits?

19   A.   Yes.

20   Q.   And when was that?

21   A.   When I was speaking with the case agents.

22   Q.   And when was that?

23   A.   That was over the course of the last week.

24   Q.   Last week?

25   A.   Yes, sir.

Dennis Kinney - Cross

1  Q.   So before last week, did you have any information about

2  this case?

3  A.   No, sir.

4  Q.   So is it fair to say that all of your testimony is based

5  upon information you have seen in the indictment, or what

6  you've read in confidential informant reports, or what special

7  agents have told you?

8  A.   That is absolutely true.

9       MR. WHITE:  Your Honor, we have no further questions.

10  I understand the Rules of Evidence are relaxed, but I would

11  just go ahead and object for on the basis of hearsay, lack of

12  foundation for these documents since this witness has no

13  information about this from direct firsthand personal

14  knowledge.

15       THE COURT:  I'm going to overrule the objection

16  pursuant to 18 U.S.C. Section 3142 F, the Bail Reform Act

17  provides that the rules concerning admissibility of evidence

18  in criminal trials do not apply to the presentation in

19  consideration of information at the hearing.  The questioning

20  elicited by the defense has not shown any reason to reject the

21  testimony of the witness.  The Government is often allowed to

22  proceed on proffer, which does not even involve the testimony

23  of witnesses themselves.  So therefore, the objection will be

24  overruled.

25       Anything further, Ms. Kocher?

Colloquy

1        MS. KOCHER:  No, Your Honor.

2        THE COURT:  All right.  Thank you, sir.  You may step

3    down.

4        THE WITNESS:  Thank you, sir.

5        THE COURT:  Any further evidence from the Government

6    today?

7        MS. KOCHER:  No, sir.

8        THE COURT:  Any evidence from the defense today?

9        MR. WHITE:  We will be making proffers during

10   argument, Your Honor.

11       THE COURT:  All right.  At this time I'll hear

12   argument from the Government.

13       MS. KOCHER:  Not to distract the Court, but to lay it

14   out on the continuum, the defense has filed memorandums with

15   the Court alleging that the murder for hire is not a crime of

16   violence.  Were it a crime of violence, of course it would be

17   a rebuttable presumption case.  I believe that the question is

18   open for interpretation.  The jury instructions on a murder

19   for hire case do require that the jury be informed and read

20   the elements of the underlying crime, that is murder in this

21   case.  So in order to establish a defendant's guilt in regard

22   to murder for hire, the Government has to show the defendant

23   had the intent to commit literally the elements of the crime

24   of murder.

25           Now, I say I don't want to distract the Court because

Colloquy

1    I'm not interested in the Court striking new legal grounds

2    today and making a ruling on that basis.  But I do think it is

3    informative to the Court of how close the -- at least the

4    murder for hire comes to that line.  I would ask you to decide

5    the case however on the more typical clear and convincing

6    evidence.

7            In this case, Your Honor, there is clear and

8    convincing evidence of danger to the community by the

9    defendant, Mr. Teyf.  First, again, going to the memorandum

10   filed by counsel, the defendant seems to exclude his wife and

11   A.G. from members of the community, claiming that danger to

12   them doesn't count.  The Government strongly disagrees with

13   that assertion.  A danger to one individual in the community

14   is sufficient for this Court to find that.  The domestic

15   violence alone would be sufficient for this Court to find

16   perhaps that there is clear and convincing evidence that this

17   defendant should not be released.

18           But we don't even need to go there.  Let's go to his

19   access.  His ability to access clean guns, guns that have been

20   stripped of any identifying information so that their source

21   can't be found.  Let's go to the fact that he had access to

22   1,500 dollars' worth of drugs.  Or in both instances, access

23   to someone who had access to drugs and guns.  This plan, Your

24   Honor, was two-fold; either to kill A.G. after they get his

25   confession, or to deport him to Russia, where if this had

1   happened there, he would already be buried, is what the

2   witness testified to.

3           We have no evidence that this particular conduct is

4   limited solely to A.G. and Mrs. Teyf.  There is no condition

5   that this Court can set when a defendant has access to those

6   types of people, that he accesses them without regard to the

7   laws, when he's willing to pay 10,000 dollars to a federal

8   officer to get that plan taken care, when he's willing to pay

9   25,000 dollars -- and this is all currency, mind you -- to an

10  individual to carry out that murder, and then comes up with

11  the plan that if you get caught, blame it on Mrs. Teyf, who by

12  the way, he has told that same informant, he's going to have

13  arrested as soon as they land in Russia.  There is no

14  condition, Your Honor, this Court can set that will adequately

15  assure the safety of these particular people or other people

16  in the community.

17          Let's turn to the Government's exhibit of the list of

18  guns seized from Glenwood Avenue.  The Government does not

19  assert that they were illegally possessed.  But it is quite an

20  array of weaponry that the defendant amassed.  In fact, let's

21  look at that condominium.  Let's look at his purchase of 6510

22  New Market Way.  Your Honor, this is an individual who knows

23  how to create LLCs, knows of the anonymity that they provide

24  in purchasing property.  That 6510 New Market Way was first

25  purchased in the name of New Market Way, LLC.  And only

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1    several years later was the quit claim signed in order to turn

2    it back over to the Teyfs.

3         THE COURT:  Well, I mean, you could argue that the

4    LLC is created not for affairs purposes, but for privacy or

5    security.  There are many people who create LLCs to own homes.

6    And it appears Mr. Teyf was, and perhaps is wealthy.  And so

7    there may be security reasons to want to protect the location

8    which he and his wife and his family resided.

