# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION
### CASE NO. 5:18-cr-452

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MOTION TO REVOKE OR AMEND** |
| | ) | **THE MAGISTRATE'S ORDER** |
| LEONID TEYF et al., | ) | **DETAINING DEFENDANT** |
| | ) | |
| Defendants. | ) | |

Defendant Leonid Teyf, by and through undersigned counsel, pursuant to 18 U.S.C. § 3145(b), moves this Court to revoke the Order of Detention Pending Trial (the "Order") entered by the Honorable Magistrate Judge Robert T. Numbers, II on December 18, 2018, or alternatively, hold an evidentiary hearing, for the reasons set forth below.

## PROCEDURAL HISTORY

Leonid Teyf stands accused of engaging in monetary transactions in property derived from specified unlawful activity and conspiring with and aiding and abetting others in furtherance of those transactions,[1] bribery of a public official,[2] "murder for hire",[3] aiding and abetting others in possessing a firearm with an obliterated serial number,[4] bringing in and harboring certain aliens, as well as conspiring with and aiding and abetting others in furtherance of that harboring,[5] and visa fraud.[6]

---

[1] 18 U.S.C. §§ 2, 1956(h) and 1957 (2018).

[2] *Id*. § 201(b)(1).

[3] *Id*. § 1958.

[4] *Id*. §§ 2, 922(k) and 924(a)(1)(B).

[5] 8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(I) and (v)(II) (2018).

[6] 18 U.S.C. § 1546(a).

The Government made an oral motion for detention as to Mr. Teyf on December 6, 2018. A Pretrial Services Report was filed recommending that Mr. Teyf be detained. (ECF No. 42.) Counsel for Mr. Teyf challenged the Pretrial Services Report at the December 14, 2018 detention hearing on Constitutional and statutory grounds. As a result, the detention hearing was continued until December 18, 2018. An Amended Pretrial Services Report was filed on December 17, 2018. (ECF No. 57). The Amended Pretrial Services Report recommended Mr. Teyf's release with the eight conditions.[7] The Defense did not have access to any material discovery prior to the hearing. Since the hearing the Defense has been provided some discovery relevant to the issue of detention that the Defense believes present part of the grounds for this motion. In addition, the Defense has obtained additional evidence regarding Mr. Teyf's medical condition.

Magistrate Numbers concluded that the Government had shown by clear and convincing evidence that there are no conditions or combination of conditions that would reasonably assure the safety of any other person and the community pending the outcome of the case and granted the Government's motion for detention. (ECF No. 68). Magistrate Numbers did not find that the Government showed that Mr. Teyf was a flight risk by a preponderance of evidence.

## STANDARD OF REVIEW

Pursuant to 18 U.S.C. 3145(b), this Court retains the authority to conduct a de novo review of a Magistrate's order detaining a defendant in a federal criminal case. The Court should conduct a hearing and de novo review.[8] In doing so, the Court makes an independent determination as to whether the magistrate judge's findings are correct based on the Court's review of the evidence

---

[7] Mr. Teyf filed a Brief in Support of Pretrial Release (ECF No. 49) and a Revised Brief in Support of Pretrial Release (ECF No. 59) in anticipation of the hearing.

[8] *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989); *United States v. Williams*, 753 F.2d 329, 333 (4th Cir. 1985); *United States v. Ramey*, 602 F. Supp. 821, 822-24 (E.D.N.C. 1985).

*(continued on next page)*

2

before the magistrate judge.[9] The Court may conduct a further evidentiary hearing if it is necessary or desirable in carrying out the review.[10]

## ARGUMENT

Mr. Teyf's continued pretrial detention is a product of the Magistrate Judge's improper analysis of the applicable factors under the Bail Reform Act. The Magistrate Judge relied upon anecdotal evidence without supporting statistical analysis to conclude pretrial release is rare in the context of murder for hire charges. The Magistrate Judge used an incomplete review of the cases and incorrect assumptions made based on that review to *presume* that in most such cases pretrial release is not to be granted. In fact, the Magistrate Judge unconstitutionally and in violation of 18 U.S.C. 3142(b), effectively reversed the presumption in favor of release. In addition, the Magistrate Judge erroneously concluded that the weight of the evidence plus the nature and circumstance of the offenses and potential harm to A.G. and Tatyana Teyf supported his determination that no conditions could reasonably ensure the safety of any person and the community. Closer analysis of these factors and the case law dictates the conclusion that the Magistrate Judge erred.

First, Mr. Teyf's release does not pose a danger to A.G. or Tatyana Teyf. Even assuming solely for the sake of argument that a risk to A.G. ever existed, the exposure of the alleged scheme in and of itself, even without any conditions of release, virtually eliminates any risk to A.G. Mr. Teyf is fully aware of the fact that should any harm whatever befall A.G. he would inescapably be charged with responsibility and face a crushing increase in a potential sentence. The same is true

---

[9] *See Williams*, 753 F.2d at 333-34.

[10] *See id.*, at 333; *see also United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990) (district court has discretion on whether to conduct a further evidentiary hearing); *United States v. Delker*, 757 F.2d 1390, 1393-94 (3rd Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 249-50 (5th Cir. 1985) (same).

for Tatyana Teyf. Moreover, detention of Mr. Teyf does not make anyone safer. Mr. Teyf is not charged with personally trying to harm anyone; he is charged with hiring someone else to do harm. He has no criminal record and no history of reported violence has been submitted against him. He is a 57-year-old business man with a variety of physical ailments. If Mr. Teyf were reckless enough to try to have harm done to A.G. or Tatyana Teyf—and he is not—continued pretrial detention would not preclude this as, theoretically, such directions could just as easily occur while Mr. Teyf remains in jail. The real deterrent is the charges against him—not his detention. The Court has the power to impose conditions preventing contact pending trial. Second, contrary to the Government's characterizations of the evidence against Mr. Teyf, the discovery materials reveal that the Government's case is far more tenuous than what was presented to the Magistrate Judge. Third, a murder-for-hire charge is not a crime of violence altering the presumption favoring release; it does not dictate confinement; and there is precedent for release in federal courts nationwide. Fourth, this Court can and must employ the statutorily enumerated conditions of release to facilitate Mr. Teyf's release given the cumulative weight of these factors.

### A. Mr. Teyf does not pose a danger to A.G. or Tatyana Teyf and cases support release.

Neither A.G. nor Tatyana Teyf are endangered by Mr. Teyf's release. First, the fact that the purported scheme has been exposed wholly undermines any potential threat to A.G. Mr. Teyf is well aware that all eyes will immediately turn in his direction should any harm befall A.G.; thus, even assuming the accuracy of the Superseding Indictment, Mr. Teyf has every incentive to assure A.G.'s safety rather than threaten it.

In *United States v. Barnett*, the court assessed the issue of how to reasonably assure the safety of the purported victims and witnesses after two defendants were charged with murder-for-

hire.[11] The Court cited Judge Keeton of the District of Massachusetts, who provided an adept interpretation of the Bail Reform Act in *United States v. Phillips*.[12] He explained:

> Congress has not provided a definition of "safety of . . . the community," 18 U.S.C. § 3142(e), or "danger to . . . the community," 18 U.S.C. § 3142(g)(4). Congress did, however, choose to use the term "danger," which by its nature is a risk concept. By using this term, Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can reasonably be assured of its safety. *See United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985) (en banc) (court "cannot require more than an objectively reasonable assurance of community safety"). Indeed, if the statute were interpreted as requiring a guarantee against any harm, pretrial preventive detention would become the norm rather than the exception because such guarantees could be made in almost no cases. As already noted, preventive detention as a norm is not the manifested congressional intent, S.Rep. No. 225, 98th Cong., 2d Sess. 12, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3195 ("it is anticipated that [pretrial] release will continue to be appropriate for the majority of Federal defendants"), nor is it consistent with the Supreme Court's opinion in *Salerno*, 481 U.S. at 755.[13]

In *Barnett*, the Magistrate Judge relied on this analysis and concluded that while "it is certainly within the wide realm of the possible" that the defendant would disregard the stringent conditions of release, it was "implausible and unlikely" that he would do so.[14] He further explained that "[a]s much as it may be desirable to eliminate *even this slight possibility* of danger to the community, the law does not permit the court to require guarantees of safety before granting pretrial release."[15]

---

[11] 986 F. Supp. 385 (W.D. La. 1997).

[12] 732 F. Supp. 255 (D. Mass.1990).

[13] *Id.* at 266-67.

[14] *Barnett*, 986 F. Supp. at 399-400.

[15] *Id.* at 400. District Court Judge Melancon subsequently reviewed the Magistrate Judge's order and concluded that one of the defendants was a flight risk given his tenuous ties to the local community and his extensive work outside the country. *United States v. Barnett*, 986 F. Supp. 405, 408 (W.D. La. 1997). Still, the District Court Judge did not overrule the Magistrate Judge's conclusion that neither defendant charged with murder-for-hire was such a danger to the community that no conditions could facilitate their release.

*(continued on next page)*

5

In regard to the animosity one of the defendants maintained against the purported victims, the court determined that:

> The government has failed to present any evidence that [the defendant's] negative feelings toward his purported victims cannot be counterbalanced by concern for his family and their property, concern for his own financial welfare, and awareness of the huge disparity in criminal penalties between the charges he faces and the charges he might face if he injures the purported victims while on release. Just as a person may be motivated by hate, he can also be motivated by love, friendship, loyalty, fear, and self-interest. These are the principles upon which the Bail Reform Act are based: that most people can be released on some combination of bond conditions which will insure the safety of the community and their appearance at trial.[16]

More specifically, the court noted that the "case has generated sensational headlines and much publicity . . . Defendants would indeed have to be irrational to attempt anything while on pretrial release. The government has offered no evidence that either defendant suffers from a mental disease or defect which would impede their ability to rationally consider these consequences."[17] Such principles are equally applicable here and underscore the Court's ability to fashion appropriate conditions to mitigate against any concerns related to A.G.'s safety and the corresponding feasibility and appropriateness of Mr. Teyf's pretrial release.

The presumption in favor of pre-trial release of a person accused of a crime is a long-established principle of our federal judicial system and a corollary of the presumption of innocence. As the Supreme Court explained in *Stack v. Boyle*:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 9 1, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 156 U.S. 277, 285 (1895). ***Unless***

---

[16] *Id*. at 402.

[17] *Id*. at 402-03.

*(continued on next page)*

6

> *[the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.*[18]

Similarly, Mr. Teyf's release does not endanger Tatyana Teyf. At no point during the alleged extended scheme does the Government allege that Mr. Teyf threatened Tatyana Teyf with violence. The Government does not accuse Mr. Teyf of plotting to physically harm Tatyana Teyf; rather, the extent of the accusations relate to allegedly framing her upon arrival in Russia. Moreover, even if a threat related to the alleged plot to frame Tatyana Teyf ever existed, it has now been extinguished by the charges brought against Mr. Teyf.

To the extent any concerns are related to the accusations of domestic violence, such concerns do not necessitate pretrial detention. The evidence against Mr. Teyf related to domestic violence amounts to unconfirmed statements from Tatyana Teyf, as well as scars she allegedly claims were products of the alleged violence. There is insufficient proof of these allegations to take adverse action against Mr. Teyf. However, even if the allegations are assumed to be true, any risk of domestic violence can be mitigated by a release condition prohibiting contact. The statistical fact is pretrial release is granted in the majority of domestic violence cases with no issue. Here it is noteworthy that Mr. Teyf has no criminal record and there is no record of any reported domestic violence incidents.

In sum, the current circumstances alleviate any threat to A.G. and Tatyana Teyf. Even assuming the validity of the Government's allegations related to the scheme against these two individuals, the exposure of the scheme undermines any ongoing risk. To the extent this Court still has concerns related to the safety of either individual, such concerns are easily mitigated by the

---

[18] *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (emphasis in original).

imposition of appropriate release conditions, as suggested by the relevant cases discussed further below.

**B. The weight of the evidence does not favor pretrial detention.**

It is clear that the Magistrate Judge's determination was based primarily on the murder-for-hire and firearm charges (Detention Hr'g Tr. 68-69 ECF 71). Turning first to the firearm charge, the Magistrate Judge's estimation that the "weight of the evidence is very strong" is simply incorrect. The superseding indictment charges that Mr. Teyf, "aiding and abetting others…knowingly possessed a firearm that had been shipped and transported in interstate commerce from which the manufacturer's serial number had been removed, altered and obliterated." However, it is clear from Special Agent Kinney's testimony that Mr. Teyf never physically possessed the firearm. (Detention Hr'g Tr. 17, ECF 71.) Instead, Mr. Teyf allegedly had "his people" place the firearm in some bushes in a public location, to be retrieved by Confidential Human Source ("CHS") 1. (*Id.*). Consequently, the Government must prove at trial that Mr. Teyf constructively possessed the firearm by establishing that he either exercised or had the power and intent to exercise dominion and control over it, a much more difficult burden than would apply for mere physical possession.[19] But even setting aside the difficulty of proving constructive possession, there is no evidence that Mr. Teyf ever even saw the firearm, obviously presenting a significant challenge to the Government's ability to establish that he knew about the obliterated serial number. For all of the foregoing reasons, the defense submits that the weight of the evidence regarding the firearm charge is very weak. Further, mere possession of a firearm or aiding and abetting another's possession of a firearm, allegedly by someone with no criminal record, is completely insufficient to justify a conclusion that no set of circumstances can be

---

[19] *See U.S. v. Scott*, 424 F.3d 431 (4th Cir. 2005).

imposed to protect the community. Indeed, if this were the logic there would be no pretrial release, ever, for this type of alleged offense, even though the presumption does not apply to this offense.

With respect to the murder-for-hire charge, Agent Kinney's characterizations led he Magistrate Judge to conclude that the evidence was "very strong" (Detention Hr'g Tr. 21, ECF 71), but a closer examination of the underlying evidence reveals the tenuous nature of the Government's case. Agent Kinney's discussion of the case against Mr. Teyf glossed over the difficulty the Government will have in its efforts to establish the requisite elements given the lack of definitive statements in support of the allegations. Specifically, Agent Kinney's testimony was that Mr. Teyf tasked CHS 1 to "do whatever means necessary to do away with A.G." (Detention Hr'g Tr. 16, ECF 71) is inconsistent with the evidence provided by the Government. In fact, Mr. Teyf makes no such statement in the transcripts provided by the Government. Agent Kinney also testified that Mr. Teyf provided CHS 1 with $20,000 dollars "for the purpose of killing A.G.," yet failed to support this assertion (Detention Hr'g Tr. 21, ECF 71). An initial review of the transcripts from this interaction reveal no such statements by Mr. Teyf, and the Government's ability to prove the element related to compensation is wholly dependent upon circumstantial evidence.

