IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:18-CR-452-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | UNITED STATES' RESPONSE TO |
| | ) | DEFENDANT LEONID TEYF's MOTION |
| | ) | FOR REVOCATION OF DETENTION |
| LEONID ISAAKOVICH TEYF, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to Defendant's motion for revocation of the pre-trial detention order by Magistrate Judge Robert E. Numbers, II. Magistrate Judge Numbers made no error in fact or law in concluding the defendant should be detained, and the factors to be considered by the Court in addressing this issue point conclusively to the need for continued detention.

## STATEMENT OF THE CASE

The defendant has been charged by Criminal Indictment with multiple instances of Money Laundering under 18 U.S.C. § 1957; Conspiring to do the same under 18 U.S.C. § 1956(h); Bribery of a Public Official and Aiding and Abetting under 18 U.S.C. §§ 201(b)(1) and 2; Murder for Hire and Aiding and Abetting under 18 U.S.C. §§ 1958 and 2; Possession of a Firearm with Obliterated Serial Number under 18 U.S.C. §§ 922(k) and 924 (a)(1)(B); Conspiracy to Harbor Illegal Aliens under 8 U.S.C. § 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(A)(v)(II); and Visa Fraud under 18 U.S.C. § 1546(a).[1]

At defendant's initial appearance on 6 December 2018, the Government moved for detention pending trial. At the subsequent detention hearing, which took place on

---

[1] *See* Superseding Indictment at DE 20.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 1 of 21

18 December 2019, the Government elicited the testimony of Special Agent Dennis Kinney of the Federal Bureau of Investigation (FBI), and entered approximately 17 exhibits. The defendant offered two exhibits regarding property ownership, and then named, but withdrew, Grigory Teyf as a proposed third-party custodian.[2] Following the hearing, the magistrate judge granted the Government's motion for detention and remanded defendant to the custody of the U.S. Marshal pending trial.

On 3 January 2019, the defendant filed a motion to this court seeking review of the detention decision.[3]

## LEGAL FRAMEWORK

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, states that a defendant may be detained pending trial where the United States shows "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e) and (f). Detention can be based on a showing by the United States of either of the following: (1) that, beyond a preponderance of the evidence, the defendant poses a risk of flight, United States v. Xulam, 84 F.3d 441, 443 (D.C. Cir. 1996); or (2) that, by clear and convincing evidence, the defendant poses a risk to the safety of any person or the community. 18 U.S.C. § 3142(f). The Bail Reform Act codifies a number of factors, discussed below, that courts should consider when assessing whether detention is appropriate. *See* 18 U.S.C. § 3142(g).

A pretrial detention hearing is neither a discovery device for the defense nor a trial on the merits. The process that is due is only that which is required by and proportionate to the purpose of the proceeding. That purpose includes neither a

---

[2] DE 71 [hereinafter Transcript] at 47, 60.

[3] *See* DE 75.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 2 of 21

reprise of all the evidence presented before the grand jury, <u>United States v. Suppa</u>, 799 F.2d 115, 119 (3d Cir.1986), nor the right to confront non-testifying government witnesses, *see, e.g.,* <u>United States v. Accetturo</u>, 783 F.2d 382, 388-89 (3d Cir.1986); Winsor, 785 F.2d at 756-57; <u>United States v. Delker</u>, 757 F.2d 1390, 1397-98 (3d Cir.1985). See also <u>United States v. Hurtado</u>, 779 F.2d 1467, 1479 (11th Cir.1985) (purpose of pretrial detention hearing is not to "rehash ... probable cause" but to provide opportunity for detainee to show no risk of flight or danger to community); <u>United States v. Williams</u>, 798 F.Supp. 34, 36 (D.D.C.1992) (same).

## <u>ARGUMENT</u>

The defense has alleged four specific basis for their claim that the Magistrate Judge improperly detained TEYF. "First, Mr. Teyf's release does not pose a danger to A.G. or Tatyana Teyf."[4]  The defense merely provides argument that existed at the time of the detention hearing; it was unpersuasive then, and remains so now.

"Second…the discovery materials reveal that the Government's case is far more tenuous than what was presented to the Magistrate Judge."[5]  This is false, and in fact, the opposite is true; however, should a trial be required, the Government will present the evidence received by the Magistrate Judge in fuller form.

