THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:18-CR-452-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | MOTION TO SUPPRESS EVIDENCE |
| v. | ) | AND RELEASE PROPERTY, AND |
| | ) | INCORPORATED MEMORANDUM |
| | ) | OF LAW |
| LEONID ISAAKOVICH TEYF, | ) | |
| Defendant. | ) | |

Defendant Leonid Teyf, by counsel, pursuant to the Fourth, Fifth, and Sixth Amendments to the United States Constitution, moves this Court for an order suppressing certain evidence seized by the Government and mandating the return of all seized and restrained property, on grounds that: (a) the warrants authorizing seizure were unsupported by probable cause; (b) the warrants contained misleading statements and omissions intentionally or recklessly made by the affiants; and (c) the Government cannot demonstrate that the seized and restrained property was involved in or traceable to criminal activity. Mr. Teyf respectfully requests a hearing on this motion.

## FACTS

Leonid Teyf stands accused of engaging in monetary transactions in property derived from specified unlawful activity and conspiring with and aiding and abetting others in furtherance of those transactions,[1] bribery of a public official,[2] "murder for hire,"[3] aiding and abetting others in possessing a firearm with an obliterated serial number,[4] bringing in and harboring certain aliens,

---

[1] 18 U.S.C. §§ 2, 1956(h) and 1957 (2018).
[2] *Id*. § 201(b)(1).
[3] *Id*. § 1958.
[4] *Id*. §§ 2, 922(k) and 924(a)(1)(B).

as well as conspiring with and aiding and abetting others in furtherance of that harboring,[5] and visa fraud.[6]

On or about December 5, 2018, the Government obtained eight warrants to seize four vehicles and funds from 22 bank accounts (the "Seizure Warrants"). In support of its applications for those warrants, the Government submitted to the issuing magistrate, Magistrate Judge Gates, sworn affidavits signed by two special agents, one from the Federal Bureau of Investigation and the other from the Internal Revenue Service. The substance of each of the eight affidavits was substantially similar, if not identical, to the others: all alleged that the property described in the warrant was subject to forfeiture under 18 U.S.C. §§ 981 and 982.[7]

The affidavits alleged that a "reliable, confidential source… ('CS-1')" provided information to investigators about a "bribe/kickback" scheme involving Mr. Teyf, former Russian Defense Minister Anatoliy Serdyukov, and others.[8] Each affidavit contained a table ("Table") listing what the affiant agents described as "the aggregate deposits of criminal proceeds of TEYF's specified unlawful activities."[9] Of the 22 accounts, the Table listed 20 that were eventually seized; the other two are an account at BB&T Bank ending in 4304 and an account at First Citizen's Bank ("FCB") ending in 0918. The Table was followed by a list of 25 purported "transactions of funds traceable to the criminal proceeds of TEYF's specified unlawful activity, each in excess of $10,000" ("Transactions List").[10]

---

[5] 8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(I) and (v)(II) (2018).
[6] 18 U.S.C. § 1546(a).
[7] *See* Affidavit in Support of Application for a Search and Seizure Warrant, No. 5:18-MJ-2088-JG (E.D.N.C.), filed Dec. 5, 2018, Exhibit A, representative of the other seven warrants with respect to the affidavit, at ¶ 1.
[8] *See id.* at ¶ 62.
[9] *See id.* at ¶ 74.
[10] *See id.* at ¶ 75.

On the basis of the affidavits, Magistrate Judge Gates signed the Seizure Warrants, which included authorization to seize the "balance of funds" in each account, "not to exceed" a specified dollar amount. As to each account, this "not to exceed" amount was identical to the amount listed in the Table for such account.

In addition to these seizures, on December 12, 2018, the Government executed search warrants (the "Search Warrants") at Mr. Teyf's homes on New Market Way[11] and Glenwood Avenue[12] in Raleigh, North Carolina. During those searches, agents of the Government seized numerous items of value, including jewelry, currency, and other items. Shortly thereafter, the Government sent an administrative forfeiture notice to Mr. Teyf, stating that the Government sought to civilly forfeit the items of value seized from his homes, along with one of the seized vehicles and funds contained in five of the bank accounts.[13] On or about March 7, 2019, Mr. Teyf filed claims with the Federal Bureau of Investigation in order to contest forfeiture.

