```
            UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NORTH CAROLINA
                  WESTERN DIVISION


_____  )
                              )
UNITED STATES OF AMERICA,     )
                              )
             vs.              )CASE NO. 5:18-CR-452-FL-1
                              )
                              )
LEONID ISAAKOVICH TEYF,       )
                              )
             Defendant.       )
_____  )
```

               WEDNESDAY, APRIL 24, 2019
       MOTION TO SUPPRESS/MOTION FOR RELEASE OF ASSETS
         BEFORE THE HONORABLE ROBERT T. NUMBERS, II
              UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

<u>On Behalf of the Government</u>:

**BARBARA D. KOCHER, Assistant U.S. Attorney**
**MATTHEW LEE FESAK, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**310 New Bern Avenue, Suite 800**
**Raleigh, North Carolina  27601**

<u>On Behalf of the Defendant</u>:

**JAMES P. McLOUGHLIN, Esquire**
**JOHN SANGSOO HAN, Esquire**
**BENJAMIN F. LEIGHTON, Esquire**
**FIELDING EVAN HUSETH, Esquire**
**Moore & Van Allen, PLLC**
**100 North Tryon Street, Suite 4700**
**Charlotte, North Carolina  28202**


            **MICHELLE A. McGIRR, RPR, CRR, CRC**
                 **Official Court Reporter**
               **United States District Court**
                 **Raleigh, North Carolina**

```
1              (Wednesday, April 24, 2019 commencing at 10:09 a.m.)

2                       P R O C E E D I N G S

3

4              THE COURT:  Good morning, everyone.

5                       (All say good morning)

6              THE COURT:  We're here today in the case of the

7    United States of America versus Leonid Teyf, case number

8    5:18-CR-452.  We're here for a hearing on Mr. Teyf's motion

9    to suppress and motion for release of assets.

10             I would like to begin by asking counsel to identify

11   themselves for the record beginning with counsel for the

12   Government.

13             MS. KOCHER:  Barbara Kocher, Your Honor, Assistant

14   United States Attorney.

15             MR. FESAK:  Matthew Fesak, Assistant United States

16   Attorney.

17             MR. McLOUGHLIN:  Good morning, Your Honor.  Jim

18   McLoughlin, Moore & VanAllen, for Mr. Teyf.

19             MR. HAN:  John Han, Moore & VanAllen, for Mr. Teyf.

20             MR. McLOUGHLIN:  And, your Honor, with us counsel

21   of record also, Fielding Huseth and Benjamin Leighton.

22             INTERPRETER VOLSKY:  Your Honor, the two

23   interpreters are present for Russian language.

24             THE COURT:  At this time I will ask the clerk to

25   please place our interpreter under oath.
```

1          (Mr. Roman Volsky and Ms. Marianne Duhaterov duly sworn by

2                              the clerk)

3               THE CLERK:  Thank you.

4               THE COURT:  As I mentioned in the text order I

5     entered earlier this week, I want to begin by discussing a

6     number of preliminary matters and then decide what, if any,

7     testimony we need to receive today.

8               Initially I want to hear from the parties on the

9     impact of Judge Flanagan's earlier ruling on Mrs. Teyf's

10    similar motion.  There was a motion to release funds and

11    there was a hearing on it at which Judge Flanagan made a

12    series of rulings.  In short, I think the ones that are most

13    relevant to what we're doing here today is she found probable

14    cause to support the seizure of bank accounts that Mrs. Teyf

15    had an interest in and she found there was not probable cause

16    to support the seizure of various jewelry and Land Cruiser

17    that were seized from the Teyfs' home.

18              And if the parties think there are other aspects of

19    that order that are relevant to what we're doing here today,

20    I'm glad to hear about them.

21              Any ruling I make obviously goes to Judge Flanagan

22    for review, one way or the other, and I'm trying to figure

23    out both from a legal and a practical standpoint what the

24    impact of that ruling is on what we're doing here today.

25              Ms. Kocher or Mr. Fesak, I'll hear from you first

1    and then, Mr. McLoughlin, I'll hear from your team.

2          MS. KOCHER:  Thank you, your Honor.

3          I do believe that the doctrine of law of the case

4    legally controls the matter.  When a court decides a rule of

5    law, that decision should continue to govern the same issues

6    in subsequent stages in the same case.  That's the *Armani*

7    case out of the Fourth Circuit as long ago as 1999.

8          In fact, the law of the case doctrine precludes

9    even co-defendants from arguing this same issue at a

10   different time than the co-defendant.  The law is clear that

11   despite varying articulations, perhaps, that a different

12   attorney might place on an issue, it is, in fact, not to be

13   heard a second time.  According to Moore's Federal Practice

14   and Procedure, the rule promotes the finality and efficiency

15   of the judicial process by protecting against the agitation

16   of settled issues.  And I think that is part of the practical

17   reference that you referred to in this particular case.

18         Briefly, and in looking at the record that was

19   established, first I note that Mr. and Mrs. Teyf, through

20   counsel, adopted each other's arguments.  So it's not only

21   that they made similar arguments, they literally adopted one

22   other's arguments as they went forward through that process.

23   So I do believe the same issues are being presented to this

24   Court.

25         Basically -- and in addition to what your Honor

stated -- so a hearing was held on March 28 before Judge

Flanagan.  On March 29th she issued an order that is found at

Docket Entry 203 and then more recently just this week, the

-- Judge Flanagan actually found there was probable cause to

seize the Land Cruiser and issued that in a written order now

found at Docket Entry 230.  And even that order relates back

and I think offers this Court instruction as well.

So in this most recent order, she found at page 3

that the Court had already found probable cause that a

particular Bank of America account, that which bore the funds

that purchased the Land Cruiser, had substantial connection

to the money laundering charges.  She referred back then to

Docket Entry 203 at page 4, specifically in this most recent

order.

Turning then to Docket Entry 203 at page 4, it

says, the Court denied the defendant's motions for release of

basically the challenged assets but for the jewelry to

include the bank accounts in currency for the reasons noted

on the record.

So then the Court here today can turn to the

transcript of that hearing, which is at Docket Entry 208.  At

page 4 it discussed the different categories of assets, which

included the jewelry, the bank accounts, New Market Way as a

property and the two Mercedes, which she contested.

In the hearing record it specifically supports that

1  she found there is probable cause as to the second category.

2  The rest of that record would indicate that second category

3  is the bank accounts.  I believe that's at page 35.  Judge

4  Flanagan found as a matter of law that there had been no

5  seizure of the New Market Way property, the house.  That's at

6  page 43.

7         In regard to the two Mercedes, which I don't

8  believe this defendant has any interest in, financial or

9  otherwise, the Judge found, I'm not going to consider the

10 Mercedes.  That's at pages 45 and 46 of the transcript.  And

11 also at page 46 she found that the currency at issue -- which

12 then was $28,000 -- that that currency was not subject to the

13 reach of the argument of defendant, that she does believe

14 there's probable cause.

15        To that end, your Honor, I believe all of those

16 things do find there was probable cause for the items at

17 issue here but for the jewelry.

18        I would note just while I'm on the law of the case

19 topic, that in addition specifically to the affidavits used,

20 the defendant at the hearing before her argued for almost

21 four pages, through -- beginning at page 22 of the transcript

22 through page 25 and maybe on into page 26, that the seizure

23 warrants lacked appropriate evidence or nexus to the moneys

24 and the crime, which is one of the issues slated for your

25 Honor here today.  Although the judge did not specifically

make a finding that she discounted those, I believe the law
in this regard holds, in regard to such decisions, that the
previous decisions can be actual decisions or they can be
those decisions that are interpreted by necessary
implication.  Meaning she heard the argument, she went on to
the probable cause determination.  So the record indicates
that it necessarily implies the decision was made that there
was sufficient argument to support -- sufficient evidence to
support the probable cause underlying the warrants that were
issued.

          Your Honor, that would be the Government's position
as to the law of the case.  I would have further argument as
to the other issues, but I assume you would like for me to
stop here.

          THE COURT:  Sure.  I guess just one question.  If I
were to find that the law of the case is as Judge Flanagan
decided it, what would that leave for us to deal with today
from your perspective?

          MS. KOCHER:  Ultimately, it leaves nothing from our
perspective.  It would be entired.  There certainly -- there
is some argument to be made that the single *Franks* aspect;
that is, the misleading -- or the allegations of misleading
or omission of statements in the affidavit is certainly
further removed from the argument that Mr. Zeszotarski made
on behalf of Mrs. Teyf at that hearing.  And so I certainly

am prepared to address that as a separate issue if the Court would so decide that we need to go forward on that; but the other issues I think are fully incorporated in the Judge's -- between the hearing and the two orders after that.

THE COURT: So would the result of that be that I determine there's no probable cause or that there's a ruling in the Government's favor on the seizure of the bank accounts, but that Mr. Teyf is entitled to the remaining 15 or so pieces of jewelry?

MS. KOCHER: Your Honor, so in sum, yes. I do want to make clear that if the Court is inclined to go that way, I don't want to lose the opportunity to say that the seizures of the jewelry -- it is not that there was not probable cause to seize it. That's not what the judge found. So I just want to say that. The Government would continue to contest it did not exceed the scope of the search warrant. The jewelry at the scene certainly -- there was probable cause to believe it was fruits of the criminal actions here.

What the Government does agree with that when we move into forfeiture -- so we're not talking about the criminal charges or the seizure under the search warrant at this point, but now we're moving over to the *Farmer* and the *Chamberlain* rule; and in that regard, the law requires us to show a substantial connection, which that's not the search warrant thing, but in order to keep the asset pretrial, we

have to show a substantial connection between that asset and
the criminal act.  And that is what the Judge found -- we
have no receipts.  The Government even in that hearing
admitted -- and in our writings -- admitted we have no
documentary evidence showing when or where -- in the main --
that that jewelry was purchased.  That remains true for the
jewelry at issue here today.

        THE COURT:  I've got a question.  I'm just trying
to figure out if now is the right time to raise it or if I
should save it until later.  You're talking about *Farmer* and
*Chamberlain*, which is an issue I think we need to address
here.  Judge Flanagan did make a finding that Mrs. Teyf
showed that she needed the funds to support her defense.  I
think there's a question as to that aspect here.  You didn't
seem to contest it too strongly, if at all, at the hearing,
but to release the 15 pieces of jewelry I would have to
presumably make a similar finding here -- if I'm doing it
under *Farmer* and *Chamberlain* -- if I would find that both of
those cases apply.

        MS. KOCHER:  My answer is it depends.  So how about
-- if I go there, I will try to stay brief on that one and
maybe it can be revisited later.

        So in regard to *Chamberlain* and *Farmer*, I believe
the Government's position is this -- I'm going to turn and
let -- if I don't articulate this right, okay.  *Farmer*

 1   specifically addressed whether seized assets pretrial, if the
 2   defendant could gain a hearing to contest the seizure of
 3   those assets, and it let -- laid out the fact that in that
 4   event, the defendant can -- if they show, first, they have no
 5   other assets by which to pay attorney's fees and that those
 6   assets weren't tainted.  I think we kind of got lost off that
 7   branch at Judge Flanagan's hearing.  Things moved very fast,
 8   I will say.

 9        All right.  *Chamberlain* then came along more
10   recently in 2017 to say that there is no allowed pretrial
11   restraint on untainted assets.  So the Government doesn't
12   believe they necessarily conflict -- the Government would
13   agree that to the extent that *Farmer* requires the showing of
14   the need of the assets for attorney's fees, that may be
15   denigrated.  If we're talking about untainted assets, then
16   there is no need to show that they're needed for attorney's
17   fees under *Chamberlain*.  What I don't think is denigrated is
18   the procedure set out in *Farmer* and that is that the
19   defendant needs to make a showing that they were not tainted.
20   The seizure itself establishes probable cause and -- for the
21   other assets in regard to the jewelry -- or rather the other
22   assets outside of the jewelry, but that *Farmer* would still
23   indicate that the process is that the defendant has to
24   show -- has to affirmatively show how those assets are not
25   tainted.

1      THE COURT:  So I was hoping to avoid jumping into

2   *Farmer* and *Chamberlain* right now, but it seems like we're

3   there.  It would be your position that if the defendant

4   challenges the taint on the assets, that they don't need to

5   show that they need those untainted funds to retain an

6   attorney.  Kind of that first *Farmer* factor disappears if

7   there's an allegation of untainted funds having been seized.

8      MS. KOCHER:  *Chamberlain* says that we can't hold

9   untainted assets pretrial.  I do think that that's the -- I

10  think that, in fact, it was our office on that case and I

11  think we conceded that in that case so I would be hard

12  pressed to argue otherwise than that.

13      So in -- now I would take the position that the

14  only asset here that's potentially untainted is the jewelry

15  and there's been a finding now to that effect -- we admitted

16  that at the earlier hearing, but that is consistent with what

17  the judge found.  And the other assets all were seized

18  pursuant to a document which set forth probable cause.  They

19  were all seized under search warrant.

20      So I would argue, unlike the hearing before Judge

21  Flanagan where we were trying to maintain our probable cause

22  for the jewelry as well, that in this case it would be their

23  affirmative duty under *Farmer* now to come forth with evidence

24  that they're not tainted.

25      THE COURT:  But we're taking off the table the need

1   for the funds issue.

2           MS. KOCHER:  Yes, sir.  As to untainted assets,

3   yes.

4           THE COURT:  All right.  Thank you.

5           Mr. McLoughlin, I'll be glad to hear from you on

6   the law of the case doctrine and then at the end of that --

7   or someone else from your team if you prefer -- and then at

8   the end of that, we can talk a little bit about *Farmer* and

9   *Chamberlain* if you want to be heard on that.  I don't know

10  what bone you have to pick with what the Government shared --

11          MR. McLOUGHLIN:  I'll save your Honor the trouble

12  on *Farmer* and *Chamberlain*.  We agree with the Government to

13  the extent in *Chamberlain*, the Government took the position

14  that no such showing with respect to attorney's fees or the

15  need to hire an attorney is required any longer.  The funds

16  are either untainted, in which case they have to be released,

17  or they're tainted, in which case it doesn't matter.  So in

18  essence, *Chamberlain* overrules any such implication.

19          With respect to the question of the application of

20  the law of the case doctrine here, we do have some points to

21  make, your Honor, and Mr. Han will make those for the Court.

22  I may add something at the end, but Mr. Han will lead that

23  effort.

24          MR. HAN:  So insofar as the rule -- the rule of the

25  case -- rule of law was established at the hearing before

Judge Flanagan, that related to probable cause findings with
respect to Ms. Teyf's property. She never made a ruling
about the accounts that are in Mr. Teyf's name. Never made
any ruling about the vehicles that are in Mr. Teyf's name.
So to the extent that that is something that the Court is
considering, we would submit that it doesn't apply here
because we're dealing with different property.

More importantly, Mr. Teyf had no opportunity to
present any arguments or evidence before Judge Flanagan
because that was not his motion. And so he wasn't afforded
the opportunity to present evidence that would call into
question probable cause to seize the bank accounts or the
vehicles pursuant to the seizure warrants. We believe that
it would violate Mr. Teyf's due process rights to simply
superimpose a finding by Judge Flanagan with respect to other
property on to property that is in Mr. Teyf's name.

THE COURT: Let me stop you there. I would largely
agree with that if I had issued the prior ruling for Mrs.
Teyf and was trying to shut you out without a hearing here on
Mr. Teyf, but any ruling I make is appealable to Judge
Flanagan. And, in fact, under the applicable statutes, she
needs to look at my order and review it at least for clear
error if no one objects to it. So even if I were to apply
the law of the case doctrine here, you-all would still have
an opportunity to object, both to that and to the underlying

1  findings, so is there really a due process concern?

2          MR. HAN:  Well, I do believe that part of us being

3  able to establish that there was no probable cause to seize

4  those items is related to what Ms. Kocher conceded was a

5  validation before this Court, which is the _Franks_ issue.  If

6  there are material omissions or false statements that were

7  contained in the affidavits that were used to seize these

8  assets, then that calls into question whether or not there's

9  probable cause to believe that the funds that were seized are

10  actually criminal proceeds.

11          We believe we have made a sufficient showing on our

12  motion papers that such false statements and material

13  omissions were included knowingly and intentionally, or at

14  least with reckless disregard for the truth.

15          And understanding that whatever ruling you make is

16  going to have to go before Judge Flanagan, I respectfully

17  submit that Judge Flanagan's ruling was based upon a

18  misstatement by the Government of the applicable standard

19  related to these bank accounts.  In the transcript of that

20  hearing, Ms. Kocher argued, quote, what we are here today on

21  is whether the Government showed a fair probability that

22  these accounts are related to the tainted funds.  And that

23  was immediately followed by Judge Flanagan's response, quote,

24  and I find that the Government has shown that and so I remove

25  at this point the second category, meaning the bank accounts,

finding that there was probable cause there.  We submit that
that's a misstatement because probable cause doesn't relate
to the bank account itself.  Bank account is not property.
Bank account holds property.  So the fact that funds may have
passed through an account, which at some point allegedly was
involved in criminal activity, means nothing.

THE COURT:  I think you're getting down the road.
I do want to address that later on today.  I think we've got
a lot to get to.  I'm just focusing on the law of the case
aspect of it.

MR. McLOUGHLIN:  Your Honor, let me -- I just
pulled this up, we'll get a copy to the court, but if one
looks at the fairly recent decision in United States Court of
Appeal for the Ninth Circuit in *Stacey v. Colvin*,
C-O-L-V-I-N -- I don't have the Lexis cite or Nexus cite,
I'll have it for your Honor in a minute -- filed June 7,
2016.  Docket number 3:11-CV-00655.  The Court addresses the
issue of the law of the case doctrine and what the Court says
about the law of the case doctrine I think controls here.
The court said, quote, the law of the case doctrine generally
prohibits a court from considering an issue that has already
been decided by the same court or a higher court in the same
case.  The doctrine is confirmed primarily with efficiency
and should not be applied when the evidence on remand is
substantially different, when the controlling law has changed

or when applying the doctrine would be unjust.  See *Merritt v. Mackey*, 932 F.2d 1317, p 1320 (9th Cir. 1991).  A District Court's discretionary decision to apply the law of the case doctrine is only reversed for abuse of discretion.  In *Stacey v. Colvin*, the court -- at issue there was two prior step-four findings by administrative law judges that Mr. Stacey could not perform past work and was therefore entitled to disability.  The courts -- those decisions by the ALJs were never affirmed by the district court but it's -- the court said it's typically the kind of thing that would apply in the law of the case; but the court said, quote, but this is not the typical case.  On remand, the second ALJ was surprised to hear new evidence that Stacey mostly performed supervisory tasks in his past job.  This new testimony led A-V-E to conclude for the first time that Stacey could still perform the job of stationary engineer supervisor.