9         MS. KOCHER:  And I fully agree with you, Your Honor.

10   I certainly have colleagues here at the U.S. Attorneys Office

11   who own their own home as a matter of safety in LLCs or some

12   other anonymous.  The difference is, however, the risk of

13   flight it presents.

14        The Glenwood Avenue apartment, the condominium, as

15   you've seen, was literally a safehouse.  This gentleman owned

16   the Glenwood Avenue condominium solely to keep a safe of guns

17   and cash.  Your Honor, the risk of flight comes in.  I don't

18   know how many other safehouses Mr. Teyf has.  Because he's

19   demonstrated the ability and the knowledge in setting up

20   anonymous property ownership, a simple record search, as had

21   been done -- no offense, as had been done by probation, who

22   has his name hit on several properties here in the Raleigh

23   area, is not the extent of Mr. Teyf's properties.  That's the

24   significance of the anonymous homeownership in this case.  It

25   does not demonstrate a tie to the community.  It demonstrates

Colloquy

1    his ability to hide below the radar.  It demonstrates

2    resources which the Government cannot know of, and an ability

3    to pay off people in order to get whatever it is he needs

4    done.  These are significant risk factors as to flight.

5         Moreover, Your Honor has heard that the plan was --

6    and complete with tickets, was that Mr. Teyf was leaving the

7    country December 15th.  That was to be a permanent departure,

8    as he has obtained employment in Russia.  Again, the wife was

9    to be arrested in Russia, and she presumably would not return

10   to the country.

11        Your Honor, certainly by a preponderance as to the

12   risk of flight -- oh actually, let's turn to the risk of

13   flight for a second.  The travel documents.  So it may be that

14   Mr. Teyf only has citizenship to two countries, Israel and

15   Russia.  I don't know.  That didn't come out in the testimony

16   today.  That was what was asserted in a filed document.  But

17   he's been traveling under five different countries' paperwork;

18   Israel, Belarus, Russia, United States, and Serbia, I believe,

19   the fifth one.  We don't --

20        THE COURT:  Isn't that issue somewhat mitigated by

21   the fact that we can take his passports and we can flag his

22   file.  And you know, if he goes to RDU to get the next flight

23   to Russia, that'll be noticed.  I mean, doesn't that mitigate

24   the risk that he's going to take a flight to Russia, or to

25   Israel, or some other place?

1          MS. KOCHER:  Not when his established pattern is to

2     pay the person at the airport 10,000 dollars.  No, Your Honor.

3     The combination of these factors is -- we cannot overcome that

4     risk.  And it's his own behavior.  I'm not attacking Mr. Teyf

5     for having wealth.  It's the manner in which he's used his

6     wealth.  The entire history.  The assertion that he has no

7     criminal record so he's been law abiding, Your Honor, it's --

8     these transfers -- the indictment is probable cause that these

9     things occurred.  And these transfers began in 2010.

10          THE COURT:  Well, he's presumed innocent of that.

11     And you presented no evidence really other than pointing me to

12     the indictment in support of that.

13          MS. KOCHER:  Which does have probable cause, right?

14     It's returned by the grand jury.  So it would be the same.  It

15     is evidence for you to consider.  That these transfers began

16     in 2010, the same year that you heard, and have before you in

17     the evidence, that he applied for the nonimmigrant worker

18     petition and then an immigrant worker petition.

19          THE COURT:  I know we didn't talk about it a lot here

20     today, and as I read the indictment, I know the allegations

21     are these were -- this was money obtained from kickbacks from

22     the Russian government and that's what makes it illegal and

23     thus gives rise to the money laundering charges.  What --

24     explain to me a little bit more -- I mean, intuitively it

25     makes sense that these kickbacks are illegal, but what's the

Colloquy

1  Government's theory on what law that actually broke?  What

2  Russian law that broke, or what American law that broke by

3  doing it?

4       MS. KOCHER:  Your Honor, with all due respect, I do

5  not have that law for you this morning.  The Government rests

6  on the bribery and the murder for hire case.  The money only

7  comes in to the detention hearing as it relates to his ability

8  to pay off the people he needs to get done what he can do.

9  And so I do not have that with me.  I apologize.

10       The bank accounts, again, there is probable cause to

11  believe there's more than seventy accounts.  Although the

12  defendant has made reference to the seizure of various

13  accounts, it certainly does not number seventy.  And there

14  is -- the Government has no belief that we have even scratched

15  the surface of the number of accounts that Mr. Teyf has.  I

16  say that by way of proffer.  There was no evidence received

17  before Your Honor today.

18       If I can have just a moment.

19       Your Honor, finally, the defendant claims strong ties

20  with the community, but yet has put no third-party custodian

21  forth.  The Government finds that extremely significant and

22  probative to the issue of whether there are conditions that

23  this Court can set.  I think for all of these reasons, for the

24  evidence before the Court, for the combination of the factors

25  of his behavior, of the strength of the evidence against him,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1    the audio and video recordings, the gun recovered, that there

2    are no conditions that will keep the community safe, nor

3    prevent his risk of flight.

4         THE COURT:  Just so I'm clear, the audio and I think

5    in some cases the audio and/or video recording, there was

6    the -- for Confidential Human Source 1, there was the alleged

7    initial conversation with Mr. Teyf that was not recorded in

8    any way, but then all of the subsequent testimony we heard

9    about regarding Confidential Human Source 1 was recorded in

10   one form or another; is that correct?