The Magistrate Judge clearly relied heavily on Agent Kinney's characterization of the various recordings and interactions involved in this case, none of which was presented by the Government at the hearing. Presumably, the Government adopted this approach because the recordings and interactions are far more nuanced and ambiguous than the crystal clear picture of malfeasance Agent Kinney presented to the Magistrate Judge. The Government's approach was to provide a big picture overview of the case—they declined to provide the law that the money laundering charges were predicated upon, and opted against playing any of the purportedly

Case 5:18-cr-00452-FL   Document 74   Filed 01/02/19   Page 9 of 45

incriminating recordings of Mr. Teyf.[20] Such an approach may be sufficient under circumstances where the elements are satisfied by overwhelming direct evidence and the evidence triggers the statutory presumption against release, but is undoubtedly inappropriate here where proof of the charges will require a far more complex showing and there is no presumption. A review of the transcripts provided in discovery does not reveal an explicit, final and unqualified order by Mr. Teyf to have A.G. killed. Rather, they indicate that Mr. Teyf struggled with how to handle his suspicions of his wife's infidelity and the suspected paramour, and that his de facto solution was to attempt to have A.G. deported.

In another example, the Government characterized an apartment in Raleigh as a "safe house." The discovery indicates this is a wildly misleading exaggeration. In a recording the Government had at the hearing, but the Defense had not been given before the hearing, Mr. Teyf states he bought the apartment, the ownership of which is in no way hidden, for his children. (He has a daughter age 20 and a son age 18). There is no evidence in the discovery to indicate the purpose of the apartment, his ownership interest in which is open an public, is a "safe house."

In sum, while the Government undoubtedly provided a forecast of the case against Mr. Teyf, it neglected to present the requisite support for the Magistrate Judge to find that there was "strong evidence" of the charges and did not identify exculpatory evidence exclusively in its possession.

**C. The nature of the charges against Mr. Teyf does not compel pretrial detention.**

A survey of federal courts faced with issues related to pretrial detention in the context of "murder-for-hire" charges undermines the Magistrate Judge's suggestion that such a release goes

---

[20] In fact, when asked for such a law by the Magistrate Judge, the Government stated they did "not have that law this morning." (Detention Hr'g Tr. 41, ECF 71)

*(continued on next page)*

against precedent. For example, in *United States v. Ross*,[21] the defendant, charged with participating in a murder-for-hire conspiracy, was released despite the Court's conclusion that the nature and circumstances clearly favored detention, as she had a clean criminal record, ties to the community, and the Government failed to present any evidence that she was "a current threat to any specific member of the community or to the community generally."[22] Additionally, *United States v. Aron*[23] and *Allen v. Hadden*[24] do not discuss the propriety of pretrial release, but demonstrate that there is precedent in both the Fourth and Fifth Circuits for releasing a defendant charged with murder for hire. In *United States v. Eischeid*,[25] the defendant was charged with Violent Crime in Aid of Racketeering with murder as the underlying offense, but he was released based on his minimal criminal history, community ties, and the failure of the Government to "provide the Court with evidence that supports the charge to demonstrate that conviction is likely." To the extent that there are only a limited number of federal court decisions involving the release of an individual charged with murder-for-hire, this can just as easily be attributed to the small universe of case law in this context or the limited number or reported cases (when release does not generate a reported decision) as it can to an indication that release is disfavored.[26]

---

[21] 2007 U.S. Dist. LEXIS 10992 (S.D. Ohio)

[22] *Id*. at *7.

[23] 904 F.2d 221 (5th Cir. 1990)

[24] 1991 U.S. App. LEXIS 29392 (4th Cir.)

[25] 315 F. Supp. 2d 1033, 1036 (D. Ariz. 2003)

[26] A search for "('murder for hire' or 'murder-for-hire') and 'pretrial detention'" in all United States federal courts in Lexis Advance only reveals thirty-nine results.

*(continued on next page)*

**D. This Court must fashion reasonable conditions to assure community safety and facilitate Mr. Teyf's release.**

The statutory framework of the Bail Reform Act compels this Court to select the least restrictive means necessary should this Court determine that one or more conditions are necessary to assure the safety of others pending Mr. Teyf's trial.[27] Section 3142(c) mandates that detention based on "flight" or "danger" be limited to those narrow circumstances where "**no condition or combination of conditions** will **reasonably** assure the appearance." (emphasis added). This Court's obligation under the statute is to impose the "*least restrictive* further condition or combination of conditions the judicial officer determines that will *reasonably* assure the appearance . . . ."[28] The Court may require no more than an objectively reasonable assurance that the defendant will appear at trial. Absolute, one hundred percent certainty is not the test.[29]

If this Court determines that Mr. Teyf presents some appreciable risk of danger to the community, it must fashion the least restrictive combination of fourteen statutory conditions specified in 18 U.S.C.§ 3142(c) to mitigate the risk. Those fourteen conditions include limitations on personal associations, limitations of travel, telephone calls, contacts, and use of firearms and narcotics, as well as other monitoring restrictions implemented and administered through Pretrial Services that will "reasonably assure" defendant's appearance. Imposition of such conditions will reduce any concerns related to the defendant's propensity for flight or dangerous activity.[30]

---

[27] 18 U.S.C. § 3142(c).

[28] 18 U.S.C. § 3142(c)(1)(B).

[29] *United States v. Orta,* 760 F.2d 887, 892 (8th Cir. 1985) (*en banc*) (district court imposition of detention on grounds defendant's appearance could not be "guaranteed" applied the wrong legal standard, which is reasonable assurance).

[30] *See, e.g. United States v. Giorando,* 370 F. Supp. 2d 1256, 1271 (S.D. Fla. 2005) (explaining that "monetary conditions [] would ameliorate the flight risk that exists" as a result of the defendant's significant financial resources); *United States v. Karni,* 298 F. Supp. 2d 129, 132 (D.D.C. 2004) (imposing conditions in conjunction with release where the defendant had no ties to the United States).

*(continued on next page)*

Case 5:18-cr-00452-FL   Document 74   Filed 01/02/19   Page 12 of 45

Here, imposition of such conditions can undoubtedly establish the requisite "reasonable assurance" of community safety. As noted in *United States v. Khashoggi* and *United States v. Barnett*, the consequences for failing to abide by the pretrial release conditions are severe,[31] and it is "implausible and unlikely" that Mr. Teyf would risk subjecting himself to additional personal, financial and penal penalties for noncompliance.

Further, unlike the defendant in the *Liebowitz* case cited by the Magistrate Judge, Mr. Teyf is willing to comply with any and all proposed conditions associated with his release.[32] The appropriateness of his release is affirmed by the adopted findings of the Revised Pretrial Services Report. This report notes Mr. Teyf's community and familial ties, highlights his lack of a criminal record (only traffic violations), and catalogues his numerous health challenges. Given Mr. Teyf's presumption of innocence, willingness to abide by any and all conditions, community ties, and his clean criminal record, the suggestion that no conditions exist to reasonably assure community safety is without merit.

The Revised Pretrial Services Report (ECF No. 57) recommends that Mr. Teyf "be released on a Personal Recognizance bond and with" eight accompanying conditions. Mr. Teyf's accounts have already been frozen, and he is amenable to the imposition of any reasonable condition necessary to ensure his appearance at future proceedings, including all of the conditions outlined in the Revised Pretrial Services Report (ECF No. 57). Those conditions provide reasonable measures to ensure Mr. Teyf's appearance at future proceedings and adequate safeguards to ensure the safety of other persons and the community.

---

[31] *United States v. Khashoggi*, 717 F. Supp. 1048, 1051 (S.D.N.Y. 1989); *Barnett*, 986 F. Supp at 402-03.

[32] *See United States v. Liebowitz*, 699 Fed. Appx. 603, 605 (2nd Cir. 2016).

### E.  Mr. Teyf's continued pre-trial detention has a disproportionate impact on him and on his ability to mount a defense.

Mr. Teyf's continued incarceration at the Edgecombe County Detention Center is having a profound impact on his health. As the Pretrial Services Report noted, Mr. Teyf suffers from hypertension, Type II Diabetes, Hepatitis B, an irregular heartbeat, a hernia, and chronic pain in his shoulders, back and hips stemming from a car accident over a decade ago. Each of these conditions is exacerbated by his detention, particularly his gastrointestinal illness and diabetes as a result of the detention center diet, and the chronic pain issues as a result of his inability to get appropriate exercise. On this latter point, Mr. Teyf is suffering from muscle spasms and lack of sleep.

His continued incarceration is also having a more severe effect on his ability to defend himself than would be true of other defendants. First, the complexity of the money laundering charges will require the collection of aged information, primarily in Russian, from sources in Russia and other countries outside the United States. His assistance in collecting and interpreting that information is absolutely critical, but it is severely hampered by his detention. And second, Mr. Teyf's inability to speak English effectively doubles the amount of time necessary for him to communicate with his attorneys. This fact is aggravated by the complex nature of the charges. Consequently, his continued incarceration greatly prejudices his ability to consult with counsel as fully and consistently as necessary.

If the court is disinclined to issue a release order outright, Mr. Teyf urges it to hold an evidentiary hearing in connection with its de novo review of the magistrate's order. Mr. Teyf is prepared to present additional evidence on his medical issues at such hearing. And even more importantly, now that the Defense has been provided access to materials in discovery, a more fair and accurate portrayal of the evidence can be provided than what was presented at the detention

hearing by Agent Kinney, who admittedly had no involvement in the investigation and could only provide what amounted to hearsay statements of, in most instances, already secondhand information. Finally, while not due to any fault by the Government, Mr. Teyf notes that the lead counsel in his defense was unavoidably unavailable at the detention hearing but will be present at any evidentiary hearing conducted by this court.

## CONCLUSION

Mr. Teyf respectfully requests that this Court adopt the recommendations of the Pretrial Services Report, conduct a further evidentiary hearing if deemed necessary, revoke Magistrate Judge Number's detention order, and order Mr. Teyf's release.

/s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.
N.C. State Bar No. 13795
Nathan A. White
N.C. State Bar No. 48684
Benjamin F. Leighton
N.C. State Bar No. 50835
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Phone: (704) 331- 1054
Facsimile: (704) 378-2054
Email: jimmcloughlin@mvalaw.com
          nathanwhite@mvalaw.com
          benleighton@mvalaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2019, I caused to be filed electronically with the Clerk of Court through the CM/ECF system the foregoing **MOTION TO REVOKE OR AMEND THE MAGISTRATE'S ORDER DETAINING DEFENDANT,** and that service will be accomplished by the CM/ECF system sending notification of such filing to the following counsel of record:

> Jason Kellhofer
> U.S. Attorney's Office
> 310 New Bern Avenue
> Federal Building, Suite 800
> Raleigh, North Carolina 27601-1461
> Jason.kellhofer@usdoj.gov
>
> Barbara Kocher
> 310 New Bern Avenue
> Federal Building, Suite 800
> Raleigh, North Carolina 27601-1461
> Barb.kocher@usdoj.gov
>
> Attorneys for the United States of America

> /s/ James P. McLoughlin, Jr.
> James P. McLoughlin, Jr.

16

# United States v. Barnett

United States District Court for the Western District of Louisiana, Lafayette-Opelousas Division

September 16, 1997, Decided ; September 17, 1997, Filed

CRIMINAL NO. 97-60033

**Reporter**
986 F. Supp. 385 *; 1997 U.S. Dist. LEXIS 18778 **

UNITED STATES OF AMERICA VS. RICHARD D. BARNETT (001) VIRGIL R. DRAKE (002)

**Counsel:** [**1] For RICHARD D BARNETT, defendant: Terry Hart, Akin Gump et al, Dallas, TX.

For RICHARD D BARNETT, defendant: Kraig T Strenge, Lafayette, LA.

**Judges:** Mildred E. Methvin, United States Magistrate Judge. JUDGE MELANCON.

**Opinion by:** Mildred E. Methvin

# Opinion

[*387] <u>RULING ON GOVERNMENT'S MOTIONS FOR PRETRIAL DETENTION</u>

### *Summary of Findings*

The government seeks pretrial detention of both defendants under the Bail Reform Act of 1984 ("the Act"). The Act requires the court to consider a number of factors in deciding whether there are conditions of release which "will reasonably assure the appearance of the [defendants] and the safety of any other person and the community." 18 U.S.C. § 3142(e).

Following a detention hearing on August 27, 1997, I ordered Drake released on a $ 500,000 secured bond, with stringent conditions of release. A stay of the release order was entered pending review by the district [*388] judge. The issue of Barnett's release was taken under advisement on September 2, 1997.

This ruling supplements the oral reasons given for Drake's release, and sets forth findings and conclusions as to Barnett's bail eligibility pending trial.

Supporting the government's motion for [**2] detention of defendants is the nature of the crime charged (attempted murder for hire), and the weight of the evidence.

Supporting the defendants' request for pretrial release are their clean records, close family ties, employment histories, length of residence in the community, past conduct, financial resources, community ties, and absence of any history of alcohol or drug abuse. Most important, both defendants have close, qualified family members willing to post their homes and other real or personal property as security for a bail bond.

The final factor, the nature and seriousness of the danger to the purported targets of the hit, weighs in favor of release in Drake's case, and in favor of detention in Barnett's case.

After carefully considering the evidence presented at four hearings, I conclude that there are conditions of release which will reasonably assure the appearance of <u>both</u> defendants and the safety of the community.

The court has the authority to require defendants and their sureties to execute not only an "Appearance Bond," but an "Appearance and Compliance Bond." Such a bond provides that the failure to appear or to comply with any condition of release, including [**3] the condition that the defendant not commit any offense while on release, will result in forfeiture of the bond. Compliance with these conditions can be assured by requiring close family members of each defendant to post their homes or other property as security for $ 50,000 bonds.

In Barnett's case, the bond securities will include his mother's mobile home, and his sister and brother-in-law's family home and 2 1/2 acres of property. In addition, all of Barnett's financial assets will be posted as security for the bond.