"Third, murder for hire is not a crime of violence…does not dictate confinement…and there is precedent for release in federal court…."[6]  This claim ignores the fact that the magistrate judge explicitly stated that this was <u>not</u> a

---

[4]  DE 75 at 3.

[5]  DE 75 at 4.

[6]  DE 75 at 4.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 3 of 21

presumption offense for confinement and explicitly stated that he was in fact aware of at least two instances in which detention was not granted despite a murder-for-hire a charge.

"Fourth, this Court can and must employ the statutorily enumerated conditions of release to facilitate Mr. Teyf's release given the cumulative weight of these facts."[7]  This conclusory statement is premised upon already failed arguments, and ignores that the weight of the evidence and consideration of the 18 U.S.C. § 3142 factors already compelled the Magistrate Judge to detain defendant TEYF.  The Government respectfully asserts that the evidence supplied to the Magistrate Judge was true and accurate; moreover, there is nothing to indicate that an evidentiary hearing is necessary or that it would have a different result.  In fact, further review compels the need for tighter restrictions and a finding that TEYF is also a flight risk.

## I.  Defendant's Motion Does Not Necessitate an Evidentiary Hearing

Defendant's motion is an improper use of this Court's time.  It is clear that Defendant wishes to debate the merits of the case at an unnecessary level of detail on an ongoing basis in relation to detention.   The Defense filed their motion and requested a hearing; yet, when granted that hearing, they sought a continuance and as one basis for this continuance noted that they had received "several thousand page of documents, and numerous video and audio files containing hundreds of hours of recording….and counsel continues to review discovery in

---

[7]  DE 75 at 4.

preparation of the hearing."[8]  This is NOT the purpose of a detention hearing.

Defendant is not the first to take this tactic of attempting to litigate the

Government's case via a detention hearing modification:

> In light of all of this, the Court cannot fathom that Congress
> intended the possibility of detention status modification to be
> twisted into an open invitation for parties to bring motions
> for detention review at any and every stage of trial in which
> new information arises regarding the weight and credibility
> of evidence in the case. Why? Because criminal trial practice
> itself involves a constant evolution, if not production, of
> information. Routine discovery procedures and investigative
> work such as witness interviews, taking statements, and
> subpoenaing documents, inevitably help parties uncover,
> clarify, and interpret the credibility and sufficiency of
> evidence in criminal cases, leading to development and
> refinement of case theories. The need for judicial efficiency
> and speed "necessarily makes arraignments, probable cause
> determinations, and bail hearings typically informal affairs,
> not substitutes for trial or even for discovery."

United States v. Rodriguez-Adorno, 606 F. Supp. 2d 232, 238 (D.P.R. 2009) *citing*

United States v. Acevedo–Ramos, 755 F.2d 203, 206 (1st Cir.1985) (internal citations

omitted).  As the Rodriguez-Adorno court recognized, "If Congress intended detention

hearings to become settings for evaluating the information inevitably accrued by

discovery and the like, it would have required (or allowed) bail status to be revisited for

each and every defendant following critical stages of discovery and other moments of

evidentiary significance. Congress has not enacted such a statute." *Id.*  Nonetheless,

to the extent that the Court intends to do more than apply a legal review to the

Magistrate's findings, the Government provides the following in rebuttal and additional

information by proffer.

---

[8]  DE 78 at 1.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 5 of 21

## II. TEYF is a Danger.

The Defendant boldly asserts that an individual would have to be suffering from "a mental disease or defect" to continue to engage in criminal conduct once their criminal scheme has been exposed.[9]   If this were the case, no individual charged would ever need to be detained as a danger to the community.  Sadly, just the opposite is true.  While not a scientific gathering of data, it is difficult to dismiss even a brief review of news articles from the last few months disclosing multiple examples of individuals who in fact continued to engage in the very conduct for which they were arrested.[10]   It is naïve to conclude that it would be "irrational" for TEYF to continue to engage in his charged behavior and thus A.G. is safe simply because TEYF has publicly been charged.  Moreover, such argument assumes that TEYF's conduct is otherwise rational, which is a difficult stance unless assuming that TEYF's decision to have his wife's paramour murdered was a logical resolution.

It is likewise naïve to claim that if A.G. is the only person TEYF wants to murder, that the rest of the community is safe.  Countless examples exist of

---

[9]  DE 75 at 6.