The Second Superseding Indictment ("Indictment") filed against Mr. Teyf also contains a notice of forfeiture, notifying him that the Government seeks to forfeit certain items including, in relevant part: (1) the New Market Way home in Raleigh; (2) the Glenwood Avenue home in Raleigh; (3) a third property owned by Mr. Teyf located on Hardwick Drive in Raleigh; (4) a fourth property owned by Mr. Teyf located on Hargett Street in Raleigh; (5) certain artwork allegedly purchased in 2015 in New York City; and (6) all funds held in the various bank accounts that were

---

[11] Search and Seizure Warrant, No. 5:18-MJ-2079-JG (E.D.N.C.), filed Dec. 5, 2018, Exhibit B (attached to the Notice of Filing of Sealed Exhibits submitted herewith).

[12] Search and Seizure Warrant, No. 5:18-MJ-2080-JG (E.D.N.C.), filed Dec. 5, 2018, Exhibit C (attached to the Notice of Filing of Sealed Exhibits submitted herewith).

[13] *See* Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings, Exhibit D.

3

CHAR1\1636981v9
Case 5:18-cr-00452-FL   Document 182   Filed 03/15/19   Page 3 of 16

the subject of the seizure warrants. The Government has placed lis pendens on each of the real properties.

## ARGUMENT

### THE SEIZURE WARRANTS WERE NOT SUPPORTED BY PROBABLE CAUSE.

Before issuing a warrant to seize property, a magistrate judge must conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[14] In reviewing a magistrate's issuance of a warrant, the duty of a reviewing court is "to ensure that the magistrate had a 'substantial basis for…[concluding]' that probable cause existed."[15] No such probable cause existed with respect to the Seizure Warrants, because the affidavits fail completely to establish the requisite nexus between alleged criminal activity and the funds transferred into the subject bank accounts. With respect to the provenance of the funds in those accounts the allegations in the warrant affidavits may fairly be summarized as follows:

(a) CS-1 overheard conversations between Mr. Teyf and others in which a supposed "kickback" scheme was discussed;[16]

(b) Mr. Teyf instructed CS-1 to pick up large sums of cash;[17]

(c) CS-1 has seen documents showing "at least some of the bribe proceeds" were transferred to banks in Cyprus;[18]

(d) Mr. Teyf has bank accounts in Cyprus;[19] and

(e) Four accounts held at Bank of America by Mr. Teyf and Tatyana Teyf received wires from banks in the United States, Cyprus, Hong Kong and Russia.[20] The wires originated from accounts held in the names of 20 foreign corporations and one in Mr. Teyf's name.[21]

---

[14] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
[15] *Id.* at 238-39 (citing *Jones v. U.S.*, 362 U.S. 257, 271 (1960)).
[16] *See* Exhibit A at ¶ 62(c).
[17] *See id.* at ¶ 62(e).
[18] *Id.* at ¶ 62(h).
[19] *Id.* at ¶ 70.
[20] *See id.* at ¶ 71(c).
[21] *See id.* at ¶ 71(b).

Other than a conclusory statement that Mr. Teyf gave cash retrieval instructions to CS-1 "[w]hile the bribe/kickback scheme was being perpetrated,"[22] the affidavits are bereft of any link between those instructions and the scheme. The affidavits do not allege that CS-1 picked up the funds from even one subcontractor. In fact, there is no allegation that the funds retrieved by CS-1 were part of any scheme whatsoever. To the contrary, the affidavits make clear that "the only information" CS-1 had about the pickups was a telephone number, a pickup location, and the name of an accountant to whom the funds should be delivered.[23] In other words, there is no salient nexus between the supposed kickback scheme and the cash allegedly retrieved by CS-1.

Further, the only allegation connecting the scheme to any banks outside of Russia is the claim that CS-1 saw some documents showing that "some of the bribe proceeds" were transferred to banks in Cyprus.[24] There is no other information concerning the amounts of those proceeds, the names of the banks, or the names on the recipient accounts at those banks. Even this allegation is an assumption, not a fact; there is no allegation explaining how CS-1 would be able to connect documents showing money transfers to Cyprus to the alleged bribery scheme. There is no allegation whatsoever attempting to connect monies from banks in Hong Kong and Russia to the alleged bribery scheme. There are certainly no allegations that the supposed "bribe proceeds" were wired to any of the 20 corporations that subsequently wired funds into any account in the United States, including the four accounts at Bank of America.

Because the affidavits fail to allege a sufficient nexus between alleged criminal activity in Russia and the funds that were seized, Magistrate Judge Gates lacked a substantial basis for concluding that there was probable cause to believe the seized property constituted contraband or

---

[22] *Id.* at ¶ 62(e).
[23] *See id.*
[24] *Id.* at ¶ 62(h).