Point being, your Honor, there are substantial limitations on the law of the case doctrine that apply here. Where in this instance, for example, the issue is not whether there's a connection to an account, but are funds -- particular funds in that act, which is a function of the deposit, withdrawal and other things -- traced to this conclusion that they are tainted funds.  Any analysis of Mrs. Teyf's account cannot, as a matter of the law of a case, establish probable cause with respect to Mr. Teyf's accounts

because the facts, e.g., the tracing, is specific to that account. The issue of the law of the case in terms of the standard to be applied, to the extent Judge Flanagan is, like your Honor would do, applying the Fourth Circuit's law or she's applying *Gates*, that obviously does not change. But the application of the law to different facts with respect to different accounts about which on the face of the order the judge does not rule. So when we think about the law of the case here, the bank account she's talking about are Ms. Tatyana Teyf's, not Leonid Teyf's.

So the law of the case with respect to -- if we were challenging the conclusion with respect to Mrs. Teyf's jewelry or Mrs. Teyf's accounts, we might be done. With respect to his, there's been no ruling so technically the law of the case can't apply because there was no ruling -- because the facts were not before her about the tracing or lack of tracing of those accounts. Statements made by the agents with respect to his accounts were not before the court. The testimony that we're entitled to put on with respect to statements with respect to his accounts were not before Judge Flanagan. So it was quite literally impossible for her to issue a ruling with respect to those accounts and we would implicate the law of the case doctrine.

If, on the other hand, one says for the sake of the argument that the law of the case doctrine in some way

1    applies, then you get to the -- let's start with the last
2    question first, which is:  Does it otherwise create an
3    unfairness?  And our -- we believe the strong position here
4    is that, of course, it does because we have not had the
5    opportunity to put on evidence in support of a bonafide
6    motion.  That is particularly true with respect to the *Franks*
7    issue, which again the Government concedes that with respect
8    to the *Franks* issue, there can't be application of the law of
9    the case because Mrs. Teyf didn't make an argument.

10           There is also the very practical consideration that
11   at that point in time, as is reflected on the record, Mrs.
12   Teyf's counsel was there for the limited appearance -- has
13   made a limited appearance with respect to obtaining funds so
14   that he can present a full defense, which as a practical
15   matter means that Mrs. Teyf's counsel has not had the
16   resources, the time or the general appearance necessary to
17   dig into a record on this case to find information about
18   whether those affidavits were truthful or not.  We're up at
19   like 6 terabytes of data that we've received from the
20   Government.  And so for Mr. Teyf to be barred by someone --
21   by a limited appearance hearing with respect to accounts is
22   not appropriate, is not called for by the law of the case
23   doctrine.  And you also then get the question of is there new
24   evidence?  And the point we're making here is there was no
25   evidence at that hearing because Mrs. Teyf didn't put on a

witness.  Mrs. Teyf didn't put in the evidence that we plan

to submit here.  And so by definition, as stated in *Colvin* --

and this is -- the law of the case doctrine is pretty

straightforward -- as stated in *Colvin*, by definition we have

additional evidence that was not considered, which as the

court said in *Stacey v. Colvin*, makes this one maybe

atypical.  So that's the thing.

The only -- the last point I would make, your

Honor, with respect to this, to the extent your Honor is

considering saying, okay, I'm going to rule here and let

Judge Flanagan deal with that, there's -- there are a couple

of concerns that we have about that.

First, Your Honor's decision with respect to that

issue is entitled to some deference with respect to, you

know, the appeal standards to Judge Flanagan and so we won't

be starting to some degree in a new slate there but puts us

at a bit of a disadvantage --

THE COURT:  Well, as much as I appreciate that

position, if you object to *de novo* review --

MR. McLOUGHLIN:  But the second point I think, your

Honor, is there's the old joke that the first step to a

successful appeal is to lose in the first instance.  To the

point that we're all here, we've subpoenaed the agents,

everybody is ready to go.  In terms of the efficiency of the

Court, the efficiency of Judge Flanagan's docket, the

efficiency of your docket, if she sends it back, in terms of all the practicalities here that I think are driving your question of whether you should just kick it up to Judge Flanagan, I think they overwhelmingly argue for proceeding today and let Judge Flanagan make her assessment on that because my guess is it's going up to her. However this plays out, she will be able to do so on a full record. And as every appellate review starts with, we want to do it on a full record.

THE COURT: Okay. The next matter I had on my list of topics to discuss was whether the defense needed to satisfy the *Farmer* standard, particularly the financial aspect of that, before we could proceed to the remainder of the hearing challenging probable cause and all that.

Ms. Kocher, you can correct me if I'm wrong, but I have taken from what you said that we don't need to get into that from your standpoint.

MS. KOCHER: That's correct, Your Honor. I just don't want to skip the issue of the *Franks* showing. Just to make certain we have that still outstanding.

THE COURT: That's where -- I want to head in that direction next. Well, let me ask, before I move on from this, are you going to claim they need to meet that financial element before we can address the *Franks* issue?

MS. KOCHER: So my position -- and I would dispute

1    that I have conceded anything in *Franks* -- all I conceded is

2    I could see the defendant arguing that -- but from our

3    position, the *Franks* hearing has nothing to do with the

4    monetary -- with the forfeiture.  That's only whether they're

5    going to get a hearing to attack the affidavit itself.

6              The other issues that were before the Court today

7    have nothing to do -- right, exactly -- so if we're talking

8    about *Franks*, it has nothing to do with attorney's fees.

9              THE COURT:  So I'm not going to delve into whether

10   Mr. Teyf needs any of these assets to support his defense

11   counsel; and I just want to be clear you're fine with that

12   before I move on to the other many issues we have to address

13   today.

14             MS. KOCHER:  For the record, the Government would

15   argue strongly that he does not need any asset for counsel;

16   but, yes, the Government understands that that is not a part

17   of this hearing as we move forward.

18             THE COURT:  All right.  And getting to the merits

19   of the motion, I see four questions here from the defense's

20   standpoint -- and please correct me if I'm wrong.  This is

21   how I'm thinking about it so I want to make sure I'm thinking

22   about the right questions.  On the first hand we have the

23   question of whether the warrants as submitted establish

24   probable cause to seize these assets.

25             Question two is whether there were material

omissions or falsehoods that, if properly included or
excluded, would defeat probable cause.

The third issue is whether the Government exceeded
the scope of the warrants when it seized various jewelry and
other items from the Teyfs' home.

And the fourth issue is whether the funds in the
account are tainted or not.

Does that accurately reflect the arguments that
we're going to be addressing here today, Mr. Loughlin or Mr.
Han?

MR. HAN:  Yes, that's fair.

THE COURT:  So I want to begin first with the
overall probable cause of the warrants as submitted and then
after that we'll deal with the _Franks_ issue of whether there
were omissions or things that were improperly included.

I'll hear from the defense on your argument as to
why there is not probable cause with the warrants as
submitted.

MR. HAN:  So primarily with respect to the warrants
as submitted, the affidavit does not have the appropriate or
the requisite nexus between what the Government alleges to be
a criminal scheme that occurred in Russia and the funds that
ultimately made their way to the U.S., which the Government
claims were monetary transactions involving the proceeds of
specified unlawful activity.

What the affidavit indicates from the confidential source is that he overheard conversations about a scheme of some sort where supposedly Mr. Teyf was receiving a percentage from certain subcontractors who had engaged in work for the Russian government. That's what he overheard.

He then says that Mr. Teyf would send him to go pick up cash from various locations. He says that's all the -- the only information he got about that cash was a phone number and a location. Nothing about who was paying this cash, nothing about what the cash was for, not even about an amount. In fact, he specifically tells the Government he doesn't know how much money he's collecting.

So then he later says that he's seen documents indicating that money was transferred from a bank in Russia that Mr. Teyf banks at to bank accounts in Cyprus. In the affidavit the FBI agent, Agent Richards, refers to that account from the confidential source as saying that he actually affirmatively said he saw documents indicating bribe proceeds.

That's part of what we claim to be a false statement based on other documents that we received in discovery. Be that as it may, even if it's true that he saw documents indicating that there were actual bribe proceeds being transferred from a bank in Russia to bank accounts in Cyprus, we don't know anything about those accounts. We

1  don't know how that money got to the bank account in Russia,
2  we don't know what accounts in Cyprus received these.  The
3  confidential source doesn't know either; and then ultimately,
4  the Government alleges that there are all the suspicious
5  wires coming into the U.S. from various countries including
6  from Cyprus where the actual bank is -- I should say,
7  companies are in various countries -- but there's no
8  connection between those wires and any of the other
9  information that the confidential source supposedly gave to
10 the Government.  There's no way to connect any of that to the
11 original alleged scheme, which they contend is specified
12 unlawful activity which is the conduct that occurred in
13 Russia with respect to these subcontractors.

14         So taking all that together, there's no probable
15 cause to believe that what Mr. Teyf actually received in the
16 U.S. has any relationship to this supposed scheme that the
17 confidential source told the Government about.

18         That's essentially the gist of the defense's
19 argument with respect to probable cause as it appears on the
20 four corners of the affidavit.

21         I should note that there were three other
22 jurisdictions where banks were and that's in the affidavit
23 itself.  So the majority of the wires were from a bank in
24 Cyprus so the Government also indicated that there was --
25 there were banks in Hong Kong and the U.S. and the Russian

1 Federation and there's literally no connection between those

2 wires and the activity that supposedly occurred in Russia.

3 THE COURT: So how would you respond to this. The

4 affidavit lays out that your client was engaged in this

5 kickback scheme which involved massive sums of money to the

6 extent that it's alleged that $150,000,000 was given to this

7 defense minister and your client was receiving a smaller but

8 unknown portion of that amount of money. He comes here to

9 the United States, his reported income on forms is under

10 $100,000 a year. His tax returns for the relevant periods of

11 time reflect income under $100,000 a year. His businesses

12 were operating at a loss or not making much money at all yet

13 there's this influx of millions upon millions of dollars into

14 his bank accounts that could arguably -- at least one

15 instance in the affidavit as it sits here, saying that bribe

16 proceeds were transferred internationally. So why would that

17 not be sufficient to establish a fair probability that these

18 funds were related to the unlawful activities.

19 MR. HAN: Mr. Teyf had no access to any other funds

20 so the fact he's not making much money in the U.S. says

21 nothing about his wealth. All it says is he's not making

22 much money in the U.S. What the Government didn't include in

23 the affidavit but what the confidential informant told them

24 is prior to 2010 -- in other words, prior to any of this

25 supposed scheme that the confidential informant tells the

1   Government about, he -- the confidential informant says that

2   he -- Mr. Teyf -- owned and sold an oil refinery in Cyprus.

3   Obviously -- I mean, he doesn't tell us how much Mr. Teyf got

4   for the oil refinery but I would imagine that it was a pretty

5   hefty sum.  That's an alternate source of funds that he could

6   be receiving.  It wouldn't be income in the U.S. for many of

7   his U.S. enterprises.

8           The confidential informant also tells the

9   Government in that -- at the very beginning of that

10  debriefing session, that Mr. Teyf owned a number of companies

11  in Russia and that he wasn't just working at Fishing Group

12  Delta, he was the president.  I'm sorry, he was the owner of

13  Fishing Group Delta in Russia.  That's in the confidential

14  informant's debrief to the Government.

15          So there are all these other sources of potentially

16  legitimate funds that the Government did not include in their

17  affidavit because --

18          THE COURT:  Well, I'm trying to focus on what is in

19  the affidavit in terms of what Judge Gates would have

20  considered for establishing probable cause and, I mean,

21  there's case law saying the Government doesn't have to do a

22  more thorough investigation; and the fact there might be

23  other facts out there unknown to the Government does not

24  negate probable cause.  So I'm looking at what's on the paper

25  that was in front of Judge Gates.  Perhaps Mr. Teyf does have

1    a lot of assets elsewhere, but what was presented to Judge

2    Gates was basically no income -- no meaningful income in

3    relation to the sums that were being received, businesses

4    operating at a loss and I guess there was a statement that he

5    had no interest in financial accounts elsewhere as well.  So

6    that's kind of what I'm focusing on.

7         The next -- I'll gladly hear from you on the next

8    section as to what should be in there, but in terms of what's

9    actually on the paper is what I'm focusing on now.

10        MR. McLOUGHLIN:  Your Honor, on that issue, just to

11   forecast for a second, this is not a case where the

12   Government didn't have the information with respect to these

13   other interests.  It did from the confidential informant, it

14   just didn't include it so it puts it in a different category;

15   but where the Government has an obligation to trace, one has

16   to distinguish between the case in which you have the average

17   search warrant, as in _Gates_ where it's -- the question is, is

18   there a probability -- a fair probability -- that the items

19   are to be found in that location.  That is the standard

20   search warrant test, okay.  That's the standard affidavit.

21   Here, under the applicable law, there is the obligation to

22   trace, which is not just is there money in the account, but

23   is there the tainted funds in the account and how do you

24   establish the probability that there's the tainted funds.

25        And so where here you have the circumstance that

there is an absolute break between money going to somewhere
in Cyprus -- we don't know what bank, we don't know how much,
we don't know when -- because none of that is provided.  And
then there are transfers not just from Cyprus, but from these
other locations -- and the affidavit makes absolutely no
effort to connect them -- you have an issue.  Because if you
look at the tax question, income is, of course, taxable and
needs to be declared, capital does not, so the tax analysis
that would be -- and I want to say required because it is --
to say, well, we know -- we can't trace any of this, but it
has to be the result of this bribery scheme.  Why does it
have to be?  Because he doesn't have any other assets.  If
they can't say in any way, shape or form he doesn't have any
capital prior to the relevant date, then one cannot draw the
reasonable inference that that's the only source because it's
a reasonable inference.  Capital -- if we assume the sale of
the oil refinery, if we assume income from being the -- a
senior official at Voentorg from his ownership interest in
these other places, then there is, by definition, a
significant amount of capital that could have been not in a
bank account and so would not have to be declared under the
-- do you have an interest in a foreign bank account -- it
could have been in a business or other circumstance, which
would, in fact, have been readily available to be transferred
in.  And the tax return would not tell you anything about

that because, again, the tax -- taxes are about income, not about capital.

THE COURT:  And this sounds like an argument that is well made before a jury in terms of why your client is not guilty of some of these offenses, but what I'm getting at is what's on the paper --

MR. McLOUGHLIN:  Absolutely --

THE COURT:  -- and if we had warrants awarded in a contested setting, this would all be great fodder for that sort of setting, but we don't, we have what's on the affidavit and I'm trying to focus on what's there at this point in time.

MR. McLOUGHLIN:  Right.  And what's on the paper, you know, that his income taxes in the U.S. or his tax returns in the U.S. show a certain amount of taxes only is as persuasive as your Honor's question implies such that, isn't that just enough.  If one simply ignores the totality of the circumstances, which _Gates_ requires the Court to consider and analyze with respect to whether the words on the paper are sufficient, and when the totality of the circumstances indicates that someone who's approximately 58 years old, who has had a -- who, according to the affidavit, was a senior official of a significant enterprise and had an ownership interest in another enterprise could have accrued capital, it's a very easy question to say that -- words on the paper

do not allow me to conclude that money coming from these places was, in fact, the result of the bribery scheme.

Because, again, let us just assume for the sake of argument that Mr. Teyf was a bank robber and he robbed 20 banks in Russia and got $40 million, okay, and he then transferred the stolen funds to those accounts. It is not the specified unlawful activity. Because the other thing that the fair probability requirement standard tells you is the funds on the face of the document have to be connected to the specified unlawful activity and there is no effort in the document to directly connect the funds that come into the U.S. to the specified unlawful activity because they don't know how much there was and they don't tell you in the affidavit -- didn't tell Judge Gates. They don't know how much money went to any foreign jurisdiction or whether, in fact, it was that money. They don't say that it was. And they don't tell you that once that money went to those jurisdictions, that that's the same money that came to the U.S. They just don't know.

And so in that circumstance where you have that substantial omission, the words on the paper are simply not enough under any standard, again, in the totality of the circumstances.

And we'll get to the misrepresentations and omissions which would create other issues for it, but in some

sense it's a black and white wall.  You get a certain amount
of money in Russia, we don't know how much, we don't know
exactly where it went and then wires came into the U.S. from
these four jurisdictions so it's the same money.  Where is
that.  Well, we know it's the same money because he filed tax
returns and he didn't declare that he had income from
anywhere else in those years.  He didn't declare he had
income in the U.S.  He had losses in U.S. businesses.  So
what.  Because all of that money comes from Russia or through
these other places so the U.S. businesses are simply
irrelevant to the question.  They're -- they don't mean
anything.

          To the extent there are other interests again in
the bank account or capital interest, we know that they
couldn't be enough for this reason.  Again, totality of the
circumstances you ask, okay, how do I draw that inference
that there's that connection when I have these gaps?  And the
answer is, of course, you can't because it's not just that
there's a fair probability anyway, it is the fact that those
tax records don't tell you anything at all about capital or
prior assets.

          You know, in the UK they now have these unexplained
wealth orders for money laundering.  If I'm a -- the first
unauthorized or unexplained wealth order was the wife of, I
think, a Kazakhstan government official who bought a fifty or

1  $48 million townhouse in Mayfair, somewhere in London.  The
2  government gets to go to court and say, the wife of an
3  official who made, you know, $100,000 a year just bought a
4  $50 million house.  We want them to explain what that's
5  about.  And if they don't explain it, then the government
6  seizes it.

7          What that order recognizes is that in that kind of
8  entire concept -- and it's fundamental to money laundering --
9  is there has to be traceability.  There has to be a direct
10 line.  There is no case that the Government can cite that
11 says, if you want to find tainted funds, even if you want to
12 show a fair probability, you don't have to trace.  If you
13 look at the *Miller* decision, for example, coming out of the
14 Fourth Circuit, which originally came out of the Eastern
15 District of Virginia, you see the government putting on a
16 forensic accountant who traces the money from the illicit
17 receipt of the funds through several bank accounts to the
18 personal account into the real estate payment of the note and
19 the rest.  Here, you have this huge gap in the middle and so
20 by definition that -- they haven't made an effort to fill
21 that.

22          THE COURT:  Thank you.

23          Ms. Kocher or Mr. Fesak.

24          MS. KOCHER:  Your Honor, first to note that I don't
25 think it has been said on the record, I believe your Honor

also handled at least one of these seizure warrants.  I don't believe that Mr. Teyf had an interest in perhaps the one or two that you considered more recently in February.  I believe that those were Tatyana Teyf's accounts, but I just wanted to make that clear if your Honor was unaware or if Mr. Teyf was unaware at all.

The defendant, in argument, uses the word, we can't conclude, the Government doesn't know, and those types of vituperative words that would be great for a jury, but aren't the standard here.  The Government doesn't have to show it knows, we don't have to be able to conclude it is a fair probability.  We're at the standard of probable cause and the affidavits do set forth probable cause.

The defense conveniently wants to break apart and study each separate sentence of the affidavit like the fact that the only information the CHS was given was a telephone number and location to make the pick up.  They ignore the other substantial -- and I think that we can conclude actually beyond a fair probability -- but they don't take the affidavit in totality -- which, of course, the Court did in its entirety -- without breaking down to those single facts.

For instance, just above the statement -- so it was argued that all we had was that the confidential source overheard conversations.  In fact, that's in the affidavit.  But the very next paragraph says, the confidential source was

1   also present for multiple conversations between Teyf and

2   another, the very individual who was hired to manage the

3   companies.  The focus of those conversations was Teyf

4   providing instructions to that employee about how to transfer

5   the proceeds of the kickback.  It also says that Teyf hired

6   the accountant which maintained records of the companies

7   including the kickbacks that he took from the subcontractors.