11        MS. KOCHER:  I don't recall that the first meeting

12   was not recorded, Your Honor.  I don't recall the witness'

13   testimony to be able to assist you with that question.  I

14   believe -- upon information, I believe that the first was in

15   fact recorded that came out in testimony today.  There may

16   have been a contact at some point that was not recorded.  Was

17   that Your Honor's question?  Was there --

18        THE COURT:  Well, I guess that's part of it.  The

19   subsequent conversations, though, were all recorded in one

20   manner or another; is that your understanding?

21        MS. KOCHER:  Yes, sir.  Now, I know independently,

22   Your Honor, that there was one later conversation that was not

23   recorded.  It just through malfunction of the equipment, but I

24   don't believe that one came up today.

25        THE COURT:  All right.  Thank you.

Colloquy

1       MS. KOCHER:  Finally, Your Honor, I would turn just

2   very briefly to the bond report, itself, reflecting the

3   Employment Security Commission records for Mr. Teyf.  Those

4   are significant in that they specifically contradict the

5   affirmed statements by both Mr. Teyf and Mr. Vasoliv (ph.) in

6   regard to those applications that are before the Court, that

7   his intent was to work here for a salary of $110,000, and yet

8   in that year 2010, he made 27,500, and in the year 2011,

9   Employment Security Commission reports, wages of $41,666.

10      THE COURT:  So do I take that as intentional deceit,

11  or do I take that as a business venture that was not as

12  successful as had been hoped?

13      MS. KOCHER:  The Government just notes, Your Honor,

14  that certainly by the time of the December 2010 application,

15  2010 had finished, and yet he continued to report and

16  anticipated salary of 110,000, did not reduce it to the

17  27,000, which he had by then only received, and I just point

18  that discrepancy out for the Court for what it's worth.

19      THE COURT:  Mr. White; Mr. Leighton?

20      MR. WHITE:  Thank you, Your Honor, I'm going to do

21  something unusual because I didn't think this was going to be

22  an issue until it was made argue, but I do have some evidence

23  I'd like to offer, and I'd like to give the Government, if

24  they'd like an opportunity to review and if they'd like to

25  make argument.  But the first one -- may I approach, Your

Colloquy

1    Honor?

2         THE COURT:  You may.

3         MR. WHITE:  I'll show this to the Government first.

4    (Pause)

5         MR. WHITE:  Your Honor, do you want us to -- I'm

6    going to rely heavily on the pre-trial services report.  Do

7    you want me to mark that as an exhibit, or do you have a copy?

8         THE COURT:  No.  I have a copy of that, and it's on

9    the docket.

10        MR. WHITE:  Okay.

11        All right.  May I approach, Your Honor?

12        THE COURT:  You may.

13        MR. WHITE:  Your Honor, this is Defense Exhibits 1

14   and 2 for identification.  Defense Exhibit 1 is the purchase

15   deed when Mr. and Mrs. Teyf purchased their original home when

16   they moved to the Raleigh area in Apex in 2008.

17        And the second deed is a 2018 deed of transfer for

18   the apartment in question in which Mr. Teyf transferred some

19   of his interest to his son, Grigory Teyf, and we'd like to

20   move those into evidence at this time, Your Honor.

21        THE COURT:  Any objection?

22        MS. KOCHER:  No, sir.

23        THE COURT:  So admitted.

24        MR. WHITE:  All right.  Thank you, Your Honor.  The

25   reason why we brought that up is just we weren't anticipating

Colloquy

1   an argument with ties to the community or lack thereof because

2   of the use of the New Market Way, LLC to purchase the property

3   at 6510 New Market Way.  Obviously, when Mr. Teyf and Mrs.

4   Teyf first moved here, they purchased their original home in

5   their own name.  So there was no intent, whatsoever, obviously

6   to obscure ownership or anything like that.

7          Mr. Teyf is a sophisticated business man, has a

8   business degree from Russia, is successful in business in

9   Russia has businesses in the Untied States.  So he knows how

10  LLCs work.  So we're just offering it for that purpose to

11  rebut that argument, Your Honor.

12          A starting point here, Your Honor, I think is the

13  pre-trial services report.  The Government spent a lot of time

14  talking about the weight of the evidence, and we will talk

15  about that prong, but the pre-trial services report -- and I

16  don't know if you had an opportunity to read our brief.  I

17  apologize for the late filing, but it was in large part due to

18  getting this updated pre-trial services report yesterday

19  afternoon.

20          But you can see that the pre-trial services

21  recommends Mr. Teyf release with eight conditions, all of

22  which are reasonable, and Mr. Teyf would agree with.  Mr. Teyf

23  would even be willing to consider additional conditions if the

24  Court was so inclined such as electronic monitoring, any

25  additional things like that.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1          I'd also like to talk about the fact, the third-party

2    custodian comment.  Mr. Grigory Teyf is here in the courtroom,

3    and as you can see in the pre-trial service report, he has

4    agreed to serve as a third-party custodian for Mr. Teyf.  We

5    have also coordinated through Ms. Teyf's counsel, as you saw

6    in the prior hearing, that she would stay in the home, the

7    6510 New Market Way home.

8          Dasha (ph.) Teyf, their daughter, serves as her

9    third-party custodian, and Grigory Teyf would serve as Mr.

10   Teyf's custodian, and they could live at the Glenwood Avenue

11   apartment.  So he does have a third-party custodian ready and

12   willing to serve in that regard to ensure his future

13   appearance at all hearings.  So --

14         THE COURT:  I mean it's the practice in this

15   district -- and I know you have colleagues at your firm who

16   practice in this district regularly, some of whom were former

17   AUSAs -- and it's our practice in this district that third-

18   party custodians are usually put on the stand so that the

19   Court or the counsel can elicit testimony about their

20   suitability.