In Drake's case, the bond securities will include Drake's family home, an additional tract of rural property, and his son's home in Baton Rouge.

Page 2 of 17

986 F. Supp. 385, *388; 1997 U.S. Dist. LEXIS 18778, **3

### 1. The Charges

The defendants are charged in a two-count indictment as follows:

⊞ Go to table1

 [**4]  The government contends that on July 10, 1997, while in Belize City, Belize, Barnett met with a person he believed to be a hit man to negotiate the murder of Ernest Parker and Logan Nichols. [1] In fact, the "hit man" was a confidential informant (CI) who recorded the conversation and turned it over to the FBI. The FBI recorded all of the meetings and telephone calls thereafter between the CI, Barnett, and co-defendant Virgil R. Drake, who allegedly helped Barnett facilitate the scheme in the United States.

The government contends that on July 11 or 12, [2] Barnett gave the CI a piece of paper containing Drake's telephone number and instructions to speak in [**5] code. On July 12, Barnett returned to Houston from Belize. On July 17, the Belize CI received a package from Barnett containing $ 2,000 in expense money. Barnett called the CI several days [*389] later to confirm his receipt of the money. On July 28 the CI left a telephone message at Drake's residence, advising him that the hit men would be arriving on July 30 or 31. On July 31 the CI traveled to Lafayette, La. and was joined by an FBI undercover agent posing as a second hit man.

On August 1, Drake met the CI and the undercover agent (hereinafter referred to as "the CIs" for sake of brevity) at a Lafayette hotel and gave them two packages containing the addresses and other information regarding Parker and Nichols. Later that morning, Barnett telephoned the CIs and set up a meeting in Orange, Texas for that afternoon. At the meeting, Barnett paid the CIs $ 5,500 in cash for the murders of Parker and Nichols. At approximately 6:00 p.m. [**6] that day, Drake drove the CIs by Parker's house in Lafayette.

Soon thereafter Barnett and Drake were arrested.

### 2. Procedural Background

#### A. Barnett

Barnett was arrested in Houston on August 5, 1997 on a criminal complaint. He waived a detention hearing in Texas and was transported by the Marshal to this district for further proceedings. The duty magistrate, Magistrate Judge Pamela A. Tynes, scheduled a bail hearing and a preliminary examination for August 18. Prior to that date, however, the indictment was returned and the case was assigned to District Judge Tucker L. Melan on and myself for all future proceedings.

Barnett appeared before me for an initial appearance, arraignment, and bail determination on the indictment on August 21, 1997. The government moved for pretrial detention on grounds that Barnett was both a danger to persons in the community, and a flight risk. A detention hearing was held over the course of three days: August 21, August 27, and September 2, 1997. Following the first detention hearing, I listened *in camera* to certain audiotapes the government obtained during its investigation of the case.

At the conclusion of the third detention [**7] hearing I took the bail determination under advisement.

#### B. Drake

Drake was arrested at work without incident on August 5, 1997, pursuant to the criminal complaint. A detention hearing was held on August 12 before Magistrate Judge Tynes. The government called no witnesses. It simply requested the court to take judicial notice of the affidavit of FBI Agent Jean St. Pierre, Jr. supporting the criminal complaint, and of the report recommending detention by Pretrial Services Officer Marc Coleman.

Drake called two witnesses to testify: Mr. Coleman and FBI Agent St. Pierre. At the conclusion of the hearing, Judge Tynes remarked that, "This case is particularly troubling in the fact that there is no apparent or detected motive apparent from the face of the record at this point." [3] Judge Tynes noted that Drake's past history was nonviolent and noncriminal, but she concluded that

---

[1] The government's contentions are outlined in the affidavit of FBI Agent Jean B. St. Pierre, Jr. attached to the criminal complaint dated August 4, and the text of the indictment which was returned on August 15. FBI Agent Garland Jean Batiste, who posed as the second hit man in the United States, provided additional information at the detention hearings.

[2] The affidavit attached to the complaint says July 11; the indictment says July 12.

[3] Tr. 8/12/97 hearing, p.16, lines 15-17.

Page 3 of 17

986 F. Supp. 385, *389; 1997 U.S. Dist. LEXIS 18778, **7

the violent nature of the crime charged, the weight of the evidence, and the nature and seriousness of the danger posed by his release weighed in favor of detention.

[**8] Judge Tynes stated, "If further evidence should come out that is new that hasn't been brought to my attention, the statute provides the defendant can file a Motion for Reconsideration of this bail determination." [4] An order of detention was entered upon the following written findings:

> I find that the credible testimony and information submitted at the hearing establishes by clear and convincing evidence that the safety of certain persons in the community cannot be reasonably assured by conditions of release. Factors in support include: (1) The charged offense is a serious crime of violence precipitated by an unknown motive; (2) the weight of the evidence is substantial and compelling; (3) Although defendant's past history and conduct seems to indicate a non-violent, non-criminal nature, his involvement in the charged offense entirely negates and supersedes [*390] his past behavior; (4) The nature and seriousness of the danger posed by his release is established by the nature of the crime charged, "murder for hire", and the weight of evidence noted above.

(Order of Detention Pending Trial, 8/12/97).

[**9] The grand jury returned the instant indictment on August 15, three days after Magistrate Judge Tynes ordered Drake detained on the complaint. On August 22, Drake came before me for an initial appearance and arraignment on the indictment. The government objected to the court holding another detention hearing, arguing that Magistrate Judge Tynes' order should remain in effect unless Drake moved for reconsideration on the basis of new evidence, or filed an appeal under 18 U.S.C. § 3145(c). The objection was overruled because the indictment was a new charging document and it differed in material respects from the preceding complaint. Consequently, I found Drake was entitled to a new bail determination. Upon the government's request, however, the detention hearing was continued to August 27.

At Drake's detention hearing on August 27, the government called two witnesses: FBI Agent Garland Jean-Batiste, who had worked undercover as the second "hit man"; and Midge Parker, wife of Ernest Parker, one of the purported targets of the murder for

hire scheme. The defense called Probation Officer Marc D. Coleman; defendant's wife, Carole Drake; and defendant's supervisor at the Louisiana Department [**10] of Natural Resources, John Edward Caldwell, Jr.

After considering the evidence presented, I concluded that there were conditions of release which would reasonably assure the appearance of Drake and the safety of any other person and the community. I ordered Drake released on the following conditions:

1. Defendant and his sureties (his wife, son, and daughter-in-law) shall execute an Appearance and Compliance Bond in the amount of $ 500,000, secured by the full unencumbered value of the home owned by Drake and his wife (approximately $ 50,000); by the full unencumbered value of the home owned by Drake's son and daughter-in-law in Baton Rouge (approximately $ 5,000); and by the full unencumbered value of real property owned by the defendant in Beauregard Parish (approximately $ 25,000);

2. The Appearance and Compliance Bond will provide that forfeiture of the posted securities will occur if Drake fails to appear as ordered, or fails to comply with a material condition of release as set forth in the Order Setting Conditions of Release (AO Form 199A);

3. Defendant and his wife, as third party custodian, shall sign an "Order Setting Conditions of Release" (AO 199A), the [**11] terms of which will be incorporated into the Appearance and Compliance Bond. The specific conditions of release to be imposed in the "Order Setting Conditions of Release" are as follows:

    a. Defendant will be placed into the third-party custody of his wife, Carole Drake, who will be responsible for supervising the defendant in accordance with all conditions of his release, using every effort to assure his appearance, and notifying the court immediately in the event he violates any release condition or disappears;

    b. The defendant shall maintain or actively seek employment;

    c. The defendant shall restrict his travel to Lafayette Parish;

    d. The defendant shall avoid all contact with the following individuals or their families: Ernest Parker, Logan Nichols, Richard Barnett, the FBI agents involved, and the confidential source;

    e. The defendant shall report on a regular basis to the Probation Office as directed;

    f. The defendant shall comply with a curfew from

---

[4] Tr. 8/12/97, p.17-18.

Page 4 of 17

986 F. Supp. 385, *390; 1997 U.S. Dist. LEXIS 18778, **11

6:00 p.m. to 7:00 a.m., which may be electronically monitored by the Probation Office.

g. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon;

[*391] h. [**12] The defendant shall refrain from excessive use of alcohol, and any use or unlawful possession of a narcotic drug and other controlled substances defined in 21 U.S.C. § 802 unless prescried by a licensed medical practitioner;

i. The defendant shall obtain no passport and shall surrender any current passport to the Clerk of Court.

A stay order was entered to allow the government to seek review by the district judge pursuant to 18 U.S.C. § 3145(a).

### 3. The Bail Reform Act of 1984

#### A. History and Purpose

The Bail Reform Act of 1984 prescribes a comprehensive procedure for release or detention of those charged with federal crimes. The Act revised the former statute, the Bail Reform Act of 1966, which focused mainly on assuring the appearance of the defendant at judicial proceedings. [5] The 1984 Act made two key changes in the law: 1) it prohibited the practice of using inordinately high financial conditions to detain defendants; and 2) authorized courts to consider the danger a defendant may pose to the community or certain individuals. United States v. Orta, 760 F.2d 887, 890 (8th Cir. 1985).

[**13] Congress was concerned about the problem of crime committed by persons on pretrial release, a concern which the former Act failed to address. [6] Congress revised the Act to give courts authority to "make release decisions that give the appropriate recognition to the danger a person may pose to others if released." [7]

---

[5] See S. REP. No. 225, 98TH CONG.,2ND SESS. 3, reprinted in 1984 U.S.C.C.A.N. 3182, 3185-86.

[6] S.REP. NO. 225, 98TH CONG., 1ST SESS. 6-7, reprinted in 1984 U.S.C.C.A.N. 3185-3188.

[7] Id. at 3185.

The pretrial detention provisions of the Act did not signal, however, a Congressional intent to incarcerate wholesale the category of accused persons awaiting trial. Id. Rather, Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions, no matter how stringent. The Senate Report states:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition [sic] of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community [**14] or other persons. It is with respect to this limited group of offenders that the courts must be given the powers to deny release pending trial.
>
> The decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. * * * It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants.

S.REP. NO. 225, 98TH CONG., 1ST SESS. 6-7, reprinted in 1984 U.S.C.C.A.N. 3189-90 (footnotes omitted).

The Supreme Court rejected a constitutional challenge to the Act in United States v. Salerno, 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). The Court held that the Act did not violate either the Fifth Amendment's guarantee of substantive due process, or the Eighth Amendment's proscription against excessive bail. The Court noted two safeguards in the Act limiting pretrial detention on grounds of danger to the community: (1) there are only six circumstances in which pretrial detention can be ordered on grounds of danger to the community; and (2) the government has a heightened burden of proof -- "clear and convincing evidence" as opposed to a [**15] preponderance of the evidence. Id. at 750.

The Court's decision relied heavily upon the narrowness of the Act's effect upon defendants awaiting trial:

> In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. We hold that the provisions for pretrial detention in [*392] the Bail Reform Act of 1984 fall within that carefully limited exception. The Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety

Page 5 of 17

986 F. Supp. 385, *392; 1997 U.S. Dist. LEXIS 18778, **15

of individuals or to the community which no condition of release can dispel.

Id. at 755.

The issue presented here is whether defendants are, as the government argues, members of that small group of individuals who are not entitled to pretrial release under the Act.

### B. Procedure under the Act

Consistent with the intent expressed in the legislative history, the statutory scheme of the Bail Reform Act favors release over pretrial detention. The Act requires pretrial release under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required [**16] and the safety of the community. 18 U.S.C. § 3142(b). United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985). Section 3142(a) provides four alternatives from which the judicial officer must choose:

(1) release on personal recognizance or unsecured appearance bond;
(2) release subject to certain conditions;
(3) temporary detention to permit revocation of conditional release, deportation, or exclusion; or
(4) pretrial detention.

Before a judicial officer may move from (1) to (2), there must be a determination that release on the less restrictive level "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b) and (c). Before considering detention under (4), the judicial officer must first consider whether there are any conditions or combination of conditions which "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c). The Act sets forth a number of conditions to be considered, including:

. third-party custody;
. employment or educational requirements;

. [**17] restrictions on personal associations, place of abode or travel;
. restrictions on contact with alleged victims or potential witnesses;
. supervision by the Pretrial Services Office, including reporting requirements;
. imposition of a curfew;
. prohibition against possessing a firearm, destructive device, or other dangerous weapon;

. restrictions on alcohol or narcotic use;
. medical, psychological, or psychiatric treatment, including residence in any treatment facility;
. execution of a property bond or posting of other security;
. return to custody for specified hours following release for employment, schooling, or other limited purposes;
. and "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."
18 U.S.C. § 3142(c)(B).

"The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." Orta, supra, 760 F.2d at 891 (8th Cir. 1985).

The Act limits the kinds of cases in which pretrial detention is available. Thus, in some cases, release will [**18] be mandated despite the fact that it will endanger an individual or the community, or present a probability of non-appearance. Detention can be ordered only in cases involving one or more of the six circumstances listed in § 3142(f)(1) and (2). United States v. Byrd, 969 F.2d 106, 109 (5th Cir. 1992). Section 3142(f) provides:

**(f) Detention hearing**. -- The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance [*393] of the person as required and the safety of any other person and the community --

(1) upon motion of the attorney for the Government, in a case that involves --
(A) a crime of violence;
(B) an offense for which a maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.) or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1902 et seq.) or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.); [**19] or (D) any felony if the person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or

Page 6 of 17

986 F. Supp. 385, *393; 1997 U.S. Dist. LEXIS 18778, **19

more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves --

(A) a serious risk that the person will flee; or
(B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

In the instant case, a crime of violence is involved. There is no dispute, therefore, that pretrial detention is available under the Act in connection with the crimes charged.

The factors to be considered in determining whether successful release conditions can be imposed are contained in § 3142(g):

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; [**20]
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including --

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Although the Act permits the court to consider the nature of the offense and the ev a pretrial determination of guilt; otherwise, "the refusal to grant release could become in substance a matter of punishment." Montamedi, supra, 767 F.2d 1403, 1408 (9th Cir. 1985).