[10]  *See e.g.,* https://fox6now.com/2018/11/21/i-did-the-homicide-man-out-on-bond-in-domestic-violence-case-accused-of-strangling-wife-to-death/ (criminal defendant charged with domestic abuse was released and placed on GPS monitoring; he was later charged with murder of his wife); https://tucson.com/news/local/crime-and-courts/tucson-man-convicted-of-attempted-first-degree-murder-after-abusing/article_72cf6090-ecd2-11e8-9857-1f555b490c92.html (criminal defendant choked his girlfriend and threatened to shoot her; two years later, while those charges were pending, he is alleged to have tried to kill her again.); https://nypost.com/2018/03/23/murder-for-hire-targets-staged-deaths-to-nab-suspect/ (criminal defendant charged with stalking and assault of a former girlfriend subsequently sought to hire an individual to murder the former girlfriend); https://jezebel.com/man-arrested-twice-on-domestic-violence-charges-shot-an-1822805782 (A man who had previously been arrested on domestic violence charges twice and released pending trial, shot and killed his ex-girlfriend on the street); https://www.myrtlebeachonline.com/news/local/crime/article222599635.html (A man free on bond and accused of murdering a 24-year-old in a Myrtle Beach bathroom, is now charged with killing a teen in North Carolina);

"collateral damage" taking place in relation to a criminal's conduct.[11]  Indeed, the facts of this case include TEYF directing that a firearm be dropped off in a bush in a public area.[12]  It does not take great imagination to consider the possibility of a minor having stumbled upon it and unintentionally harming himself/herself or another.  Of course, the intended murder event itself could have include a myriad of dangers to the community.

While the defendant quotes a case from the Western District of Louisiana for the premise that a defendant could be more strongly motivated by love than hate, thus allowing for release of an individual facing serious charges.[13]  These countervailing interests existed at the time of the charged conduct and they were not enough to stop TEYF from attempting to have A.G. murdered.  TEYF's murderous rage is far outweighed by love for family.  In fact, as SA Kinney testified, TEYF was intending to have the blame for A.G.'s murder placed on his wife should the hitman be caught and questioned.[14]

Moreover, violence is TEYF's manner of resolving conflict.  CHS reporting which was provided to the Defense in late December displays this:

> The CHS explained that TEYF in the past asked the CHS to "take care" of someone or put them in a hospital. The first instance occurred in 2014 in Russia, where TEYF asked to take out an individual associated with Delta Plus

---

[11]  *See e.g.,* https://www.wzzm13.com/article/news/crime/man-who-police-say-killed-kent-county-couple-was-due-in-court-for-domestic-violence-charge/69-597622465 (while facing a charge of domestic abuse, the defendant broke into the home that his wife was staying at, killed the owners of the home and then kidnapped his wife).

[12]  Transcript at 18.

[13]  DE 75 at p.6 *citing* U.S. v. Barnett, 986 F.Supp, 385, 402 (W.D.La. 1997).

[14]  Transcript at 20-21.

company who TEYF owed money to. The second instance was in the United States when TEYF found out that MIKHAIL LNU, a former dispatcher at CTK, was stealing money. The CHS refused to take any further action and warned TEYF that such activity should not be conducted in the United States.[15]

## III.  The Evidence is Formidable.

The Government cannot and should not be required to litigate the merits of this case, particularly on an ongoing basis, simply because the Defense receives evidence they contend to be lacking strength.  That would lead to a never ending string of mini-trials because as any practitioner in criminal law is aware, there will be a continuous stream of discovery for some time.[16]  In order to induce this Court to have this hearing, the Defense has made unsupportable claims that the Government, via SA Kinney, misled the Magistrate Judge.  The Defense has asserted that the Government's case is "far more tenuous" than what was presented at the detention hearing and that Government "did not identify exculpatory evidence exclusively in its possession."[17]  The matters offered in support of such ferocious claims are extraordinarily toothless.

Defendant declares there is a significantly "difficult burden" upon the

---

[15]  Supplied to Defense in discovery at Bates # B1052-1054.

[16]  As is often the case in a multi-defendant criminal case, a host of activity nearly always takes place surrounding the dates of arrest and well after arrest:  For example, interviews of the subjects occur, additional search warrants are executed, interviews now take place of individuals who would otherwise have possibly tipped off that Law Enforcement was interested in the subject of the questioning, cooperators begin to emerge – and then all of this information provides law enforcement with additional investigative leads that are explored.  Then, records reflecting these activities must be created by law enforcement and receive supervisor approval before being finalized, and the evidence itself must be catalogued and filed appropriately.  Finally, the U.S. Attorney's office, must review all of this to determine what is discoverable and then ensure it is in a format amenable to being provided to the Defense.