5
CHAR1\1636981v9
Case 5:18-cr-00452-FL   Document 182   Filed 03/15/19   Page 5 of 16

evidence of a crime. Those items must therefore be suppressed. Moreover, given the lack of connection to any criminal activity, Mr. Teyf is entitled to the return of all such seized property.

**<u>The warrant affidavits contained false and misleading statements.</u>**

Where a defendant demonstrates that an affiant in a warrant affidavit has made a "false statement knowingly and intentionally, or with reckless disregard for the truth" and, absent such false statement, "the affidavit's remaining content is insufficient to establish probable cause, the warrant must be voided and the fruits of the search excluded."[25] Moreover, the omission of relevant facts from an affidavit, like the inclusion of a false statement, may form the basis for suppressing evidence.[26] In this case, the affidavits contained both intentionally false statements and material omissions that rendered the warrants fatally defective.

First, the affidavits repeatedly characterize Mr. Teyf's alleged conduct in Russia as extortion.[27] These statements are false. Extortion, whether under U.S. federal law or North Carolina law, requires the employment of a "threat" against person or property.[28] In fact, none of the affiants allege any threats, let alone any facts that create such an inference. The Indictment alleges no threat.[29] To the contrary, it contradicts any suggestion that threats were employed, stating instead that the supposed "kickback" scheme consisted of subcontractors agreeing to pay a certain percentage to Mr. Teyf as a condition of being awarded a subcontract.[30] Even assuming such

---

[25] *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).
[26] *U.S. v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).
[27] *See* Exhibit A at ¶¶ 62(d), 79(a).
[28] *See, e.g.*, 18 U.S. Code § 3559(c)(2)(C) ("[T]he term 'extortion' means an offense that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person…."); *see also*, 18 U.S.C. §§ 875 & 876; N.C. Gen. Stat. § 14-118.4 (2018).
[29] *See* Second Superseding Indictment, No. 5:18-CR-452 (E.D.N.C.), filed Feb. 6, 2019, Doc. No. 127.
[30] *See Id.* at ¶¶ 7-8.

6

CHAR1\1636981v9
Case 5:18-cr-00452-FL   Document 182   Filed 03/15/19   Page 6 of 16

allegations were true, the activity alleged amounts to nothing more than a general contractor negotiating a percentage of a contract with a subcontractor. The affiants' employment of extortion terminology is nothing more than an illegitimate attempt to portray Mr. Teyf as a criminal. The affiants themselves cannot characterize the alleged conduct consistently and the contradictions in their affidavits are fatal to the conclusions they persuaded Magistrate Judge Gates to accept. CS-1 and the affidavits characterize the proceeds of the alleged scheme as "*bribery*" proceeds. To state the painfully obvious, under U.S. federal and North Carolina law, bribery is not extortion.[31]

Second, an even more material false statement is the affiants' representation that CS-1 saw documents showing that "at least some of the bribe proceeds" were transferred to banks in Cyprus.[32] In fact, the Department of Homeland Security's Report of Investigation ("ROI") related to the debriefing of CS-1 makes clear that CS-1 never claimed a connection between the alleged "kickback" scheme and transfers to banks in Cyprus. Instead, CS-1 stated merely that Mr. Teyf banked at Alfa Bank in Russia, that CS-1 would make deposits at that bank or provide escorts on behalf of Mr. Teyf, and that CS-1 saw documents indicating "*money*," as opposed to bribe proceeds, was transferred to Cypress.[33] Based on the ROI, CS-1 appears to have made those

---

[31] U.S. federal law on bribery, summarized in the broadest and most simple terms, requires the accused to have directly or indirectly corruptly given, offered or promised anything of value to the public official for the purpose of influencing the public official's performance of a specific official act. Similarly, any public official who directly or indirectly corruptly seeks, receives, accepts, or agrees to receive or accept, anything of value in return for being influenced in the performance of a specific, identifiable official act may be guilty under U.S. federal law. *See* 18 U.S.C. § 201(b). In either case, threat is not an element; to the contrary, the offense presupposes that the payor acts voluntarily.

Extortion, on the other hand, is "the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person…." 18 U.S. Code § 3559(c)(2)(C). *See also*, 18 U.S.C. §§ 875 & 876(b); N.C. Gen. Stat. § 14-118.4 (2018).

[32] *See* Exhibit A at ¶ 62(h).