8           From there -- and I can't recall, your Honor, if

9   the affidavit -- let me -- if I can double check because I

10  don't want to get out of the four corners of the document so

11  I'm not certain and I don't want to take -- I'll withhold

12  that comment for the next phase.

13          From there, it's not simply that this amount of

14  funds -- which roughly corresponds, by the way, to the

15  percentage that the CHS said that Teyf was receiving overall

16  -- that overall he was aware of at least 150 million that

17  went up the chain and that Teyf was receiving a portion of

18  kickbacks outside of that 150 million.  The manner in which

19  it was transferred here goes to probable cause and the fair

20  probability.  Not simply that it came from four

21  jurisdictions, most of it from Cyprus.  The manner it came

22  from Cyprus is through these multiple -- and they're set out

23  on page 39 and 40 of the affidavit that was filed as an

24  exhibit by the defendant with his motion -- one, two, three,

25  four, five, six, seven, eight, nine, ten, eleven, twelve,

thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty -- different companies are the source of this $39.5 million.  That alone sets aside the argument that the defendant has just made that it could be legitimate funds from capital or from his income at Voentorg.

And actually, just stepping to that for a second. Capital may not be taxable -- and I'm not in private practice so my income is limited and my experience with ownership of capital is therefore limited -- but in his example, he specifically said that he had capital and income from Voentorg and I point back out, we're back to income.  The jumping back and forth between the different topics is confounding the issues.

Capital may not be taxable.  That, in my belief, would be the building of Voentorg or the building of Delta Plus.  To the extent that that was -- that he was able to withdraw capital from that, that becomes cash and that becomes income.  There has to be a source of that cash.  He has denied having financial interest in any foreign account. So at best it is, in fact, income cashed out from his capital.  So that argument, in the Government's opinion, is distracting and it's not significant.

The Government does not have the obligation to trace the funds and that's where we come down.  Particularly at the warrant stage, at the fair probability; but I go

further, your Honor. The Government doesn't have the
requirement to trace the funds period.

There are two forfeiture statutes at issue and the
briefs again co-mingle -- not borrowing the term from the
asset issues -- but the case law -- you can't just type in
the word "forfeiture" and use the case that comes up in
support of your position. The forfeiture in this case is
under Title 18, Section 982 and that section provides
specifically that what can be forfeited are proceeds or
property involved in.

All the case law cited by the defendant in regard
to tracing -- and I'll back up -- maybe not all of it, but
the vast majority of it is citing Title 21, United States
Code, Section 853. 853 requires tracing. It specifically
says proceeds traceable to. The way the confusion comes in
is that 853 contains the procedural rules which are adopted
by Title 18, 982. So 853 does play in when we start talking
about substitute assets and the process the Government must
go to get them, but the law of forfeiture in this case is
controlled by 982. We have access to proceeds traceable to
the offense and property involved in the offense.

In this case, the Government did establish, as
affirmed by two separate magistrate judge opinions, that
these affidavits established the fair probability that the
significant funds transferred over here in the manner they

1  were in, once they got here, the transfers by and in between
2  70 different financial accounts -- many times those happening
3  without any reason.  With the denials on the tax return of
4  having any financial interest in a foreign account, there is
5  fair probability that that 39.5 million that came in through
6  those wires, through those what we believe to be shell
7  companies are, in fact, proceeds and property involved with
8  the crime we allege occurred in Russia.
9          MR. HAN:  Your Honor, if I may being heard.
10         THE COURT:  Sure.
11         MR. HAN:  So I just want to make sure that we're
12 all on the same page here.  When we talk about fair
13 probability, it's not just fair probability to believe these
14 are proceeds from some, you know, unsavory activity or some
15 attempt to hide money or anything like that.  You have to
16 have a fair probability that these are criminal -- these are
17 proceeds as specified unlawful activity.  That's the only way
18 you get to money laundering.
19         So the affidavits sort of claim that these are
20 proceeds of specified unlawful activity.  Never tell you what
21 the specified unlawful activity is.  Those are enumerated.
22 In the definition of specified unlawful activity, there are a
23 bunch of crimes that would constitute specified unlawful
24 activity.  As far as I can tell, there is no way to tell from
25 this affidavit what that specified unlawful activity is.  And

1    I think that's the point here is that the Government is
2    essentially saying there are wires coming in from various
3    companies, that these look unusual, it's indicative of
4    criminal activity.  You can't just then say, oh, and we know
5    about this alleged scheme by this confidential informant.
6    And, therefore, it must be related to that activity.
7            THE COURT:  The allegations in the affidavit are
8    that your client engaged in this kickback or bribery scheme
9    with a government official and that it -- when it was
10   revealed, it engendered an investigation that was only
11   stopped because your client allegedly bribed the government
12   official to stop it.  And your brief, I think, mentions a
13   crime against a foreign nation as one of the predicate acts.
14   And, again, we're dealing with fair probabilities here.  Why
15   doesn't that get you across the line?  I know we're straying
16   a little bit into the next section, but here we are.
17           MR. HAN:  And that does go into our arguments about
18   omissions and false statements; but very briefly, the
19   confidential informant believed that these payments occurred
20   in 2013 when everybody agrees that the Russian defense
21   minister was no longer the Russian defense minister.  So how
22   those can possibly be bribe proceeds when you're not paying a
23   government official, or public official, I don't know.  But
24   that seems to me to be a material omission with respect to
25   the affidavits.

1          And one last minor point.  The Government, I think,

2     indicated that withdraw of capital is not income -- or it is

3     income.  That's just flatly not true.  If I invest money, my

4     own money, and then I withdraw my principal, I haven't made a

5     cent.  I haven't gotten income.  So there are all kinds of

6     ways in which Mr. Teyf could have had interests that are not

7     reportable but from which he could have drawn assets.  He

8     could have had property against which he took a loan and that

9     wouldn't be income, that wouldn't be reportable?

10          So the affidavit kind of depends on kind of boxing

11     Mr. Teyf into this situation where he doesn't have access to

12     any other funds and the only possible explanation is this

13     supposed criminal scheme that occurred in Russia.

14          THE COURT:  I feel like what you're asking me to do

15     on that point is to say the Government should have done more

16     investigation before they applied for the warrant.  Because

17     what you're saying is the Government should have figured out

18     where his money -- where all of his assets were and all of

19     his financial abilities were, but they either didn't or

20     couldn't do that and, therefore, the warrant is invalid.  And

21     I think that's contrary to the law which says the Government

22     doesn't have to do substantial additional investigation

23     before they apply for a warrant.  I'm paraphrasing but

24     that's generally the gist --

25          MR. HAN:  That's not our argument.  We understand

1    that the Government doesn't have to do additional

2    investigation, but this is all information the Government had

3    and didn't put it into the affidavit.  That's why we believe

4    it's a material omission.  That's all information that the

5    magistrate should have been presented with so that they can

6    make a fair determination about whether or not there was

7    probable cause to believe that the funds that the magistrate

8    was authorizing for seizure, that there was a fair

9    probability it was connected to this so-called scheme in

10   Russia.

11           MR. McLOUGHLIN:  Your Honor, I want to go back

12   to -- as Mr. Han said -- make sure we're all on the right

13   page.  There are two different issues, one of which is are

14   the funds -- particular funds in these accounts -- connected

15   to money laundering, but there's no allegation either in the

16   affidavits or the indictment that there was illegal money

17   laundering activities in the United States.  It's -- once it

18   gets here, it's all before that.

19           And the second thing is are they tainted assets.

20   And the statement made by the Government that they have no

21   obligation to trace in order to get a search -- to get a

22   seizure warrant -- not a search warrant for bank records, a

23   seizure warrant -- is absolutely not the law.  It's not

24   close.  There's no case that the Government can cite to your

25   Honor that says the Government doesn't have to show to a fair

1    probability that these funds are traceable.

2           THE COURT:  Well, is there a case that you can cite

3    me that says they have to produce that tracing in order to

4    get a seizure warrant?  Because here's the way I'm look at

5    this.  When we consider these search warrants -- search

6    warrants and seizure warrants, the same standard applies

7    generally that they can be based on hearsay and all sorts of

8    inadmissible evidence.  So if the confidential source came in

9    and said, I heard Mr. Teyf said say, or, I heard the

10   accountant say we're sending it here, there and the other

11   place, that would be sufficient even if there was no actual

12   tracing to back that up.  So I don't -- you're proposing a

13   very thorough standard here.  Is there a case that says they

14   need to do it and if not, then why, given the loose way in

15   which evidence is accepted for warrants, do we need to do

16   that?

17          MR. McLOUGHLIN:  Well, your Honor, we would -- you

18   know, we would look at *Miller*, right, and we would go back

19   also to *Chamberlain* and we would go back before that to

20   *United States v. Lewis* where --

21          THE COURT:  Let me stop you there because

22   *Chamberlain* -- and this is an interesting question that I

23   don't know that we need to get into -- but *Chamberlain* was

24   853(e), the restraining order provision, and it talks about

25   how the specific language of 853(e) refers to 853(a) and that

was the reasoning behind the *Chamberlain* decision.  They repeatedly cite 853(e) and 853(a).  When you look at 853(f), it talks about anything -- and I'm going to paraphrase a bit -- but any assets that are forfeitable under this section. It's not connected to 853(a) like 853(e) is.  853(f) applies to all of 853, which would also include substitute assets.

So -- under 853(p) -- so I'm not 100 percent sure that *Chamberlain*, by its specific language, applies to 853(f).

MR. McLOUGHLIN:  Your Honor, we would submit that it does because *Chamberlain* is unambiguous; and as I think Ms. Kocher has acknowledged, the Government in that case acknowledged -- in fact, they didn't even have oral argument because the Government acknowledged -- but also in *Lewis* the Government made absolutely clear that you can't seize substitute assets before a conviction.

So to the extent there are substitute assets that you are going to seek forfeiture in, that's the civil proceeding that comes after the conviction.  Prior to the conviction you cannot seize substitute assets.  That is the core of *Lewis*.  And we're not trying to set an unusual or an unusually high standard here.

THE COURT:  *Lewis* was untainted assets that are necessary for retention of counsel.  It was very specific. Justice Breyer at the outset said, here's the question we've

1 been asked to decide. It includes the Sixth Amendment issue.

2 And then he says, here's how we're answering it, and he

3 answers in the context of the Sixth Amendment issue.

4 　　　　MR. McLOUGHLIN: But if you look at -- that's the

5 basis, but if you read *Chamberlain* -- the Fourth Circuit's *en*

6 *banc* decision in *Chamberlain* makes very clear that the issue

7 of whether you need them for legal fees is now off the table.

8 That is not --

9 　　　　THE COURT: I don't think -- it doesn't explicitly

10 say that. I know *Miller* takes that view point at the trial

11 level and then the Fourth Circuit doesn't address it in

12 *Miller* specifically.

13 　　　　MR. McLOUGHLIN: But they affirmed.

14 　　　　THE COURT: I know, but I don't necessary know that

15 *Chamberlain* explicitly takes that off the table; but for the

16 purposes of today, I think we've dealt with that issue.

17 　　　　MR. McLOUGHLIN: But to Your Honor's point, we're

18 not talking about an unreasonable standard here. We are

19 saying that if there is this absolute blank in the middle,

20 all right, that is as wide as it is here, you haven't met

21 probable cause. And we're not saying you have to trace it

22 all the way through to get fair probability, what we're

23 saying is you have to do something. And where you can't do

24 anything, just like in any search warrant case where you know

25 if you don't know where it is or you don't know what it came

from or -- every day law enforcement doesn't have enough to
get a search warrant so they have to get more information.
They have to do more surveillance, they have to interview
another witness, they have to do something else.  That is not
unusual.  That is not an unreasonable burden on the
Government to preserve the Fourth Amendment.  So all we are
saying here is under that fair probability standard, there is
a minimal connection that is required and here where you have
such huge gaps on essential pieces of identified funds in a
specific account, there is to some degree some tracing or,
again, fair probability of showing, okay, here are these
connections, that is required.  And these affidavits simply
don't get there.  I want to be clear.  We're not advocating
for a new legal standard or a different legal standard, we're
asking that the Government do what it's required to do every
day when it gets a warrant.

      THE COURT:  So you didn't tell me a case that
requires tracing at the warrant stage, did you?

      MR. McLOUGHLIN:  So -- (conferring briefly with
Attorney Han off the record at counsel table).

      Your Honor, we'll have to get -- on our brief, the
issue is that you have to show a fair probability that the
funds are the funds of specified unlawful activity and so I
think the cases simply assume that as *Miller* does.  Because
if you haven't traced money from the specified unlawful

activity to a particular account, how can you establish that
there's a fair probability that it's the same money?

And so, again, I think that is one of those first
principles that cases like *Miller* simply assume; that if you
can't show that -- if you can't show a connection -- and
tracing can be done by a witness -- confidential informant --
it can be done by accounting, it can be done in any number of
ways to show that connection -- and maybe tracing may be the
wrong word.  Is a fair probability to show the continuous
line from the specified unlawful activity to the specific
funds in the account.  However, you want to articulate that.
That's what didn't happen here.

And, your Honor, in terms of your process, spent a
fair amount of time with this and we appreciate your
patience.  Do you want us -- because it is part of the same
analysis at the end of the day, would you like us to start
talking about the misrepresentations and omissions, which we
think are compelling.

THE COURT:  Ms. Kocher, anything you want to add
finally at the back end on this issue?

MS. KOCHER:  It would -- just repeating the
information in the affidavit, your Honor.  The Government
showed a nexus -- may be the best word -- between the funds
by a fair probability.  What the defendant is asking for is a
tracing that establishes, as a matter of fact, that the

1  allegations of crime there is, in fact, the money here and

2  that's not the standard.  It is a fair probability.  And

3  given the totality of the affidavits, particularly in the one

4  that is their example that was filed with the motion at

5  paragraph 74, it does detail exactly how the money moved, and

6  in those paragraphs surrounding where it came from and how it

7  ended up here.  And again, the totality is that there was

8  probable cause for the issuance of those seizure warrants.

9          THE COURT:  Boiled all the way down, your nexus

10  argument is effectively what I laid out at the beginning.

11  He's getting a whole lot of money and he seems to have no

12  legitimate means for doing it.  Is that the crux of your

13  argument?

14          MS. KOCHER:  I would only add, coupled with the

15  methods of concealment with the -- to borrow a phrase from a

16  colleague -- funny money moves funny -- and this money

17  definitely moved funny.  And that does support our argument,

18  your Honor.

19          THE COURT:  Thank you.

20          All right.  Moving on to the alleged misstatements

21  and omissions.  Mr. McLoughlin, how do you want to proceed

22  with those?  I noted five that you raise in your motion.  I

23  don't know if we just want to discuss those and hear argument

24  on those.  I don't --

25          MR. McLOUGHLIN:  Give us one second, your Honor.

1          THE COURT:  Sure.

2     (Attorneys McLoughlin and Han conferring briefly at counsel

3                    table off the record)

4          MR. McLOUGHLIN:  Your Honor, this is where we come

5     to Your Honor's preferences.  There are misrepresentations

6     and omissions that are not laid out in briefs or which we

7     expected and, therefore, subpoenaed witnesses.  And we can

8     put those on through the witness in cross-examination of

9     those witnesses or we can do a proffer and then back them up

10    with a witness.

11         I would request that if we take the latter point,

12    that the individuals who were subpoenaed to testify be

13    sequestered, asked to leave the courtroom, so they don't get

14    a forecast of what the issues are but we can put them up.

15    However your Honor would like to proceed.

16         THE COURT:  So you intend to raise additional

17    issues beyond the five that were raised in your motion?

18         MR. McLOUGHLIN:  We do.

19         THE COURT:  Ms. Kocher, any preference on how we

20    proceed?

21         MS. KOCHER:  Your Honor, I would proceed with legal

22    argument that they're not entitled to put on any evidence at

23    this point.  So under _Franks_, they have the requirement of

24    making a substantial preliminary showing not only that a

25    false statement was made, but that the statement was

knowingly and intentionally made or with reckless disregard
was made that -- and that the statement was necessary for
probable cause.  Their filing doesn't make that substantial
showing.

So I can go through each of these -- mainly, it
does not establish any *mens rea* on the part of the affiants.

Now a case that is significant to the Court's
consideration of this is the *Tate* case from 2008 here in the
Fourth Circuit.  524 F.3d 449.  In that case, a search
warrant was obtained by an officer or agent who alleged that
a trash pull gave evidence giving rise to a search of the
place to be searched.  I think today it was the home, but I
may not be remembering that correctly.  The defendant in that
case found -- and that affidavit just simply said something
to the effect of, I obtained trash from a place where trash
is normally located.  The defendant in that case in the
written motion for the hearing provided other affidavits that
the same agent had made based on trash pulls.  And in the
other affidavits, the agent had included that he had obtained
the trash from an area in a public location or from an area
where everybody's trash was put for pick up or something like
that.  Notably in the *Tate* case, the affidavit that was being
challenged did not include that statement.  That is a
substantial preliminary showing of an intent.  The Fourth
Circuit was very clear it wasn't deciding that the agent

intentionally or recklessly omitted that language from the affidavit, but the defendant had made a substantial preliminary showing.

In this case, there's been nothing about the *mens rea* of the affiants. The Government does not believe that they have made a showing for *Franks*.

In regard to their issues, the five issues, the Court doesn't need to -- you know, as a matter of law the characterization of the conduct as extortion is an overstatement. As I noted in our response there's no -- that's not a misstatement or an omission that goes to probable cause. Certainly no evidence. I would ask -- the Court doesn't need to be heard on that one.

The fact that no mention of Russian law was made, the specific law, is not a false statement or an omission that goes to probable cause. The affidavit sets out that bribery is a violation of Russian law; and for these items that don't go to false statement or omissions, they don't get an evidentiary hearing. We have already had the conversation over whether there's probable cause on the four squares of the affidavit itself.

So if we go forward to hearing, the issues should be limited to false statements or omissions that were intentionally or recklessly made and that affected probable cause. And the Government's position is these things did not

affect probable cause in any event.

Taking, for example, the argument about the, probably occurred in 2013. It's been mentioned several times this morning. First, the very word "probably" for acts that occurred six years ago from this point -- the word "probably" has -- I mean, exactly what it is. It's a limitation on that witness; but even more than that, what they're trying to use is basically -- an inconsistent statement is not talking about Teyf's receipt of the bribes. That shipment in 2013 is referring to the deliveries the CH, the confidential source, made to Serdyukov or his people. That's not the basis for our seizure and our seeking the seizure of these accounts. I don't know when Serdyukov was paid. Maybe it was in 2013.

So the information that they're alleging isn't even a direct match and it is not -- it doesn't go to probable cause.

I think the final issue in regard to the jurisdiction of primary concern being misleading to the Court -- again, the affidavit sets out what is relevant and that is the money came from Cyprus, a jurisdiction of primary concern. The fact that the United States might also be on that first doesn't take into account the way the countries fight money laundering -- the United States does a lot, Cyprus not so much; but the fact that the United States is also a jurisdiction of primary concern, the Government would

1  argue, does not affect probable cause.