21         Now, you can obviously have chosen to pursue your

22   case the way you've wanted to, and so we are here now, but I

23   don't have a whole lot of information about Mr. Teyf to assess

24   whether he can satisfy what the statute requires which is that

25   he would reasonably assure that Mr. Teyf would appear, and he

Colloquy

1  would reasonably assure that Mr. Teyf would not pose a threat

2  to any other person or the community.

3        MR. WHITE:  Sure.  Well, we can put him on the stand

4  right now, Your Honor.  We can do that right now, if you would

5  like, so --

6        THE COURT:  It's your call.  I mean, you have rested

7  already.  We're here at the argument.

8        MR. WHITE:  Okay.  Well, we can reopen your case,

9  Your Honor, and we could call Mr. Grigory Teyf to the stand

10  and ask him a few questions about that.

11        THE COURT:  All right.  Sure.

12        MR. WHITE:  All right.  So the Defense would like to

13  call Mr. Grigory Teyf.

14        DEFENDANTS'S WITNESS, GRIGORY TEYF, SWORN

15                   DIRECT EXAMINATION

16  BY MR. WHITE:

17  Q.   Good morning, Mr. Teyf.  Could you spell your last name

18  and first name for the record, please?

19  A.   Yes.  T-E-Y-F, G-R-I-G-O-R-Y.

20  Q.   And what is your relation to Mr. Leonid Teyf?

21  A.   Son.  I'm his son.

22  Q.   And how old are you?

23  A.   Eighteen.

24  Q.   And what is your current occupation?

25  A.   College student.  I have no occupation.  I'm just a

Grigory Teyf - Direct

1   student.

2   Q.   And where are you student at?

3   A.   UNCG.

4   Q.   Would you be willing to serve as a third-party custodian

5   of your father if he were released?

6   A.   I would.

7   Q.   Would you be willing to assure that he maintains contact

8   with US Probation Office and all the other conditions that

9   have been outlined in the pre-trial services report?

10  A.   Yes.

11  Q.   Would you be willing to make sure that he comes to future

12  court appearances in this case?

13  A.   Yes.

14  Q.   Would you be willing to report him to the authorities if

15  he were to violate any of the conditions of his conditional

16  release?

17  A.   Yes.

18  Q.   If he was arrested or questioned by authorities in any

19  way?

20  A.   Yes.

21  Q.   Including traffic stops?

22  A.   Yes.

23          MR. WHITE:  We have no further questions, Your Honor.

24          THE COURT:  Cross-examination?

25          MR. KELLHOFFER:  Yes, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Grigory Teyf - Cross

1                    CROSS-EXAMINATION

2    BY MR. KELLHOFFER:

3    Q.   Where do you live?

4    A.   6510 New Market Way currently, but when I'm at college, I

5    live in my dorm.

6    Q.   So when do you go to college?

7    A.   I'm on break right now, but I come back on the 7th.

8    Q.   So when will you be returning to college?

9    A.   On the 7th, but on -- due to this, I would probably be

10   living at 6510 and going to UNCG.

11   Q.   So your intent would be to travel back and forth daily?

12   A.   Yes.

13   Q.   How long would you be at school?

14   A.   It would differ, but most likely til 2 p.m. from

15   morning -- from 8 to 2 p.m.

16   Q.   Now, have you visited your father in jail?

17   A.   By electronic phone.  Like a -- I don't know what you

18   would call it, but like on a screen.

19   Q.   Okay.  You've never physically?

20   A.   No, not physically.  That -- I don't think they allow it.

21   Q.   I'm sorry?

22   A.   I don't think they allow it.

23   Q.   Okay.

24   A.   To face-to-face.

25   Q.   All right.  Have you acted as interpreter for your

Grigory Teyf - Cross

1   father?

2   A.   On some occasions, yes.

3   Q.   Okay.  And why -- when you say on some occasions, what

4   type of occasions are those?

5   A.   When -- when we were visiting with my father's lawyer, I

6   was translating what my father's lawyer was saying to him over

7   phone.

8   Q.   Where?

9   A.   At the detention center.

10  Q.   Were you at the detention center?

11  A.   Yes, but --

12  Q.   Okay.  You just said two seconds ago you hadn't --

13  A.   No, I have, but not physically.  Like just over telephone

14  like on --

15  Q.   So you were on telephone --

16  A.   Yes.

17  Q.   -- operating as a translator --

18  A.   Yes.

19  Q.   -- between the attorneys and your father?

20  A.   Yes.

21  Q.   Okay.  And what was that conversation about?

22  A.   That was just about pre-trial and when I was going to

23  take and when the hearing was going to -- what date was going

24  to take.

25  Q.   Okay.  How long did that take?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Grigory Teyf - Cross

1   A.   About forty to fifty minutes.

2   Q.   Did you discuss your father's finances?

3   A.   No.

4        MR. WHITE:  Your Honor, could we approach?  Could we

5   approach the bench?

6        THE COURT:  Yes.

7        (Sidebar discussion off the record)

8   BY MR. KELLHOFFER:

9   Q.   All right.  So you were saying you had about forty to

10  fifty-minute conversation that involved your father's

11  attorneys and your father, correct?

12  A.   Yes, sir.

13  Q.   Okay.  Was that -- that conversation was not monitored by

14  the jail in any regard; that's your understanding?