In the Ninth Circuit, the weight of the evidence is the least important of the factors. Id; United States v. Honeyman, 470 F.2d 473, 474 (9th [**21] Cir. 1972);

United States v. Gebro, 948 F.2d 1118 (9th Cir. 1991). See also United States v. Edson, 487 F.2d 370, 372 (1st Cir.1973).

## C. Presumptions Against Release

Although the government argued at the August 22 detention hearing that there is a statutory presumption against defendants' release, this is not the case. [8]

The Act imposes a presumption against pretrial release in certain designated cases. The cases fall into two general categories. The first category involves offenders charged [*394] with serious crimes who **previously** committed a serious crime while on pretrial release. See 18 U.S.C. § 3142(e)(1), (2) and (3). This type of presumption does not apply to either Barnett or Drake since neither defendant has a criminal record. [9] The second category involves offenders charged with one of the following particular offenses:

. a drug offense for which a maximum term of imprisonment of ten years or more is prescribed in one of the [**22] following statutes:
-- the Controlled Substances Act (21 U.S.C. 801 et seq.),
-- the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or
-- the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.),
. an offense under § 924(c) (using or carrying a firearm during a crime of violence or a drug trafficking offense);
. an offense under § 956(a) (conspiracy by one inside the United States to commit murder, kidnaping, or maiming at any place outside the United States);

---

[8] Tr. 8/22/97, p.13, lines 16-23.

[9] The Order of Detention entered by Magistrate Judge Tynes as to Drake is ambiguous as to whether a presumption against release was found. The Order is set forth on a form AO 472 which contains boxes to be checked if either of the presumptions against release is found. Under "Part I - Findings of Fact," Judge Tynes checked off the boxes indicating that a presumption had been found under this part of the Act as a "crime of violence." However, no finding is indicated that Drake had a previous federal or state offense as required to trigger this presumption. Because Drake has no criminal record, and Judge Tynes made no mention of it in her oral remarks or written findings, I conclude that the checked boxes were simply an oversight.

Page 7 of 17

986 F. Supp. 385, *394; 1997 U.S. Dist. LEXIS 18778, **22

. an offense under § 2332b (acts of terrorism transcending national boundaries).

18 U.S.C. § 3142(e).

[**23] This second category of cases also does not apply to the defendants, since they are not charged with any of the cited offenses.

The legislative history of the Act shows that Congress had reason to require different treatment of persons accused of drug offenses:

> * * * It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

S.REP. No. 225, 98TH CONG., 2D SESS. 20, reprinted in 1984 U.S.C.C.A.N. 3182, 3203.

Congress did not restrict the presumption against release, however, to drug offenders. As noted above, Congress found several other types of crimes particularly heinous and grounds for concern regarding pretrial release. However, Congress did not include among them conspiracy to commit murder for hire or interstate travel with intent that murder for hire be committed -- the crimes charged here. Consequently, the court is required to apply [**24] the factors in § 3142(g) without inclusion of any presumption against release.

### D. The Act Favors Pretrial Release

In Byrd, the Fifth Circuit reversed this court's order detaining a pedophile considered dangerous to children, and remanded with instructions to release the defendant on conditions of release. The appeals court did not dispute that the defendant presented a danger to children. Rather, it found that the charge (receiving child pornography in the mail) did not fall within one of the six circumstances prescribed by the Act. The court found that detention was not authorized under the Act, despite the fact that Byrd's release would jeopardize the safety of children upon his release. The court held:

> * * * There can be no doubt that this Act clearly favors nondetention. It is not surprising that detention can be ordered only after a hearing; due process requires as much. What may be surprising is the conclusion that even after a hearing, detention can be ordered only in certain designated

and limited circumstances, irrespective of whether the defendant's release may jeopardize public safety.

[*395] Byrd, 969 F.2d at 109-110. The court therefore vacated [**25] the detention order entered by the district court.

Unlike Byrd, this case clearly involves a "crime of violence" within the meaning of 18 U.S.C. § 3142(f)(1)(A). A "crime of violence" is "an offense that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. Section 3156(a)(4)(A). Therefore, this court has authority to detain the defendants if it concludes that no conditions of release will reasonably assure their appearance and the safety of the community. However, as Byrd pointed out, the Act allows pretrial detention only in a narrow range of circumstances, consistent with constitutional guarantees. "Due to weighty liberty interests, the typical pretrial detainee is rarely detained prior to trial." Hamilton v. Lyons, 74 F.3d 99, 105 (5th Cir. 1996) (citing Salerno supra, 481 U.S. 739, 754).

Release should be denied only in rare circumstances, and doubts regarding the propriety of release should be resolved in the defendant's favor. Sellers v. United States, 89 S. Ct. 36, 38-39, 21 L. Ed. 2d 64 (1968) (Black, J., in chambers); Gebro, supra, 948 F.2d 1118 (9th Cir. [**26] 1991); United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985); Herzog v. United States, 226 F.2d 561 (1955) (Douglas, J., in chambers); United States v. McGill, 604 F.2d 1252, 1255 (9th Cir. 1979), cert. denied, 444 U.S. 1035, 100 S. Ct. 708, 62 L. Ed. 2d 671 (1980). This is particularly true in cases where no statutory presumption against release exists. United States v. Flores, 856 F. Supp.1400, 1402 (E.D.Cal.1994).

The command of the Eighth Amendment that 'Excessive bail shall not be required * * *' obligates judges to deny bail only for the strongest of reasons. Id., citing Truong Dinh Hung, v. United States, 439 U.S. 1326, 1329, 99 S. Ct. 16, 18, 58 L. Ed. 2d 33 (1978) (Brennan, J., in chambers). Federal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail. Stack v. Boyle, 342 U.S. 1, 4, 72 S. Ct. 1, 3, 96 L. Ed. 3 (1951); United States v. Honeyman, 470 F.2d 473, 474 (9th Cir.1972).

With these precepts in mind, I now turn to the particular facts and legal issues presented.

Page 8 of 17

986 F. Supp. 385, *395; 1997 U.S. Dist. LEXIS 18778, **26

### 4. Findings of Fact and Conclusions of Law

*A. Background: Richard D.* [**27] *Barnett*

Barnett is 51 years old and holds a B.S. in Petroleum Engineering from the University of Southwestern Louisiana (USL). He has worked for the past twenty years as a petroleum engineer and an engineering consultant. He spent one year as an instructor teaching Advanced Petroleum Engineering classes at USL. Barnett has published numerous technical manuals on plate tectonics and deep well drilling, and was recently working on a patent application through his company, Mitchell Trading Co. [10] Barnett has no criminal record and has heretofore been a law-abiding, productive member of society.

Barnett resided in the Lafayette, Louisiana community for over 25 years, until he relocated to Houston four years ago. He has an apartment in Houston, but in recent years has worked predominately in other countries as a consultant and a teacher, including China, Spain, Pakistan, Italy, France, Netherlands, Mexico, Guatemala, [**28] Belize, and Trinidad. [11]

Barnett has been married to Kay Lewis Barnett for 29 years. Mrs. Barnett is the office manager for a CPA firm in Lafayette. The couple have four children and one grandchild, all of whom live in Lafayette. Two of the children are minors (ages 16 and 14) who live with their mother.

Barnett and his wife have been physically separated for the past several years, although [*396] they remain friends and have no plans to divorce. [12] Despite his relocation, Barnett continues to spend approximately 15% of his time in the Lafayette community, and maintains close contact with his children via telephone calls and extended vacations together. Barnett spent six weeks vacationing this summer with his two youngest children. [**29] [13] Mrs. Barnett testified that she is willing to serve as a third-party custodian and will allow Barnett to reside in her home while he is on pretrial release.

Barnett's personal history and characteristics weigh in favor of pretrial release. While the government contends that Barnett no longer has strong ties to this community, this is refuted by the evidence summarized above. In addition, approximately [**30] fifteen to twenty members of the community appeared at Barnett's August 21 hearing, indicating that he retains strong ties to this community. [14]

Barnett is close to his mother, Margie Barnett Enis, as well as his seven siblings. Barnett's mother is 87 years old. She testified to her close relationship with all eight of her children, including the defendant. She is willing to put up the mobile home in which she resides in Dubac, Louisiana as security for an Appearance and Compliance Bond. [15] The mobile home is unencumbered and has a value of approximately $ 30,000.

Barnett's sister and brother-in-law, Dinah and Jerry Brazzel, are willing to put up their home and the 2 1/2 acre tract of land on which it (and Mrs. Enis' mobile home) are situated to secure Barnett's [**31] Appearance and Compliance Bond. The unencumbered value of the improved tract is approximately $ 100,000. [16] Mrs. Brazzel testified at the detention hearing that she and her husband have full faith that Barnett will comply with all conditions of release. They understand the serious nature of the commitment they are making.

In addition to assets belonging to family members, counsel for Barnett provided the court with a list of all assets owned by Barnett which can also be posted as security for the bond. In addition to assets totaling

---

[10] Pretrial Services Report dated August 6, 1997, and testimony at August 27 detention hearing.

[11] Pretrial Services Report. Barnett's wife, Kay Lewis Barnett, testified that The National Republic of China invited Barnett to give a series of lectures to their drilling personnel, and that Barnett's work on drilling practices is being studied by a school in Copenhagen. Tr. 8/21/97, p. 25

[12] Barnett told the Pretrial Services Officer that he and his wife had been physically separated for four years. Mrs. Barnett also testified at the August 21 hearing that they had been physically separated for four years. However, at the August 27 hearing, she, testified that although her husband began to travel extensively three or four years ago, they remained married in both "form and substance" until about a year ago. She testified that they remain good friends and she has no plans to file for divorce. Tr. 8/27/97, p.20-27. Tr. 8/21/97, p.

23.

[13] Testimony of Kay Lewis Barnett, Tr. 8/27/97, p.27, lines 20-25.

[14] Tr. 8/21/97, p.24, lines 16-25.

[15] See discussion at p. 36 *infra*.

[16] Tr. 9/2/97 at p. 11.

Page 9 of 17

986 F. Supp. 385, *396; 1997 U.S. Dist. LEXIS 18778, **31

approximately $ 69,030.59, Barnett is the sole stockholder of Mitchell Trading Co., a Texas corporation. Counsel proposed that Barnett execute a power of attorney in favor of his wife or his sister, directing that Barnett's posted assets be forfeited and surrendered in the event the court finds Barnett has violated a material condition of release or has failed to appear.

### B. Background: Virgil R. Drake

Drake is 61 years of age and has resided in [**32] the Lafayette area for 38 years. He and his wife Carole have been married for 40 years and have three grown children. Two of the children reside in Lafayette and one resides in Baton Rouge. Drake's mother, age 78, resides in DeQuincy, La., and he has three siblings who reside in Texas and Oklahoma. Drake has no criminal history.

Drake studied petroleum engineering for three years in college and has worked in the past as a well tester and an equipment operator. Drake's work in the oil field took him to Iran and South America in the 1970's. Drake was also employed at one time as a Louisiana State Trooper, although the time and duration of this employment was not placed in the record. Since 1990, Drake has been employed as a Conservation Enforcement Agent with the Louisiana Department of Natural Resources.

 [*397] In January 1986, Drake was involved in an automobile accident and suffered a blood clot to the brain which required surgery. For approximately two years, Drake was "not in touch with reality" and was under treatment by a neurologist. As a result of this injury, Drake occasionally suffers seizures for which he takes anti-convulsive medication. He also has sleep apnea and occasionally [**33] suffers periods of amnesia. [17] No issue of Drake's competency was raised at the detention hearings, however, and the medical information provided was not a factor in my bail determination.

Drake and his wife are willing to post their home as security for the appearance and compliance bond. Evidence at the August 27 hearing indicated that the home is valued at approximately $ 88,727, and there is an outstanding mortgage in the amount of $ 38,750.49.

The equity in the home is therefore approximately $ 49,976.51.

The Drakes also own a rural lot in Beauregard Parish valued at approximately $ 25,000, with no outstanding mortgage. This property will also be posted as security.

Finally, Drake's son is willing to post his Baton Rouge home as security for the bond. The home was recently purchased and there is little equity in it -- approximately $ 5,000 to $ 6,000. However, this represents the son's full interest in the home, and a bond violation by Drake [**34] would result in a loss of the home.

### C. Authority to Hold a Second Detention Hearing on Drake

The government challenges the court's authority to re-open Drake's bond status because Magistrate Judge Tynes previously ordered detention. This contention is without merit.

Drake came before Magistrate Judge Tynes on an arrest warrant in connection with a criminal complaint which charged a conspiracy to commit murder for hire (Rec. Doc. 4). Drake came before me on a summons after issuance of a subsequent indictment (Rec.Doc. 14). The indictment contains two counts: the conspiracy charge as well as a substantive charge of interstate travel with the intent to commit murder for hire under 18 U.S.C. § 1958. The complaint and the indictment are separate charging documents and are different in material respects.

Rule 5 F.R.CR.P. requires that "when a person, arrested with or without a warrant or given a summons, appears initially before the magistrate judge. . ." the magistrate judge is to advise the defendant of the charges, of his right to remain silent, and of his right to counsel. In addition, the magistrate judge "shall detain or conditionally release the defendant as provided [**35] by statute or in these rules." Rule 5(c) F.R.CR.P.

The plain words of Rule 5 require an initial appearance -- and a concomitant bail consideration -- with respect to each charging document. The government offers no authority for its position otherwise.

In a case on point, another court rejected the government's argument that it was unnecessary to hold a separate bail determination after issuance of an indictment:

    The government contends that a separate

---

[17] Addendum to Pretrial Services Report dated August 23, 1997.

Page 10 of 17

986 F. Supp. 385, *397; 1997 U.S. Dist. LEXIS 18778, **35

determination under Section 3141 et seq. is unnecessary because the order to detain "prior to trial" covers the indictment issued after the criminal complaint. The position of the government does not have express support in the statute, nor has this judge been able to discover any case law which supports such a position. Therefore, in the interest of providing the most comprehensive protection of the defendant's due process rights a distinct detention hearing based on the indictment was conducted on January 22, 1987.

 United States v. Leibowitz, 652 F. Supp. 591, 592 (N.D.Ind.1987).

I conclude that an independent bail determination on the indictment was proper under these circumstances.

### D. "Prejudgment Argument"

 [**36]  At Drake's detention hearing, the government argued that detention of the defendants should be ordered because the issue had been "prejudged" by Magistrate Judge Tynes and by two Pretrial Services Officers: the one in Houston who recommended detention [*398] of Barnett, and the local one who recommended detention of Drake. I will first address the detention order of Magistrate Judge Tynes.