[17]  DE 75 at 4, 10.

Government to display that TEYF's direction to transport the subject firearm meets the definition of constructive possession.[18] This is a far cry from evidence of a weak Government case. Defendant had his opportunity to make argument at the Detention hearing and now merely makes a second attempt to interpret the evidence in his favor. The Government will enthusiastically prove this fact at trial if required and is confident that a jury will understand the evidence in the same manner that the Magistrate Judge did – that when you arrange to have a .40 caliber Ruger handgun hidden in a bush and to have your paid hitman pick it up to murder someone, you had sufficient "possession" under the law. More appropriately though and actually most relevant to the issue of detention: TEYF can get others to assist in his endeavor to kill someone and has done so; TEYF can and will obtain a firearm in a covert manner to accomplish this.[19] He is a danger.

The Defense alleges malfeasance by the Government based on an "initial review" of thousands of documents and dozens of hours of audio recordings. Defense claims that SA Kinney mischaracterized the evidence because the actual evidence lacks "definitive statements."[20] This is absurd. As SA Kinney explained, there is a CHS able to testify at trial that he was paid by TEYF for the purpose of killing A.G., which was to occur by the end of 2019, and that TEYF would be out of country during that time frame.[21] The audio recordings support this. The money received and in FBI custody support this. The actual firearm given to the CHS and ready for

---

[18] DE 75 at 8.

[19] Transcript at 17-18.

[20] DE 75 at 9.

[21] Transcript at 17-21.

presentation to a jury will support this. Pen registers support this. And, so on. It is wholly accurate that TEYF underwent a myriad of plans by which to see that A.G. was murdered, but this is the one he settled on. But, it is absurd to assert that the Government misled the Magistrate Judge.

In February of 2018, TEYF was already obsessed with hearing directly from A.G. that he had slept with TEYF's wife: "Need to fucking get him to admit….hang, hang him by his balls and get him to admit. Or get him hooked on drugs , especially because he used them, shit."[22]

In March of 2018, TEYF made it clear, "[i]f it were, were in Russia he would be buried already." The CHS replied that they should be able to have him (A.G.) deported by mid-summer. TEYF replied, "No, it's enough…if, if you send him off then I'll deal with him there myself. Shit, he'll tell me everything there. Even the things he doesn't know."[23]

In September of 2018, frustrated that efforts to have A.G. deported had not been fruitful, TEYF stated, "I am about to lose it…I can't live like that…I am ready to tell you already, 'pull him out, take him somewhere far, I'll come there with a gun and fucking whack him.' First I'll shoot him in his knee so he would fucking tell me everything, then I'll fucking whack him. I'm over it…I would just strangle him any second with one hand. I would just strangle him. Mother fucker." TEYF goes on to lament that the attempt to have A.G. deported to Russia is taking too long. " Mother fucker….I don't have any choice but go to Russia , call on the guys and whack his

---

[22]  Supplied to Defense within Discovery Bates # A7-T17.

[23]  Supplied to Defense within Discovery Bates #A13-T10.

entire family."[24]

By October of 2018, TEYF had already provided a gun to CHS 1 and confirmed with CHS 1 that A.G. needed murdered. The timing was confirmed in a conversation in which TEYF asked, "So what's the news?" and CHS 1 replied, "It will be done, at Christmas." At one point, CHS 1 again stated, "The subject will be closed by the end of the year, I told you it would be closed," and TEYF replied, "Do I need to be here or is it better if I leave?" In regard to the possibility of also murdering TEYF's wife, CHS 1 also noted that, "Maybe do two concerts at once, and that's it, so that everything is cool." TEYF responds, "Simultaneously?" And TEYF then noted, "Then I need to leave for sure."[25]

While the Defense seeks to parse out and engage in argument over the meaning of each conversations, this is neither the time nor the place. In any case, as their client is well aware, and as full review of the evidence supplied discloses, the meaning of "concert" was well understood by the CHS 1 and TEYF at that time. In April of 2018, CHS 1 had stated, "But in any case, um, I have a feeling the concert will have to be performed here." TEYF replies, "Maybe." CHS 1 questioned "with a violin" and TEYF replied, "Maybe," and moment later affirmed, "We need, we need a violin." CHS 1 replied, "Then…yes, a violin. As soon as you whistle, I'll come by and pick it up."[26] The CHS will of course testify that the "violin" was the gun and the "concert" is the murder.