[33] *See* Dep't of Homeland Security, Report of Investigation, CHS Debrief regarding TEYF (Oct. 12, 2018), Exhibit E, at 6.

statements in the context of providing general information about Mr. Teyf, rather than providing additional information about the alleged "kickback" scheme. This distinction is critical in light of the above-referenced lack of nexus between the alleged scheme and the seized funds.

Third, the affiants also made a material omission in the affidavits that goes directly to CS-1's reliability as a source. The affidavits allege that CS-1 delivered payments of $70 Million (USD), $30 Million (USD), and $50 Million (USD) to Defense Minister Serdyukov via his son-in-law Puzikov.[34] The ROI states that CS-1 "believes all three shipments were probably in the 2013 timeframe."[35] This fact, left out of the warrant affidavits, is crucial because placing the payments in the 2013 timeframe calls CS-1's entire account into question, considering that: (a) according to the Government's own Indictment, Mr. Teyf ceased being the Deputy Director of Voentorg in 2012;[36] and (b) also according to the Indictment, Defense Minister Serdyukov ceased being the Russian Minister of Defense in 2012.[37] In other words, CS-1's supposedly reliable information consisted of bribe payments made by Mr. Teyf at a time when he apparently no longer had anything to gain from making such payments, to Mr. Serdyukov at a time when he apparently no longer had any power to provide a benefit to Mr. Teyf.

Fourth, the affiants completely omit any mention of a Russian law that might have been violated as a result of the alleged "kickback" scheme. This is a critical point because the money laundering statutes require a predicate offense that falls within the category of "specified unlawful activity."[38] While the list of specified unlawful activities in 18 U.S.C. § 1956 is long, the vast

---

[34] *See* Exhibit A at ¶ 62(f).
[35] *See* Exhibit E at 4.
[36] *See* Indictment at ¶ 8.
[37] *See* Exhibit A at ¶ 62(b).
[38] *See* 18 USC §§ 1956(a) and 1957(a).

majority are circumscribed by their eligibility for prosecution in the United States.[39] Consequently, when dealing with a completely extraterritorial predicate offense like the one at issue here, the Government must ordinarily look to 18 U.S.C. § 1956(c)(7)(B), which pertains to offenses "against a foreign nation." Of course, to qualify as an offense against a foreign nation, there must actually be a foreign law against the activity.[40] But rather than apprising the magistrate of any such law, the affiants merely resorted to conclusory, loaded language like "bribery" and "extortion." In so doing, they avoided difficult questions that might have been raised about whether a crime occurred in Russia at all and, if so, whether such crime would even qualify as a specified unlawful activity. A negative answer to either of those questions obviously would have negated any probable cause with respect to a money laundering violation in the U.S.

And finally, an even more flagrant misleading omission concerns the affiants' characterization of the foreign countries associated with the companies that wired funds into the Bank of America accounts. Citing the U.S. Department of State's website, Special Agent Phillips refers to these countries as either "jurisdictions of primary concern" or "jurisdictions of concern," in support of his allegation that the alleged activity is consistent with international money laundering.[41] While technically true, these appellations are misleading to the point of being deceptive without additional context. The State Department's website makes explicitly clear that the category of "jurisdictions of primary concern" is based on "the significance of the amount of

---

[39] *See, e.g.,* 18 U.S.C. § 1956(c)(7)(A) (referencing 18 U.S.C. § 1961(1) ("racketeering activity" means (A) any act or threat involving murder, kidnapping… *which is chargeable under State law*…; (B) any act *which is indictable* under any of the following provisions of title 18, United States Code…" emphases added)).

[40] *See U.S. v. Awan*, 459 F. Supp. 2d 167, 183 (E.D.N.Y. 2006).

[41] *See* Exhibit A at ¶ 73.

proceeds laundered, not of the anti-money laundering measures taken."[42] It is no wonder, then, that the affiants did not disclose to the Magistrate that other "jurisdictions of primary concern" include France, Germany, the United Kingdom, and the United States.[43]

Taken together, the various misleading statements and omissions by the affiants render the affidavits incapable of establishing the probable cause necessary to support seizure. After correcting for these misstatements, the "criminal" activity of which the affiants complain amounts to nothing more than (a) negotiations between a general contractor and subcontractors about the general contractor's override; (b) supposed "bribes" (or extortion proceeds) that were paid at a time when the alleged recipients of funds were no longer involved in the activities relevant to those alleged payments; and (c) an allegation that the CS-1 viewed documents showing that Mr. Teyf has sent money sometime in the past to a jurisdiction that is in the same category as the United States in terms of money laundering activity.