2        So until the defendant makes the substantial --

3  substantial preliminary showing -- more than a fair

4  probability perhaps -- a substantial preliminary showing that

5  there was intention or the required *mens rea* in regard to

6  these omissions, claimed omissions and falsehoods, then there

7  is no *Franks* hearing.

8        THE COURT:  What about the bribe proceeds/money

9  discrepancy that's been raised?

10        MS. KOCHER:  Your Honor, again I go back to the

11  totality of that affidavit.  So the -- the context of the

12  conversation with the confidential source is only about the

13  bribe proceeds.  Whether the agent wrote down, bribe

14  proceeds, in that source report or wrote, money, in that

15  source report, the context was bribe proceeds.  They weren't

16  talking about anything other than bribe proceeds.  It's not

17  an omission.  It's just simply not.  And it's one of the

18  reasons why the *Franks* hearing doesn't come up without that

19  substantial showing.  Because otherwise we're second-guessing

20  all of these types of things and it's -- we can go over every

21  sentence in the affidavit in the same way and see if there's

22  a writing in discovery that supports it or might somehow

23  undercut it.

24        THE COURT:  So, Mr. McLoughlin, let's talk a little

25  bit about whether you've met the standard based on what's in

1    your motion.  And I want us to all assume for the purposes of

2    argument for this portion of our discussion that there is

3    probable cause to support the seizures and the warrants as

4    written and we'll go from there.

5            MR. McLOUGHLIN:  Yes, your Honor.

6            THE COURT:  To be frank, I think the -- and it's

7    not a pun -- but under *Franks* --

8            MR. McLOUGHLIN:  Puns are a good thing, Judge.

9            THE COURT:  So as Ms. Kocher mentioned, you need to

10   make a substantial preliminary showing the false statement

11   was knowingly and intentionally made or that it was made with

12   reckless disregard for the truth and that the offending

13   information that was omitted or incorrectly included is

14   essential to the probable cause determination such that if I

15   exclude it, there's not probable cause or if I include it, it

16   defeats probable cause.  So that's kind of how I'm looking at

17   this.

18            I'm going to go through these one by one and we can

19   talk about them.  If you want to make a discussion at the end

20   we can talk about a totality sort of situation here.

21            MR. McLOUGHLIN:  Can I suggest, your Honor, what we

22   could do is -- in terms of making the probable cause showing,

23   we've got some exhibits we put in.  We have a little

24   confidentiality issue, we can talk about that, but we'll

25   use --

1    (Attorneys McLoughlin and Han conferring briefly at counsel
2                      table off the record)
3           MR. McLOUGHLIN:  We'll have to talk about that,
4    your Honor, but we could just very quickly go through those
5    exhibits which we obtained in discovery which demonstrate
6    either omissions or misrepresentations, make the proffer on
7    that without a witness, go through that list and then your
8    Honor would have the complete list.  That might be better
9    than just going through the first five and then we have to do
10   all that, but however your Honor would like to do it.
11          THE COURT:  I'm trying to figure out the right way
12   to proceed here.  I mean, you raised five issues in your
13   motion and now you want to raise a bunch of others.  I'm
14   questioning whether that's appropriate in the first instance.
15   I don't know if these other issues all build off of what's
16   already in the motion or if these are wholly new items.
17          MR. HAN:  They go to information that the affiants
18   had about the confidential source that affects the
19   confidential source's reliability, which we argue in our
20   motion that they had reason to doubt his reliability and that
21   was not disclosed to the magistrate.
22          MR. McLOUGHLIN:  We just didn't go into the
23   specifics for a variety of confidentiality reasons and others
24   and now we have the documents here to say, okay, we told you
25   he was unreliable -- they should have said he was unreliable.

1   Here are the specific facts that tell you what was unreliable
2   about it and we can make those real for your Honor.
3          THE COURT:  Well, you said he was unreliable
4   because he didn't mention -- or the report -- the affidavit
5   didn't mention that these payments may have taken place in
6   2013.
7          MR. McLOUGHLIN:  That's far from the only reason,
8   your Honor.
9          THE COURT:  But that's the only reason contained in
10   your motion.  So I want to focus on those --
11          MR. McLOUGHLIN:  Yes, your Honor.
12          THE COURT:  -- that are in your motion and then
13   I'll mull over whether we consider other things.
14          The first issue you raise, the affidavits
15   repeatedly characterize Mr. Teyf's alleged conduct in Russia
16   as extortion.  Tell me how that gets you over the initial
17   showing required for a *Franks* hearing.
18          MR. HAN:  So we listed a number of false statements
19   and omissions because the Government is relying -- with
20   respect to that affidavit, they are relying on a totality of
21   the circumstances.  They're relying on various specific, what
22   they allege to be, suspicious indicators.
23          THE COURT:  Let me simplify this.  If I strike out
24   the word "extortion" from the warrant, why does it defeat
25   probable cause?

1          MR. HAN:  That standing in and of itself doesn't

2     completely defeat probable cause.

3          THE COURT:  Okay.  The bribe proceeds and money

4     distinction, let me hear from you on that.  That's one of

5     your better points.

6          MR. HAN:  I think that's key, right, because if the

7     confidential informant is saying, I saw documents indicating

8     this money -- which is related to the scheme that I've just

9     described -- was sent to a bank in Cyprus, that gets you

10    halfway down the chain of connecting the money that was

11    obtained in -- received in the U.S. from the money that

12    supposedly was obtained using the scheme; but the other

13    documents that we have received from the Government clearly

14    indicate that he never said that.  All he -- to be clear, in

15    that debriefing report, that conversation or that account

16    comes up in the context of the confidential informant

17    describing Mr. Teyf's banking activities.  It's a separate

18    section from the part where he talks about this supposed

19    kickback scheme.  And, in fact, he talks about a bunch of

20    other things in between.  So for the Government to say that

21    the conversation in this debriefing was only about the bribe

22    proceeds, that's just false -- and you can take a look at the

23    report yourself.

24          So it is absolutely not the case that the

25    confidential informant was clearly referring to bribe

1  proceeds when he said he saw money being transferred to
2  Cyprus.
3          THE COURT:  I guess the question I'm mulling over
4  is if the warrant application said the confidential source
5  heard -- saw documents reflecting that money was transferred
6  internationally when really all the discussion here is about
7  illegal money or allegedly illegal money, would that defeat
8  probable cause and why?
9          MR. HAN:  Because, again, whether something is
10 illegal money is a separate question from whether or not they
11 are proceeds of specified unlawful activity.  So the fact
12 that he's just talking about some money that's being
13 transferred, we don't know whether that's legitimate money or
14 criminal proceeds.  He's just talking about the fact that Mr.
15 Teyf banks at a bank called Alpha Bank in Russia and
16 sometimes he helps Mr. Teyf make deposits.  That's completely
17 separate from the conversation about this supposed kickback
18 scheme.
19          So then take that and use that as a nexus for
20 marrying up the Cyprus banks with the specified -- with what
21 they claim to be the bribe kickback scheme is disingenuous.
22          At the end of the day that statement provides, what
23 we contend, is the only real connection between the so-called
24 scheme that occurred in Russia and Cyprus.  And we just know
25 that that's a false connection.  So without that, I think

1   that -- I think that in and of itself defeats probable cause.

2           THE COURT:  What about the *mens rea* aspect on that

3   particular item.  How would you satisfy that?

4           MR. HAN:  Well, what other reason would there be to

5   characterize those transfers as bribe proceeds if not to --

6   they had the report in front of them, right.  They know

7   exactly what he said and to then go around and

8   mischaracterize them as bribe proceeds -- and if you take a

9   look at the actual debriefing report -- and now I'm going to

10  refer to what we've included as Exhibit C.  This was the

11  report of the debriefing that occurred in September of 2017

12  and the agent who prepared it -- Agent Lagocha -- very

13  helpfully broke up the sections by big spaces to indicate

14  different topics that were discussed.

15          THE COURT:  Can you tell me the docket entry number

16  on that and the page number you're referring to, please?

17          MR. HAN:  Sorry.  This was in the notebook that we

18  submitted.  It's Exhibit C.

19          MR. McLOUGHLIN:  Your Honor, while Mr. Han is

20  flipping pages, I'll note when you talk about the statements

21  in the briefs, the exhibits that we submitted to your Honor

22  provide the evidence of the misstatements.  So our view is

23  that it's in the record for purposes of our discussion today.

24          We believe that the individual who's identified in

25  those discussions -- we'll call him CH 1.  The Government has

not confirmed for us the individual we're talking about is, in fact, CH 1. We think that the totality of the circumstances -- to use a pun here -- make it overwhelmingly clear who that is. If that's incorrect, the Government will tell us; but we'll talk about what other statements that individual made that were not included in the affidavit with respect to his information that we believe the cases -- particularly *Lull*, the Fourth Circuit's decision in *Lull* -- make absolutely clear should have been included.

And so I'll -- now that Mr. Han is to his page, I'll sit down for a minute.

MR. HAN: So the account concerning money being transferred to Cyprus appears on what is marked as Bates B 1006. And it's its own separate section, it's just talking about Mr. Teyf using Alpha Bank in Russia and how the confidential source would take money from Mr. Teyf or provide escorts. There's -- but if you take a look at the sections that immediately precede -- they're not talking about the bribe kickback scheme. The immediate paragraph before that talks about Mr. Teyf's family connections, an ex-girlfriend. Before that, talks about Mr. Teyf -- his working history in Russia and it's not until you go back several pages that the discussion about the bribe -- the alleged bribe kickback scheme occurs.

So the only logical conclusion as to why this

1  statement by the confidential source was superimposed in the

2  bribe scheme was to try and bolster what little probable

3  cause they had to believe that Cyprus was connected at all to

4  the scheme.

5          And while we're in this section, I would also note,

6  we've talked at length this morning about how, according to

7  the affidavit, it appears that Mr. Teyf did not have any

8  other legitimate sources based on his lack of income.  This

9  section right here discusses the fact that Mr. Teyf sold an

10 oil refinery he had in Cyprus.  That was not included in the

11 affidavit.  Again, that's an important point.  I think we all

12 agreed this morning that's critical to the probable cause.

13 Why would you leave that out or not allow the magistrate to

14 have that information to make a fair determination about

15 probable cause if your whole point is he doesn't have any

16 other funds and you know that he sold an oil refinery in

17 Cyprus where you're alleging that these criminal proceeds

18 were sent.  Why wouldn't you put that information in front of

19 the magistrate?

20          THE COURT:  Is that in your motion?

21          MR. HAN:  That's not in our motion.

22          THE COURT:  Okay.

23          MR. HAN:  So that's -- I think that's all I have

24 with respect to the omission -- the statement about the bribe

25 proceeds.

1          THE COURT:  Ms. Kocher.

2          MS. KOCHER:  If I can respond to the *mens rea*, your

3     Honor.  It is telling that in reviewing this document, which

4     by its own headings is prepared by a case agent Dmitry

5     Lagocha out of Chicago, first.  So there's -- other than it

6     being in discovery, there is no evidence or understanding as

7     to how this came into discovery and whether, as alleged, the

8     affiants had this in front of them at the time they were

9     writing the affidavit.  That's number one.

10          Number two -- and this is the interesting one.  Did

11    you hear the characterization that the report carefully broke

12    into separate sections to help us.  That was the assertion,

13    getting into the head of this agent in Chicago based on the

14    physical presentation of this document.  My suspicion is,

15    your Honor, knowing the various platforms that are used to

16    write things, that this is from the transfer of one document

17    from one system -- like WORD -- cutting and pasting into this

18    system; and these breaks, while they may be according topic,

19    were not intentional on the agent's part.

20          THE COURT:  Let me get to a question that's popped

21    up in my mind which is, is what you're telling me the agent

22    who compiled this document that we're looking at, Exhibit B

23    in the binder, Bates page 1006, that that's prepared by a

24    different agent than the affiants who submitted the affidavit

25    at issue?

1          MS. KOCHER:  That's correct, Your Honor.

2          THE COURT:  Is there any indication that we've got

3    here that they were aware of this document?

4          MR. McLOUGHLIN:  They were there.

5          MS. KOCHER:  The document --

6          MR. McLOUGHLIN:  They were in the room.  The

7    Government has not disclosed to your Honor that what the

8    document says -- and it's dated 9/27/17.  So it's dated well

9    over a year before these affidavits.  That SA Paul Minella

10   from the FBI, SA Robert Richards, Jr., from the FBI, Michael

11   J. Saylor from the FBI, Special Agent Tony Bell from HSI, who

12   is one of the key agents here, SA Eric Phillips from the IRS,

13   SA Dmitry Loach from the FBI and Gregory Zaikin from the FBI

14   were all there in person.

15         MS. KOCHER:  Your Honor --

16         MR. McLOUGHLIN:  To make the implication that those

17   agents didn't know about this and didn't have copies of this

18   when they filled out those affidavits is not something that

19   should be said in a courtroom.  That's just not -- that is --

20   you know, they were there.

21         MS. KOCHER:  Which goes to my point, your Honor.

22   They were not the authors of this report.  The term "money"

23   may very well have been bribe proceeds.  There is no evidence

24   presented by this writing -- which is not verbatim, it is not

25   a recording of what was said there.  This document, my point,

does not present any *mens rea* as to the affiants in this
case.  Particularly in that -- the term "money" as relates to
bribe proceeds.

So the Government certainly takes the position at
Your Honor's question that even if you change the word to
"money", that it does not, you know, defeat probable cause in
that record.

MR. McLOUGHLIN:  Your Honor, if we want to talk
about *mens rea,* let's -- of the affiants, let's talk about
that.  It is at tab E of the binder, it is the report of --
and includes a transcript of a conversation between one
individual who's called Snowman and the individual, that I
think totality of the circumstances, demonstrate is CH 1.  In
that discussion, 2/26/17 at page 5, which is Bates A triple
zero 114-T7, Snowman says, quote, that if the authorities ask
CH 1 to cooperate and tell them everything CH 1 knows, they
will deport CH 1 if he only says, I don't know anything.  CH
1 then is asked -- so Snowman asks if CH 1 has anything on
tape at all and CH 1 replies, that all he has is documents
from some meetings but that the documents are nonsense.  He
says earlier in the discussion that he has nothing.  He says
quote, what do I know?  Do I know he was laundering money,
no.  Do I have any facts, nope.

Now, this -- to put this in context, this is a
conversation between Snowman and CH 1 who are good friends.

This is a secretly-recorded conversation in which CH 1 is not on guard.

THE COURT:  What does this have to do with the bribe proceeds/money issue?

MR. McLOUGHLIN:  Because CH 1 is the basis of the affidavit which says, I picked up the money, I did this, I did that.  Meanwhile, in February CH 1 has said, I don't have anything at all.  Then what happens?  In September -- was it September?  (Conferring with Attorney Han briefly at counsel table off the record).  CH 1 is visited by the Immigration and Naturalization Service in September.  He, in a recorded conversation or in discussions blames Mr. Teyf for the fact that he has been contacted by Immigration believing that Teyf has reported him or somehow whistle-blown on him to go after him.  He's furious.  The same week, he goes in to talk to the FBI.

If you are the magistrate and if you look at the *Lull* decision, in terms of did the confidential informant have contrary interests that the judge should know to measure credibility, you say, this is a conflicted witness.  This as witness who previously, your Honor, said he didn't have anything at all.

THE COURT:  Where is this in your motion?

MR. McLOUGHLIN:  Your Honor, we put these documents in -- we expected to call the agents to get this information

1    out and so we didn't go over this --

2          THE COURT:  We're here for a hearing on your

3    motion.  It's not in your motion.  They weren't on notice

4    about these things, at least according to the motion.  We

5    don't do trial by ambush or motion by ambush here.

6          MR. McLOUGHLIN:  Your Honor, with an apology, we

7    said that in the motion that they had not disclosed facts and

8    there were material omissions and misrepresentations and we

9    provided the exhibits.  We were anticipating a fact hearing

10   where we would demonstrate what those facts and issues were.

11   The Government has had the exhibits from us.  They know in

12   our argument that we alleged that there were material

13   omissions and misrepresentations and so we don't -- I don't

14   believe this is ambush anymore than you have ambush in any

15   other factual hearing where you put on evidence.

16         THE COURT:  The only argument you make about

17   reliability is about the timing of the payments to the

18   defense minister.  And that's what I'm trying to figure out.

19   If you meet the *Franks* standard to get an evidentiary

20   hearing, and that's what I'm focusing us on.  I'm focusing on

21   what's in the paper you submitted.  There's been no motion to

22   amend, none of that, so we're focusing on what's here.

23         MR. McLOUGHLIN:  Your Honor, again with apologies,

24   these exhibits were submitted with the motion.  Not all these

25   were.  They were provided to the Court beforehand.  They were

submitted after.  It was our understanding of the procedure

is that you come in and you make your factual showing and

then you proceed from there.  If your Honor is saying that

your Honor has -- is uncomfortable with respect to the

Government needing more time to respond, you know, we're

happy to resubmit and lay all this out -- we have some

confidential redaction issues -- and then have the Government

make its response.  Or make these arguments today and give

the Government a week to file a written reply.  Happy to do

that.

THE COURT:  Here's how I'm looking at this.  *Franks*

requires you to meet two standards before you get an

evidentiary hearing.  You have given me five reasons why you

meet that standard.  I'm addressing those five.  If you don't

meet the *Franks* standard, you don't get the evidentiary

hearing.  That's Black Letter Law.  So that's what I'm

talking about.  I don't want to have you try to back door all

the other stuff in here that's not appropriate at this time.

You've raised five issues.  You have not tried to amend.  You

have not submitted a supplemental anything to raise these

additional issues.  So we're going to focus on these five to

decide if you get past the *Franks* initial phase.  And then if

you do, we'll move on.

MR. McLOUGHLIN:  Yes, your Honor.

THE COURT:  So I go back to my question of what

does -- these things you pointed me to here -- have to do
with this issue on money/bribe proceeds, if anything?

MR. McLOUGHLIN:  Well, your Honor, when you say the
things I've pointed to, the points that I've just read?

THE COURT:  Yeah, the Snowman matters.

MR. McLOUGHLIN:  Because the source of all of the
information with respect to the scheme in Russia, the alleged
bribery, the movement of money from Russia to Cyprus all
comes from that individual.  No other source for it.  They
say there are some open source news articles about this, but
there's no source with respect to verification and you
couldn't get an affidavit -- you couldn't get a search
warrant on news articles out of Russia.  And so where the
sole source that the Government has for the allegations about
the scheme and the collection of money and money going to
Cyprus or other places is this individual, the Government
then has the obligation under the case law to provide the
court with all of the information that would indicate whether
that individual was trustworthy or not.  And they simply
state the conclusion, he's trustworthy, in the affidavit when
they had very substantial evidence to indicate he had a bias.
He had given inconsistent statements and those should have
been presented to the Court for its evaluation and they
weren't; and that -- those omissions are enough under _Franks_
to call into question these connections that we've been

1    talking about.