15  A.   I -- yeah.  I think so.  I'm not sure.

16  Q.   And it's your understanding a moment ago that normally

17  you'd be monitored having any conversations with your father,

18  correct?

19  A.   Yes, sir.

20  Q.   All right.  Now, your college is paid for by yourself or

21  your father?

22  A.   First semester was by my father.  Second semester was

23  just by me.

24  Q.   Okay.  What is your job?

25  A.   I don't have a job.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Grigory Teyf - Cross

1    Q.   Okay.  And where did this money come from?

2    A.   It's a savings account I had.

3    Q.   From your father?

4    A.   Yes.

5    Q.   Okay.  What vehicle are you presently driving?

6    A.   Rental.

7    Q.   Okay.  And how are you paying for that?

8    A.   Out of that savings account.

9    Q.   Okay.  And you previously --

10         THE COURT:  Mr. Kellhoffer -- sir, I know this is an

11   unusual circumstance for you to find yourself in, but if you

12   please try to keep your voice up so the interpreter over there

13   can hear you and translate for the various folks.

14         THE WITNESS:  Okay.

15         THE COURT:  Thank you.

16         MR. KELLHOFFER:  Thank you, Your Honor.

17   BY MR. KELLHOFFER:

18   Q.   I was asking you about the vehicle you previously drove

19   prior to your rental.  What was that?

20   A.   It was a Land Cruiser 2017.

21   Q.   Okay.  And you're not driving that because it was seized

22   by the government, correct?

23   A.   Yes, sir.

24   Q.   And that had been paid for by your father?

25   A.   Yes.

Grigory Teyf - Cross

1    Q.   And the house that you're living at, that's paid for by

2    your father as well, correct?

3    A.   Yes.

4    Q.   Okay.  And you understand the allegations that your

5    father has been charged with, correct?

6    A.   Yes.

7    Q.   Okay.  And you understand that that involves financial

8    crimes as well?

9    A.   Yes.

10   Q.   All right.  And that part of the Government's assertion

11   is that the money your father has was unlawfully gained by

12   him; you understand that?

13   A.   Yes.

14   Q.   And that the Government's case part of that includes

15   forfeitures, i.e., an effort to seize those funds and that

16   money from him?

17   A.   Yes.

18   Q.   Okay.  And you understand that that would have an effect

19   on your life then?

20   A.   Yes.

21   Q.   Now, you are aware of your father's business, though,

22   correct?

23   A.   Yes.

24   Q.   Okay.  You've actually have been, I guess for a lack of a

25   better word, you're looking at -- you've been involved in some

Grigory Teyf - Cross

1    of your father's business?

2    A.   Involved to what extent?

3    Q.   I don't know.  You tell me.

4    A.   I -- I've -- he's telling -- he told me certain aspects

5    of the business, how it runs, but I don't have any direct

6    involvement.  I don't have any decision-making of all -- at

7    all.

8    Q.   Well, you have over five million worth dollars' worth of

9    involvement, correct?

10   A.   That's not mine.

11   Q.   That wasn't transferred into an account, a wire transfers

12   that you have access to now?

13   A.   Yes, but I don't have control of that money per se.  I

14   can't just take it out without my father's permission.

15   Q.   Is that a spoken agreement between you and your dad?

16   A.   No.  It's a -- it's in a bank account.  It was co-owned.

17   Q.   It's co-owned.  So you do have access to it, correct?

18   A.   Yes, but I first -- I can't take it out myself.  I have

19   to ask my father.

20   Q.   How much money are we talking about?

21   A.   Where?  In that account?

22   Q.   Within these accounts?

23   A.   Well, five million in first account and two other

24   accounts where it's five million in each.

25   Q.   And those occurred recently, correct?

Grigory Teyf - Cross

1    A.   Yes.

2    Q.   All right.  You ever been to Doctors Express in Cary,

3    North Carolina?

4    A.   Yes.

5    Q.   All right.  And why were you there?

6    A.   To help with my dad.  He was visiting it as well, and he

7    asked me to come along just to see it.

8    Q.   You were visiting as well --

9    A.   Yeah, yeah.

10   Q.   -- with your father?

11   A.   Yes.

12   Q.   All right.  Getting an idea of the business how it works?

13   A.   Yes.

14   Q.   You were scheduled to depart with your family in Russia

15   on December 15th of this year, correct?

16   A.   Yes.

17   Q.   All right.  And you're aware that your father has told

18   people that he may not be returning?

19   A.   No.

20   Q.   You were unaware of that?

21   A.   I was unaware.

22   Q.   Okay.  You're aware that your father has told people that

23   you would be responsible for handling his business and assets

24   if he did not return?

25   A.   No.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Grigory Teyf - Cross

1    Q.   You're aware your mother had a romantic relationship with

2    someone that you know, correct?

3    A.   Yes.

4    Q.   All right.  And I'm going to refer to that individual as

5    A.G., and you know who I'm referring to, right?

6    A.   Yes.

7    Q.   Okay.  And your father's reaction to this was he was

8    pretty furious, correct?

9    A.   Yes.

10   Q.   Now, you mentioned having assisted in translating for him

11   on occasion.  Some of those were to help him locate A.G.,

12   correct?

13   A.   Yes.

14        THE COURT:  I just want to inform the witness you

15   have a 5th Amendment right not to make any statements or

16   answer any questions that might tend to incriminate yourself.

17   If you believe that any questions you are asked may tend to

18   incriminate you -- and I'm not saying that this one does, but

19   I'm just notifying you of this fact -- you can let me know and

20   we'll pause the proceedings to allow you to speak with an

21   attorney about whether you should answer the question.  Al

22   right?