The bail proceeding before Magistrate Judge Tynes differed in material respects from the one held before the undersigned. Only two witnesses testified at the hearing before Magistrate Judge Tynes: the FBI case agent, Jean B. St. Pierre, Jr. and Marc Coleman, the pretrial services officer.

At the hearings before the undersigned, five witnesses testified: FBI Agent Gatland Jean-Batiste, who had worked undercover as the second "hit man"; Midge Parker, wife of Ernest Parker, one of the purported targets of the murder for hire scheme; Marc D. Coleman, the probation officer; Carole Drake, the defendant's wife; and John Edward Caldwell, Jr., defendant's supervisor at the Louisiana Department of Natural Resources.

In addition, I listened to several of the government's tapes of the transactions in question,  [**37]  which were key to my determination regarding the nature of Drake's involvement in the crimes charged.

The evidence presented to me was much more comprehensive than that presented to Magistrate Judge Tynes. In particular, Judge Tynes did not have the

benefit of listening to the government's tapes and hearing the testimony of FBI Agent Batiste that Drake was a reluctant participant in the alleged scheme. This information directly lowers the court's assessment of "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). Furthermore, Judge Tynes did not have an opportunity to hear the testimony of Mrs. Drake regarding her husband's non-violent history and personality, and her willingness to serve as a third-party custodian and to post their home as security for a bond.

Under the circumstances, it is not surprising that Judge Tynes and I reached different conclusions on pretrial release of Drake. Of note is Judge Tynes' own statement suggesting that there might be more to the issue than was put before her. She stated, "If further evidence should come out that is new that hasn't been brought to [**38]  my attention, the statute provides the defendant can file a Motion for Reconsideration of this bail determination." [18]

A bail determination under the Act is intensely fact-driven. The record shows that the parties failed to provide Magistrate Judge Tynes with the detail and range of information which was provided to me. I therefore conclude that the government's reliance upon the previous detention order is misplaced.

Turning to the recommendations of the two Probation Officers, such recommendations are not meant to represent an analysis under the Bail Reform Act. They are intended only to aid the court in its determination of certain factors highlighted by the Act.

Probation Officer Marc Coleman acknowledged at the August 27 detention hearing that the charges in question carry only maximum penalties of up to five and ten years respectively. He also testified that Drake had an unblemished personal history. He admitted that his recommendation of detention was almost exclusively based [**39]  upon the nature of the crime charged. While he did not believe there was a statutory presumption against Drake's release, he felt that "perhaps the Congress may have let this slip by." [19]

The point needs no elaboration that the court's duty is to apply the law as it is written by Congress. The information provided by both probation officers was

---

[18] Tr. 8/12/97, p.17-18.

[19] Tr. 8/27/97 at p. 81, line 11-12.

Page 11 of 17

986 F. Supp. 385, *398; 1997 U.S. Dist. LEXIS 18778, **39

certainly helpful to the court in its underlying factual determinations. However, the recommendation of the Probation Office is just that: a non-binding recommendation. The ultimate bail decision lies with the court, after careful consideration of the facts and the law.

[*399] *E. The Issue of Danger*

**(1) Drake is not a danger**

It should first be noted that the government does not contend that Drake is a flight risk. Detention is sought solely on the ground that no conditions of release can reasonably assure the safety of Parker, Nichols, FBI Agent Batiste, and the Belize CI. This contention must be supported by "clear and [**40] convincing evidence." 18 U.S.C. 1342(f).

The government presented no evidence that Drake has any personal motive or vendetta against the purported victims in this case. To the contrary, Agent Batiste, the undercover FBI agent who posed as the second "hit man" testified that Drake was a facilitator to Barnett. Drake delivered a package of information to the CIs, and he drove them hurriedly past Ernest Parker's home. Throughout, he was extremely nervous. Agent Batiste admitted that Drake appeared to be a reluctant participant in the scheme. [20] This is corroborated by the government's tapes, which contain a conversation in which the two "hit men" tell Barnett that Drake was behaving as if he were the target of the hit.

The wife of one of the purported targets, Midge Parker, testified that she had never met Drake before and knew nothing about him except what she had read in the paper. No evidence was presented of a relationship between Drake and either of the victims. Evidence also shows [**41] that the Belize CI is not in the country. Thus, Drake's release does not pose a danger to him.

Under these circumstances, there is no basis to conclude that Barnett poses a danger to any person or the community. The court can obviate any lingering concerns by imposing stringent release conditions tied to a bond secured by Drake's home, the rural property he owns, and the home of his son. The bond will be forfeitable upon violation of any condition of release.

**(2) "Reasonable Assurance" of Safety**

The issue of Barnett's release is a closer question. Evidence shows that Barnett was the moving force behind the alleged scheme, and that Barnett had a personal motive. Consequently, Barnett's release poses more danger than Drake's. However, the ultimate question remains the same: are there conditions of release which can reasonably assure the safety of the purported victims and the witnesses?

Judge Keeton of the District of Massachusetts posed another pertinent question: "What degree of risk, taking account of both severity of harms and probability of occurrence, is enough to constitute 'danger' in the statutory sense?" He answered the question as follows:

> The Bail Reform Act [**42] does not provide a specific, bright-line answer to this question. Instead, it prescribes a standard--"reasonably assure safety"--that requires the judicial officer to make an evaluative, judgmental determination. In using the word "danger" and phrases such as "reasonably assure safety,"
>
>> Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of safety.
>
> [United States v. Phillips, 732 F. Supp. 255, 266 (D.Mass.1990).] The judicial officer's principal sources of guidance for understanding this statutory standard are the congressional paradigms implicit in the presumptions regarding appearance and safety. They are explained as well in the legislative history* * *

 United States v. Shea, 749 F. Supp. 1162, 1167 (D.Mass. 1990).

In the instant case it is certainly within the wide realm of the possible that -- for the chance to carry out a scheme of revenge -- Barnett will disregard the conditions of release, forfeit all [**43] of his financial assets, render his 87-year old mother homeless, render his sister and brother-in-law homeless, and incur criminal penalties up to life in prison or the [*400] death penalty. However, I find this scenario implausible and unlikely.

As much as it may be desirable to eliminate even this slight possibility of danger to the community, the law

---

[20] Tr. 8/27/97, p.65-66.

Page 12 of 17

986 F. Supp. 385, *400; 1997 U.S. Dist. LEXIS 18778, **43

does not permit the court to require guarantees of safety before granting pretrial release. All that is allowed is a "reasonable assurance" of the safety of any person and the community. United States v. Fortna, 769 F.2d 243, 250 (5th Cir. 1985) citing Orta, supra, 760 F.2d at 890-92 (8th Cir.1985).

In Orta, the district court found the defendant could not be released on conditions because "they cannot guarantee that defendant will not attempt to harm witnesses * * * or will not flee the jurisdiction * * *." Id. at 889. The Eight Circuit reversed and remanded, noting that the Act does not mandate guarantees:

> In this case, the district court erred in interpreting the "reasonably assure" standard set forth in the statute as a requirement that release conditions "guarantee" community safety and the defendant's appearance. [**44] Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act. Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial. The district court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns. Further, the burden on the government in most cases to show a defendant's dangerousness and flight propensity would be lessened considerably if the government need only show by clear and convincing evidence that no release condition could "guarantee" the community's safety and by a preponderance of the evidence that no condition could "guarantee" a defendant's appearance. The structure of the statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a "guarantee" requirement atop the legal criterion erected to evaluate release conditions in individual cases.

Orta, 760 F.2d at 891-92.

There is precedent in this Circuit for the pretrial release of a defendant charged with attempted [**45] murder-for-hire. In United States v. Aron, the defendant was charged with use of interstate commerce facilities in the course of a conspiracy to commit murder-for-hire, carrying a firearm in relation to a crime of violence, and mail fraud. 904 F.2d 221 (5th Cir.1990). The court denied the government's motion for detention, and released the defendant on a $ 100,000 bond. Although

release was later revoked for a violation of conditions, the case demonstrates that the nature of the crime alone cannot be grounds for pretrial detention.

Considering the facts presented and the applicable law, I find that there are conditions of release which will more than "reasonably assure" the safety of the two purported victims and the government witnesses.

### (3) Objective Test of Danger

The danger posed by a defendant's pretrial release must be judged by an objective standard, not a subjective one. United States v. Tortora, 922 F.2d 880 (1st Cir.1990); United States v. Flores, 856 F. Supp. 1400, 1402 (E.D.Cal.1994); Orta, supra, 760 F.2d at 892 (8th Cir.1985) ("We do not believe the 'reasonably assure' standard is an unduly difficult one to apply. The judicial officer cannot [**46] require more than an objectively reasonable assurance of community safety and the defendant's appearance at trial.")

At the August 27 detention hearing on Drake, the government asked Midge Parker, Ernest Parker's wife, what emotions she felt when she learned of the alleged murder-for-hire scheme. In response to an objection, the government argued that the witness was a victim, and therefore "entitled to address the Court . . . relative to what impact the release of this man may have on her." [21] The government cited the Victim and Witness Protection Act in support of this argument, without elaboration. The government later argued that the perceptions of the intended victims were relevant to the court's determination. [22] [*401] The government was in error.

Both the Victim and Witness Protection Act (VWPA) of 1982 and the Bail Reform Act of 1984 were products of a national grass roots movement popularly known as the Victim's Rights Movement. [**47] [23] The VWPA was passed two years before the Bail Reform Act, and thus has no effect upon the standards to be followed by the court in determining pretrial release. [24] Both Acts

---

[21] Tr. 8/27/97 at p.70, lines 5-23.

[22] Tr. 8/27/97 at p.72, lines 15-17.

[23] Karen L. Kennard, The Victim's Veto: A Way to Increase Victim Impact on Criminal Case Dispositions, 77 Calif.L.Rev.417, 422 (1989).

[24] The major provisions of the VWPA were (1) to amend the Federal Rules of Criminal Procedure to require that federal judges be given a Victim Impact Statement prior to sentencing

Page 13 of 17

986 F. Supp. 385, *401; 1997 U.S. Dist. LEXIS 18778, **47

contained provisions to increase the role of victims in the criminal justice system. The Bail Reform Act did this by including danger to the community as one of the factors to be considered by the court. Still, danger to the community must be judged by an objective standard, not a subjective one.

[**48] Testimony of a family member of an intended murder victim is relevant to a bail determination when the member has relevant information, e.g., bearing upon the motive of the defendant, the history of the relationship between the defendant and the victim, or statements made by the relevant parties. However, Mrs. Parker admitted that she knew nothing about Drake other than what she read in the paper, and had never met him. She was called solely to testify regarding her personal feelings and perceptions that her family would be endangered by the release of either defendant, regardless of the conditions imposed. [25]

The court is extremely conscious of the importance of the safety issues presented, and is sensitive to the feelings of fear and vulnerability which the Parkers and the Nichols must be experiencing. The concerns of these families [**49] are valid and understandable. The undersigned would not order release if there was a reasonable possibility that either defendant would commit a crime while on release. The nature and amount of the bonds to be set, and the stringent conditions of release, will reasonably assure the compliance of the defendants.

### F. Is Barnett "Irrational?"

The government contends that Barnett should not be released because he still has a strong motive to harm Parker and Nichols, and will also likely try to harm the

criminals; (2) to amend Title 18 of the U.S. Code to require restitution for crimes involving loss of property or personal injury; (3) to amend Title 28, the Federal Tort Claims Act, to make the federal government civilly liable for bodily injury caused by a "dangerous person" who has either escaped or been released from federal custody where the government is found to be "grossly negligent"; (4) to require the Attorney General to prepare guidelines for the fair treatment of victims of federal crimes; and (5) to require that the Attorney General recommend legislation requiring that restitution be made to the victim before a federal felon may profit from his crime's notoriety, S.REP. NO. 97-532, at 9-10 (1982).

[25] The government was partially successful in this tactic; the local newspaper parlayed the testimony into a sensational and misleading headline which appeared the following day.

Belize CI and the undercover FBI agent involved in the investigation. The government argues that Barnett is "fueled by hate, vengeance and retribution" against Parker and Nichols, and that Barnett's thinking is "clouded." The government contends that Barnett cannot be motivated to comply with conditions of release because he doesn't think like a normal person; he is irrational.

The tapes I heard support the government's theory that Barnett has a long-standing hatred of Parker. On the tape marked "July 11, 1997," Barnett makes the statement that Parker "deserves to die." He indicates that he had tried once before to hire someone to harm or kill Parker, but the plan fell through. [**50] He states that at times he thinks he should just injure Parker, and at other times he thinks "dying" is the best thing. Barnett states he is "committed to getting it done" and that he just needs to "find the right guy." He states he has spent a lot of time thinking about it, and he knows how to build a silencer.

The recorded conversations establish that Barnett has, or at least had, a strong desire to see harm and even death come to his [*402] intended victims -- particularly Parker. Although the government presented no evidence to explain Barnett's motive, I obtained and reviewed copies of two civil suits filed by Barnett against Parker and Nichols which have been widely discussed in the news media. The first suit was filed on November 22, 1991 by Barnett and his corporation, Marsh Engineering, Inc., against Parker and Nichols. It alleges that Parker fraudulently induced Barnett and his corporation to transfer to Parker a valuable 25% stock ownership in Campbell Wells, Inc. and a 25% interest in CAMCO-85, a partnership. At the time, Parker, Nichols, and a third investor, William C. Davis, also owned 25% shares along with Barnett.

The complaint alleges that Parker was Barnett's attorney [**51] at the time, that Barnett trusted Parker, and that Barnett transferred the property upon Parker's false representation that he would hold it in trust until some financial difficulties Barnett was experiencing could be worked out. Instead, Parker and Nichols allegedly converted the property into other valuable holdings and have refused to return Barnett's property to him or otherwise account for it.

Barnett filed a similar suit individually against Logan Nichols on December 16, 1996. The suit was based upon the same facts, and alleged that Nichols was aware of the fraudulent means used by Parker to obtain

Page 14 of 17

986 F. Supp. 385, *402; 1997 U.S. Dist. LEXIS 18778, **51

the property.