---

[24] Supplied to Defense within Discovery Bates #A90-T-15.

[25] Supplied to Defense within Discovery Bates #A101-T-12,19,27

[26] Supplied to Defense within Discovery Bates #A26-T-20.

The Defense complains that prior to the hearing they were not provided with a recording in which TEYF states he bought the Glenwood Ave. apartment for his children, but that the Government had characterized this apartment as a safe house. The Defense uses this to illogically accuse the Government of withholding exculpatory evidence.[27] This is ludicrous. It was an apartment that had next to nothing in it except a safe with money and guns. It is the place that TEYF took the CHS to obtain money from a safe to pay the CHS for the planned murder of A.G.. It is accurately described as a safe-house, because that is literally, what it is.

The Defense also seems to believe that the Government's case is weak for relying in part upon circumstantial evidence.[28] This assertion is in contrast to both law and practical application; as is well understood within the practice of criminal law, circumstantial evidence is as compelling, and in many instances more compelling than direct evidence.[29]

The Defense then criticizes as "inappropriate," that the Government "opted against playing any of the purportedly incriminating recordings of Mr. Teyf."[30] This

---

[27] DE 75 at 10: "In sum…the Government…did not identify exculpatory evidence exclusively in its possession."

[28] "…the Government's ability to prove the element related to compensation is wholly dependent upon circumstantial evidence." DE 75 at p.9.

[29] *See e.g.,* 1A Kevin F. O'Malley et. al., <u>Federal Jury Practice and Instructions, Criminal</u>, ' 12.04 (6th ed. 2014) holding that there are two types of evidence which are generally presented during a trial B direct evidence and circumstantial evidence. Direct evidence is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact. The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all the evidence in the case.

[30] DE 75 at p.10.

is yet more ridiculous claims wrapped in unwarranted indignation. The vast majority of the recordings are in Russian. The Government reasonably concluded that playing recordings in Russian would have provided the Magistrate Judge, who presumably does not speak Russian, with little assistance in his decision making. Rather, FBI linguists and the Russian speaking CHS who was present at the recorded conversations conveyed what took place and this information was then presented to the Magistrate Judge via SA Kinney.

## IV.   The Magistrate Judge Did NOT Apply a Presumption of Detention

At no time did the Magistrate Judge assert that murder for hire was a crime of violence thus indicating a rebuttable presumption of detention. In fact, in contradiction to the Government's position that it was a question "open to interpretation," the Magistrate Judge explicitly stated that, in his opinion, it was not, and prior to his decision he made that unambiguous: "As I indicated at the outset, this is not a case in which the rebuttable presumption in favor of detention applies."[31]   Regarding his consideration of the nature and circumstances, the Magistrate Judge simply noted that Congress has indicating that gun offenses should receive close scrutiny and that his research additionally had located few instances in which murder for hire cases received pretrial release. These were, and remain, appropriate factors for considerations.

## V.   The Magistrate Judge Appropriately Applied 18 U.S.C. § 3142

The Bail Reform Act provides four factors the Court must consider in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged, including whether the offense is a federal crime

---

[31] Transcript at 65.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 13 of 21

of terrorism; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Magistrate Judge heard sufficient evidence and applied each of the four factors under §3142.

### Nature and circumstances

He considered the nature and circumstances of the allegations and found that they support detention.[32]

### Weight

As to the weight of the evidence, he found that this varied depending on the charge, but,

> With respect to the murder for hire, firearm, and bribery offenses, however, the Government has presented compelling evidence in support of its case, although we are at an early point in this case, and there's much work to do be done by the attorneys in flushing out and testing the Government's case. So I believe on those charges, which are the ones the Government relies principally on, I believe the weight of the evidence is very strong.[33]

### Defendant's History and Characteristics

On this factor, the Magistrate Judge adopted the findings of the pre-trial services report, which documented no prior criminal behavior.[34]

---

[32] Transcript at p.65-66.

[33] Transcript at p.67.

[34] Transcript at p.67.