**THE GOVERNMENT EXCEEDED THE SCOPE OF THE SEARCH WARRANTS.**

The Search Warrants included enumerated categories of items authorized for seizure. They consisted of: (a) records, documents and materials; (b) currency; (c) records of real properties owned; (d) car titles; evidence of financial transactions; (e) computer equipment; (f) correspondence, documents or photographs corroborating specified unlawful activity as it relates to Voentorg and the "kickback" scheme; firearms, ammunition and related items; and (g) cellular telephones and SIM cards.[44] Despite the clearly enumerated categories of items authorized for

---

[42] *See* Exhibit A at ¶ 73, n.6. The affidavit refers to the U.S. State Department's website for a list of such countries: https://www.state.gov/j/inl/rls/nrcrpt/2011/vol2/156373.htm (2011); https://www.state.gov/j/inl/rls/nrcrpt/2012/vol2/184112.htm (2012); https://www.state.gov/j/inl/rls/nrcrpt/2013/vol2/204062.htm (2013).
[43] *See id.*
[44] *See* Exhibit B at 37-39; Exhibit C at 35-37.

seizure, the Government took more than 70 pieces of jewelry from the two residences. In so doing, they exceeded the scope of the warrants authorized by Magistrate Judge Gates.[45] Those items must therefore be suppressed.

## THE GOVERNMENT CANNOT RESTRAIN "UNTAINTED" ASSETS.

When, as in this case, the Government seeks forfeiture pursuant to 18 U.S.C. §§ 981 and 982, it may only restrain property directly traceable to a defendant's crimes.[46] In *United States v. Chamberlain*, the Fourth Circuit addressed a challenge to its well-established rule that substitute property, as defined by 21 U.S.C. § 853(p), could be subject to pretrial restraint.[47] The court noted that property forfeitable under the criminal forfeiture statute generally falls into two categories: (1) "tainted" property, which can be directly linked to the defendant's offense(s); and (2) "untainted" property, which has no relation to any such offense(s) but is used to take the place of tainted property that has either diminished in value or is beyond the court's reach. Historically, the Fourth Circuit permitted pretrial restraint of both types of assets, based largely on its reading of past Supreme Court decisions.[48] Acknowledging the Supreme Court's more recent decision in *Luis v. United States*,[49] however, the Court of Appeals concluded that its prior interpretation was no longer tenable and held that the criminal forfeiture statute "permits the government to obtain a pretrial restraining order over ***only*** those assets that are ***directly*** subject to forfeiture as property ***traceable*** to a charged offense."[50]

---

[45] *See U.S. v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) ("It is axiomatic that a 'search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization.'" (citations omitted)).
[46] *U.S. v. Chamberlain*, 868 F.3d 290, 297 (4th Cir. 2017).
[47] *Id.* at 291.
[48] *See U.S. v. Bollin*, 264 F.3d 391, 421 (4th Cir. 2001).
[49] 136 S. Ct. 1083 (2016).
[50] See *Chamberlain*, 868 F.3d at 297 (emphasis added).

11
CHAR1\1636981v9
Case 5:18-cr-00452-FL   Document 182   Filed 03/15/19   Page 11 of 16

**The amounts authorized for seizure in the Seizure Warrants included "untainted" assets.**

Even if this Court determines that there is probable cause to believe some of the funds wired from various foreign financial institutions to the four accounts at Bank of America consisted of criminal proceeds, there is no question that the Seizure Warrants were defective in that they authorized the Government to seize untainted funds along with allegedly tainted funds. This is plainly seen first in the fact that, while the Government alleges a total of approximately $39.4 million in criminal proceeds were wired into the four initial accounts at Bank of America, the warrants authorized seizure of funds totaling over $102 million. The root cause of this overreaching appears to be double-counting of funds transferred out of certain accounts.

Moreover, the amounts authorized for seizure, whether $102 million or $39.4 million, fail to account for legitimate funds that were wired into the accounts—which the affiants made no effort distinguish from alleged criminal proceeds. Further, the affidavits do not address any other activity that occurred in the accounts. But such activity is critical to the question of whether any tainted funds remained in those accounts at the time of seizure. In order to make that determination, the Government must perform a funds-tracing analysis using an appropriately accepted methodology. In the Fourth Circuit, one of the most commonly employed methodologies is the Lowest Intermediate Balance Rule ("LIBR"). Originally set out in the context of a business dispute involving commingled funds in a bank account,[51] the rule has subsequently been utilized in bankruptcy proceedings[52] and in criminal proceedings involving money laundering.[53] The Court of Appeals has described the rule thus:

> The rule, which operates on a common-sense view that dollars are fungible and cannot practically be earmarked in an account, provides a presumption that

---

[51] *Sony Corp. of Am. v. Bank One*, 85 F.3d 131, 139 (4th Cir. 1996).
[52] *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998).
[53] *United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018).

proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are "identified" by presuming that they remain in the account even if other funds are paid out of the account… Under the rule, however, if the balance of the account dips below the amount of deposited proceeds, [the prior] security interest in the identifiable proceeds abates accordingly. This lower balance is not increased if, later, other funds of the debtor are deposited in the account…[54]

When LIBR is applied to the Bank of America account ending in 1736 ("BOA 1736"), for example, it quickly becomes apparent that the Government has overreached. The Table lists the aggregate deposits in that account as $1,300,000. The Transactions List includes only three deposits totaling $1,250,000, all transferred from BOA 6014: $450,000 on February 12, 2015; $700,000 on November 6, 2015; and $100,000 on February 3, 2016. Although it is unclear what transaction the Government relies on for the remaining $50,000, bank records provided by the Government list only two deposits for that amount, one on February 20, 2015, and the other on November 5, 2015. In either event, what is clear is that the last deposit of allegedly "tainted" funds occurred on February 3, 2016. Subsequent to that deposit, the balance of the account fell to a low of $16,522.64 on August 24, 2016. The affidavits filed in support of the seizure do not indicate that any subsequent deposits were made into the account from any of the other accounts involved in this case or otherwise constituted criminal proceeds. Consequently, $16,522.64 should have been the maximum amount authorized for seizure from BOA 1736. Nevertheless, the warrant signed by Magistrate Judge Gates authorized seizure from BOA 1736 of up to $1,300,000.

To date, the Government has not provided Mr. Teyf with sufficient records to perform an independent funds-tracing analysis, but this exercise was the responsibility of the Government to conduct as a predicate to seizure of the funds. Given the obvious overbreadth and inaccuracies of the warrants, and particularly in light of the fact that the Government has effectively seized

---

[54] *Sony Corp. of Am.*, 85 F.3d at 139 (quoting *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 431 N.E.2d 370, 372 (Ill. 1982).

substantially all of the money available to Mr. Teyf to fund his defense, it is incumbent upon the Government to perform a tracing analysis to establish probable cause to believe *all* of the assets seized, whether pursuant to the Seizure Warrants or the Search Warrants, constitute tainted assets subject to forfeiture. The same holds true with respect to the lis pendens filed with respect to each of Mr. Teyf's real properties.

## CONCLUSION

For the foregoing reasons, all property seized pursuant to the Seizure Warrants and the specified category of items seized pursuant to the Search Warrants must be suppressed. Further, all seized and restrained property must be released to the extent that the Government cannot demonstrate that they are traceable to or were involved in criminal activity. At the very least, the Court should order a hearing pursuant to *Franks v. Delaware*.[55] Further, in the interests of justice and fairness, and consistent with the Fourth Circuit's concerns in *U.S. v. Farmer*,[56] if the Court does not order suppression and release of all seized and restrained property, Mr. Teyf requests a *Farmer* hearing.

**[SIGNATURE ON FOLLOWING PAGE]**

---

[55] *See* 438 U.S. at 156 ("if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.").

[56] 274 F.3d 800, 805 (4th Cir. 2001) (holding that Due Process may require providing defendant a hearing to "prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that he needs those same assets to hire counsel.").

Dated this 15th day of March 2019.        By:     /s/ James P. McLoughlin, Jr.

James P. McLoughlin, Jr.
N.C. State Bar No. 13795
Nathan A. White
N.C. State Bar No. 48684
Benjamin F. Leighton
N.C. State Bar No. 50835
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Phone: (704) 331- 1054
Facsimile: (704) 378-2054
jimmcloughlin@mvalaw.com
nathanwhite@mvalaw.com
benleighton@mvalaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I also served a copy of the foregoing upon counsel for the United States in this action by sending a copy to each counsel by electronic communication as references below:

| | |
|---|---|
| Barbara D. Kocher | Jason M. Kellhofer |
| U.S. Attorney's Office | U.S. Attorney's Office |
| 310 New Bern Ave. | 310 New Bern Ave. |
| Suite 800 | Suite 800 |
| Raleigh, NC 27601 | Raleigh, NC 27601 |
| Email: barb.kocher@usdoj.gov | Email: jason.kellhofer@usdoj.gov |

By: /s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003