2            THE COURT:  When you talk about the reliability of

3    CS 1 or CH 1, either one is fine, the issue you're raising in

4    your motion is the timing of this payment.  Why does the fact

5    that the defense minister received a payment in 2013 when he

6    was no longer the defense minister undermine the credibility

7    of the fact that this kickback scheme was going on?  Because

8    it seems quite reasonable to me that if I'm a public official

9    and I've got this giant bribe, I don't want to receive

10   $150 million while I'm in office.  The example you raised

11   earlier of the house in London, right, it raises red flags if

12   a public servant is doing things with tens of millions of

13   dollars.  So why does the timing issue undermine his

14   credibility?  It seems somewhat consistent with at least a

15   theory of how this all happened.

16           MR. McLOUGHLIN:  Your Honor, because if you look at

17   the -- the connections in time, at that point in 2013, Mr.

18   Teyf, according to the affidavits or the information provided

19   by CS 1, CH 1, has already left Voentorg.  He leaves in 2012.

20   And so to the extent that the organization, Voentorg, is in

21   some way involved in this nefarious activity, in 2010 or

22   earlier, Mr. Teyf at that point has already left.  And so one

23   gets these questions that get raised about, wait a minute, if

24   Mr. Teyf has already left Voentorg and Voentorg is making

25   payments, how does he get connected to those?  There's no

1    explanation for that.

2            When the individual who has left no longer has the

3    authority to direct payments -- direct business to anybody,

4    and you are now three years down the road from the time that

5    Mr. Teyf has left Russia and come to the United States in

6    2013, you have these issues.  You also have the connection

7    with the fact that he said -- CH 1 says that he made all

8    these payments and did all of this in Russia in 2013.  I

9    believe the evidence is that he came to the United States

10   before that time.  And so you have this question of how does

11   this man who had already immigrated to the United States be

12   some kind of employee or agent of Voentorg to deliver money

13   to the son-in-law of a former official; and the CH 1 also

14   says he believes there are some business interests between

15   Serdyukov and Teyf.  And so you also get the question of,

16   once they have both been removed, and he says, well, gee,

17   they have business interests that I don't know about, we

18   don't know whether these deliveries of money are related to

19   those legitimate -- or those business interests that CH 1

20   says they have that are not in the affidavit but unrelated.

21           What's also important here is we're throwing around

22   150 million, okay.  What CH 1 also said was, I got these -- I

23   got bags.  I never counted because they were too big and they

24   were in a variety of currencies.  Having said he never

25   counted it, somehow you get, oh, on these three occasions I

delivered 70 million, 30 million. $70 million in Rubles is somewhere around a thousand pounds. We did the math. The average bill weighs a gram. You do the math. It's almost a thousand pounds. There's a certain inherent incredibility about, I took a thousand pounds in bags across the city when I had already left the country and delivered it to a man three -- over a year after the guy I accused of master-minding this scheme has already left the organization and three years after he left the country.

So the timing, again, figures into the totality of the circumstances and you say, well, wait a minute, is there a red flag here that he has inconsistencies? And particularly when you take how the timing affects the probabilities and the totality of the circumstances and you look at the fact that this individual now has a motive to slander Teyf, he thinks he got him in trouble with Immigration, and he's previously claimed he didn't have any information at all, then you have to say, well, wait a minute, the timing doesn't make sense either -- and you put the whole thing together in the totality of the circumstances -- that is exactly the kind of evaluation that the affiant has the obligation to put in front of the magistrate so the magistrate can judge whether there's a fair probability or not and none of that was put before the magistrate.

THE COURT: And so what I'm getting at is if we put

it in there, which is the thing I need to do under *Franks*
consider whether I insert this in there, it defeats probable
cause and then we get to move on to the hearing.  What I'm --
the thing I'm having trouble with is the fact that the money
was allegedly paid to the defense minister in 2013 after his
time as defense minister concluded.  I don't see how that
defeats probable cause or calls into question his
credibility.

MR. McLOUGHLIN:  It is -- again, it is 2013 taken
in the context of the other information about -- the
affidavit also says that Teyf had left Voentorg by 2012, the
year before.  So if Voentorg is paying this organization, why
is someone who left a year before earlier -- and again CH 1
has already left Russia at that point -- and so that date
makes it all less likely in the totality of the circumstances
because you have these other facts, some of which are in the
affidavit, some of which are in here which should have gone,
which would say, well, wait a minute, why are you -- what's
going on a year later.

And I would respectfully suggest, your Honor, if --
you know, and this is a matter of degree -- that where the
individual in this case is talking about -- I think it was
2013.  He's not even sure.  The affidavit doesn't make that
exactly clear, but he says, I think it was 2013.  Again, when
your antennae are up because the dates don't match up, 2013

1  is a lot more recent.  I would respectfully suggest that had

2  I been driving around Moscow at various times with

3  $70 million in the back of my car -- nine hundred and some

4  odd pounds of it -- I might remember when it was; but the

5  issue on the 2013 is to -- with respect to, again, these

6  business interests.  There are also alternative explanations

7  that CH 1 gives that make sense in 2013 that might not make

8  sense in 2010.  Again, that's why 2013 becomes a red flag.

9  And in the totality of the circumstances, you follow the red

10  flag, still to get -- and we're not changing the standard --

11  fair probabilities.

12            THE COURT:  Ms. Kocher, what do you say about this

13  timing issue?

14            MS. KOCHER:  Your Honor, I think that there are

15  exactly 60 minutes between 2012 and 2013.  I mean, it's --

16  the statement, probably 2013, does not imply as argued that

17  it's much later or a year later.  It could be from

18  December 31st to January 1st.  I don't think that the

19  statement that the shipment to the defense minister, probably

20  in 2013, defeats probable cause.

21            And it goes back -- just the length of the

22  discussion that we've had, takes away the argument on the

23  *mens rea* because it has to have been in reckless disregard.

24  And clearly if we can have this discussion over this single

25  fact, then the agents themselves aren't shown, by this

1    evidence, to have acted in reckless disregard.

2          The fact that -- then we come back to the idea that

3    what they're using are reports of a statement -- again, maybe

4    the agent who wrote the affidavit heard five years ago or six

5    years ago and the reporting agent on this wrote, probably

6    2013.  We don't know that.  So the fact that there's even an

7    omission hasn't been established or a misleading statement by

8    these particular agents.  But even assuming that, probably

9    2013, is correct; that everyone who was present at that

10   interview heard, probably 2013.  The fact that the shipments

11   went to Serdyukov probably in 2013 doesn't identify it with

12   specificity.  Could have been the day before, could have been

13   2012, could have been 2013 -- probably 2013 -- and it does

14   not defeat the idea of probable cause in this regard.

15          MR. HAN:  Your Honor, if I may?

16          THE COURT:  Sure.

17          MR. HAN:  So the Government -- I appreciate the

18   statement that there's 60 minutes difference between 2012 and

19   2013 but really, that's not what we're talking about here,

20   right?  We're talking about payments that are occurring after

21   Mr. Teyf is no longer at Voentorg and after Serdyukov is no

22   longer the Russian defense minister.  In that context, given

23   the fact this affidavit is all about the bribe scheme where

24   business is being steered by Voentorg to the Russian

25   government in exchange for kickbacks, it absolutely

1  undermines the confidential source's credibility when he's

2  talking about payments that aren't even occurring when the

3  parties to these payments have anything to do with the roles

4  that are implicated by this scheme.

5       THE COURT:  Both you and Mr. McLoughlin have

6  mentioned Voentorg.  The allegations here are not that it was

7  a Voentorg corporate decision to do these kickbacks or

8  bribes, presuming they happened, Mr. Teyf did and the defense

9  minister did.  So I'm having trouble with your argument that

10 somehow the individuals who were allegedly running this

11 enterprise, their separation from the corporate entity or

12 their separation from the government position they were in

13 somehow diminishes the desire to get the money they feel they

14 were owed.

15       MR. HAN:  Well, what would be the purpose of a

16 payment to Serdyukov?  What can he offer for those payments

17 at that point?

18       THE COURT:  Well, I take it the payments were --

19 it's reasonable to believe the payments were made when the

20 contracts were signed and things like that.  I mean -- and

21 having $150 million is better than not having $150 million

22 regardless of what your job is.  So, I mean, I think that --

23 I'm trying to figure -- my concept of this is a contract is

24 awarded and there's an agreement that you'll pay money to Mr.

25 Teyf -- that's the allegation -- and then he'll pay some of

1    it up the chain and keep some of it himself.  The contracts

2    being awarded and the payments being made have no

3    connection -- and tell me if you think differently -- have no

4    connection to whether these individuals are in their jobs.

5    If they've arranged for the contracts and the payments, then

6    I presume they would still believe they're owed that money.

7         MR. HAN:  So if these were all payments that are

8    being made pursuant to the legal contracts, then I don't

9    understand why we have a crime.

10        THE COURT:  So if there's an agreement that when

11   the contracts are given out, there will be a kickback to Mr.

12   Teyf -- if that agreement has been reached and a contract is

13   awarded, even if Mr. Teyf has left and the defense minister

14   is no longer the defense minister, I would presume -- in the

15   universe where this all happened the way the Government

16   alleges it happened -- that Mr. Teyf and the defense minister

17   would still want their money from the kickbacks.

18        And so, thus, I don't know that the end of their

19   corporate affiliation or the government affiliation is the

20   same as kind of disengaging from a conspiracy as we see in

21   drug cases or things like that.  I think you want me to draw

22   a bright line saying, when they left, there's no way they can

23   receive any illicit money after that and I'm not sure that's

24   reality.

25        MR. McLOUGHLIN:  Your Honor, if you go to paragraph

62, which is where the description of this is, it says -- and you particularly go to --

THE COURT:  62 is quite long, so if you could direct me to a subsection.

MR. McLOUGHLIN:  Yes.  Go to (e) and then (f).  It says, while the bribe kickback scheme was being perpetrated, Teyf instructed CS 1 to meet curriers at various locations, and talks about how he picked it up, he opened the packages to ensure it was money but never counted it.  He would then -- Teyf would then call him to bring it to an accountant.

It then says in the very next paragraph, most of the kickbacks were paid by Teyf to Defense Minister Serdyukov with Teyf retaining the next largest share.

So if you think about the timing, okay, and you read this fairly -- he then talks about always having two security guards and then sometime in or about '13 the scheme became public.

To your point, your Honor, it's yet another -- it's two things.  One, when you read this, it's clear from the context that the pick up of money and the delivery of money is contemporaneous, which means that Teyf -- if this is 2013, Teyf does not have the power to direct contracts to subcontractors because he's gone from Voentorg.  His ability to do that is expressly contingent in the affidavit on the fact, in paragraph (b), that he is the deputy director of

Voentorg. Then again in (f), it is contemporaneous that the large deliveries are made.

Again, we also get back to the fact that he says, I had these three deliveries. Meanwhile in the previous paragraph he says he didn't count money because it was too voluminous. The largest bill in the Russian lexicon is a 5,000 Ruble bill. If you take 70 million and divide it by 5,000, that's 42,000 individual notes. 42,000.

Red flag goes up -- another red flag goes up here, he knows what this money is and this paragraph implies it's contemporaneous.

And then to Your Honor's point. 2013, according to him, there are public reports of this scheme. The exact opposite inference that your Honor has proposed should be given occurs. Because in 2013, think about the United States -- and let's say Russia is not any different. If the New York Times and Wall Street Journal are saying on the front page that the former defense minister took $150,000,000 in bribes to get contracts, it seems highly unlikely that that Russian defense minister -- unless he's in a coma -- would be telling anybody, please take a thousand -- thousand-pound bags of currency and drive them across town to my son-in-law and give them to him.

THE COURT: That presumes the scheme became public before the payments were made, which is not a fact that I

1    think is anywhere in this document.

2            MR. McLOUGHLIN:  No, it isn't, your Honor, but it

3    is -- in the totality of the circumstances -- a question that

4    one would ask.  Again, taking all of this in the point -- if

5    you're looking at how the 2013 issue plays out -- if there

6    were a full discussion about this individual's bias and these

7    other issues, you say, well, wait a minute, I think you need

8    a little bit more here.  Come back to me when you have a

9    little bit more, which magistrates say to agents every day.

10           THE COURT:  So here's what I have to do with that

11   paragraph, 62(f).  I look at what you're proposing and I take

12   it and I modify the language in my head to say, most of the

13   kickbacks were paid by Teyf to Defense Minister Serdyukov

14   probably in 2013, and everything else remains the same.  And

15   then I decide if that eliminates probable cause.  Why?  Does

16   that eliminate -- I hear what you're saying, that it is a

17   less compelling case, but why does it defeat probable cause

18   when the issue isn't really the payments to the defense

19   minister directly.  I mean, that's part of all of this, but

20   that's not the -- and what I hear, because he allegedly

21   bribed the defense minister in Russia directly.

22           MR. McLOUGHLIN:  It's relevant for two reasons,

23   your Honor.  The first reason is -- and that's why the

24   omissions we talked about are also critical here.  The

25   credibility of this affidavit rises or falls on the

credibility of that confidential informant because he's the
only evidence they have that's remotely admissible with
respect to Mr. Teyf's involvement and all of this
information.  And so anything that raises questions about his
credibility becomes material and relevant.

You then take his bias and his claim he didn't know
anything and you throw that into the mix and that makes the
second point.  This is not an isolated -- that date, does
that defeat probable cause.  In and of itself, no, it doesn't
have to.

The issue is you take -- the totality of the
circumstances works both ways.  If, in the totality of the
circumstances, the things that we've been discussing,
including his bias and the fact he claims he never had any
documents that weren't nonsense and the fact that he knew
nothing at a time when he was talking to his good friend
unguarded when -- it wasn't an agent -- all of that goes to
his credibility.  And the issue then is if the magistrate had
known all of these facts about his prior denials and his bias
and his anger at Mr. Teyf because he accused him of calling
Immigration and -- that puts some of these inconsistencies in
a very different light; and because the totality of the
circumstances works both ways, then you say in the totality
of the circumstances, this doesn't look so good.  Come back
to me.

1          Then you add on top of that, of course, you know,

2     all of this again comes into the other context that says, you

3     know what, the other issue you have here with this affidavit

4     is -- again, you can't get any of this money from this

5     alleged scheme to $40 million -- never mind 40 --

6     $120 million that you're seeking seizure of in the United

7     States, because in the totality of this affidavit and the

8     totality of the circumstances, this affiant, who relies on

9     this confidential informant, has no -- there's nothing in

10    this affidavit about whether Mr. Teyf got $1 or a million

11    dollars or 120 million or 40 million.

12         And the question then becomes, okay, in light of

13    all of these issues about the dates and the credibility, do

14    you have a fair probability that every single dollar -- every

15    single dollar -- that Mr. Teyf brought into the United

16    States -- much of which is in 2010, '11 and '12 or even

17    thereafter -- is tainted as opposed to some is tainted, some

18    is untainted.  It's all untainted.  How do you get there, to

19    a fair probability, and the answer is you can't.

20         THE COURT:  Okay.  Do you want to be heard on any

21    of the other issues?  I feel like we've covered most

22    everything in these five matters that have been raised in the

23    motion.

24         MR. HAN:  I think the only point I would add, your

25    Honor, is that we've been going through these false

1  statements and omissions and you've been asking us whether or

2  not, you know, if we strike this one part, you know, does it

3  defeat probable cause.  And I think our argument has been all

4  along that just like the government is allowed to rely on the

5  totality of the circumstances to make out probable cause, we

6  are also permitted to point to not just each of these

7  statements or omissions in isolation, but you put them

8  altogether, they take away from that totality that the

9  government is relying on to establish probable cause.

10         At the end of the day, they've got all these other

11  sort of -- I mean, it all feeds in, right.  They want to

12  paint our client as an extortionist, that he's got -- you

13  know, that he's got -- that these bribe proceeds that this

14  government confidential source saw documents about being

15  transferred to Cyprus and he's got a bank account in Cyprus

16  and now there's money coming in from all these different

17  companies that are based in these jurisdictions of primary

18  concern, which that term is, as far as I'm concerned, is

19  meaningless.  If the U.S., the UK and Japan and France -- and

20  basically any other country with a healthy economy is on that

21  list, it means nothing.

22         And so you have to put all that together and when

23  you do, that takes away from the Government's totality of the

24  circumstances that they have probable cause.

25         MR. McLOUGHLIN:  And, your Honor, I would like to

close this point with a quote from *Illinois v. Gates*, of course, 462 U.S., 213. The official pages are 5 -- 548, 549. Talking about what is an adequate affidavit. And the court says, our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that he -- that, quote, he has caused to suspect and does believe that liquor legally brought into the U.S. is located on certain premises will not do. Cite *Nathanson v. U.S.* An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause. And the wholly conclusory statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that, quote, affiants have received reliable information from a credible person and do believe that heroin is stored at home is likewise inadequate. *Aguilar v. Texas*. As in *Nathanson*, this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause. His action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an advocation of a magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.

          When you look at this affidavit, you get the bare

conclusion, for example, that these are shell companies.
There's no fact alleged in that affidavit as to what a shell
company is, why they think it's a shell company or that, in
fact, one of these companies with respect to Cyprus, doesn't
own oil refineries. There is the mere statement that they're
shells. Under *Gates*, *Aguilar*, *Nathanson*, wholly inadequate.

The affiant's statements here that they have a
reliable, confidential source are exactly the kind of
conclusions that the Supreme Court said were inadequate in
*Gates*, where here -- as we've probably beat to death, you
probably feel -- there are lots of omissions and not enough
to allow the magistrate to do the kind of analysis that is
required. Because, you know, we can talk about a fair
probability, but the Supreme Court said what a fair
probability is, quote, a substantial basis for determining
the existence of probable cause and a wholly conclusory
statement fails to meet that requirement.

And so if you hold these affidavits up against that
lens where, again, it's a shell company and these other
things are missing, where is the substantial basis to allow
that conclusion. And, again, we have these things that are
omitted and, you know, inaccurate statements about what the
CH 1 or CS 1 said that bring you squarely to within the fact
that the Government's affidavits rely on conclusions. And
quite frankly, there is no allegation in this affidavit that

calling subcontractors and getting them to rebate a

percentage of the fees is, in fact, against Russian law.

They call it bribery extortion.  That's a US concept.  You

have to have a threat and based on a threat, you have to

secure funds.  There is no allegation in the affidavit that

there was any such threat or that there was any coercion,

which means it's not extortion.  There's nothing in the

affidavit that actually -- it says, you know, he conspired

with Serdyukov, but there's no allegation here that would

allow the Court to conclude again that there was a violation

of law.  Is there a statute in the Soviet -- in Russia that

says you can't demand a percentage rebate from your

subcontractors?  Nothing in it.

THE COURT:  So I want us to take a break in a few

minutes --

MR. McLOUGHLIN:  Sure.

THE COURT:  -- and I want to give Ms. Kocher a

chance to respond.  I feel like this question is going to

take us down a road, but -- that's going to take some time --

but the *Kaley* decision --

MR. McLOUGHLIN:  Yes.