23        THE WITNESS:  May I do that now?

24        THE COURT:  Let me ask you, do you have an attorney

25   representing you, other than these gentlemen who are

Grigory Teyf - Cross

1      representing your father?

2             THE WITNESS:  No.

3             THE COURT:  Will counsel approach, please?

4        (Sidebar discussion off the record)

5             THE COURT:  With the assistance of counsel and the

6      fact that he does not have counsel present here today, I'm

7      going to ask our Federal Public Defender's Office to assist

8      him.  What we will do is we will take a recess from this

9      matter to allow the attorney who is present here from the

10     Federal Public Defender's Office to speak with the witness and

11     discuss whether he should answer this or other questions.  And

12     the Attorney's name is Laura Wasco.

13            Ms. Wasco, when you are prepared -- when you finish

14     meeting with your client, please let the clerk know.  We're

15     going to take up other matters in the meantime and go from

16     there.  All right?

17            MS. WASCO:  Yes, Your Honor.

18            THE COURT:  Thank you.  All right.  This matter will

19     be continued until counsel has had the opportunity to speak

20     with the witness.

21            You may step down.  Do you need space?  Would you

22     take him to the jury room?  Take him to the jury room, please.

23     All right.  Follow Ms. Wasco, please.

24        (Recess from 11:27 a.m., until 11:45 a.m.)

25            THE COURT:  Okay.  And counsel for the Teyf can

(973)406-2250 | operations@escribers.net | www.escribers.net

Grigory Teyf - Cross

1    approach if they're -- I don't think anyone is in the

2    courtroom.  All right.

3         And Ms. Wasco, I'm leave it up to you.  You're

4    welcome to be up here at the front of the courtroom with the

5    witness, if you wish to do so.

6         MS. WASCO:  I'm sorry, Your Honor.  Can you repeat

7    that?

8         THE COURT:  Sure.  You're welcome to be here at the

9    front of the courtroom with the witness, if you believe it's

10   appropriate to do so.

11        MS. WASCO:  Thank you, Your Honor.

12        THE COURT:  You can pull over a chair and sit next to

13   the witness stand if you like.

14        MS. WASCO:  Thank you.

15        THE COURT:  Where ever you're most comfortable.

16   (Pause)

17        THE COURT:  Mr. Grigory Teyf, if you would please

18   retake the witness stand.

19        And I'll just note for the record that it's warm in

20   here.  As those who inhabit this building that would be -- the

21   temperature is out of everyone's control it appears.  I ask

22   that they do what they can to make it more temperate in here,

23   but we're at the mercy of the boilers in the basement.

24        MS. KOCHER:  It's only, Your Honor, we usually put on

25   sweater vests to come into this courtroom.  So it's --

Grigory Teyf - Cross

1        THE COURT:  That's how you know it's bad that it's

2   hot in the seventh floor courtroom.

3        (Pause)

4        THE COURT:  All right.  We're back here in the case

5   of United States of America versus Lenoid Isaakovich Teyf,

6   case number 5:18-CR-452.  Madam Interpreter, you are still

7   under oath.

8        Mr. Teyf, you have assistance -- Mr. Grigory Teyf,

9   you have the assistance of counsel.  If at any point in time

10  you wish to speak with your counsel, simply let me know, and

11  we'll allow you to speak with Ms. Wasco who is seated next to

12  you.  All right?

13       THE WITNESS:  Okay.

14       THE COURT:  All right.  Mr. Kellhoffer, the witness

15  is with you.

16       MR. KELLHOFFER:  Thank you, Your Honor.

17              RESUMED CROSS-EXAMINATION

18  BY MR. KELLHOFFER:

19  Q.   Sir, you mentioned that you'd had some understanding of

20  your father's business.  Did that include some of your

21  father's trucking business up in Chicago having paperwork

22  emailed to your account?

23       THE COURT:  Mr. Kellhoffer --

24       MR. WHITE:  Can we approach?

25       THE COURT:  One second.

Closing Argument

1          MR. WHITE:  Can we approach?

2          THE COURT:  Certainly.

3      (Sidebar discussion off the record)

4          THE COURT:  Before the witness answers the question,

5      the Defense counsel wish to raise an issue with the Court.

6          MR. WHITE:  Yes, Your Honor.  What we'll do is we'll

7      go ahead and withdraw our proffer of Mr. Grigory Teyf as a

8      third-party custodian.  We're prepared to argue.  We've

9      discussed with the Government.  One of things we'll argue

10     we're fine with the condition precedent to his release being

11     finding a suitable substitute third-party custodian.

12         THE COURT:  Thank you, Mr. Teyf.  You may step down.

13         THE COURT:  All right.  Mr. White, I believe before

14     we went down that road you were in the middle of your

15     argument.  Is there any additional argument you'd like to

16     make?

17         MR. WHITE:  Yes, Your Honor.  So in continuing with

18     the pre-trial services report, all these conditions are

19     reasonable.  We would agree to additional conditions, if

20     necessary.  Mr. Teyf is amenable to whatever conditions this

21     Court feels necessary to craft an appropriate solution to

22     ensuring his continued participation in this case and these

23     hearings to include electronic monitoring.

24         Obviously, he would surrender his passports, but he

25     would also be willing to waive any extradition, should the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Closing Argument

1    Court require things of that nature. He is more than willing

2    to cooperate with whatever conditions that the Court feels

3    necessary to impose to continue participation. Contrary to

4    the Government's assertion, there are conditions that you can

5    impose to ensure his continued participation.