It appears that Barnett's motive, if any, emanates from these events, and that he bears an animosity toward Parker and Nichols. However, the government has failed to present any evidence that Barnett's negative feelings toward his purported victims cannot be counterbalanced by concern for his family and their property, concern for his own financial welfare, and awareness of the huge disparity in criminal penalties between the charges he faces and the charges he might face it he injures the purported victims while on release.

Just as a person may be motivated by hate, [**52] he can also be motivated by love, friendship, loyalty, fear, and self-interest. These are the principles upon which the Bail Reform Act are based: that most people can be released on some combination of bond conditions which will insure the safety of the community and their appearance at trial.

The concept of criminal motive is based upon the theory that rational people may be motivated to do things by a variety of emotions. When people are motivated to do good things at their own personal expense, we do not say they are irrational. Likewise, when people do illegal or immoral things out of hate or desire for revenge, they are not necessarily irrational or insane.

As mentioned, one of the obvious disincentives for the defendant to carry through any plan he may have had to harm the intended victims is the effect on the criminal penalties he is facing. The Probation Office, at my request, did a rough calculation of the Sentencing Guidelines which would apply to the current charges. If the defendants plead guilty to both counts, the sentencing range would be roughly between 7.25 and 8.75 years.

If the defendants were to retaliate against a government witness, including Parker and Nichols [**53] in this case, they would face a possible sentence of death or life imprisonment under 18 U.S.C. § 1513, if the person involved is killed in a premeditated fashion. In the case of an attempt to kill someone, the maximum penalty is twenty years imprisonment under § 1513.

Likewise, under state law, second degree murder carries a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1(B).

The cited penalties are substantially more serious than those the defendants are currently facing. I conclude

that the likelihood that either defendant will risk exposure to these penalties is extremely minute. Furthermore, the chance that these defendants could get away with any form of physical attack -- direct or indirect -- upon the purported victims or witnesses in this case is nonexistent. This case has generated sensational headlines and much publicity. One of the purported victims, Parker, is a co-owner of the popular Ice Gators ice hockey team. Defendants would indeed have to be irrational [*403] to attempt anything while on pretrial release. The government has offered no evidence that either defendant suffers from a [**54] mental disease or defect which would impede their ability to rationally consider these consequences.

To detain a defendant prior to trial, the court must find by "clear and convincing evidence" that "there is no condition or combination of conditions which will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). "Clear and convincing evidence" is more than a preponderance of the evidence and less than "beyond a reasonable doubt." United States v. Chimurenga, 760 F.2d 400 (2nd Cir. 198). "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." Id.

Considering the testimony and other evidence presented, I conclude that the government has failed to prove by clear and convincing evidence that there are no conditions of release which will reasonably assure Barnett's appearance and the safety of the purported victims, the CIs and the community.

### G. Authority for Appearance/Compliance Bond

Under the Bail Reform Act, bond forfeiture is limited to instances of non-appearance. Title 18 U.S.C. § 3146(d). Under the Act, the court has only two [**55] remedies when a defendant violates a condition of his release short of non-appearance: (1) revocation of release and entry of an order of detention; and (2) prosecution for contempt of court. See 18 U.S.C. § 3148.

There is authority outside of the Bail Reform Act, however, for the forfeiture of posted security as a consequence of any violation of a bond condition. Rule 46(e)(1) of the Federal Rules of Criminal Procedure states: "If there is a breach of condition of a bond, the district court shall declare a forfeiture of the bail." Citing Rule 46(e), the Fifth Circuit has twice allowed bond forfeiture for a violation of travel restrictions. United States v. Dunn, 781 F.2d 447 (5th Cir. 1986); Brown v.

Page 15 of 17

986 F. Supp. 385, *403; 1997 U.S. Dist. LEXIS 18778, **55

United States, 410 F.2d 212, 218 (5th Cir.), cert. denied, 396 U.S. 932, 90 S. Ct.272, 24 L. Ed. 2d 230 (1969). Brown held that a court can forfeit a bond under Rule 46(e) regardless of the provisions of the Bail Reform Act, as long as the condition was explicitly made a part of the bond.

In a more recent case, the Tenth Circuit noted that a court can incorporate the "Order Setting Conditions of Release (AO Form 199A) into the Appearance Bond (AO Form 98) so that violation [**56] of a release condition results in bond forfeiture. United States v. Dudley, 62 F.3d 1275, 1278 (10th Cir.1995). Because the lower court had not incorporated the two forms, forfeiture in that case was not authorized. However the court noted that an appearance bond is a contract and that "the bond could be conditioned on the same factors as contained in the order setting conditions of release." Id. (emphasis supplied). The court cites the Brown case as well as several other cases as authority.

Considering the foregoing authorities, I have modified AO Form 98 ("Appearance Bond") into an "Appearance and Compliance Bond" which by its own terms incorporates the stringent conditions of release and authorizes bond forfeiture for a violation of any release condition.

## 5. Order Setting Conditions of Release as to each defendant

### A. Barnett

It is hereby ORDERED that Barnett may secure his release under the following conditions:

1. Barnett and his sureties shall execute an Appearance and Compliance Bond in the amount of $ 500,000.

2. The bond sureties shall include Barnett's wife, Kay Lewis Barnett; his mother, Margie Barnett Enis; his sister Dinah [**57] Brazzel, and Mrs. Brazzel's husband.

3. The bond shall be secured by the full unencumbered value of the mobile home owned by Mrs. Enis (approximately $ 30,000); by the full unencumbered value of Mr. and Mrs. Brazzel's home and the 2 1/2 acre tract of land on which it sits (along with Mrs. Enis' [*404] mobile home) (approximate value $ 100,000); and by Barnett's own assets as listed in the letter of counsel dated August 28, 1997 and filed with the Clerk,

such assets totaling approximately $ 69,030.59. In addition, Barnett shall post as security stock holdings in Mitchell Trading Co.

4. Barnett shall execute a power of attorney in favor of his sister, Dinah Brazzel, which shall expressly direct and authorize Mrs. Brazzel to forfeit and surrender all assets owned by Barnett which are posted as bond security in the event the court finds Barnett has violated a material condition of release or has failed to appear.

5. The Appearance and Compliance Bond will provide that forfeiture of the posted securities will occur if Barnett fails to appear as ordered, or fails to comply with a condition of release as set forth in the Order Setting Conditions of Release (AO Form 199A);

6. [**58] Defendant and his wife, as third party custodian, shall sign an "Order Setting Conditions of Release" (AO199A), the terms of which will be incorporated into the Appearance and Compliance Bond. The specific conditions of release to be imposed in the "Order Setting Conditions of Release" are as follows:

  a. Defendant will be placed into the third-party custody of his wife, Kay Lewis Barnett, who will be responsible for supervising the defendant in accordance with all conditions of his release, using every effort to assure his appearance, and notifying the court immediately in the event he violates any release condition or disappears;

  b. The defendant shall maintain or actively seek employment;

  c. The defendant shall restrict his travel to Lafayette Parish;

  d. The defendant shall avoid all contact with the following individuals or their families: Ernest Parker, Logan Nichols, Virgil R. Drake, the FBI agents involved, and the confidential source;

  e. The defendant shall report on a regular basis to the Probation Office as directed;

  f. The defendant shall comply with a curfew from 6:00 p.m. to 7:00 a.m., which may be electronically monitored by the Probation [**59] Office.

  g. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon;

  h. The defendant shall refrain from excessive use of alcohol, and any use or unlawful possession of a narcotic drugs and other controlled substances defined in 21 U.S.C. § 802 unless prescribed by a licensed medical practitioner;

Page 16 of 17

986 F. Supp. 385, *404; 1997 U.S. Dist. LEXIS 18778, **59

i. The defendant shall obtain no passport and shall surrender any current passport to the Clerk of Court.

### B. Drake

The conditions of release previously set forth herein will remain in effect for Drake. (See pp. 7-8 *supra*).

### C. Bond Forms

To assist the court on review, I have attached hereto the bond documents which must be executed by the defendants. Other legal documents will be required to secure the real and personal property to the bond documents. Counsel has already been furnished with the list of items required for securing the real property.

### 6. Order of Stay

This ruling is hereby STAYED pending review by the district judge under 18 U.S.C. § 3145(a). In the event no request for review is filed within ten days of this date, this order shall be effective and defendants may be released [**60] after execution of the necessary documents.

 [*405] IT IS FURTHER ORDERED that the Clerk shall FAX a copy of this ruling to all counsel of record.

Signed at Lafayette, Louisiana on September 16, 1997.

Mildred E. Methvin

United States Magistrate Judge

705 Jefferson St., Suite 207

Lafayette, LA 70501

(318)          262-6651          FAX          262-6653

Page 17 of 17

986 F. Supp. 385, *405; 1997 U.S. Dist. LEXIS 18778, **60

**Table1** ([Return to related document text](#))

| CHARGE | MAXIMUM SENTENCE |
|---|---|
| COUNT I. | |
| Conspiracy to travel and cause another a to travel in interstate commerce with | Up to five years in prison, or fine of $ 250,000, or both; plus a term of supervised release of up |
| the intent that murder for hire be committed. 18 U.S.C. § 371 and § 1958 | to 3 years; plus a $ 100 special assessment. |
| COUNT II. | MAXIMUM SENTENCE |
| Interstate travel and use of interstate facilities with intent that murder for hire be committed. 18 U.S.C. § 1958. | Up to ten years in prison, or a fine of $ 250,000, or both; plus a supervised release term of up to 3 years; plus a $ 100 special assessment. |

**Table1** ([Return to related document text](#))

**End of Document**

# United States v. Orta

United States Court of Appeals for the Eighth Circuit

January 17, 1985, Submitted ; April 29, 1985, Decided

No. 84-2530

**Reporter**

760 F.2d 887 *; 1985 U.S. App. LEXIS 31022 **

United States of America, Appellee, v. Storie Lynn Orta, Appellant

**Prior History: [**1]**   Appeal from the United States District Court for the Eastern District of Missouri.

**Counsel:** Counsel for Appellant, Donald Wolff, St. Louis, Missouri.

Counsel for Appellee, Sam Rosenthal, JD, Washington, District of Columbia.

**Judges:** Lay, Chief Judge, Heaney, Bright, Ross, McMillian, Arnold, Gibson, Fagg, and Bowman, Circuit Judges. Gibson, Circuit Judge, with whom Ross and Fagg, Circuit Judges, join, concurring in part, and dissenting.

**Opinion by:** LAY

# Opinion

 **[*887]** LAY, Chief Judge

Storie Lynn Orta appeals from a district **[*888]** court [1] **[**2]** order accepting a magistrate's [2] recommendation that Orta be detained before trial pursuant to the pretrial detention provision of the Bail Reform Act of 1984. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, tit. II, ch. I, Sec. 203, 1984 U.S. Code Cong. & Ad. News (98 Stat.) 1976, 1978-79 (to be codified at 18 U.S.C. § 3142(e)). [3] This court en banc heard Orta's appeal on January 17, 1985, and entered an order on

---

[1] The Honorable John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri.

[2] The Honorable David D. Noce, United States Magistrate for the Eastern District of Missouri.

[3] Provisions of the Bail Reform Act of 1984 are cited by future United States Code sections. Section 3142 of the Bail Reform Act of 1984 is included as an appendix to this opinion.

January 21, 1985 remanding to the district court its detention order. This opinion follows as a more complete exposition of the issues involved and the reasoning supporting our order of January 21. [4]

 **[**3]** A. Facts and Procedural History

On November 1, 1984, Storie Lynn Orta was arrested on a federal complaint charging her with conspiracy to possess and intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846 (1982). Bail was set at $500,000. At the time of her arrest, Orta was approximately five months pregnant. The grand jury indictment charging Orta was filed on November 8, 1984. On the same day, Orta filed a motion to reduce bond and the United States moved for a pretrial detention hearing pursuant to 18 U.S.C. § 3142(f)(2).

---

[4] The January 21st order reads:

> Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, John R. GIBSON, FAGG, and BOWMAN, Circuit Judges.
>
> ORDER
>
> On December 14, 1984, we remanded this case to the district court to determine whether Orta's activities could be adequately monitored so as to justify her release prior to trial. On remand, the district judge concluded that the United States Marshal's Service and the United States Probation Office could not "*guarantee* that defendant will not attempt to harm witnesses * * * or flee the jurisdiction * * *" and that anything "less than a *guarantee* * * * is neither adequate nor reasonable." Consequently, the district judge denied Orta's release.
>
> We conclude that the district judge applied an incorrect legal standard in ordering Orta's detention pending trial. The Bail Reform Act of 1984 provides that "if, after a hearing * * the judicial officer finds that no condition or combination of conditions *will reasonably assure* the appearance of the person as required and the safety of any other person and the community," the person shall be ordered detained prior to trial. 18 U.S.C. § 3142(e). The legal standard required by the Act is one of

The presiding magistrate held Orta's detention hearing on November 8, 1984. After considering the evidence, the magistrate concluded: "no condition of release for [the] defendant, under 18 U.S.C. § 3142(b), will reasonably assure [her] appearance * * * in court as required and will protect both the public at large and any cooperating individuals from retaliation or intimidation." *United States v. Orta*, No. 84-209Cr(1), slip op. at 6 (E.D. Mo. Nov. 13, 1984). [5]

 **[\*\*4]** The district court reviewed the magistrate's detention order and denied Orta's motion for rehearing and amendment. [6] **[\*889]** The court held the "pre-trial provisions of the Bail Reform Act of 1984 were correctly applied in this case." *United States v. Orta*, No. 84-209Cr(1), slip op. at 2 (E.D. Mo. Nov. 21, 1984). [7]

---

reasonable assurances, not absolute guarantees. Consequently, we must remand this action to the district judge for further hearing and determination based on the appropriate legal standard.

A memorandum opinion addressing the issues upon appeal will follow.

LAY, Chief Judge, and HEANEY, BRIGHT, and McMILLIAN, Circuit Judges, concurring.

We agree that the district judge applied an incorrect legal standard and that this case should be remanded. However, we would direct the district judge to release Orta pending trial and to conduct a hearing to determine the conditions of Orta's release.

[5] We note the magistrate appears to have applied incorrectly the pretrial release provisions in Orta's November 8 hearing. After finding the forms of release available under section 3142(b) will not meet the statutory safety and appearance concerns, the judicial officer must consider whether the more restrictive alternatives under section 3142(c) will assure community safety and the defendant's appearance before determining that detention is appropriate. *See infra* slip op. at 7.