<u>*Nature and Seriousness of Risk to Any Person or the Community*</u>

Recognizing the risk to A.G., and potentially to TEYF's wife, the Magistrate

Judge stated,

> The evidence we received here today demonstrates an extended and involved plan to orchestrate and commit the murder and to avoid responsibility
> …
> His plan extended over a series of months, which indicates an ongoing interest in bringing harm to A.G. Given the nature of the threat, the way that it came about, the fact that it's the internalized affair between the defendant's wife and A.G. and the defendant's apparent commitment to seeing it through, I frankly see a great risk to A.G. and to potentially other people involved in this case, and I don't see any option short of detention that would reasonably assure the safety of that individual or anyone else.[35]

Based on these findings, the Magistrate appropriately concluded that the

Government had shown by clear and convincing evidence that no conditions or

combination of conditions existed to reasonably assure the safety of any other person

and the community, thus mandating detention. The evidence provided via the

present motion response only further strengthens the evidence supplied to the

Magistrate Judge and the Government respectfully requests that the Court uphold

that finding. Moreover, the Government requests that this Honorable court

additionally find that 1) TEYF is additionally a flight risk, and 2) Stricter limitations

on TEYF's ability to communicate with other is necessary.

## VI. Flight Risk

In addition to upholding the findings of the Magistrate Judge, the Government

requests that this Honorable court also find that the evidence provides by a

---

[35] Transcript at 68-69

preponderance that TEYF is a flight risk. As SA Kinney testified that TEYF was intentionally going to be out of the country when the murder of A.G. was to occur.[36] In the last few years, TEYF has used "five different countries of citizenship to travel, that being Belarus, Israel, Serbia, Russia, and the United States."[37] During the course of the investigation, "there was found to be seventy some [bank accounts] that were related to Mr. Teyf. Out of these seventy, there were over 300 different transactions between those accounts. And at one point originally, it was totaling over thirty-nine million dollars."[38] TEYF keeps extensive amounts of cash on hand at various locations, for example, his car and properties he does not reside at.[39] TEYF has employment opportunities already in place in Russia and is able to influence law enforcement in Russia.[40]

By way of proffer, the Government would additionally inform this Court that an additional CHS (CHS 3) has provided the following information to the Government based on personal conversations with TEYF:

- TEYF has several properties at various locations in Russia. For example, apartments in Domodedovo. Krasnodar, Sudak, and Moscow; as well as a "compound" outside of Moscow described as including the main home, outbuildings, and security personnel.

- TEYF has stated that he has millions in overseas bank accounts.

[36] Transcript at 21.

[37] Transcript at 29.

[38] Transcript at 32.

[39] Transcript at 20.

[40] Transcript at 21.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 16 of 21

- TEYF has both an apartment and a house in Switzerland, which CHS 3 has seen photos of. CHS 3 is aware that at one point TEYF flew to Switzerland for the sole purpose of obtaining a dog to bring back to the United States.

- Moreover, TEYF has two brothers in Israel and at least one of these brothers has traveled to the U.S. to meet with TEYF in the past. TEYF has traveled to Israel and within the past 10 years has had some hand in the purchase of an apartment in Israel.

- The December 15, 2018 trip, which was precluded by TEYF's arrest, was one in which TEYF intended to look at an additional apartment to purchase near the Tretyakov Gallery in Moscow.

- TEYF had been transferring large sums of money to his son Grigory so that if TEYF did not return to the U.S. after his December trip, Grigory would be able to handle business matters for him.

Moreover, a fourth CHS (CHS 4) has informed the Government that while in Russia, an investigation for prosecution was under way into the conduct of TEYF regarding TEYF's unlawful benefit from Russian government contracts. CHS 4, based on personal observations, can confirm that TEYF bribed Russian officials to drop this investigation.

Based on the above, the Government respectively asserts that a preponderance of the evidence is present to find that no other manner than detention will secure the presence of TEYF for proceedings on these matters. As set forth above, the nature and circumstances of the allegations are of the most

serious nature and if convicted, TEYF faces the possibility of prison for what would be the rest of his life. As expressed above, and as determined by the Magistrate Judge, the weight of the evidence against TEYF is compelling. The history and characteristics involve bribery of foreign officials to avoid prosecution. Moreover, insofar as ties to the community, as exemplified through TEYF's preparations, he was more than ready to remain out of country than return to the United States. Had his plans gone as planned, A.G. would be dead and TEYF would be enjoying a new apartment in Moscow. TEYF operates in a covert manner, has people who will do his bidding, has family and property in multiple foreign countries, has extensive funds, has used these funds to bribe foreign officials, has attempted to use these funds to bribe a U.S. official, and has multiple locations with family he could flee to. The preponderance of the evidence is that in light of his resources and past behavior, there are no sufficient safeguards that could keep him from fleeing.