THE COURT:  -- do you get to challenge that point

now, whether there's a predicate crime?  The Grand Jury

indicted him for this and it would seem like that case now

prevents you from arguing that --

1          MR. McLOUGHLIN:  No doubt --

2          THE COURT:  -- there was no crime committed.

3          MR. McLOUGHLIN:  Yes.  But here's where it goes,

4     your Honor.  You are absolutely right except for two things.

5     One, under *Kaley*, we're not entitled to challenge the

6     probable cause that there was a crime committed.  However,

7     there are two issues here.  One, that doesn't mean that

8     looking at the conclusory nature of the affidavit doesn't

9     call into question the affidavit itself and whether the

10    affidavit meets the *Gates* standard.  Because the indictment

11    stands and there's probable cause to believe there was a

12    crime, but the affidavit doesn't rely on the indictment.  The

13    affidavit doesn't say, the Grand Jury affirmed.  The

14    affidavit, in the totality of the circumstances, you say,

15    well, wait a minute, where is the crime.  That doesn't take

16    away from the fact that there was a probable cause.  And

17    you're right, under *Kaley* we -- and we're not challenging

18    that.

19          The second thing --

20          THE COURT:  Well, wait.  I need to be clear on that

21    point.

22          MR. McLOUGHLIN:  Sure.

23          THE COURT:  You're not challenge there is probable

24    cause to believe that he committed a crime in the context of

25    challenging the seizure of the assets, but you are saying

1    there's no probable cause to believe there's a crime in terms
2    of the warrant and they seem to be the same thing to me.
3            MR. McLOUGHLIN:  No.  And I apologize, I'm not
4    being clear.  We are not challenging the fact that there was
5    probable cause based on the Grand Jury's approval of the
6    indictment to say that a crime was committed.  But whereas
7    here there's no indication that the indictment was submitted
8    to the magistrate and the affidavit doesn't rely on the
9    indictment, the affidavit makes no reference to the Grand
10   Jury, the affidavit must stand on its own.  And the affidavit
11   here, you get to the question -- which is irrelevant to *Kaley*
12   -- of whether it states a violation of the specified unlawful
13   activity and it doesn't.  Because that's also, again, key to
14   the tracing question.  You can't separate the question of
15   whether there's specified unlawful activity and what is it
16   from this issue of, do they otherwise have probable cause.
17           So your Honor is exactly correct.  Under *Kaley* we
18   do not have the ability to challenge the underlying
19   presumption, but since they didn't put the indictment in, and
20   since we have the affidavit standing on its own, the question
21   is whether the affidavit standing on its own is adequate to
22   provide probable cause on that reason to believe the second
23   prong, which is that these are tainted funds.  And the answer
24   to that is that's something we have the right to do.
25           THE COURT:  Real quick.

1          MR. HAN:  Just really quick is that, your Honor,

2     you're right*, Kaley* does not allow us to challenge the

3     probable cause with respect to something that was found by

4     the Grand Jury but, your Honor, whatever it was the Grand

5     Jury indicted Mr. Teyf for is different from what appears to

6     be the specified unlawful activity that the Government relies

7     upon in the affidavit.  You yourself indicated that the

8     specified unlawful activity appears to be a bribery of public

9     officials.  No such allegation like that appears in the

10    indictment.  Doesn't appear that that was presented to the

11    Grand Jury so they didn't indict him on that.  We're talking

12    about specified unlawful activity.  That's different from

13    what the Grand Jury voted on.

14          THE COURT:  Ms. Kocher, I'll give you the last

15    couple of minutes on these issues -- or Mr. Fesak.

16          MR. FESAK:  Your Honor, because we're in kind of a

17    segue and I'll probably be handling the second part of the

18    hearing, there's just one point that I wanted to make in

19    addition to what's already been said, which is even assuming

20    there's an issue with the search warrant -- which I think Ms.

21    Kocher has aptly argued against -- the remedy for a violation

22    of the Fourth Amendment, well established, is the

23    exclusionary rule.  It is suppression of the fruits of the

24    warrant as evidence.

25          And I think we cited *United States v.  Martin*, a

1    Fourth Circuit case, in our brief for the proposition -- for

2    that proposition and I think it's well established across all

3    the circuits that a warrant -- a problem with a warrant does

4    not impact the forfeitability of property.

5            And I think it's an important point to understand

6    where we are here, the Government's continued -- right to

7    continued possession of this property throughout the trial

8    process is not going to rise or fall on the validity of this

9    warrant.  Even *Farmer* makes, I think, abundantly clear, when

10   we're at this stage of a hearing, you know, it's the

11   defendant's burden to put on evidence to rebut probable

12   cause.  The Government can put on new evidence to buttress a

13   finding of probable cause.  So basically we're at a clean

14   slate, we're not relying on this seizure warrant anymore.  We

15   can obviously rely, as your Honor said, on the Grand Jury's

16   finding of probable cause as to the offenses that were

17   committed and I think that will resolve all the issues as to

18   return of the property.

19           And so as far as I can tell -- everything that

20   we've argued thus far -- the only remedy that the defendants

21   will be able to get would be suppression.

22           THE COURT:  So you're telling me if I rule in the

23   defendant's favor and find that you did not have probable

24   cause to get a seizure warrant, that he doesn't get his

25   assets back?

1          MR. FESAK:  That's, I believe, the state of the

2     law, your Honor.

3          THE COURT:  What would be the justification for

4     seizing the assets then and holding them?

5          MR. FESAK:  Again, the justification is we have

6     probable cause established now through the indictment,

7     through the findings of the Grand Jury, which as your Honor

8     is aware, they can't second guess, and any other evidence

9     that we put on this afternoon, which we don't feel we need

10    to, but based on the indictment.

11         THE COURT:  Yes, sir.

12         MR. McLOUGHLIN:  Judge, if you want to hear more on

13    this, we can do it after the break.  I think your Honor has

14    asked -- the trenching question is:  If you haven't

15    established a basis for holding the assets, how are you

16    holding the assets and the answer is, you can't.  If what the

17    Government is saying is we would like to have a seizure

18    hearing where we put on evidence to establish the basis for a

19    seizure and so we can try to keep it, I think that would be

20    scheduled for another day and we would be entitled to notice

21    of a motion and we would be entitled to prepare witnesses and

22    do all of those things.

23         It's interesting to me the Government started out

24    this hearing saying, we don't have any witnesses, we don't

25    think there are fact issues and everything else and now we're

1    hearing, we would like to have a seizure hearing.

2          So the argument that the suppression of the warrant

3    is -- the only remedy is exclusion, it's true it's one of the

4    remedies and we would ask for that, but there is simply no

5    basis in logic or case law for the proposition if the

6    Government affidavits -- we're talking the affidavits and

7    then the warrant -- has not established that the order -- in

8    fact, if we have established that the order on which the

9    seizure occurred is invalid and was invalid *ab initio*, the

10   notion that the Government could then say, well, that doesn't

11   matter, we get to keep it anyway.  We have not seen that

12   case.

13         THE COURT:  All right, counsel.  We're going to

14   take a break for lunch and otherwise.  Would 30 minutes be

15   sufficient or would you like longer?  I do have another

16   hearing later this afternoon, but I don't mind pushing that

17   out a little bit today.

18         MR. McLOUGHLIN:  Your Honor, we learned a long time

19   ago that if it's enough for you, it is more than enough for

20   us.  So we're happy to have 30.

21         THE COURT:  Well, we'll reconvene at 1:15.  We'll

22   be in recess.

23              (Luncheon Recess at 12:31 p.m.)

24     (The defendant, Leonid Isaakovich Teyf, escorted into the

25                  courtroom at 1:10 p.m.)

1          (Luncheon recess concluding at 1:22 p.m.)

2                        (Open Court)

3          THE COURT:  All right.  We're back here in the case

4    of United States of America versus Leonid Teyf.

5          I remind our interpreters they are still under

6    oath.

7          We've covered the first two issues today.  I'll

8    eventually issue a written order on this, but I'm going to

9    deny the motion with respect to the general challenge for

10   probable cause; and I'm going to find the defense has not

11   made the necessary showings to proceed past the initial

12   phases of the *Farmer* analysis and deny that portion of the

13   motion as well.

14         All right.  That brings us to the jewelry issue.

15   We talked about this a bit at the outset.  I don't know if

16   the Government is wishing to contest that particular issue

17   any more or whether that's something we can settle by

18   agreement.

19         MS. KOCHER:  The return of the jewelry is something

20   we can settle by agreement, your Honor.  The only thing I was

21   reserving is that we do -- it had been framed originally as

22   the jewelry seizure had exceeded the scope of the search

23   warrant.  So I just wanted to make it clear that that's not

24   what the Government is conceding.  We believe that there was

25   authority for the agents at the scene to seize the jewelry

1    both from Glenwood Avenue and from the New Market Way

2    properties.  And those theories are presented in our writings

3    so I won't repeat those, but I do stand strong on that.

4         Where we do agree is that we have no documentary

5    evidence.  I can't show even probable cause as to when -- in

6    particular to Mr. Teyf, when the watches that were seized and

7    other items of jewelry that appear to be gentleman's items

8    were purchased.  And so yes, in accordance with Judge

9    Flanagan's ruling we would concede that we have -- in regard

10   to the forfeiture -- no probable cause to continue holding

11   those assets.

12        THE COURT:  Perhaps it's an academic argument, but

13   how does the defense wish to proceed on this particular

14   issue?

15        MR. HAN:  We're happy to take the Government's

16   concession that they don't have probable cause.  Just as they

17   do not concede they exceeded the scope of the warrant, we

18   also are not conceding that they didn't.  Other than that, if

19   we can resolve this with an agreement, I think we're fine.

20        THE COURT:  I guess the question is do I need to

21   make -- do you want me to make a decision on whether it

22   exceeded the scope of the warrants or not or do you wish to

23   -- I don't know -- withdraw that portion without prejudice or

24   something else?

25        MR. McLOUGHLIN:  We'll withdraw that portion

1  without prejudice, your Honor.

2          THE COURT:  All right.  Then with respect to the

3  motion to suppress portion of the jewelry issue, that's

4  withdrawn without prejudice to being re-raised at a later

5  date if deemed appropriate.  In terms of the return of the

6  jewelry, the Court will grant that portion of the motion.

7          Do we need to review that in detail or would you

8  like -- I guess we probably should so I'll have to enter an

9  order indicating the --

10          MR. McLOUGHLIN:  Your Honor, what I would propose

11  is that we not take the Court's time on that.  We could

12  submit a joint list to your Honor, which we could do quite

13  easily without taking up your time and then you could just

14  base your order on that.  We could just -- we can do a

15  stipulation and then you can just so order.  Does that make

16  sense?

17          THE COURT:  All right.  That sounds fine.  And if

18  you-all run into difficulties working that out -- I take it

19  there's been some discussion -- and this won't be difficult

20  -- but if you run into some problems, let me know and we'll

21  reconvene either on the phone or here in the courtroom and

22  hash out whatever the difficulties are.

23          All right.  The fourth issue is the issue related

24  to whether the assets -- the bank accounts that were seized

25  -- qualify as tainted assets such that the Government can

1  continue to restrain them pending the outcome of the case.

2          Are there any other assets at issue other than the

3  bank accounts, the funds in the bank accounts?

4          MR. HAN:  Just the two vehicles.  There were two

5  Mercedes that are Mr. Teyfs, not his wife's, but did he --

6  (Attorney Han conferring with Attorney McLoughlin briefly at

7  counsel table off the record).

8          THE COURT:  Were those the Mercedes that Judge

9  Flanagan addressed or different Mercedes?

10         MR. HAN:  No, they were different Mercedes.

11         MR. McLOUGHLIN:  And I think, your Honor, just for

12 the record, there are *lis pendens* filed on properties, but

13 our understanding is that those *lis pendens* are a function of

14 the civil forfeiture proceeding so aren't implicated in the

15 issues of the affidavits or the warrants.

16         Is that the Government's position?  Or if it's not,

17 then those *lis pendens* are also in the mix.

18         MR. FESAK:  The *lis pendens* are definitely related

19 also to the criminal case.

20         MR. McLOUGHLIN:  No, I mean to the affidavits and

21 the warrants.  They're not -- the affidavits and the warrants

22 would not be the basis for the *lis pendens,* it would merely

23 be the indictment.

24         MR. FESAK:  The indictment, yes, sir.

25         MR. McLOUGHLIN:  So, your Honor, at that point I

think that with respect to *lis pendens*, since that's not a function of the affidavit and the warrants, those are not within the scope at this time.

THE COURT:  All right.  All right.  It's the defense's motion.  I'll be glad to hear argument from you-all on what we're doing here.  I think I've heard some of what we already talked about today.  You-all prefer a tracing, the Government believes it's -- the involved-in prong allows them to seize these assets, but I'll be glad to hear from you on more detail in that.

MR. McLOUGHLIN:  I'm going to let Mr. Han talk about that, your Honor, particularly the involved-in prong versus the --

MR. HAN:  So I think we've gone through *Farmer* this morning.  And ordinarily *Farmer* requires the defendant to make a showing -- two substantial showings that there's a portion of assets that have been restrained pursuant to criminal forfeiture statutes that are untainted; and, two, no other funds are available through which to secure counsel of choice.  And the Government has conceded the second point is no longer in play and so we're just talking about the first point.

And I believe that we have made the requisite showing.  As we indicated in our motion, the amounts that were authorized for seizure in these seizure warrants

necessarily had to have included both tainted and untainted

assets.  And that's because if you add up all the amounts,

you get a total of $102 million.  That number is, I think, up

to over 104 million with the addition of other accounts

subsequent to the issuance of the initial warrants.  And as

we know, the Government is only alleging the $39.4 million in

what they call criminal proceeds were wired into the U.S.  So

by definition, at least 64 million of the amounts authorized

for seizure had to be untainted assets.  Put another way, by

seeking to seize triple the amount of what they themselves

believe are criminal proceeds, it's clear that the

methodology that was employed by the Government for

determining what assets to seize was fundamentally flawed

and, therefore, there was a substantial probability of

gathering up untainted assets with tainted ones.

        Now, in both their reply papers and in the hearing

for Ms. Teyf, the Government responded that the actual amount

seized were far less than what was authorized and so

essentially, why are we complaining.  And they even called

the line of argument a red herring because the amount seized

were far below what the warrants authorized.  But that

argument really side steps the issue.  It's not simply

whether or not they collected the right amount of money, but

whether they have collected the right assets.  As we

indicated in -- this morning, a bank account is not property.

A bank account holds property. That's self-evident by the fact that in the warrants themselves, they authorize seizure of funds in a bank account up to a certain amount. And so it does no good to say that a bank account was involved in criminal activity. You have to show that the amounts that you actually took from the bank account were involved or were the proceeds of criminal activity.

The Government makes a second sort of argument about how, even if they're not directly criminal proceeds, they get the benefit of the involved-in language. And I would point out to the court that in the indictment, Mr. Teyf is only charged with spending money laundering under Section 1957. And even with respect to the one charge of 1956, it's not a count involving intent to promote or conceal specified unlawful activity. I think the Government actually argued that in their response to our motion, that he was charged under 1956 with conspiracy to -- with intent to conceal and that's not what the indictment says. It is conspiracy to engage in spending money laundering. In other words, monetary transactions.

So the Government -- you can't get to, the defendant used innocent proceeds in order to hide tainted proceeds, simply by dropping money into an account and, therefore, the Government can take anything that's in the account. That's not the way that it works.

And it's also -- you know, it kind of ignores the point or the concerns that tracing is intended to address, which is, you know, the money that you seize from this account, are they, in fact, the proceeds that are involved in the criminal activity or proceeds of criminal activity.

If Mr. Teyf -- so the amounts that are authorized in the warrants are essentially tied to the amounts that they've identified as being deposits into those accounts. And they just added them all up without accounting for movements out of the account. So, for example, if there was a million dollars dropped into one account, say, on January 1st, and they're all tainted proceeds -- just say for the sake of argument -- and then the defendant spends all that money and then the next week he gets a paycheck from a legitimate work for $200,000 and drops it into that account. The Government's position is, well, we don't need to trace that. We know it was the same bank account that had criminal proceeds so we're entitled to take whatever is in that account, but those are not tainted funds and they're not even involved in -- even if you give them the benefit of the doubt, that they could rely on this involved-in theory to grab innocent proceeds that were co-mingled with tainted funds, you still don't even have that. So we don't know because the Government hasn't traced to figure out whether or not all the money that they seized is actually connected to

money laundering activity.

And the Government isn't willing to do this tracing requirement. I don't know why. It seems to me that would answer a lot of questions about, you know, whether or not they've seized the right assets.

So we submit, your Honor, that in order for the Government to continue to restrain these assets, which, if they are untainted, they're not entitled to keep them. The only way to establish that is for the Government to trace the funds and, what we've highlighted, is that they cannot rely on this fundamentally flawed methodology just resorting to the amounts that were deposited into the account to say, oh, well, we can grab anything below that amount.

THE COURT: As I understand their argument, it's that any property involved in the money laundering is forfeitable. And in this case, because the -- they allege the proceeds of the money laundering were moved from account to account to account, all those separate accounts are involved in the money laundering because it enabled the defendants to continue the money laundering and then spend the money on a variety of things. And thus, those accounts are involved in the money laundering and forfeitable in their entirety regardless of whether they no longer have the actual assets in them.

MR. HAN: But, again, because a bank account is not

property, the property that would be involved in a scenario
like that are whatever innocent funds are in that bank
account that are being used to conceal the illicit nature of
the tainted proceeds.  In order to get there, you still have
to trace.

MR. McLOUGHLIN:  Your Honor, in our -- in our brief
we cited to *United States v. Beltramea*, (8th Cir.),
September 20th, 2016, 849 F.3d 753, in which the court says,
in *United States v. Hawkey*, 148 F.3d, 920, we explicated the
difference between property involved in an offense and
property traceable to such property.  Property involved in an
offense included the money or other property laundered, the
corpus, which is what we're talking about here, tainted, any
commissions or fees paid to the launderer and any property
used to facilitate the laundering offense.

So here, a bank account in which traceable funds
are deposited does not become involved in the offense merely
because, over the course of time, you have additional funds
brought in.  If the Government's theory were correct, then
there would be no need for the intermediate lowest balance
rule that the Fourth Circuit has talked about several times,
a variety of district courts have talked about, because if
the Government's theory were correct, you would never have to
look at what happened to a bank account and did it go below
the tainted amount.  If it went below the tainted amount, did

1   it come back up.  Because it's a bank account.  It's

2   involved, we're done.  But as the courts have said, when

3   you're talking about a bank account and proceeds, the

4   definition of property is the corpus.

5           So here we would also note that the funds that were

6   brought into the U.S. the Government hasn't alleged in the

7   affidavits -- or in the indictment -- as Mr. Han noted, the

8   relevant characteristics of involved-in money laundering in

9   part for the very simple thing is there's no effort to do so

10  because the money is virtually always wired in to an account

11  in the name of Mr. Teyf or Mrs. Teyf or both.  It couldn't be

12  more simple than, I put the money in my bank account.