6         I'd like to turn now just to the main thrust of the

7    Government's argument which is the weight of the evidence

8    against the person. Your Honor, you have this -- it reads

9    like kind of an international crime novel here, but you have

10   this alleged 150-million-dollar kickback scheme, which first

11   of all on its face, appears to be general contractors working

12   with subcontractors and imposing some sort of margin in

13   exchange for providing that business to the subcontractor. So

14   on its face that doesn't look like criminal activity. It

15   certainly doesn't look like specified criminal activity within

16   the meaning of a statute.

17        And in addition to that, there does not seem to be

18   any link whatsoever between this alleged scheme and the later

19   transactions alleged in the indictment constituting the money

20   laundering charges.

21        Additionally, the Government had an opportunity to

22   put on evidence here of things for example the actual

23   investigating agents involved in this case but chose not to.

24   Understanding obviously, the relaxed rules, but there's simply

25   not enough information here to determine that this is -- that

Closing Argument

1    there's a basis for his continued confinement.  It seems like

2    they're just simply resting alone on the egregious nature of

3    the allegations in the indictment as Your Honor pointed out

4    during Government counsel's argument.

5         So there are conditions that can be imposed on Mr.

6    Teyf to ensure his continued participation.  He's willing and

7    amenable to all those, as I said earlier, including finding a

8    suitable third-party custodian.  He has substantial ties to

9    this community.  This is where he lives.  This is where his

10   family is.  This is where his home is.  This is where his

11   business is.

12        So Your Honor, we would ask that you deny the

13   Government's motion for continued pre-trial detention.

14        THE COURT:  Do you want to say anything about the

15   murder for hire aspect of this case.  The standard I need to

16   apply is, can I impose conditions that will reasonably assure

17   that the defendant will appear, and can I impose conditions

18   that will reasonably assure that the defendant will not pose a

19   danger to any other person and the community?

20        And we've heard a lot of evidence here today about

21   alleged steps that your client took to engineer the murder of

22   an individual and absolve himself the responsibility.  Now, we

23   are at an early point in this case, but that's the evidence

24   we've heard today.  So I need to consider whether I can impose

25   conditions that would reasonably assure the safety of that

1  person and the Government would also have me assess the safety

2  of Mrs. Teyf.  So what do you say on that point?

3          MR. WHITE:  Your Honor, first -- who knows where this

4  individual is?  But as the indictments, itself, the FBI has

5  reached out to this individual to provide protection.  Mr.

6  Teyf has -- will obviously agree to not have any contact with

7  any witnesses whatsoever in this case as one of the conditions

8  in the pre-trial services report had said, and it can be

9  twenty-four-hour continuous monitoring of his location, and he

10  can be required to check in on regular intervals to ensure his

11  whereabouts at all times.  If you want to take away -- like

12  deny him the ability to use his cell phone or whatever to

13  attempt to communicate by means other than just simply verbal

14  communication with people in his immediate vicinity, that's

15  something we would be willing to do.

16          We don't believe he's a danger in any way whatsoever

17  to the community to this alleged individual, A.G., or anybody

18  for this matter.  He's certainly not a flight risk, at all.

19  His passports have been seized, which he would surrender as

20  well, anyways.  As I'm sure you've been able to observe here,

21  Your Honor, I've only been able to communicate with my client

22  through a translator.  So without his passports, he's

23  certainly not going to be able to travel internationally, and

24  the likelihood that he's going to be able as a very, very

25  limited English speaker, broken English at best, Russian

Closing Argument

1    speaker, make his way to the Canadian border or the Mexican

2    border or anything like that.

3          So there are plenty of ways you can craft a way keep

4    constant surveillance on him.  If you want to consider

5    something like house arrest or something like that, that's

6    something that Mr. Teyf would be amenable to restrict his

7    movement in additional to his ability to communicate.  Again,

8    that's something Mr. Teyf would be amenable to.  He's amenable

9    to multiple conditions, Your Honor.

10         THE COURT:  In reviewing the submissions, both the

11   initial one and the one that was submitted this morning, you

12   cite a lot of cases that deal with individuals with

13   connections to foreign countries charged with money

14   laundering, and the courts in those cases as I would expect

15   from your side indicate that the defendant should not be

16   detained, but in none of those cases were the defendants

17   charged with this additional kind of violent or one step

18   removed from violent sort of conduct.  So do those cases

19   really apply here?

20         MR. WHITE:  I think they do, Your Honor.  I think

21   this is the thrust of this case are these -- is this alleged

22   kickback scheme and these money laundering charges.  And then

23   there's these -- this side issue of this alleged murder for

24   hire and the alleged bribery of a government official.  So

25   yes, those cases don't have that, but I would not in those

 1   cases, Your Honor, that those -- we cited those conditions for

 2   the purpose of the fact that every one of those detainees had

 3   far less connections to the United States than Mr. Teyf does

 4   and those courts were able to fashion reasonable conditions to

 5   ensure their continued participation.

 6        THE COURT:  Are you aware of any cases in which

 7   defendant was charged with murder for hire that they received

 8   pre-trial release?

 9        (Gap in audio)

10        THE COURT OFFICER:  Now back in session.  Be seated.

11        THE COURT:  All right.  I've considered the testimony

12   and the credible information presented here today, including

13   the findings in the pre-trial services report.  As I indicated

14   at the outset, this is not a case in which the rebuttable

15   presumption in favor of detention applies.  So I'll turn to

16   the four factors the Bail Reform Act requires me to consider

17   in determining whether release or detention is appropriate.