[6] *See* 18 U.S.C. § 3145(b).

[7] The district court did not disagree with the magistrate's findings that Orta had once struck a woman in the head with a revolver, that several weapons and various quantities of cocaine and marijuana had been found in Orta and her husband's places of residence, that Orta had been carrying a loaded gun in her purse, and that in both the matter at issue and another incident involving Orta and her husband, witnesses had been threatened or had expressed fears of reprisal. The length of sentence Orta could receive if found guilty was considered significant in determining Orta's propensity for flight.

Orta appealed the district court's denial of her **[\*\*5]** motion to this court. On December 14, 1984, we entered an order remanding Orta's case to the district court and instructing the court:

[To determine] whether defendant's activities may be adequately monitored by the United States Marshals Service and/or by the federal probation office for the Eastern District of Missouri so that defendant is not likely to constitute any danger to the public including witnesses for the prosecution and so that her appearance in court may be assured.

*United States v. Orta*, No. 84-2530 (8th Cir. Dec. 14, 1984).

The district court directed the magistrate to conduct a second evidentiary hearing and to file a report and recommendation on the remanded issues. After the supplemental hearing, the magistrate determined the new evidence did not contradict the findings and conclusions in his original order, and recommended that Orta be denied bail.

Orta filed objections to the magistrate's report and requested a hearing before the district court. On December 28, 1984, the district court accepted the magistrate's recommendation and found that Orta's activities could not be monitored adequately to ensure compliance. The court reasoned **[\*\*6]** that probation office or Marshal Service surveillance would not be:

adequate or reasonable for the very reason that they cannot *guarantee* that defendant will not attempt to harm witnesses * * * or will not flee the jurisdiction * * * *Anything less than a guarantee* against such misconduct, especially where the record suggests that there is a *strong likelihood* of such misconduct, *is neither adequate nor reasonable*.

*United States v. Orta*, No 84-209Cr(1), slip op. at 1-2 (E.D. Mo. Dec. 28, 1984) (emphasis added).

Orta appealed the district court's order. On January 21, 1985, this court held that the district court had erred in requiring a "guarantee" that Orta would not flee or compromise the community's safety. We remanded Orta's case to the district court for further hearing based on a legal standard requiring a *reasonable assurance* of Orta's appearance and lack of danger to others.

**B. Discussion**

Orta argues on appeal that the district court's insistence on a "guarantee" she remain in the jurisdiction and pose no threat to the community is an erroneous interpretation of the pretrial detention provision of the Bail Reform Act [**7] of 1984. [8] We [*890] agree, and thus remanded this action to the district court for further consideration under the correct legal standard.

[**8] The Bail Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. I, 1984 U.S. Code Cong. & Ad. News (98 Stat.) 1976 (hereinafter cited as "the 1984 Act"), was a legislative response to growing public concern over increased crime and the perceived connection between crime and defendants released on bail. The legislative history explains that the 1984 Act:

> reflect[s] the Committee's determination that Federal bail laws must address the alarming problem of crimes committed by persons on release and must give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. The adoption of these changes marks a significant departure from the basic philosophy of the [Superseded Bail Reform Act of 1966], which is that the sole purpose of bail laws must be to assure the appearance of the defendant at judicial proceedings.

S. Rep. No. 225, 98th Cong., 1st Sess. 3, *reprinted in* 1984 U.S. Code Cong. & Ad. News 9A at 5-6.

The major differences between the superseded Bail

---

[8] Orta also challenges the pretrial detention provision on several constitutional grounds, including the fifth amendment due process clause and the eighth amendment prohibition against excessive bail. Orta did not, however, raise her constitutional arguments in the district court. Absent exceptional circumstances, we do not consider constitutional questions when unnecessary. *Dougherty v. White*, 689 F.2d 142, 144 (8th Cir. 1982). Although we intimate neither approval nor disapproval of any specific decision, we note the constitutional issues surrounding the pretrial detention provision have received attention in many of the opinions examining the Bail Reform Act of 1984. *See, e.g., United States v. Kouyoumdjian*, 601 F. Supp. 1506 (C.D. Cal. 1985); *United States v. Acevedo-Ramos*, 600 F. Supp. 501 (D.P.R. 1984), *aff'd*, 755 F.2d 203 (1st Cir. 1985); *United States v. Payden*, 598 F. Supp. 1388 (S.D.N.Y. 1984); *cf. United States v. Edwards*, 430 A.2d 1321 (D.C. App. 1981) (en banc), *cert. denied*, 455 U.S. 1022, 102 S. Ct. 1721, 72 L. Ed. 2d 141 (1982) (discussing constitutional challenges to the District of Columbia Code pretrial detention provision upon which 18 U.S.C. @ 3142 was modeled).

Reform Act and the 1984 Act pretrial release provisions relevant to this case are the prohibition against using inordinately [**9] high financial conditions to detain defendants, and the authorization to consider in determining release conditions or detention the danger a defendant may pose to the community or certain individuals. The two changes eliminate the judicial practice of employing high bail to detain defendants considered dangerous and substitute a procedure allowing the judicial officer openly to consider the threat a defendant may pose. The passage of the pretrial detention provision of the 1984 Act did not, however, signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial. Rather, Congress was demonstrating its concern about "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition [sic] of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 225, 98th Cong., 1st Sess. 6-7, *reprinted in* 1984 Code Cong. & Ad. News 9A at 9. The legislative history stresses that "the decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior [**10] to trial. * * * *It is anticipated that* [pretrial release] *will continue to be appropriate for the majority of Federal defendants." Id.*, at 7, 12 *reprinted in* 1984 U.S. Code Cong. & Ad. News 9A at 9, 15 (emphasis added).

Consistent with the intent expressed in the legislative history, the statutory scheme of 18 U.S.C. § 3142 continues to favor release over pretrial detention. Section 3142 provides four alternatives from which the judicial officer must choose: (1) release on personal recognizance or unsecured appearance bond, [9] or (2) release subject to certain conditions, [10] or (3) temporary detention to permit, among other things, revocation of conditional release, [11] or (4) pretrial detention. [12] The judicial officer most often will be deciding between the first and the second alternatives. The statutorily mandated progression from one choice to the next is critical: a judicial officer cannot determine that a detention hearing and the possible imposition of pretrial detention is appropriate merely by determining that

---

[9] *See* 18 U.S.C. § 3142(b).

[10] *See* 18 U.S.C. § 3142(c).

[11] *See* 18 U.S.C. § 3142(d).

[12] *See* 18 U.S.C. § 3142(e).

release on personal recognizance will not "reasonably assure" the defendant's appearance at trial or "will endanger" the community. The judicial [**11] officer must also consider whether one of the codified conditions or any combination of [*891] the conditions [13] will "reasonably assure" the defendant's appearance and the safety of the community. [14] The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention.

[**12] In Orta's case, the magistrate did not follow the statutory progression from release on personal recognizance to conditional release because the government moved upon Orta's arrest for an evidentiary hearing to consider the appropriateness of her release. [15] [**13] Although the hearing is designated a "detention hearing," the appellation is not completely accurate. The purpose of the hearing is to determine whether any of the release options available to defendants not immediately subject to a detention hearing will satisfy the statutory safety and appearance concerns. [16] Only if the government [17] shows by clear and convincing evidence [18] that no release condition or set of conditions will *reasonably assure* the safety of the community and [19] [**14] by a preponderance of the

---

[13] *See* 18 U.S.C. § 3142 (c) (2) (A)-(N).

[14] The difference between the legal standard set forth in subsection (b) and that found in subsections (c), (e), (f), and (g) reemphasizes congressional intent to preserve the statutory bias favoring pretrial release for most defendants. Subsection (b) directs release unless release "will not reasonably assure" the defendant's appearance, or "will endanger" the community's safety. 18 U.S.C. § 3142(b). Although the judicial officer may impose further restrictions upon a finding that the legal standard for either the flight or the danger concern is not met, a determination that a defendant's release "*will* endanger" the community will be rare. In contrast, subsections (c), (e), (f), and (g) change the legal standard to require release if any set of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community * * *." 18 U.S.C. § 3142 (c), (e), (f), (g). The change from the negative to the positive in the flight determination standard and from "will" to "will reasonably assure" in the dangerousness evaluation criterion renders it more difficult to find the defendant a flight and safety risk.

[15] *See* 18 U.S.C. § 3142(f)(2). The government is empowered to move for a detention hearing under limited circumstances. *See* 18 U.S.C. § 3142 (f)(1)(2). In this case, the government's motion was made pursuant to section 3142(f)(2).

---

evidence [20] that no condition or set of conditions under subsection (c) will *reasonably assure* the defendant's appearance can a defendant be detained before trial.

In this case, the district court erred in interpreting the "reasonably assure" standard set forth in the statute as a requirement that release conditions "guarantee" community safety and the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act. Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial. The district [*892] court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns. [21] Further, the burden on the government in

---

[16] *See* 18 U.S.C. § 3142(f), (c).

[17] Orta's indictment and charge were based on provisions of United States Code Title 21 which give rise, upon the judicial officer's finding of probable cause, to a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community. *See* 18 U.S.C. § 3142(e). We strongly encourage the finding of probable cause and the defendant's successful or failed rebuttal of the statutory presumptions be expressly discussed in cases applying section 3142(e). Further, although we do not decide the question in this case, we note the majority of cases thus far addressing the issue have held that the presumption shifts only the burden of production to the defendant; the burden of persuasion remains with the government. *See, e.g., United States v. Payden*, 598 F. Supp. 1388, 1397 (S.D.N.Y. 1984).

[18] *See* 18 U.S.C. § 3142(f).

[19] We do not decide today whether section 3142(e) requires the judicial officer to find that the defendant presents both a flight risk and a safety risk before she or he can be detained or whether the judicial officer can impose detention upon a finding of either flight or safety risk. *Cf. United States v. Kouyoumdjian*, 601 F. Supp. at 1508-10 (concluding the judicial officer can detain a defendant upon finding either flight or safety risk).

[20] The statute does not expressly state the appropriate evidentiary standard necessary to support a finding of propensity for flight, indicating the preponderance of evidence standard usually applied in pretrial proceedings is appropriate. *See United States v. Freitas*, 602 F. Supp. 1283 (N.D. Cal. 1985).

[21] We note also the passage of the Pretrial Services Act of 1982, 18 U.S.C. §§ 3152-55 (1982), only two years before the

---

most cases to show a defendant's dangerousness and flight propensity would be lessened considerably **[\*\*15]** if the government need only show by clear and convincing evidence that no release condition could "guarantee" the community's safety and by a preponderance of the evidence that no condition could "guarantee" a defendant's appearance. The structure of the statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a "guarantee" requirement atop the legal criterion erected to evaluate release conditions in individual cases.

We do not believe the "reasonably assure" standard is an unduly difficult **[\*\*16]** one to apply. The judicial officer cannot require more than an objectively reasonable assurance of community safety and the defendant's appearance at trial. This legal test ensures that, as in Storie Lynn Orta's case, defendants who can be released pending trial will be released.

We hold in this supplemental opinion the district court erred in its interpretation of the pretrial release and detention provisions of the Bail Reform Act of 1984. We thus have remanded this action for further consideration. [22]

 **[\*\*17]** It is so ordered.

 **[\*893contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the

_____

1984 Act. The Pretrial Services Act was intended to reduce both pretrial crime and the number of defendants detained unnecessarily while awaiting trial through programs increasing pretrial release supervision and services. _See_ S. Rep. No. 77, 97th Cong., 1st Sess. 1, _reprinted in_ 1982 U.S. Code Cong. & Ad. News 2377.

[22] We are informed that on remand the district court directed the magistrate to conduct a further supplemental hearing and file a report and recommendation with the district court. On January 30, 1985, the magistrate filed his report and recommendation describing conditions of release necessary to reasonably assure Orta would appear in court and would not endanger the community or particular individuals. The district court accepted the magistrate's report on February 7, 1985. On February 8, 1985, Orta agreed to comply with all the release conditions, but was unable to meet the financial security bond requirement. Because the Bail Reform Act of 1984 prohibits pretrial detention on the sole basis of an inability to satisfy a financial condition of release, _see_ 18 U.S.C. § 3142(c), Orta was released upon execution of an appearance bond.

pagination of the original published documents.]

Appendix

## § 3142. Release or detention of a defendant pending trial

(a) IN GENERAL. -- Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be --

(1) released on his personal recognizance or upon execution of an unsecured appearance bond, pursuant to the provisions of subsection (b);
(2) released on a condition or combination of conditions pursuant to the provisions of subsection (c);
(3) temporarily detained to permit revocation of conditional release, deportation, or exclusion pursuant to the provisions of subsection (d); or
(4) detained pursuant to the provisions of subsection (e).

(b) RELEASE ON PERSONAL RECOGNIZANCE OR UNSECURED APPEARANCE BOND. -- The judicial officer shall order the pretrial release of the person on his personal recognizance, or upon execution of an unsecured appearance bond in an amount specified **[\*\*18]** by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of his release, unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.

(c) RELEASE ON CONDITIONS. -- If the judicial officer determines that the release described in subsection (b) will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, he shall order the pretrial release of the person --

(1) subject to the condition that the person not commit a Federal, State, or local crime during the period of release; and
(2) subject to the least restrictive further condition, or combination of conditions, that he determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person --

(A) remain in the custody of a designated person, who agrees to supervise him and to

report any violation of a release condition to the court, if the designated person **[**19]** is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

(B) maintain employment, or, if unemployed, actively seek employment;

(C) maintain or commence an educational program;

(D) abide by specified restrictions on his personal associations, place of abode, or travel;

(E) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

(F) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

**[*894]** (G) comply with a specified curfew;

(H) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(I) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

(J) undergo available medical or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

(K) execute **[**20]** an agreement to forfeit upon failing to appear as required, such designated property, including money, as is reasonably necessary to assure the appearance of the person as required, and post with the court such indicia of ownership of the property or such percentage of the money as the judicial officer may specify;

(L) execute a bail bond with solvent sureties in such amount as is reasonably necessary to assure the appearance of the person as required;

(M) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

(N) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to

assure the safety of any other person and the community.

The judicial officer may not impose a financial condition that results in the pretrial detention of the person. The judicial officer may at any time amend his order to impose additional or different conditions of release.