## VII. Additional Conditions on Incarceration

The Government additionally seeks stronger conditions of confinement limiting the visitors of Defendant TEYF. This request is based on substantiated concerns that TEYF is actively bypassing proper monitoring of his activities and is doing so with witnesses and subjects pertinent to his existing charges.

On the day he was arrested, TEYF was co-located with a co-conspirator for mere moments while being booked. At this time TEYF threatened that co-conspirator in Russian. Referencing what is believed to be the possibility of speaking to law enforcement, TEYF told the co-conspirator that the co-conspirator had better not even think about it.

At the Detention Hearing on December 18, 2018, the Defense called TEYF's son, Grigory Teyf, in regard to serving as a third party custodian.[41] During cross-examination, it was elicited that he had unmonitored communications with his father while his father was in jail because Grigory claimed to be "operating as a translator" between his father and his father's attorneys.[42] This is obviously problematic as Grigory is an individual involved with some of the charges against his father. For example, as Agent Kinney testified, Grigory had also threatened A.G.[43] Through cross-examination, it also became apparent that Grigory had involvement in the business dealings with his father and the transfer of substantial sums of money.[44] After Grigory agreed that he had assisted his father in attempting to locate A.G., the Magistrate Judge *sua sponte* advised Grigory of his right to counsel, which he then requested.[45] The defense subsequently withdrew Grigory as a third-party custodian.

This is not the first instance in which TEYF has attempted to bypass proper monitoring by the confinement facility. The Government will further address this at the hearing scheduled for January 22, 2018.

## CONCLUSION

For the reasons expressed above, no condition or combination of conditions will reasonably assure the appearance of defendant TEYF and the safety of other persons

---

[41] Transcript at 47-48.

[42] Transcript at 50.

[43] Transcript at 24-25; notably, this testimony occurred prior to the Defendant's decision to call Grigory to testify.

[44] Transcript at 53-55

[45] Transcript at 56.

Case 5:18-cr-00452-FL   Document 95   Filed 01/18/19   Page 19 of 21

and the community at large. The Magistrate Judge correctly found that the United States has shown by clear and convincing evidence the risk posed by defendant TEYF to the safety of any person or the community. Moreover, The United States has shown beyond a preponderance of the evidence that the defendant poses a risk of flight. Taken together, this risk of flight and risk of danger to the community are simply too great to allow for defendant TEYF's pre-trial release. *See* Unite States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) (noting home detention, family assurances and electronic monitoring were not sufficient in the face of strong evidence that the defendant presented a flight risk and danger to community).

For these reasons, defendant TEYF's motion should be denied and further restrictions imposed. Respectfully submitted this 18th day of January, 2019.

ROBERT J. HIGDON, JR.
United States Attorney

By: */s/ Jason M. Kellhofer*
JASON M. KELLHOFER
BARBARA D. KOCHER
Assistant U.S. Attorney
310 New Bern Avenue, Suite 800
Raleigh, NC 27601
Telephone: 919-856-4530
Fax: 919-856-4487
E-mail: jason.kellhofer@usdoj.gov
OH Bar: 0074736

## CERTIFICATE OF SERVICE

This is to certify that I have this 18th day of January 2019, served a copy of

the foregoing filing upon counsel for the defendant in this action by electronically

filing the foregoing with the Clerk of Court, using the CM/ECF system which will

send notification of such filing to:

James P. McLoughlin, Jr
jimmcloughlin@mvalaw.com,
johnnathanruff@mvalaw.com

Nathan A. White
nathanwhite@mvalaw.com
melissanazario@mvalaw.com

Benjamin F. Leighton
benleighton@mvalaw.com,
jenniferbraccia@mvalaw.com,
johnhan@mvalaw.com,
victorialyons@mvalaw.com

      By: */s/ Jason M. Kellhofer*
JASON M. KELLHOFER
Assistant U.S. Attorney
310 New Bern Avenue, Suite 800
Raleigh, NC 27601
Telephone: 919-856-4530
Fax: 919-856-4487
E-mail: jason.kellhofer@usdoj.gov
OH Bar: 0074736