13          So the traceable analysis, as they said

14  correlatively, property traceable to means property where the

15  acquisition is attributed to the money laundering scheme

16  rather than the money obtained from untainted sources.  Point

17  being, if it's -- you know, where you're talking about

18  tracing -- money from untainted sources is not subject to

19  seizure or forfeiture because it is, quote, untainted.  You

20  have to trace the corpus to get there.

21          So under the involved-in prong, or the traceable

22  prong, either way, the Government doesn't meet the legal

23  standard with respect to a bank account.

24          This is in stark contrast, for example, to the kind

25  of situation you find in *Miller* where they take tainted funds

and improve the property and they pay the loan off on the
property, they pay taxes on the property.  Where it is a
fungible, unitary asset where you can't parse out the tainted
and the untainted piece in that property.  Here, when you're
talking about money in accounts, not unreasonably, the
standard is quite different.

           THE COURT:  Mr. Fesak.

           MR. FESAK:  Just a couple points, your Honor --

           THE COURT:  Sorry to interrupt you at the
beginning.  If I said you needed to trace the assets as the
defense wants you to, are you prepared to do that?

           MR. FESAK:  Yes, your Honor.  I think the
Government could put on that showing.  Certainly that's -- we
don't interpret that to be the Government's burden today
based on the state of the law, which is when this case gets
to trial, your Honor, and we're presenting our forfeiture
case to the jury, we'll probably need to do more of an
analysis than we needed to do to establish probable cause,
but right now the Government is looking at the probable cause
case law and we think we have more than established that
burden.

           And really, this goes back to *Kaley* and I want to
clarify something Ms. Kocher said earlier.  We don't have any
obligation to trace and they say we do have an obligation to
trace and really, I think it's somewhere in the middle.  We

1   have to trace proceeds of specified unlawful activity because

2   that's an element of 1957 money laundering, right. You have

3   to spend proceeds. But the Grand Jury, in returning now the

4   third superseding indictment, has found, as an essential

5   element of each of those -- I don't know how many substantive

6   charges -- as well as the conspiracy, all of the transactions

7   involving proceeds of specified unlawful activity. So that

8   has been conclusively established under *Kaley*.

9        THE COURT: Walk me through that again because

10  that's something I've been kicking around in my head because

11  of the specificity of the indictment; but just go over that

12  point again for me one more time, please.

13       MR. FESAK: Right. An element of money laundering

14  is you have to -- in the case of 1957, you have to spend

15  greater than $10,000 and that transaction has to involve

16  proceeds of specified unlawful activity. So as an essential

17  element of the offense charged, the Grand Jury has already

18  found probable cause to believe that.

19         So now we look to the forfeiture statute; and as

20  Ms. Kocher very accurately said, there are different

21  theories. And *Miller* makes that abundantly clear that money

22  laundering -- forfeiture under money laundering is much

23  different than forfeiture, say, under a proceeds -- only drug

24  trafficking or fraud-type forfeiture. And it's much broader

25  and it's involved in -- and I think the case law is very

1    ample -- that when you have money laundering and we now have

2    -- the Grand Jury that has found money laundering, it has

3    found specific transactions that relate to specific accounts.

4    And I would refer the Court to Government's Exhibit 1, which

5    lays some of this out.  We now have these bank accounts

6    clearly involved in and a substantial connection to each of

7    the charged offenses.  And we submit, your Honor, that that's

8    all our burden at this stage of the case.

9         THE COURT:  So *Kaley* talked about how, with the

10   Grand Jury indictment, the defendant cannot challenge the

11   underlying offense that allows forfeiture, but it mentioned

12   that courts generally allow the defendant to challenge

13   whether the assets that have been taken are the correct

14   assets to be forfeited.  What I'm hearing from you is that --

15   and please correct me if I'm wrong -- is that the manner in

16   which this case has been indicted kind of rolls that second

17   factor into the first; that because of the indictment, the

18   second issue is also precluded because attacking that would

19   require attacking the indictment, which *Kaley* would indicate

20   you can't do.

21        MR. FESAK:  I think that's -- yes.  If I understand

22   you correctly, it has to do with how it's charged and how

23   it's charged as money laundering and it -- the indictment and

24   the Grand Jury have identified specific transactions

25   pertaining to either specific accounts or other pieces of

property; but it also has to do with the way money laundering
forfeiture differs from other types of forfeiture in that you
can seize and ultimately forfeit co-mingled, clean assets
under a money laundering theory so you're not limited to
tracing only dirty proceeds.

THE COURT:  Well, walk me through that in more
detail, please.

MR. FESAK:  So the Fourth Circuit case really on
that point is -- I don't know how to pronounce it -- Kivnac,
K-I-V-N-A-C (sic).  Is that right?

MS. KOCHER:  I think it's K-I-V-A-N-C.

MR. FESAK:  K-I-V-A-N-C.  I'm sorry, I'm quoting
from that case.  It says, the Fourth Circuit said, when
legitimate funds are co-mingled with property involved in
money laundering or purchased with criminally-derived
proceeds the entire property, including legitimate funds, is
subject to forfeiture.

THE COURT:  But that case wasn't dealing with a
bank account though, it was dealing with a physical structure
if I recall; is that correct?

MR. FESAK:  I think you may be right, Judge.

THE COURT:  And so then that gets to the defense's
argument that bank accounts are not property or at least not
the kind of property that can be seized here.  How would you
respond to that?

1      MR. FESAK:  I don't think there's any meaningful

2   distinction.  Again, referring the Court to cases that are

3   dealing with the probable cause stage of a criminal case, the

4   general law and the one that the Government has followed thus

5   far basically says, if you have X amount of proceeds that you

6   can trace into an account, then you have probable cause to

7   seize that much money out of the account.  And that's why the

8   warrants are, in fact, limited the way they are in this case,

9   which were the balance of account whatever, up to or an

10   amount not exceeding the amount that we actually have traced

11   into each account.

12      And so that establishes probable cause, we submit,

13   and under *Farmer*, the burden shifts to the defense to show

14   that there are untainted funds and this is -- again, even if

15   we go down this tracing analysis.  So I guess our first

16   argument is it's property involved in and that ends it, but

17   even if we go down the tracing analysis under *Farmer*, we've

18   established probable cause because the indictment and the

19   warrant affidavit trace X number of dollars of proceeds into

20   each of these accounts.  We did not exceed that amount during

21   the seizure and now the burden shifts to them to show that

22   it's untainted money, which, I mean, they have come up with

23   no evidence to support.

24      MR. HAN:  May I be heard?

25      THE COURT:  Just one second.

1          MR. HAN:  Sure.

2          THE COURT:  And for the court reporter, it's --

3   K-I-V-A-N-C is the name of the case.

4          MR. McLOUGHLIN:  Your Honor, 714 F.3d 782.

5          THE COURT:  Thank you.

6          MR. McLOUGHLIN:  That was *Kivanc*, your Honor.

7   *Kivanc*.  That's K-I-V-A-N-C.

8          THE COURT:  All right.  I'll hear from the defense.

9          MR. HAN:  Your Honor, I think everybody here agrees

10  that *Kaley* precludes the defense from contesting the probable

11  cause determination that was made by the Grand Jury.  Really,

12  the only thing that we can talk about at this point is

13  whether or not the funds that were seized by the

14  government -- whether there was probable cause to seize

15  those.

16          So let's be clear about what the Grand Jury

17  actually found, all right.  The Grand Jury found that on

18  certain dates the defendant engaged in monetary transactions

19  across accounts.  What that tells me is that the Grand Jury

20  found that there was specified unlawful activity on those

21  dates with respect to those proceeds.  Says nothing at all

22  about whether or not the funds that the Government seized on

23  December 5th of 2018 are the same funds or traceable to the

24  monetary transactions that the Grand Jury found involved

25  specified unlawful activity.

1          So that's why -- that's the whole point of our

2     motion is that -- regardless of whatever the Grand Jury

3     found, did the government seize the right proceeds on the

4     dates of the seizures and they say -- (conferring with

5     Attorney McLoughlin briefly at counsel table off the record).

6          So we would also argue that *Kaley* -- tracing was

7     not even an issue in *Kaley*.  That was left to a later case

8     because the defendants waived that issue, all right.

9          But so now we're left with did the government seize

10    the right funds and Mr. Fesak argued that whether it's --

11    whether it's -- a bank account is property or the funds in

12    the bank account are property, it's no meaningful

13    distinction.  Respectfully, I wholeheartedly disagree.  If

14    it's the bank account that is the property that can be found

15    to be involved in money laundering, then Mr. Teyf could drop

16    $100 into one of the accounts that was seized on December 5th

17    and the government would still be allowed to take that money.

18    That can't possibly be correct, right.  Just because money

19    hits an account doesn't render those funds tainted because at

20    some point in time, that same account held tainted proceeds.

21    The question is whether or not -- even under the Government's

22    theory of involved-in, which again, we submit that is not

23    what the defendant is charged with -- that he attempted to

24    conceal illicit proceeds by co-mingling it with innocent

25    funds, but even if you give that to the Government, the

question is whether or not the funds they seized are either

innocent funds that were co-mingled with tainted funds or

tainted funds themselves; and in order to get to either of

those, you still have to trace.  It's not enough to just say,

well, they were found in an account that at some point in

time held criminal proceeds.

THE COURT:  I'm not unsympathetic to your argument.

When you say the bank account isn't property, do you mean

that as a strict legal matter or do you mean that it's not

the right kind of property in this case?  It's like, I think

a bank account is in some sense property.  I can own a bank

account in joint tenancy with my spouse or something like

that.  So I'm not sure that I'm 100 percent there with you on

the argument that a bank account is not property.

MR. HAN:  Well, the Government didn't seize these

bank accounts.  They didn't take the bank accounts from Bank

of America and retitle them in the name of the United States

of America, right.  They took the money that was in the bank

accounts.  I don't know how you actually seize a bank

account.  It's not a tangible object that you can take.  So

that's all I mean when I say a bank account is not property.

It's just a container for property.  And so the fact that a

particular account may or may not have been used to

facilitate activity that the Government contends is illegal,

says nothing about whether or not other funds that then enter

1   that account are automatically tainted by -- simply by virtue
2   of the fact they are in that account.
3           THE COURT:  So under your reasoning you could never
4   have a bank account in which legitimate or illegitimate funds
5   are co-mingled because the property is the actual physical
6   dollar bills in the account or the entry on the balance sheet
7   that indicates what the property -- so there could never be
8   co-mingling there because it's always -- it's not in a --
9   we're talking about money in bags, right.  It's not in --
10  it's kind of that sort of scenario.  If money was kept in a
11  bag, it would be seizable, but if it's not kept in a bag,
12  it's kept in an account, it's not seizable -- that's kind
13  of --
14          MR. HAN:  We're not contending that you can never
15  get involved in forfeitable property through co-mingling.  So
16  if the Government were able to demonstrate that Mr. Teyf
17  dropped criminal proceeds into an account holding innocent
18  proceeds and the purpose of dropping that money into that
19  account was to hide the criminal nature of the criminal
20  proceeds, then those tainted funds become involved in money
21  laundering.  They facilitate the money laundering offense and
22  they are, therefore, seizable pursuant to the Government's
23  theory of involved-in.  But simply dropping in an account --
24  simply co-mingling funds does not get you to that.  And
25  again, Mr. Teyf is charged with spending money laundering.

How do you facilitate spending of illicit funds with innocent

funds?  You can't.  That just doesn't make any sense.  It

only makes sense in the context of a defendant using innocent

funds to hide the criminal nature of illicit funds and

there's no allegation like that in the indictment.

THE COURT:  Doesn't it facilitate the spending by

-- you have an account which you can use to either take the

money out of or use for a line of credit or things --

collateral or things like that.

MR. HAN:  But, again, we're talking about what is

the property here.  It's the innocent funds, right.  The fact

that innocent funds are sitting in that account don't -- does

not render it easier for the defendant to access tainted

funds.  The reason why he has easier access to the funds is

because it's sitting in the bank account.  That's the nature

of the bank account.

MR. McLOUGHLIN:  Your Honor, if you want to think

about it this way.  A bank account -- I mean, if you read the

contractual agreement with the bank, the bank account isn't

your property, it's the bank's.  They have a responsibility

with respect to your assets.  It's no different -- let's say

I -- again, I have laundered a million dollars.  No debate

about the million dollars.  I take that million dollars and I

put it in a safety deposit box at the bank.  The Government

comes in and says -- and there's all kinds of other stuff in

1  there.  Pick whatever you want that has value.  The

2  Government doesn't get to take the safety deposit box from

3  the bank and say, you know, somebody used this to launder

4  funds so we're taking the safety deposit box.  They get to

5  take the million dollars.  They don't get to take whatever

6  else is in the safety deposit box that can be established to

7  be untainted.

8          Again, as Mr. Han mentioned, it is a vessel -- the

9  bank account is no different.  In an intangible -- you're

10  exactly right, because money is fungible in an intangible way

11  than a safety deposit box in that regard.

12          THE COURT:  Let's take your safety deposit box

13  example and there's uncontested evidence that a million

14  dollars of laundered funds was put in the safety deposit box.

15          MR. McLOUGHLIN:  Yes.

16          THE COURT:  Time passes.

17          MR. McLOUGHLIN:  Yes.

18          THE COURT:  And we're here at a hearing and you're

19  arguing, well, money may have come in and out of that safety

20  deposit box.  The government needs to show that this is that

21  million dollars.  That seems to be the analog that we're

22  arguing today.  Would that be your argument in that scenario?

23  The Government has to show that million dollars in the box is

24  the same million dollars that was laundered?

25          MR. McLOUGHLIN:  They have to show it's the million

bucks that was laundered. Where the difference is -- and so

that we don't have to go too deep into cases or hypotheticals

that depend on their own facts and so the facts matter, in

this circumstance, we are not talking about some long period

of time over which, you know, funds came in, funds came out

and they failed to do any kind of analysis, again, of the

lower intermediate balance rule. You know, for example, as

is discussed in *Miller*. But the Government is basically

taking the position that they don't have to do anything.

It's all taint -- it's all -- doesn't matter whether it's

tainted or not, they get to keep it and that's not the law.

If that were the law, again, you wouldn't need

things like the lower intermediate -- lowest intermediate

balance rule; and the Fourth Circuit and the District Court

in *Miller* would not have spent time analyzing the way the

forensic accountant in that case did the tracing. Because,

again, you go back to what is the definition of property. If

we go back to the definition, it is the corpus of the funds

that were -- that are the tainted proceeds.

And so the fact that there might be additional

other money that is not the corpus means that it is not

property subject to forfeiture and one dollar is different

property from another dollar. So the mere fact that they're

stored in the same place doesn't make one -- doesn't make

them the same. And it is important in that regard -- because

1    the Government is still, again, relying on *Kaley* to

2    reiterate -- that in *Kaley* the Supreme Court was very clear

3    that the defendants in that case had waived the right or --

4    to challenge the traceability of the funds and waived that

5    and specifically said, no, we don't want to argue or discuss

6    the second prong.  We are just saying there's no basis in

7    fact for the original charge, we didn't violate the law.

8    That's where the Supreme Court says in *Kaley*, you know, you

9    can't go there.  And so *Kaley* at the end of the day, doesn't

10   really provide any guidance with respect to the issues that

11   we're talking about here because you can agree that there was

12   no basis to challenge the allegations in the indictment and

13   still have nothing to do with the question of whether there

14   are untainted funds in those bank accounts and whether the

15   Government has established the tainted funds went into the

16   bank account in the seizure warrants.

17           THE COURT:  So under *Kaley* the defense cannot

18   challenge -- and if I'm wrong, tell me -- the defense cannot

19   challenge the Grand Jury's findings that these accounts had

20   illicit funds put into them or forfeitable funds put into

21   them; is that correct?

22           MR. McLOUGHLIN:  No.  I'm not sure that that's

23   correct because that's exactly what the Kaleys waived.  Under

24   *Kaley*, you can challenge the issue of where the property went

25   and whether it's traceable.  What you can't challenge is

whether there was a crime committed.  So *Kaley* -- if you read
the Court's decision -- and I'll come back and grab it here
in a second --

THE COURT:  And I'm not disputing that portion of
it.  What I'm saying is when I look at -- I have the third
superseding indictment in front of me and it says -- on page
7 in Count Two, it says, the defendants on or about
August 11, 2017 transferred $260,000 from account 1736 to
account 4884, right.  That's what the Grand Jury found
probable cause of for Count Two.

So under *Kaley*, can you challenge that at some
point there was $260,000 of forfeitable funds in account 4884
is kind of my question where I'm at right now.

MR. HAN:  So if we're talking about a specific
transaction and a specific date, we could not challenge that
on that date, tainted funds were deposited into that account
because the Grand Jury found that that was, in fact, a money
laundering transaction.

THE COURT:  So then the argument you're making now
is that between August 11, 2017 and the seizure in December
of 2018, things went on and it may not be the same $260,000,
right.  And that's prong two that they talked about in *Kaley*,
that wasn't at issue in *Kaley*, right.

So if that's the case, what do I do with the *Kivanc*
language that when legitimate funds are co-mingled with

property involved in money laundering or purchased with criminally-derived proceeds, the entire property, including the legitimate funds, is subject to forfeiture. Because if I directly apply that language, it would seem to say that account 4884 may have had legitimate assets in it, but they've been co-mingled and, thus, are subject to seizure.

MR. HAN: So there are a couple of maybe hypothetical scenarios that might help. So let's say there were no funds in that account and then these funds were dropped into the account -- the funds that the Grand Jury found was money laundering transactions. Clearly, Government at that moment, could seize the entire contents of that account. If there were innocent funds in there and the defendant dropped tainted funds in there and co-mingled them with the intent to conceal the criminal nature, then they could take that -- the contents of that entire account at that point in time.

But let's say then -- let's say that happens and then a week later the Government spends -- I mean, the defendant spends all that money. Drains the account and wins the lottery and drops a million dollars into that account. There's no property in that account that was involved in money laundering and the government can't seize it.

And that's the -- that's all that we're asking the government to do. Show your work. Show us that, in fact,

1    the funds that you seized on December 5th of 2018 are still

2    the funds that were deposited in there at the point where the

3    Grand Jury found that this was a money laundering

4    transaction.  They haven't done that.  All they're relying on

5    is the fact that this is the total amount of illicit proceeds

6    that were dropped into an account at that point in time.

7          MR. McLOUGHLIN:  Your Honor, I would refer you to

8    one of the cases we cited, *United States v. Bornfield*, U.S.

9    Court of Appeals for the Tenth Circuit, 145 F.3d, 1123,

10    decided May of 1998.  Citing to *United States v. Schifferli*

11    and *United States v. Tencer*  -- *Tencer* is 107 F.3d 1120 (5th

12    Cir. 1997) -- in which the Circuit Court says, the mere

13    pooling or co-mingling of tainted and untainted funds in an

14    account does not, without more, render the entire contents of

15    the account subject to forfeiture.