18        Those factors are of a nature and circumstances of

19   the offense, the weight of the evidence against the defendant,

20   the defendant's history and characteristics, and the nature

21   and seriousness of the danger to any person or the community

22   that will be posed by the defendant's release.

23        Beginning with the nature and circumstances of the

24   offense, the defendant is charged with many counts in a

25   lengthy superseding indictment including charges of money

Colloquy

1    laundering, murder for hire, possessing a gun with an

2    obliterated serial number, bribery of a federal official, and

3    numerous immigration offenses.

4        These offenses carry with them lengthy sentences

5    individually and cumulatively indicate that the defendant, if

6    convicted on all charges, would likely spend the rest of his

7    life in prison or at least the potential for that exists.

8        Among the offenses is a firearm offense which is

9    among the categories offenses Congress has instructed the

10   courts to scrutinize closely in determining whether release or

11   detention is appropriate.

12       With respect to the murder for hire cases, the

13   Court's research has found only two instances in the last

14   twenty years in which defendants have been released on pre-

15   trial release when facing murder for hire charges.  In one

16   case the court did not explain its reasoning in any detail.

17   In the other case, the court indicated that its decision to

18   release the defendant was based on the government refusing to

19   produce evidence in support of its allegations against the

20   defendant.

21       This case appeared more similar to two particular

22   cases that have caught my attention, United States of America

23   v. Leibowitz, 669 Federal Appendix 603, 2nd Cir. 2016 and

24   United States v. Kellogg, 2011, Westlaw 28532 District of

25   Colorado 2011.

eScribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1    The second factor, the weight of the evidence against

2    the defendant, that factor the Court's view of it varies

3    depending on which charges we're discussing.  The indictment

4    contains several money laundering counts.  The Government has

5    presented little to no evidence in support of those charges

6    here today.  So obviously, those charges do not carry much

7    weight for the purposes of this proceeding.

8    In terms of the immigration offenses, there appears

9    to be some evidence in support of that given the distinction

10   between what the defendant listed on his immigration forms and

11   the reality, although I think there's much to be argued about

12   in that case or with those charges.

13   With respect to the murder for hire, firearm, and

14   bribery offenses, however, the Government has presented

15   compelling evidence in support of its case, although we are at

16   an early point in this case, and there's much work to do be

17   done by the attorneys in flushing out and testing the

18   Government's case.  So I believe on those charges, which are

19   the ones the Government relies principally on, I believe the

20   weight of the evidence is very strong.

21   In terms of the Defense history and characteristics,

22   I'll adopt the findings of the pre-trial services report

23   regarding the defendant's background.

24   In terms of the nature and seriousness of the risk

25   posed to any person or the community by the defendant's

1    release, the Government has argued that the defendant poses a

2    substantial risk of harm to both A.G., the victim, and

3    potentially his wife or perhaps ex-wife, depending on what

4    their marital status is at this time.

5         The murder for hire charge represents a threat to a

6    certain individual, obviously.  The individual A.G. has been

7    discussed here today.  The evidence we received here today

8    demonstrates an extended and involved plan to orchestrate and

9    commit the murder and to avoid responsibility.  The evidence

10   we received here today indicates that the Defense spoke with

11   Confidential Human Source 1 about the murder, paid him with

12   25,000 dollars to commit the murder, made multiple efforts

13   using intermediaries to get a gun with an obliterated serial

14   number to him, and then tried to arrange the murder to take

15   place at a time when he would be out of the country and

16   apparently tried to frame his wife for the murder.

17        He also listed Confidential Human Source 2 according

18   to what we've heard here today to locate A.G. after A.G. fled

19   the area when threatened by -- allegedly by the defendant and

20   defendant's son.  His plan extended over a series of months,

21   which indicates an ongoing interest in bringing harm to A.G.

22   Given the nature of the threat, the way that it came about,

23   the fact that it's the internalized affair between the

24   defendant's wife and A.G. and the defendant's apparent

25   commitment to seeing it through, I frankly see a great risk to

Colloquy

1    A.G. and to potentially other people involved in this case,

2    and I don't see any option short of detention that would

3    reasonably assure the safety of that individual or anyone

4    else.

5         Based upon that finding, I'm going to find the

6    Government has shown by clear and convincing evidence that

7    there are no conditions or combination of conditions that I

8    could impose that would reasonably assure the safety of any

9    other person and the community pending the outcome of this

10   case and grant the Government's motion for detention.

11        Anything further from the Defense?

12        MR. WHITE:  No, Your Honor.  Thank you.

13        THE COURT:  Anything further from the Government?

14        MS. KOCHER:  No, Your Honor.

15        THE COURT:  All right.  Mr. Teyf will remain in the

16   custody of the U.S. Marshals.

17                    (Court is adjourned)

18                        *  *  *  *  *

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF TRANSCRIBER

2

3              I, Amber Minton, court-approved transcriber, in and

4       for the United States District Court for the Eastern District

5       of North Carolina, do hereby certify that pursuant to Section

6       753, Title 28, United States Code, that the foregoing is a

7       true and correct transcript from the official electronic sound

8       recording of the proceedings held in the above-entitled matter

9       and that the transcript page format is in conformance with the

10      regulations of the Judicial Conference of the United States.

11

12                    Dated this 20th day of December, 2018.

13

14

15

16             /s/

17             _____

18             AMBER MINTON

19             COURT-APPROVED TRANSCRIBER

20

21

22

23

24

25
```