(d) TEMPORARY DETENTION TO PERMIT REVOCATION OF CONDITIONAL RELEASE, DEPORTATION, OR EXCLUSION. -- If the judicial officer determines that --

(1) the person --

(A) is, and was at the time the **[**21]** offense was committed, on --

(i) release pending trial for a felony under Federal, State, or local law;

(ii) release pending imposition or execution of sentence, appeal of sentence or conviction, or completion of sentence, for any offense under Federal, State, or local law; or

(iii) probation or parole for any offense under Federal, State, or local law; or

(B) is not a citizen of the United States or lawfully admitted for permanent residence, as defined in section 101(a) (20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)); and

(2) the person may flee or pose a danger or any other person or the community;

he shall order the detention of the person, for a period of not more than ten days, excluding Saturdays, Sundays, and holidays, and direct the attorney for the Government to notify the appropriate court, probation or parole official, or State or local law enforcement official, or the appropriate official of the Immigration and Naturalization Service. If the official fails or declines to take the person into custody during that period, the person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability **[**22]** of other provisions of law governing release pending trial or deportation or exclusion proceedings. If temporary detention is sought under paragraph (1)(B), the person has the burden of proving to the court that he is a citizen of the United States or is lawfully admitted for permanent residence.

(e) DETENTION. -- If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he

shall order the detention of the person prior to trial. In a case described in (f)(1), a rebuttable **[*895]** presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community if the judge finds that --

(1) the person has been convicted of a Federal offense that is described in subsection (f)(1), or of State or local offense that would have been an offense described in subsection (f)(1) if a circumstance giving rise to Federal jurisdiction had existed;

(2) the offense described in paragraph (1) was committed while the person was on release **[**23]** pending trial for a Federal, State, or local offense; and

(3) a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the offense described in paragraph (1), whichever is later.

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), section 1 of the Act of September 15, 1980 (21 U.S.C. 955a), or an offense under section 924(c) of title 18 of the United States Code.

(f) DETENTION HEARING. -- The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community in **[**24]** a case --

(1) upon motion of the attorney for the Government, that involves --

(A) a crime of violence;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or section 1 of the Act of September 15, 1980 (21 U.S.C. 955a); or

(D) any felony committed after the person had been convicted of two or more prior offense described in subparagraphs (A) through (C), or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) if a circumstance giving rise to Federal jurisdiction had existed; or

(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, that involves --

(A) a serious risk that the person will flee;

(B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The hearing **[**25]** shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of the person may not exceed five days, and a continuance on motion of the attorney for the Government may not exceed three days. During a continuance, the person shall be detained, and the judicial officer, on motion of the attorney for the Government or on his own motion, may order that, while in custody, a person who appears to be a narcotics addict receive a medical examination to determine whether he is an addict. At the hearing, the person has the right to be represented by counsel, and if he is financially unable to obtain adequate representation, to have counsel appointed for him. The person shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by **[*896]** proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer **[**26]** uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. The person may be detained pending completion of the hearing.

(g) FACTORS TO BE CONSIDERED. -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning --

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including --

    (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, he **[**27]** was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(2)(K) or (c)(2)(L), the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potention forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

(h) CONTENTS OF RELEASE ORDER. -- In a release order issued pursuant to the provisions of subsection (b) or (c), the judicial officer shall --

(1) include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and

(2) advise the person of --

    (A) the penalties for **[**28]** violating a condition of release, including the penalties for committing an offense while on pretrial release;

    (B) the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and

    (C) the provisions of sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investigations), 1512

(tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim, or an informant).

(i) CONTENTS OF DETENTION ORDER. -- In a detention order issued pursuant to the provisions of subsection (e), the judicial officer shall --

    (1) include written findings of fact and a written statement of the reasons for the detention;

    (2) direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

    (3) direct that the person be afforded reasonable opportunity for private consultation with his counsel; and

    (4) direct that, on order of a **[**29]** court of the United States or on request of an **[*897]** attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding.

The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

(j) PRESUMPTION OF INNOCENCE. -- Nothing in this section shall be construed as modifying or limiting the presumption of innocence.

**Concur by:** GIBSON (In Part)

**Dissent by:** GIBSON (In Part)

# Dissent

**[*892contd]**  [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.]

GIBSON, Circuit Judge, with whom ROSS and FAGG, Circuit Judges, join, concurring in part, and dissenting.

The court today correctly analyzes the provisions of 18 U.S.C. § 3142 and **[**30]** further correctly holds that the

district court improperly required a "guarantee" which is beyond the language of the statute.

The evidence before the magistrate, however, was sufficient to sustain the findings that had earlier been made that no condition for release would protect both the public at large and any cooperating individuals from retaliation or intimidation. Accordingly, I would affirm the order of the district court denying pretrial release.

While appellant's condition calls for concern and even sympathy as she was five months pregnant when arrested, the district court did not err in determining that she posed a potential danger to the community. The court in footnote 7 sets forth a number of facts in the record. The magistrate found a number of other facts that are of extreme significance. Not only was appellant carrying a loaded gun in her purse when she was arrested but another loaded revolver, a loaded shotgun, and yet another revolver were seized when she and her husband were arrested. There was evidence that she was sitting on one of the weapons when arrested. The magistrate found that Mrs. Orta and her husband were engaged in an armed confrontation with a person **[**31]** in another vehicle, although no weapons were fired. A loaded revolver belonging to Mrs. Orta was later found in their vehicle. The magistrate found that **[*893]** the Ortas resided in a home from which some fifteen to twenty shots were fired, some of which penetrated the walls of the house next door. On that occasion two Uzi semi-automatic rifles, which had been purchased by Mrs. Orta, were seized from the Ortas' vehicle. On two occasions witnesses expressed fear of reprisal. The court acknowledges the finding that Mrs. Orta struck a woman in the head with a pistol. This evidence is sufficient to support the finding that Mrs. Orta had endangered the public at large by the use of firearms. While appellant was an expectant mother when arrested, the public is entitled to protection from pistol-carrying mothers-to-be who have in the past shown propensities to use weapons.

Because the order denying release was properly ruled by the district court before the remand that led to the utilization of the improper legal standard, I would affirm and deny release.

# United States v. Ross

United States District Court for the Southern District of Ohio, Eastern Division

January 31, 2007, Filed

Case No. 2:07-mj-0022

**Reporter**
2007 U.S. Dist. LEXIS 10992 *; 2007 WL 397115

United States of America, Plaintiff, v. Carolyn Ross, Defendant.

**Counsel:** [*1] For Carolyn Ross (1), Defendant: Steven Scott Nolder, LEAD ATTORNEY, Federal Public Defender, Columbus, OH.

For USA, Plaintiff: Gary L. Spartis, LEAD ATTORNEY, United States Attorney's Office - 2, Columbus, OH.

**Judges:** Terence P. Kemp, United States Magistrate Judge.

**Opinion by:** Terence P. Kemp

# Opinion

*ORDER*

The above defendant appeared before the Court for a detention hearing on January 29, 2007. Following the hearing, the Court requested the parties to brief two issues: whether a rebuttable presumption of detention applies to this case, and whether other courts have established bond conditions, or denied release, to defendants charged with capital murder. Those briefs have now been filed. For the following reasons, the Court concludes that there are conditions of release which adequately assure the safety of the community and insure the defendant's appearance at future court proceedings. Consequently, the Court will enter an order of release.

The factual background of this case comes mainly from the superseding indictment which was returned in the Western District of Michigan on January 25, 2007. Defendant, along with Jeremiah Sims, is charged with being part of a murder-for-hire conspiracy [*2] that resulted in the death of Chrissy Satterfield on August 5, 1996. The indictment alleges that defendant agreed to pay another individual, Joshshan Childs, to kill Ms. Satterfield, and that Childs and Sims carried out the murder after crossing state lines to do so. The indictment also contains death-penalty specifications against Ms. Ross. Although the indictment does not provide additional details of the crime, the United States presented testimony at the detention hearing (which was relayed to the witness by the case agent in Michigan) that Ms. Ross's husband was allegedly having an affair with Ms. Satterfield, a teenager, and that Ms. Ross offered Mr. Childs money to kill both Ms. Satterfield and her husband. Mr. Childs has been convicted of murder, and Mr. Sims is awaiting trial.

Ms. Ross's background, as revealed in the Pretrial Services report, will be set forth below, as will additional facts which the Court considers to be important for this decision. The threshold legal issue, however, is what legal standard is to be applied to the United States' request for detention.

Under the Bail Reform Act, a two-step process has been established for conducting detention hearings [*3] and for determining which legal standard to apply to requests for detention. 18 U.S.C. § 3142(f) provides that the United States is entitled to a detention hearing in certain kinds of cases, which include cases such as this one where the defendant is accused of both a crime of violence and an offense which carries a potential death sentence. 18 U.S.C. § 3142(f)(1)(A), (B). Section 3142(e) provides that if the Court determines, after a detention hearing, that no conditions or combination of conditions, will reasonably assure the appearance of the defendant or protect either specific individuals or the community from a risk of harm, the Court shall order the defendant detained without bond. In making that decision, the Court must apply a rebuttable presumption against release in certain classes of cases specified in § 3142(e). Those include cases described in § 3142(f)(1), such as this case, but only if the Court finds that the defendant has been previously convicted of such offense, that the offense was committed while the person was on pretrial release, and the instant offense was committed within five years of the previous offense. [*4] Otherwise, the presumption applies only in certain drug, firearm, and terrorism cases, and cases involving

minor victims, that are specifically detailed in § 3142(e). Capital murder is not one of those offenses. *See United States v. Eischeid,* 315 F.Supp.2d 1033 (D.Ariz. 2003). Consequently, the United States' request for detention is evaluated without reference to any presumptions, and the United States must demonstrate by clear and convincing evidence that the defendant is a danger to the community or must show by a preponderance of the evidence that the person sought to be detained is a serious risk of flight.

In making the determination about whether the United States has met its burden of proof, the Court is required to look at the factors described in 18 U.S.C. § 3142(g). That section of the Act requires the judicial officer to consider available information concerning (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, and (4) the nature and seriousness [*5] of the danger to any person or the community that would be posed by the person's release. *See, e.g., United States v. Arvanitis,* 676 F. Supp. 840 (N.D.Ill. 1987). Detention may be ordered based upon a finding that the defendant is likely to continue to engage in criminal activity which poses a threat either to the community or to the safety of particular persons, and such circumstances are not limited to proof that the defendant poses a serious risk either to obstruct justice or to intimidate or injure a prospective witness or juror. *See, e.g., United States v. Daniels,* 772 F.2d 382 (7th Cir. 1985); *United States v. Yeaple,* 605 F.Supp. 85 (M.D.Pa. 1985).

Taking these factors in order, the nature and circumstances of the offense clearly favor the United States. The crime charged is a crime of violence and represents one of the most serious crimes a defendant can be charged with in the federal system. "Other courts have given considerable weight to the prospect of the death penalty in assessing whether a defendant has an incentive to flee. *See United States v. Gonzales,* 995 F.Supp. 1299, 1302 (D.N.M.1998) (death penalty [*6] creates "strong incentive to flee prior to trial"); *United States v. Nichols,* 897 F.Supp. 542, 547 (W.D.Okl.1995)(same)." *United States v. Eischeid,* 315 F.Supp.2d at 1037. The weight of the evidence is a neutral factor here. There is an indictment, so a grand jury has found probable cause, but no direct evidence was presented at the detention hearing, so the Court cannot evaluate this factor beyond noting that a probable cause showing has been made.

With respect to the characteristics of the defendant, the Pretrial Services report reveals the following. Ms. Ross has resided in the Columbus area for at least ten years. She is 44 years old. She had been gainfully employed for most of her adult life, and currently works as an aide at an assisted living facility, a job she had held for more than four years. She lives with her fiance of seven years in his home. She has three children, all of whom reside in Columbus, and the youngest of whom still resides with her mother. She has no record of substance abuse, and her criminal record includes only traffic offenses, the last of which occurred more than seven years ago. These factors strongly favor the defendant.

[*7] The United States did not present any evidence that the defendant is a current threat to any specific member of the community or to the community generally. Although there was mention made of an attempt to have her ex-husband murdered in 1996, there was no evidence that the defendant currently poses a threat to Mr. Ross. Further, apart from the instant offense, there was no evidence presented that she is generally a danger to the community.

Finally, there was evidence presented that the defendant has been aware for a substantial period of time that she might face charges in this case. She has been interviewed on at least four occasions by an FBI agent, and was aware of the case pending in Michigan. She made no effort, however, to conceal her whereabouts, and has maintained the same address for approximately seven years. Certainly, there is a difference between being generally aware of the possibility of facing a criminal charge and being indicted for an offense that potentially carries the death penalty. However, the defendant's awareness of the charge and the fact that she has made no effort to avoid apprehension or prosecution are factors that favor the setting of release conditions. [*8] The Court also notes that she appears to have substantial support from family, friends, and co-workers who would be of assistance in assuring that she continues to face these charges responsibly. Finally, at least two other courts have established conditions of release in similar cases based upon similar factors. *See United States v. Eischeid, supra* ("The Court is reluctant to conclude that a serious flight risk must be found in an otherwise stable life solely because the charge asserted by the Government carries the death penalty"); *cf. United States v. Barnett,* 986 F.Supp. 385 (W.D. La. 1997)(setting bond conditions for two defendants involved in attempted murder-for-hire scheme).

Taking all of these factors together, the Court finds that the United States simply has not proved that there are no release conditions that would assure either the defendant's appearance or the safety of the community. The release conditions should necessarily be strict, however, given the seriousness of the charges pending. The Pretrial Services office has recommended conditions which include electronic monitoring, travel restrictions, and pretrial supervision. The Court [*9] concludes that a monetary bond should also be imposed. Therefore, the Court will enter an order of release that incorporates all of the recommended conditions of release but, in addition, requires the posting of a $ 200,000.00 unsecured bond with a ten percent deposit. The Court finds that this combination of conditions will be sufficient to assure the safety of the community and the appearance of the defendant at future court proceedings.

The Clerk is directed to set a time for an in-court hearing where the release conditions can be explained to the defendant and her signature on the bond can be obtained.

/s/ Terence P. Kemp

United States Magistrate Judge

_____

**End of Document**