16          The Government has to plead and prove and had to

17    show by probable cause more than that.  It had to show that

18    the purpose of this co-mingling and the pooling of funds was

19    to disguise the nature and source of his scheme.  And there's

20    no such allegation in the affidavit nor is there one in the

21    indictment.  So the proposition that the Government has,

22    again, once they are merely co-mingled or pooled, that's the

23    end of the issue.  A, *Kaley* doesn't address the issue at all;

24    and B, the Fifth Circuit -- excuse me, Tenth Circuit -- and

25    we believe the fair reading of the U.S. Court of Appeals'

decision -- the Fourth Circuit's decision in *Miller* -- and we can provide other circuits -- is the opposite. And, in fact, the Seventh Circuit -- to add another circuit -- in *United States v. Hendrickson* said, quote -- this is 513 U.S. -- excuse me, 22 F.3d 170, 1994 -- quote, the key to whether property is forfeitable is whether it is involved in or traceable to the offense. Citing 982(a)(1).

And so we have already talked about this involved-in issue and the traceable-to issue with respect to the bank accounts and so there's -- if you haven't said a word about it, not a word, and you haven't charged it -- you haven't said a word about it in the affidavits and you haven't charged it in the indictment, by definition, you cannot argue that you have proved the requirement as set out in *Bornfield*, *Schifferli*, *Tensen* (sic) -- *Tencer*, T-E-N-C-E-R, with respect to this issue.

THE COURT: Clarify for me -- we talked earlier about the need to focus on the statutes we're proceeding under. There's 981, 982 and 853, which are under different titles but we all know what we're talking about, which one are we proceeding on here, and explain to me how they're working in the scenario.

MR. FESAK: Judge, that's a loaded question, but the safe answer is we're proceeding under 18 U.S.C., 982(a), which is the criminal forfeiture for property involved in a

money laundering transaction. There is an analog 18 U.S.C.,
981(a), which is civil forfeiture of -- basically verbatim
language. Property involved in a money laundering
transaction. 981 is tangentially relevant because the
seizure warrants in this case both -- invoked both the
criminal and civil seizure authority. And the Government
actually still has the option, within 90 days of when the
administrative claim is filed, to file a civil case and in
that civil case we could theoretically make an allegation of
concealment and correct some of these defects they've been
talking about, but I'm going to steer away from that and
focus on 982, which is the authority directly at issue in
this criminal case.

The theory of forfeiture is that it was involved in
charged money laundering being a conspiracy and multiple
substantive counts of the spending money laundering statute.

If I may briefly respond to a couple of their
points. If the Court has a copy of *United States v. Miller*,
it's been cited multiple times. There's obviously the Fourth
Circuit case, but there's also a District Court case, which
is 295 F.Supp.3d 690. And on page 699 of that case, the
court actually addressed the fact that the government had
charged spending money laundering, which is a 1957 violation,
and the money that was spent was spent on improvements and
taxes and things on this real property. There was also

established clean money was spent on this property and the entire -- the upshot of the District Court case and the Fourth Circuit case was that those properties were forfeitable in their entirety following the *Kivanc* rule of law.

So the idea that we have to allege concealment money laundering under 1956 seems at odds with this language in *Miller* where 1957 was sufficient.

Second quick point I would like to make is even though concealment money laundering is not charged in the indictment I think there is plenty of evidence in the search warrant -- or seizure warrant affidavits to establish concealment. We have money, we have very bizarre transactions, money moving through shell corporations, fictitious wire instructions, money being moved between accounts once it gets to the United States, money moving between different account holders, from husband to wife to children and back again. So we would also submit that there is actually plenty of evidence to support concealment and forfeiture for that reason as well.

And the final and probably the biggest point I would like to make, your Honor, is there's a big assumption being made here, which is that there's clean, innocent money in these accounts. The Government's position, I would offer this, is all the money that the Teyfs had here in the country

1  ultimately goes back to that initial 39 and a half million

2  that came from Russia and from the bribe scheme or the

3  kickback scheme, I should say, and I would proffer that to

4  you right now.  The upshot really though, Judge, is that

5  under the governing case law, under *Farmer*, it's their burden

6  at this point to come forward and prove that there's

7  innocent, untainted money.

8          And I can cite you some other cases if you need me

9  to that stand for that same proposition, but they have not

10  come forward with any such evidence.  So I think at this

11  point we do have -- met the probable cause standard that it's

12  tainted and forfeitable.

13          MR. McLOUGHLIN:  A couple of brief points, your

14  Honor.

15          With respect to *Miller* that the Government relies

16  on, I think the most telling point is if you look at -- and

17  again, it's page 24 or star 24 or star 794, depending on your

18  official reporter -- my printout, it's page 7 of 8 -- but you

19  look at the paragraph that begins under 981(a)(1).  It says,

20  when legitimate funds are co-mingled with property involved

21  in money laundering or purchased with criminally-derived

22  proceeds, the entire property, including --

23          THE COURT REPORTER:  Please begin that statement

24  again.

25          MR. McLOUGHLIN:  I apologize.  I'm getting way

1    ahead of myself.

2              In the decision that the United States relies upon,

3    -- the Fourth Circuit relies on *United States v. McGauley*,

4    M-c-G-A-U-L-E-Y, 279 F.3d 62 (1st Cir. 2002) and the

5    parenthetical relied upon by the Fourth Circuit in that

6    decision is telling.  The parenthetical is, quote, stating

7    that legitimate funds that are co-mingled with illegitimate

8    funds can be forfeited if the co-mingling was done to conceal

9    the illegitimate funds.  Then they cite *United States v.*

10   *Baker*, 7th Circuit, 227 F.3d 955, year 2000.  Paren, the

11   same, close paren.

12             Point being, your Honor, that -- I apologize, this

13   isn't *Miller*, this is *Kivanc*.  Government relied on *Kivanc*.

14   My apologies.  I have too much paper around here.  So this is

15   quoted in *Kivanc* 714 F.3d 782.  And that is the case the

16   Government relied on for that point.

17             So when the Fourth Circuit was talking about this

18   issue, it made the point that co-mingled funds are

19   forfeitable, again, if it was done to conceal the

20   illegitimate funds.

21             Now, the Government can stand here all day and say

22   if we were to do that and if we were to bring a civil case,

23   then we would have all these additional facts and we could

24   probably get it anyway.  And when that day comes, you know,

25   we'll be back torturing your Honor; but until that day comes,

1  it's not in the indictment and it's not in the affidavits and
2  so there's no basis to hold the funds.

3          THE COURT:  I've got a case that I found in my
4  research for this and I'll let you know what I find to be the
5  relevant part and hear whatever thoughts you have on it.
6  It's *United States v. Matai*, M-A-T-A-I, 173 F.3d 426 (4th
7  Cir. 1999).  It's an unpublished case, but it's a rather
8  detailed case.  It says in relevant part at star page 5, in
9  this case, we also looked at the foundation set in
10 *Schifferli*.  The reasoning in that case and other cases cited
11 above is persuasive.  In fact, those cases justify our
12 conclusion that under Section 982(a)(1), quote, property
13 involved in, close quote, criminal activity includes property
14 that is substantially connected to that activity in that it
15 further facilitated or aided the commission of the activity.
16 As a result, property that is substantially connected to the
17 commission of a money laundering offense such that it
18 assisted those convicted of the offense in committing the
19 crime is forfeitable under 982(a)(1).

20          That would seem to indicate that Fourth Circuit, at
21 least at one time, considered property that is substantially
22 connected to money laundering, that assisted in committing a
23 money laundering offense is forfeitable.  And I know we've
24 got to drill into what exactly is property, but if I find the
25 bank account to be property, it would seem the bank account

1   facilitated the -- some of the spending that went on here.

2           MR. McLOUGHLIN:  Well, first, Your Honor, the

3   procedural response, which is -- the Fourth Circuit has made

4   painfully clear -- certainly done so to me more than once --

5   that its unpublished opinions are not to be cited as

6   precedence.  And the cases we're talking about here, *Kivanc*

7   is 2013.  And given the change in the law after the series of

8   the U.S. Supreme Court cases such as *Lewis*, one should be

9   careful, I think, about exactly what the language means and

10  exactly what the facts tell you.

11          I would also say to the extent one is reading tea

12  leaves about that decision -- and I apologize, I have not

13  read it and I am not familiar with it -- but the language

14  that jumps out at me is this element of use of those -- that

15  property -- to facilitate and enable the money laundering,

16  which at least arguably is the equivalent -- if one is going

17  to parse the language -- of the point made by the Fourth

18  Circuit in its citation of *Kivanc*, that is, that the

19  co-mingling was done in order to conceal the illegitimate

20  funds because, again, that's talking about using those --

21  that property in the act of money laundering and that, of

22  course, is not the case that we are looking at here.  It's

23  not pleaded, it's not in the affidavit.

24          So in one reading of that -- again, not having time

25  to think about it -- it's not inconsistent and can be easily

1  conformed toward the reading of *Kivanc* and the cases relied

2  upon by the Fourth Circuit, which if you look at the Fifth

3  Circuit, the Fourth -- the Seventh Circuit, the Tenth Circuit

4  and the First Circuit, all which say the same thing, that

5  seems to be the consensus.  And so if on the other hand one

6  is going to read it so that there is a conflict between the

7  two and go with that, then you have to go with the published

8  opinion in 2013.

9           THE COURT:  The Government has indicated it's the

10 defendant's burden at this point to show that there are

11 untainted funds in the account.  I think there's a case,

12 *United States v. Cohen*, 888 F.3d 667, 2018, in footnote --

13 I'm sorry -- talking about a *Farmer* hearing more broadly, but

14 it seems to indicate in footnote 4 that it is the defendant's

15 burden to show untainted funds are in the account.  Is there

16 anything you would like to offer today in terms of proffer or

17 otherwise on that particular issue?

18          MR. HAN:  Your Honor, I think what we said at the

19 beginning, which was that the methodology used to determine

20 the amounts seized from these accounts presents a very high

21 likelihood that untainted funds were seized with tainted

22 funds.  I can't -- as we sit here today, I don't know that I

23 can point to a particular dollar, but that's because the

24 Government hasn't traced anything and they have all the

25 records.  They've had this case for, I don't know how many

years, and they're still refusing to follow the money and tell us whether or not the money that they seized is the same money that is charged in the indictment. So we're sort of at a --

MR. McLOUGHLIN: Your Honor --

THE COURT: And Mr. McLoughlin, I'll hear from you in a second. This came up in the motion to quash I addressed a couple weeks ago. A similar argument was made that you've either been unable to access the documents -- and that's sort of what I heard here but not exactly. I mean, do you-all have access to the Government's documents that they are supposed to turn over in discovery?

MR. McLOUGHLIN: It has been a rolling production. We don't have all the documents yet. The Government, I believe, is working diligently to get them to us. We got 4 terabytes -- which I think would actually fill this room if you printed it out and get you out the hall -- two weeks ago, two and a half weeks, something like that. Before that we got 2 terabytes, you know, a month or six weeks ago and we've been sending hard drives to the Government and they've been very diligent about getting information to us, but, A, we haven't had possession of it for so long; and, B, once you have possession and you are swimming in the ocean, you have to find the fish and it's a big ocean.

But we will, for the record, reserve all our rights

1    to come back when we have the opportunity to put this

2    altogether, but I think the more relevant point for today is

3    that, in fact, the obligation to show that they're untainted

4    funds by tracing only accrues once the Government has done,

5    A, pleaded the relevant facts that establish that the funds

6    that are untainted are in some way used to conceal or

7    something else; or, B, shows probable cause that the funds in

8    the account are all tainted.  In which case it becomes our

9    burden -- the burden shifts -- to show by a preponderance of

10    the evidence, or whatever the standard is -- I apologize, I

11    don't recall at the moment -- that, in fact, no, that's not

12    correct.  That's not.  Our entire position here today is we

13    haven't gotten there yet because the Government has failed to

14    meet that initial burden which shifts the burden to us

15    because under *Lewis*, under *Chamberlain*, under these other

16    cases, there is no question that the burden in the first

17    instance -- if it is going to seize tainted funds -- is on

18    the Government to establish a basis for seizure; and if they

19    haven't done that by probable cause with respect to those

20    funds, then there's no burden shifting and our position is we

21    haven't gotten to that point yet.

22          MR. HAN:  Judge, I just wanted to quickly -- you

23    mentioned how there was an illusion to the fact that we don't

24    have access and you asked whether or not we've been provided

25    with discovery.  So to give you an idea of the challenge

involved here in us trying to do the tracing -- we included

exhibits hopefully that were -- I recognize it might be hard

to decipher what the intent of these exhibits were -- but,

for example, in account 1991, Bank of America, the last

account statement that we've been provided by the Government

-- and just based on the subpoenas, it looks like that's the

last statement that they have -- indicated that there was a

balance in that account of $50,000. And then -- that was in

July of 2018.

And then in December -- on December 5th of 2018 is

when they seized that account and from that account they

seized that $250,000. So I can't sit here today and tell you

that the $200,000 that got dropped into that account between

July of 2018 and December 5th of 2018 constitutes untainted

funds because I don't know -- but neither does the Government

-- and that's why we're asking the Government to trace these

funds because they're the ones who seized it and we don't

have enough information to be able to say whether or not, you

know, the funds that -- all the funds they seized are

untainted. All I can tell you is that the methodology they

chose to get these warrants grossly exceeded the amount of

criminal proceeds.

MS. KOCHER: If I can, your Honor, very briefly in

regard to discovery -- I know this isn't a discovery hearing.

It certainly is true the amount of gigabytes is correctly

recited. I do feel the need to let the Court know that at least 4 of those gigabytes are simply copies of the various electronic devices that were found. So the discovery itself isn't 6 tera -- what they're looking for in this regard is not that large.

Moreover, unless I misremember, which sometimes happens. My theory is the gray hair erodes through the brain cells and you forget things; but the documents seized in the search, which is -- if I understand their position -- that would be where we would know, right. We have all their bank records from the seizures. Those are actually PDFs titled, documents, from the search of 6510 New Market Way and documents from Glenwood Avenue, if there were any. And so I don't think those would be too difficult to find. I literally think you could search the title and find those documents.

The Government's position -- I just want to come back to AUSA Fesak's last point and that was -- and this goes to my statement that it's a red herring to Judge Flanagan. What's presented here is that we sought seizure of $102 million and then ergo, I assume, that the missing $60 million is legitimate funds. That's not the case, your Honor. The $102 million is the same $39.4 million that we have charged each transfer. So, for instance, the largest one is a $9 million transfer. For some reason, unknown to

the Government, Mrs. Teyf transferred the same $9 million three different times from one account to another. In fact, back to the first account, I believe, and then out to a third account. That results in a $27 million liability because it's a 1957 charge. Each transfer is a count and results in forfeiture of the funds relative to that account. That's where that extra money comes in. The Government's position is it's all traced back -- and, thus, is the purpose of Government's Exhibit 1 -- all of the money traces back to the original wires. So as you can see, line 2 is Bank of America account 3905. Line 13, line 17 and line 19 are the four original accounts -- they're in bold. Those received the foreign wires. The ones underneath that show in a progressive nature where their funds came from and they all eventually end at one of those other four accounts, which was the recipient of those foreign wires. There is no other money -- not significant -- and I will admit there is a possibility of the question of whether there was very small, nominal salary paid by a local company to Mr. Teyf. That may be.

        If I can use your example, Mr. Fesak was telling me yesterday rather than a drop of ink in a glass of water, this is a case where the glass that we're holding is ink; and if there are any legitimate funds, it's the interest from the American-held accounts that result from the specified

1  unlawful activity or this nominal payment from Delta Express.
2  That drop of water does nothing to lessen the color of the
3  rest of that bottle of ink.
4          THE COURT:  All right, counsel.  I believe that
5  covers all the issues we need to cover today.  Anything
6  remaining?
7          MR. McLOUGHLIN:  NBA championships, your Honor.
8          THE COURT:  Well beyond my prognostication
9  abilities.
10          All right, counsel.  I'm going to take the last
11  matter under advisement and go over the statutes in the cases
12  one more time before I make my decision so I'll take that
13  under advisement.
14          How long do you think you need to hash out the
15  jewelry and all that?  Would a week be sufficient time or do
16  you need more than that?
17          MS. KOCHER:  I think it's just a matter of -- my
18  intention would be to compare Judge Flanagan -- in other
19  words, the only issue is what's already been released so I
20  would ask them to redact from his claim those that have
21  already been released.
22          THE COURT:  Before we wrap up -- we've talked about
23  the bank accounts, but we haven't talked about the two
24  Mercedes at all that are also at issue here --
25          MS. KOCHER:  Coming back around to that, I would

1    ask counsel if I might, your Honor, I'm only --

2              MR. McLOUGHLIN:  I think there's one.

3              MS. KOCHER:  -- aware of three.  Thank you.  There

4    were three Mercedes, two belonged to Mrs. Teyf.

5              The Government would again note that it all came

6    from tainted funds, your Honor.  They are -- (conferring with

7    Attorney Fesak briefly at counsel table off the record) --

8    related to account 35.

9              So if I can turn to the indictment.  So Count 35 of

10   the indictment alleges that that check came from -- the check

11   that purchased this third Mercedes came from PNC account

12   4726.  That is on Exhibit 1 at line 8, your Honor.  And it

13   traces, again, back to one of those original four accounts.

14   It was originally funded by 3905 and then in turn by 1991.

15   So those funds used for the Mercedes directly trace back to

16   those foreign wires.

17             THE COURT:  Anything from the defense on that

18   point?

19             MR. HAN:  Yeah.  I think it's just kind of an

20   extension of what we've been arguing all along, which is that

21   the point where that check was cut from account 1991, if

22   those were proceeds that kind of traced back to the accounts

23   found by the Grand Jury, then they should have to show that.

24   Just the fact that there was money transferred from 3095 to

25   1991 at some point in time and then a cashier's check -- or a

1    check was cut from 1991 -- we submit does not get them to a

2    probable cause to believe that the Mercedes were purchased

3    with criminal proceeds.

4            THE COURT:  Okay.  All right.  So I'll give you all

5    until next Friday to submit the stipulation on the jewelry.

6    That would be May 3rd, 2019.  I will endeavor to get out a

7    written order on this as promptly as I can.

8            Any appeal timeline or review timeline would be

9    triggered by the filing of that written order, not what we've

10   done here today.

11           All right, counsel.  Thank you very much.  Very

12   involved case, good presentation by both sides, very

13   interesting issues.

14           I'm going to remand Mr. Teyf to the custody of the

15   U.S. Marshals.

16           I will be in recess until 2:45 and we'll begin our

17   next matter.

18

19                (Hearing concluding at 2:32 p.m.)

20

21

22

23

24

25

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NORTH CAROLINA

3

4              CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RPR, CRR, CRC, Federal

7   Official Court Reporter, in and for the United States

8   District Court for the Eastern District of North Carolina, do

9   hereby certify that pursuant to Section 753, Title 28, United

10  States Code, that the foregoing is a true and accurate

11  transcript of my stenographically reported proceedings held

12  in the above-entitled matter and that the transcript page

13  format is in conformance with the regulations of the Judicial

14  Conference of the United States.

15

16  Dated this 21st day of May, 2019

17

18                              /s/ Michelle A. McGirr
                                MICHELLE A. McGIRR
19                              RPR, CRR, CRC
                                U.S. Official Court Reporter
20

21

22

23

24

25