IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CR-00452-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **OBJECTIONS TO THE MAGISTRATE** |
| v. | ) | **JUDGE'S MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| LEONID ISAAKOVICH TEYF | ) | |

Defendant Leonid Teyf, pursuant to 28 U.S.C. 636 (b)(1)(C), objects to the May 8, 2019 Memorandum & Recommendation of United States Magistrate Judge Robert T. Numbers, II, (DE 247) regarding the Defendant's Motion to Suppress Evidence and Release Property (DE 182), pursuant to the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution, and for the reasons that: (1) the warrants authorizing seizure were not supported by probable cause, (2) the warrants were based on misleading statements and omissions made by affiants; and (3) the Government cannot demonstrate that the seized and restrained property was involved in or traceable to criminal activity.

## BACKGROUND

On November 8, 2018, an indictment was returned charging Defendant with engaging in monetary transactions in property derived from specified unlawful activity and conspiring with and aiding and abetting others in furtherance of those transactions,[1] bribery of a public official,[2] "murder for hire,"[3] aiding and abetting others in possessing a firearm with an obliterated serial

---

[1] 18 U.S.C. §§ 2, 1956(h) and 1957 (2018).
[2] *Id*. § 201(b)(1).
[3] *Id*. § 1958.

number,[4] bringing in and harboring certain aliens, as well as conspiring with and aiding and abetting others in furtherance of that harboring,[5] and visa fraud[6] (DE 1). The indictment also contained a forfeiture notice advising Teyf of the Government's intent to forfeit real properties located at 6510 New Market Way and 7900 Hardwick Drive in Raleigh, North Carolina, a firearm, and the contents of several domestic bank accounts.

On or about December 5, 2018, the Government obtained eight warrants to seize four vehicles and funds from 22 bank accounts (the "Seizure Warrants"). In support of its applications for those warrants, the Government submitted to the issuing magistrate, Magistrate Judge Gates, sworn affidavits signed by two special agents, one from the Federal Bureau of Investigation and the other from the Internal Revenue Service. The substance of each of the eight affidavits was substantially similar, if not identical, to the others: all alleged that the property described in the warrant was subject to forfeiture under 18 U.S.C. §§ 981 and 982.[7]

The affidavits alleged that a "reliable, confidential source ('CS-1')" provided information to investigators about a "bribe/kickback" scheme involving Mr. Teyf, former Russian Defense Minister Anatoliy Serdyukov, and others.[8] Each affidavit contained a table ("Table") listing what the affiant agents described as "the aggregate deposits of criminal proceeds of TEYF's specified unlawful activities."[9] Of the 22 accounts, the Table listed 20 that were eventually seized; the other two are an account at BB&T Bank ending in 4304 and an account at First Citizen's Bank ("FCB") ending in 0918. The Table was followed by a list of 25 purported "transactions of funds traceable to the criminal proceeds of TEYF's specified unlawful activity, each in excess of $10,000"

---

[4] *Id.* §§ 2, 922(k) and 924(a)(1)(B).
[5] 8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(I) and (v)(II) (2018).
[6] 18 U.S.C. § 1546(a).
[7] *See* Affidavit in Support of Application for a Search and Seizure Warrant, No. 5:18-MJ-2088-JG (E.D.N.C.), filed Dec. 5, 2018, previously filed at (DE 182-1), representative of the other seven warrants with respect to the affidavit, at ¶ 1.
[8] *See id.* at ¶ 62.
[9] *See id.* at ¶ 74.

("Transactions List").[10]

On the basis of the affidavits, Judge Gates signed the Seizure Warrants, which included authorization to seize the "balance of funds" in each account, "not to exceed" a specified dollar amount. As to each account, this "not to exceed" amount was identical to the amount listed in the Table for such account.

On December 6, 2018, the grand jury returned a Superseding Indictment adding immigration, visa fraud, and unlawful citizenship or naturalization procurement counts against Teyf. (DE 20). The Government also amended the forfeiture allegations to give notice of its intent to forfeit four Mercedes Benz vehicles, artwork acquired by Teyf, and the contents of 10 additional domestic bank accounts.

On December 12, 2018, the Government executed search warrants (the "Search Warrants") at Mr. Teyf's homes on New Market Way[11] and Glenwood Avenue[12] in Raleigh, North Carolina. During those searches, agents of the Government seized numerous items of value, including jewelry, currency, and other items. Shortly thereafter, the Government sent an administrative forfeiture notice to Mr. Teyf, stating that the Government sought to civilly forfeit the items of value seized from his homes, along with one of the seized vehicles and funds contained in five of the bank accounts.[13]

On February 6, 2019, the grand jury returned a Second Superseding Indictment adding four new Section 1957 counts (Counts 33-41) against Teyf's wife, Tatyana Anatolyevna Teyf, and five new §1957 counts (Counts 37-41) against Teyf. (DE 127). The indictment also

---

[10] *See id.* at ¶ 75
[11] Search and Seizure Warrant, No. 5:18-MJ-2079-JG (E.D.N.C.), filed Dec. 5, 2018, previously filed at (DE 183-1).
[12] Search and Seizure Warrant, No. 5:18-MJ-2080-JG (E.D.N.C.), filed Dec. 5, 2018, previously filed at (DE183-2).
[13] *See* Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings, previously filed at (DE-182-2).

3

amended the forfeiture notice, notifying Defendant that the Government seeks to forfeit (1) real property located at 133 Hargett Street in Raleigh, North Carolina (2) real property located at 510 Glenwood Avenue, #503, in Raleigh, North Carolina; and (3) all funds held in the various bank accounts that were the subject of the seizure warrants. The Government has placed *lis pendens* on each of the real properties.

On or about March 7, 2019, Mr. Teyf filed claims with the Federal Bureau of Investigation contesting the forfeiture.

On April 4, 2019, the grand jury returned a Third Superseding Indictment. (DE 215). This Indictment did not add new criminal charges or defendants but added new assets to the forfeiture notice, including a new motor vehicle (Toyota Land Cruiser), the contents of a new domestic bank account, unidentified pieces of jewelry, currency, and undisbursed funds to be deposited by Lank Ventures LLC. (DE 215). The forfeiture notice was also amended by removing five bank accounts originally identified in the Second Superseding Indictment. The factual and legal basis for the forfeiture notices in the Second and Third Superseding Indictments is identical.

On May 9, 2019, the grand jury returned a Fourth Superseding Indictment adding 18 USC § 1956(a)(1)(B)(i) to the statutes allegedly violated by the conduct described in Count One, and changing the description of the specified unlawful activity ("SUA") alleged to support the money laundering violations in Count One. (DE 248, Count One, at p. 6, par. 19). The Fourth Superseding Indictment also added counts alleging tax violations related to purportedly false statements made by Leonid and Tatyana Teyf regarding interests in foreign bank accounts on their 2012, 2014 and 2015 tax returns, in violation of 26 USC § 7206(1); and counts alleging failure to report said accounts to the Financial Crimes Enforcement Network (FinCEN), in violation of 31 U.S.C. §§5314 and 5322 and 31 CFR §103.24 and 103.27(c) and (d). (DE 248,

Counts 44-50, at pp. 25-28).

On March 15, 2019, Defendant filed a Motion to Suppress Evidence and Release Property and Incorporated Memorandum of Law (DE 182). The Government filed its Response on March 26, 2019 (DE 197). The Defendant filed a Reply on April 8, 2019 (DE 210). After a hearing before Magistrate Judge Robert T. Numbers, II, on April 24, 2019, a Memorandum & Recommendation was filed on May 8, 2019. (DE 247). Pursuant to Motions for Extension of Time and Oral Orders of the Court, Defendant was allowed until September 6, 2019 to file these objections. (DE 270, 271, 281, 283, 288, 304, 325, 329).

## ARGUMENT

### I. THE SEIZURE WARRANTS ARE NOT SUPPORTED BY PROBABLE CAUSE BECAUSE THE AFFIDAVITS FAIL TO ESTABLISH A NEXUS BETWEEN THE SEIZED PROPERTY AND THE ALLEGED CRIMINAL ACTIVITY.

In its Memorandum & Recommendations, the Magistrate Judge found that the issuing court had a substantial basis for its conclusion that the seizure warrants were supported by probable cause. (DE 247, II.a.i., at pp. 4-5). Defendant objects to this finding.

Before issuing a warrant allowing the seizure of property, a magistrate judge must conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[14] In reviewing a magistrate's issuance of a warrant, the duty of a reviewing court is "to ensure that the magistrate had a 'substantial basis for…[concluding]' that probable cause existed."[15] No such probable cause existed with respect to the Seizure Warrants, because the affidavits fail to establish the requisite nexus between alleged criminal activity and the funds transferred into the subject bank accounts. With respect to the provenance of the funds in those accounts, the allegations in the warrant affidavits may fairly be summarized as follows:

---

[14] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
[15] *Id*. at 238-39 (citing *Jones v. U.S.*, 362 U.S. 257, 271 (1960)).

(a)  CS-1 overheard conversations between Mr. Teyf and others in which a supposed "kickback" scheme was discussed;[16]

(b)  Mr. Teyf instructed CS-1 to pick up large sums of cash;[17]

(c)  CS-1 has seen documents showing "at least some of the bribe proceeds" were transferred to banks in Cyprus;[18]

(d)  Mr. Teyf has bank accounts in Cyprus;[19] and

(e)  Four accounts held at Bank of America by Mr. Teyf and Tatyana Teyf received wires from banks in the United States, Cyprus, Hong Kong and Russia.[20] The wires originated from accounts held in the names of 20 foreign corporations and one in Mr. Teyf's name.[21]

Other than a conclusory statement that Mr. Teyf gave cash retrieval instructions to CS-1 "[w]hile the bribe/kickback scheme was being perpetrated,"[22] the affidavits are bereft of any link between those instructions and the scheme. The affidavits do not allege that CS-1 picked up the funds from even one subcontractor. To the contrary, the affidavits make clear that "the only information" CS-1 had about the alleged money pickups was a telephone number, a pickup location, and the name of an accountant to whom the funds should be delivered."[23] In other words, there is no salient nexus between a crime and the cash allegedly retrieved by CS-1.

Further, even if credulity is given to the CS-1's fractured theory, the only allegation connecting the funds collected in Russia to any banks outside of Russia is the claim that CS-1 saw some unidentified documents showing that "some of the bribe proceeds" were transferred to banks in Cyprus.[24] There is no other information concerning the amounts of those proceeds, the names of the banks, the beneficiaries of said accounts, dates of the transactions, names of

---

[16] *See* (DE 182-1) at ¶ 62(c).
[17] *See id.* at ¶ 62(e).
[18] *Id.* at ¶ 62(h).
[19] *Id.* at ¶ 70.
[20] *See id.* at ¶ 71(c).
[21] *See id.* at ¶ 71(b).
[22] *Id.* at ¶ 62(e).
[23] *See id.*
[24] *Id.* at ¶ 62(h).

depositories, or the names on the recipient accounts at those banks. The affidavits fail to explain how the Government connected the unidentified documents showing transfers to Cyprus to a crime. Void of any tracing efforts whatsoever, the affidavits also contain no allegation whatsoever connecting monies from financial institutions in Hong Kong and Russia to any foreign crime committed in violation of Russian law. There are certainly no allegations that the supposed "bribe proceeds" were wired to any of the 20 corporations that subsequently wired funds into any account in the United States, including the accounts at Bank of America.

Because the affidavits fail to allege a sufficient nexus between alleged criminal activity in Russia and the funds that were seized, the issuing court could not have had a substantial basis to conclude that there was probable cause to believe the seized property constituted illicit property subject to forfeiture. Given the lack of connection to any criminal activity, Defendant is entitled to the return of all such seized property.

## II. THE WARRANT AFFIDAVITS CONTAIN FALSE AND MISLEADING STATEMENTS, RENDERING THE WARRANTS FATALLY DEFECTIVE.

In its Memorandum & Recommendations, the Magistrate Judge rejected Defendant's argument that the warrant affidavits contained intentionally false statements and material omissions that rendered the warrants fatally defective. (DE 247, II.a.ii., at pp. 5-9). The Magistrate Judge further found that Defendant failed to make the necessary showing to entitle him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (DE 247, II.a.ii., at pp. 7-9). The Magistrate Judge specifically found that, even if Defendant could satisfy the intentionality prong outlined in *Franks*, he could not satisfy the materiality prong. (DE 247, II.a.ii., at p. 7). Defendant objects to these findings.

Where a defendant demonstrates that an affiant in a warrant affidavit has made a "false statement knowingly and intentionally, or with reckless disregard for the truth" and, absent such

false statement, "the affidavit's remaining content is insufficient to establish probable cause, the warrant must be voided and the fruits of the search excluded."[25]  Moreover, the omission of relevant facts from an affidavit, like the inclusion of a false statement, may form the basis for suppressing evidence or releasing seized assets.[26]  In this case, the affidavits contained both intentionally false statements and material omissions that rendered the warrants fatally defective.

First, the affidavits repeatedly characterize Mr. Teyf's alleged conduct in Russia as "*extortion*".[27]  These statements are false. Extortion requires the employment of a "threat" against a person or property.[28]  In fact, none of the affiants allege any threats, let alone any facts that create such an inference. None of the five Indictments allege a threat.[29]  To the contrary, the Indictments contradict any suggestion that threats were employed, stating instead that the supposed "kickback" scheme consisted of subcontractors agreeing to pay a certain percentage to Mr. Teyf as a condition of being awarded a subcontract.[30]  CS-1 and the affidavits elsewhere characterize the proceeds of the alleged scheme as "*bribery*" proceeds but also refer to it as a "*kickback*" scheme. The contradictions in the affidavits are fatal to any finding of probable cause.

Second, even more material is the affiants' misrepresentation regarding what CS-1 saw in the unidentified documents showing that "at least some of the bribe proceeds" were transferred to banks in Cyprus.[31]  In fact, the Department of Homeland Security's Report of Investigation ("ROI") related to the debriefing of CS-1 makes clear that CS-1 never claimed a connection between the alleged "kickback" or "extortion" or "bribery" scheme and transfers to

---

[25] *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

[26] *U.S. v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).

[27] *See* (DE 182-1) at ¶¶ 62(d), 79(a).

[28] *See, e.g.*, 18 U.S. Code § 3559(c)(2)(C) ("[T]he term 'extortion' means an offense that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person…."); *see also*, 18 U.S.C. §§ 875 & 876; N.C. Gen. Stat. § 14-118.4 (2018).

[29] *See* Second Superseding Indictment, No. 5:18-CR-452 (E.D.N.C.), filed Feb. 6, 2019, Doc. No. 127.

[30] *See Id.* at ¶¶ 7-8.

[31] *See* (182-1) at ¶ 62(h).

banks in Cyprus. According to the ROI, all CS-1 said was that Mr. Teyf banked at Alfa Bank in Russia, that CS-1 would make deposits at that bank or provide escorts on behalf of Mr. Teyf, and that CS-1 saw documents indicating "*money*," as opposed to bribe or kickback or extortion proceeds, was transferred to Cyprus.[32] This distinction is critical in light of the above-referenced lack of nexus between the alleged scheme and the seized funds.

Third, the affiants also made a material omission in the affidavits that goes directly to CS-1's reliability as a source. The affidavits allege that CS-1 delivered payments of $70 Million (USD), $30 Million (USD), and $50 Million (USD) to Defense Minister Serdyukov via his son-in-law Puzikov.[33] The affidavits did not inform the Magistrate Judge, however, of CS-1's belief that "all three shipments were probably in the 2013 timeframe."[34] This fact is crucial because by 2013 (a) Mr. Teyf was no longer Deputy Director of Voentorg;[35] and (b) Defense Minister Serdyukov was no longer the Russian Minister of Defense in 2012.[36] In other words, CS-1's supposedly reliable information consisted of purported bribe payments made by Mr. Teyf at a time when he no longer had anything to gain from making such payments, and when Mr. Serdyukov was no longer a public official.

Fourth, the affiants failed to identify a Russian law violated as a result of the alleged "kickback" or "extortion" or "bribery" scheme. This is a critical point, because federal money laundering statutes focus on financial transactions involving illicit proceeds generated from a "specified unlawful activity."[37] While the list of specified unlawful activities in 18 U.S.C. § 1956(c)(7) is long, the vast majority are circumscribed to offenses committed in the United

---

[32] *See* Dep't of Homeland Security, Report of Investigation, CHS Debrief regarding TEYF (Oct. 12, 2018), (DE 182-3), at 6.
[33] *See* (DE 182-1) at ¶ 62(f).
[34] *See* (DE 182-3) at 4.
[35] *See* Indictment at ¶ 8.
[36] *See* (DE 182-1) at ¶ 62(b).
[37] *See* 18 USC §§ 1956(a) and 1957(a).

States.[38] Consequently, when dealing with an extraterritorial SUA, like the one at issue here, the Government must look to 18 U.S.C. § 1956(c)(7)(B), which pertains to offenses "against a foreign nation." Of course, to qualify as an offense against a foreign nation, there must be an actual foreign law proscribing the activity.[39] Here, affiants neglected to apprise the Magistrate Judge of any such law, and therefore provided to the Court no legitimate legal basis for the warrant whatsoever.

Further evidence of the Government's lack of a legal basis to seize the funds on deposit within the accounts identified in the affidavits is the fact that it moved to seize the assets based on the wrong legal theory. According to the affidavits, the funds were being seized "as the funds and assets described below are property representing the proceeds of, involved in, or facilitating violations." In support thereof, the affidavits make a blanket referral to 18 U.S.C. §§981 and 982: "we have probable cause to believe the aforementioned assets are subject to seizure pursuant to 18 U.S.C. §§ 981, 982, and forfeiture as property involved in money laundering transactions pursuant to 1956(a)(1), 1956(a)(2), 1957, and 1956(h)."[40] This is insufficient. Through Sections 981 (civil) and 982 (criminal), Congress established different bases for forfeiture depending on the crime committed. For instance, Section 981(a)(1)(C) provides that only the proceeds of bank fraud can be forfeited to the United States. Section 981(a)(1)(D) states that only property representing or traceable to the gross receipts of Federal program fraud (18 U.S.C. §666) can be forfeited. These forfeiture theories are not interchangeable. The affiants failed to apprise the Magistrate Judge of the specific legal authority providing the basis for forfeiture. Instead, the Government claimed that the funds on deposit within the identified accounts were forfeitable as

---

[38] *See, e.g.,* 18 U.S.C. § 1956(c)(7)(A) (referencing 18 U.S.C. § 1961(1) ("racketeering activity" means (A) any act or threat involving murder, kidnapping… *which is chargeable under State law*…; (B) any act *which is indictable* under any of the following provisions of title 18, United States Code…" emphases added)).
[39] *See U.S. v. Awan*, 459 F. Supp. 2d 167, 183 (E.D.N.Y. 2006).
[40] (DE 182-1, at par. 79).

"facilitating property." However, Sections 981(a)(1)(A) and 982(a)(1), which establish the civil and criminal authority for money laundering forfeiture **_do not_** authorize the seizure of property facilitating money laundering.

Despite challenging the legal authority for the seizures, Teyf's arguments fell on deaf ears. In fact, in addressing the absence of an identifiable SUA, the Magistrate Judge held that even "if the Government were to have included the specific Russian laws that Teyf may have violated by engaging in the bribe and kickback scheme, it would strengthen the case for probable cause, not diminish it." (DE 247, at p. 7). Teyf respectfully disagrees. The Government bears the burden of providing probable cause tending to show that an actual criminal offense has been committed, and that such an offense provides the legal basis for the warrants. The Government has repeatedly argued that the purported crimes (i.e., extortion, kickbacks) were committed in Russia. Having failed to show that an actual crime occurred in violation of Russian law, the Magistrate Judge lacked the authority to issue a legal warrant and lacked probable cause to find that the property identified in the warrants was traceable to or involved in money laundering transactions in the U.S.

Another flagrant and misleading omission concerns the affiants' characterization of the foreign countries associated with the companies that supposedly wired funds into the Bank of America accounts. Citing the U.S. Department of State's website, Special Agent Phillips referred to these countries as either "jurisdictions of primary concern" or "jurisdictions of concern," in support of his allegation that the alleged activity is consistent with international money laundering.[41] While technically true, these appellations are misleading to the point of being deceptive without additional context. The State Department's website makes explicitly clear that the category of "jurisdictions of primary concern" is based on "the significance of

---

[41] *See* (DE 182-1) at ¶ 73.

the amount of proceeds laundered, not of the anti-money laundering measures taken."[42]  It is no wonder, then, that the affiants did not disclose to the Magistrate that other "jurisdictions of primary concern" include France, Germany, the United Kingdom, and the United States.[43]

Taken together, the various misleading statements and omissions by the affiants render the affidavits incapable of establishing the probable cause necessary to support seizure.

## III.  THE SEIZURES EXCEEDED THE SCOPE OF THE WARRANTS.

The Government conceded that it could not establish that Defendant purchased various items of jewelry seized from his home during the December 2018 search with tainted funds, and the parties filed a stipulated motion and order releasing these assets (see DE 246).  The Magistrate Judge, in his Memorandum & Recommendation, held that Defendant's argument that the Government exceeded the scope of the search warrants in seizing the jewelry was therefore moot. (DE 247, II.b., pp. 9-10).  However, Defendant also contends that the seizure of artwork, cars, and untainted funds exceeded the scope of the warrants, as argued in Section 4, *infra*, and objects to the Magistrate Judge's Memorandum & Recommendation on this ground.

## IV.  THE GOVERNMENT CANNOT RESTRAIN "UNTAINTED" ASSETS.

In the Memorandum & Recommendation, the Magistrate Judge rejected Defendant's argument that the Government should return funds and an automobile because it improperly restrained untainted assets. (DE 247, II.c., at pp. 10-11).  The Magistrate Judge found that, when challenging a pretrial seizure of assets, the Defendant has the burden of showing by a preponderance of the evidence that the Government has improperly seized untainted assets. (DE 247, II.c., at p. 10).  The Magistrate Judge noted that Defendant Teyf could not make such a

---

[42] *See* (DE 182-1) at ¶ 73, n.6. The affidavit refers to the U.S. State Department's website for a list of such countries: https://www.state.gov/j/inl/rls/nrcrpt/2011/vol2/156373.htm (2011); https://www.state.gov/j/inl/rls/nrcrpt/2012/vol2/184112.htm (2012); https://www.state.gov/j/inl/rls/nrcrpt/2013/vol2/204062.htm (2013).
[43] *See id.*

showing because he had not completed a tracing analysis of the seized funds (DE 247, II.c., at p. 11). Defendant Teyf argued he did not yet have sufficient records to perform a tracing analysis. (DE 182 at p. 13). The Magistrate Judge also noted that after conviction, the Government would be required to show by a preponderance of the evidence that assets are forfeitable. (DE 247, II.c., at p. 10, footnote 5.) Defendant objects to these findings.

First, the Magistrate Judge's reasoning that Teyf failed to trace the seized assets constitutes an improper shift of the burden upon the defendant. The standard for seizing property is probable cause. It is the Government, not the defendant, who bears the burden to establish probable cause depending on its forfeiture theory. For instance, if the theory of forfeiture is that the property constitutes or is traceable to the proceeds of a crime, as is the case with a seizure of proceeds involved in or traceable to a money laundering offense (18 U.S.C. §§981(a)(1)(A) and 982(a)(1)), then the Government bears the burden of establishing probable cause to believe that it can show that nexus. If at the time of seeking a seizure warrant the Government knows that the only a fraction of the funds it wants to seize is traceable to the offense, then it bears the burden of establishing probable cause to seize the traceable part.[44] The Government, not the defense, bears the burden and a failure to meet it should result in the return of the seized property.

When, as in this case, the Government seeks forfeiture pursuant to 18 U.S.C. §§ 981 and 982, it may only restrain property directly traceable to a defendant's crimes.[45] In *United States v. Chamberlain*, the Fourth Circuit addressed a challenge to its well-established rule that substitute property, as defined by 21 U.S.C. § 853(p), could be subject to pretrial restraint.[46] The court noted that property forfeitable under the criminal forfeiture statute generally falls into two

---

[44] *See, e.g., United States v. Dupree*, 2011 WL 3235637, *10 (EDNY July 27. 2011).
[45] *U.S. v. Chamberlain*, 868 F.3d 290, 297 (4th Cir. 2017).
[46] *Id.* at 291.

Case 5:18-cr-00452-FL   Document 330   Filed 09/06/19   Page 13 of 26

categories: (1) "tainted" property, which can be directly linked to the defendant's offense(s); and (2) "untainted" property, which has no relation to any such offense(s) but is used to take the place of tainted property that has either diminished in value or is beyond the court's reach. Historically, the Fourth Circuit permitted pretrial restraint of both types of assets, based largely on its reading of past Supreme Court decisions.[47] Acknowledging the Supreme Court's more recent decision in *Luis v. United States*,[48] however, the Court of Appeals concluded that its prior interpretation was no longer tenable and held that the criminal forfeiture statute "permits the government to obtain a pretrial restraining order over **only** those assets that are **directly** subject to forfeiture as property **traceable** to a charged offense."[49]

### (a) The amounts authorized for seizure in the Seizure Warrants included "untainted" assets.

Even if this Court determines that there is probable cause to believe some of the funds wired from various foreign financial institutions to the four accounts at Bank of America consisted of criminal proceeds, there is no question that the Seizure Warrants were defective in that they authorized the Government to seize untainted funds along with allegedly tainted funds. This is plainly seen first in the fact that, while the Government alleges a total of approximately $39.4 million in criminal proceeds were wired into the four initial accounts at Bank of America, the warrants authorized seizure of funds totaling over $102 million. The root cause of this overreaching appears to be double-counting of funds transferred out of certain accounts.

Moreover, the amounts authorized for seizure, whether $102 million or $39.4 million, fail to account for legitimate funds that were wired into the accounts—which the affiants made no effort to distinguish from alleged criminal proceeds. Further, the affidavits do not address any

---

[47] *See U.S. v. Bollin*, 264 F.3d 391, 421 (4th Cir. 2001).
[48] 136 S. Ct. 1083 (2016).
[49] See *Chamberlain*, 868 F.3d at 297 (emphasis added).

other activity that occurred in the accounts. But such activity is critical to the question of whether any tainted funds remained in those accounts at the time of seizure. In order to make that determination, the Government must perform a funds-tracing analysis using an appropriately accepted methodology. In the Fourth Circuit, one of the most commonly employed methodologies is the Lowest Intermediate Balance Rule ("LIBR"). Originally set out in the context of a business dispute involving commingled funds in a bank account,[50] the rule has subsequently been utilized in bankruptcy proceedings[51] and in criminal proceedings involving money laundering.[52] The Court of Appeals has described the rule thus:

> The rule, which operates on a common-sense view that dollars are fungible and cannot practically be earmarked in an account, provides a presumption that proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are "identified" by presuming that they remain in the account even if other funds are paid out of the account… Under the rule, however, if the balance of the account dips below the amount of deposited proceeds, [the prior] security interest in the identifiable proceeds abates accordingly. This lower balance is not increased if, later, other funds of the debtor are deposited in the account.…[53]

When LIBR is applied to the Bank of America account ending in 1736 ("BOA 1736"), for example, it quickly becomes apparent that the Government has overreached. The Table lists the aggregate deposits in that account as $1,300,000. The Transactions List includes only three deposits totaling $1,250,000, all transferred from BOA 6014: $450,000 on February 12, 2015; $700,000 on November 6, 2015; and $100,000 on February 3, 2016. Although it is unclear what transaction the Government relies on for the remaining $50,000, bank records provided by the Government list only two deposits for that amount, one on February 20, 2015, and the other on November 5, 2015. In either event, what is clear is that the last deposit of allegedly "tainted"

---

[50] *Sony Corp. of Am. v. Bank One*, 85 F.3d 131, 139 (4th Cir. 1996).
[51] *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998).
[52] *United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018).
[53] *Sony Corp. of Am.*, 85 F.3d at 139 (quoting *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 431 N.E.2d 370, 372 (Ill. 1982).

funds occurred on February 3, 2016. Subsequent to that deposit, the balance of the account fell to a low of $16,522.64 on August 24, 2016. The affidavits filed in support of the seizure do not indicate that any subsequent deposits were made into the account from any of the other accounts involved in this case or otherwise constituted criminal proceeds. Consequently, $16,522.64 should have been the maximum amount authorized for seizure from BOA 1736. Nevertheless, the warrant signed by Magistrate Judge Gates authorized seizure from BOA 1736 of up to $1,300,000.

Defendant has not had sufficient time to perform an independent funds-tracing analysis, as Defendant's present counsel received the Government's production of electronic discovery, which included banking and financial records seized from Defendant's home and from various electronic devices, for the first time on August 30, 2019.

However, funds-tracing analysis is the responsibility of the Government and should be performed prior to the seizure of funds. Given the obvious overbreadth and inaccuracies of the warrants, and particularly in light of the fact that the Government has effectively seized substantially all of the money available to Mr. Teyf to fund his defense, it is incumbent upon the Government to perform a tracing analysis to establish probable cause to believe *all* of the assets seized, whether pursuant to the Seizure Warrants or the Search Warrants, constitute tainted assets subject to forfeiture. The same holds true with respect to the *lis pendens* filed with respect to each of Mr. Teyf's real properties.

**(b) Seizure of untainted funds in bank accounts is improper because there is no indication that the untainted funds were used to disguise allegedly tainted funds.**

The District Court denied Ms. Teyf's request for release of funds seized from her bank accounts based on the Government's argument that those funds (and by extension, the funds seized from Mr. Teyf's accounts) were "involved in" money laundering violations. The Government's

argument is inaccurate[54] because it effectively presupposes that the bank account itself is the property "involved in" money laundering. The Government claims it is not required to trace any funds because forfeitable property can encompass the entire account. However, untainted funds are subject to forfeiture only if used to facilitate a money laundering offense, *e.g.*, by using the funds to disguise the nature of comingled criminal proceeds. "The mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture.'" *See United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (based on the rapid and simultaneous movement of both legitimate and illegitimate funds into bank accounts in order to conceal narcotics proceeds, the jury could infer legitimate funds were used to "cover" the illegitimate funds, thus subjecting the legitimate funds to forfeiture) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) ("[f]orfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme"). Courts in the Fourth Circuit and other circuits have adopted the Eleventh Circuit's 18 U.S.C. § 982 "involved in" definition. *See United States v. Varner*, 2005 U.S. Dist. LEXIS 19754 at footnote 1; 2005 WL2206083 (September 9, 2005 W.D. Va.) ("if a defendant 'knowingly commingles legitimate funds with property obtained through a specified unlawful activity' and uses the legitimate funds to conceal the criminal proceeds, then 'the entire property, including the legitimate funds, is subject to forfeiture.'") (citing *Puche*); *United States v. One 1987 Mercedes Benz 300E, 820* F. Supp. 248, 252 (E.D. Va. 1993) (same); *United States v. Beltramea*, 849 F.3d 753, 758 (8th Cir. 2017) (real estate development "integral" to money

---

[54] Mr. Teyf hereby adopts the motions and arguments in support of release of seized assets made by his co-defendant Tatyana A. Teyf in her Motion filed with this Court at DE-186. Mr. Teyf also adopts the arguments set forth in Ms. Teyf's Reply Brief attached to Ms. Teyf's Motion for Leave to file a Reply Brief at DE-199, particularly Ms. Teyf's arguments that: (a) a showing of need in order to pay for legal counsel under *United States v. Farmer* no longer applies in the context of untainted assets; and (b) the Government's argument under *Kaley* fails because the grand jury made no assessment of concealment. DE-199 at 2, 7.

laundering scheme); *United States v. Cessa*, 872 F.3d 267, 273-74 (5th Cir. 2017) (commingling of funds in accounts and use of aircraft were used to facilitate the money laundering scheme). However, any "involved in" argument is unsupportable here because the Government has not made any allegation in the Superseding Indictment or the papers in support of the seizure that untainted funds were used to disguise or "cover" allegedly tainted funds.

It does not follow that just because a defendant deposits allegedly criminal proceeds into an account at one point in time that all funds subsequently deposited into that account become subject to forfeiture. Yet this is precisely what the Government argues by claiming it is entitled to seize, without tracing, all of the contents of accounts in 2018 because Mr. Teyf allegedly deposited criminal proceeds into those accounts between 2010 and 2012. That is simply not correct. Rather, the Government must demonstrate that all of the untainted funds seized in 2018 were "involved in" the violation, *i.e.,* used to disguise the allegedly tainted funds. It can only do so by tracing them, which the Government has made no effort to do. The Government's position runs afoul not only of *Chamberlain* and *Luis*, *supra*, but also of Eighth Amendment protections against excessive and disproportionate civil forfeitures. *Austin v. United States*, 509 U.S. 602 (1993); *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

Further, the Government's argument is unsupported by any predicate to the seizure because the Government has never alleged nor charged that Mr. Teyf comingled allegedly tainted funds with untainted funds in order to facilitate a violation of the money laundering statute. As noted by counsel for Ms. Tatyana Teyf, the Government might have a point if the defendants had been charged under the concealment theory of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i). DE-199 at 6.  Instead, however, the Government has only charged Mr. Teyf with the "spending" money laundering statute. In fact, it has not even alleged that there was a single dollar of

untainted proceeds in the accounts at the time of the supposed comingling.

In addition, the Government takes issue with Mr. Teyf highlighting the lack of evidence to support the Government's money laundering theory. Particularly, the Government states that Mr. Teyf "relies on one document from discovery" in a case where "[d]iscovery has included tens of thousands of pages of documents and records." DE-197 at 10. Tellingly, what the Government did not do was point out other documents to demonstrate any material flaw in Mr. Teyf's argument. It is not Mr. Teyf's fault that he points to only one document; rather, it is the fault of the Government, as its theory that funds coming into the United States were the proceeds of specified unlawful activity is based on one report from a confidential human source (CS-1) who set forth a highly improbable scenario in which Mr. Teyf "conspired with senior Russian government officials…" with no subsequent Russian prosecution or conviction. DE-197 at 6.

Surely, if CHS-1's narrative of wrongdoing were true, in a case with thousands of pages of documents and records assembled through at least four years of investigating, the Government would have been able to find some other evidence to corroborate CHS-1's fanciful allegations of a supposed scheme in Russia that never resulted in any criminal convictions in Russia and that is at odds with basic common sense.

**(c) The Search Warrants Do Not Support Seizure of any Property, Possession of which is Not *Res Ipsa* Criminal, and the Plain View Doctrine Does Not Apply to Seizure of Property.**

The Government sets forth two alternative theories under which seizure of property, including cars and artwork not specified in the search warrants, was legitimate. The first theory is that seizure of the property was lawful under the "plain view" exception to the Fourth Amendment. The Government mischaracterizes the exception's requirements by claiming that *United States v. Uzenski*, 434 F.3d 690 (4th Cir. 2006) permits agents to "seize articles [subject

19

to forfeiture] that they come across while performing a search in a given area pursuant to a valid search warrant." ***Uzenski* states no such thing.** Rather, it provides that agents may "seize articles *of incriminating character* that they come across while performing a search…" *Id*. at 707 (emphasis added). This distinction is particularly important given the plain view exception's requirement, cited by the *Uzenski* court, that "the object's incriminating character must… be immediately apparent." *Id*. Here, there is nothing of an incriminating nature about the property, including cars and artwork, that could be apparent at all.

Second, it argues that authorized seizure "include[d], ***but [was] not limited to***, the categories specifically enumerated therein." The Government's argument appears to be that, since Mr. Teyf was not earning much in terms of annual income and "at least some of [the property] was purchased during the timeframe of the charged conduct," a fact not argued in obtaining the warrants, there is a "fair probability" that the seized items were purchased with tainted funds. This argument would essentially render every item of value in Mr. Teyf's homes subject to seizure. Warrants allowing general searches do not comport with the Fourth Amendment's requirement that they "particularly describe[d] the… things to be seized," nor do they satisfy the Supreme Court's requirement that a "sufficiently particular warrant describe[] the items to be seized in such a manner that it leaves nothing to the discretion of the officer executing the warrant." *United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001), *citing Marron v. United States*, 275 U.S. 192, 196 (1927). The general search of Mr. Teyf's residences violated his fundamental rights. *See Marron* at 195. Accordingly, *all* items seized pursuant to these illegitimate warrants should be suppressed and returned.

**V. THE GOVERNMENT'S RELIANCE ON *KALEY* TO OPPOSE TEYF'S CHALLENGE OF THE MAGISTRATE JUDGE'S PROBABLE CAUSE FINDINGS IS GRAVELY MISPLACED.**

The Government argues that, pursuant to *Kaley v. United States*, 571 U.S 320, 328-330 (2014), "[i]f a defendant has been indicted for the offense pertaining to forfeiture, the grand jury's finding of probable cause is conclusive and is not to be revisited by a court assessing the validity of the pre-trial restraint of assets." (DE 197 at p. 4). The Government further contends that, because the grand jury determined that the accounts and items listed in Counts 2 through 26, and 33 through 42, were specifically involved in money laundering, "the grand jury's determination is conclusive" as to those accounts and items. (DE at p. 7-8). The Government includes in its responsive brief a Table listing the "accounts and items" for which the grand jury found probable cause. (DE 197 at p. 8). The Table lists twenty bank accounts, which is the total number of bank accounts to which the seizure warrants apply (*see* DE 197 at pp. 1-2, and footnote 2), as well as the artwork, and three vehicles. (DE 197 at p. 8).

The Government's reliance upon *Kaley* is decidedly misplaced as the facts and procedural background in *Kaley* are nowhere similar to that faced by Teyf. Moreover, in its argument the Government misstates the holding of *Kaley*. As the Fourth Circuit made clear in *United States v. Miller*, while *Kaley* establishes that a court may not "second-guess a grand jury's finding that probable cause supports the charged offense. . .*We can, however, revisit a finding of probable cause that certain assets are subject to forfeiture*." 911 F.3d 229, 233 (emphasis added).

In *Kaley*, two indicted defendants challenged a pre-trial restraint of assets they needed in order to retain legal counsel. The restraining order had been issued pursuant to 21 U.S.C. §853(e)(1) which provides that at the Government's request, a court may order the post-

Case 5:18-cr-00452-FL   Document 330   Filed 09/06/19   Page 21 of 26

indictment restraint of assets upon a showing that the property would be forfeitable in the event of a conviction. Knowing that in order to forfeit property the Government needs to show both that a crime has been committed and a link between the crime and the property, the *Kaley* defendants also sought to challenge the grand jury probable cause determination leading to the return of the criminal charges. The Supreme Court ultimately held that a defendant cannot use a *Monsanto* hearing to challenge a grand jury's probable cause finding regarding the commission of a crime. In this regard, the Court clearly said that "[t]he question presented is whether criminal defendants are constitutionally entitled in such a [*Monsanto*] hearing to contest a grand jury's prior determination *of probable cause to believe they committed the crimes charged*. We hold that they have no right to relitigate that finding." *Kaley*, 571 U.S. at 322 (emphasis added).

The *Kaley* court reasoned that, when a grand jury has found probable cause to believe a crime has been committed, it is improper for a Court reviewing a pre-trial restraint of assets to make a contrary finding. That is, the Court may not overrule the grand jury's determination *of probable cause to believe the defendant committed the crimes charged. Kaley*, 571 U.S. at 322-23. If a court could undo a grand jury's probable cause determination that a crime was committed, then the Indictment would necessarily need to be dismissed, and defendants would be acquitted. However, the *Kaley* Court was careful to note that while there are two elements to ordering the post-indictment pre-trial restraint of an asset, probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime, M*onsanto* had declined to consider whether the due process clause entitled a defendant to a hearing on both. *Kaley*, 571 U.S. at 323–324. The *Kaley* Court also distinguished and solely addressed the defendants' efforts to challenge the grand jury's criminal finding probable cause – *not* the connection between the crime and the assets.

Case 5:18-cr-00452-FL   Document 330   Filed 09/06/19   Page 22 of 26

In other words, contrary to the Government's claim, the *Kaley* court never addressed whether a defendant challenging a Section 853(e)(1) order retains the right to challenge a probable cause finding of a connection between the crime and the property listed in the indictment. As a matter of fact, *Kaley* did not foreclose the defendant's ability to challenge the grand jury's determination of probable cause to believe assets restrained prior to trial are traceable or otherwise sufficiently related to the crime charged:

> Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate. . .whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment. But the courts have divided over extending the hearing to the first issue [whether the defendant has committed an offense permitting forfeiture]. Some have considered, while others have barred, a defendant's attempt to challenge the probable cause underlying a criminal charge. This case raises the question whether an indicted defendant has a constitutional right to contest the grand jury's prior determination of that matter.

*Kaley*, 571 U.S. at 322-23.

The *Kaley* court explained that the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function, which is to determine whether there is probable cause to believe the defendant committed a crime, and has no impact upon the criminal justice system itself:

> The dissent argues that the same is true when a judge hears evidence on whether frozen assets are traceable to a crime, because that allegation also appears in the indictment. But the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function—to determine whether there is probable cause to think the defendant committed a crime. And a judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself. So that determination does not similarly undermine the grand jury or create internal contradictions within the criminal justice system.

*Kaley*, 571 U.S. at 357, n. 11 [internal quotes omitted].

Teyf's case is far different from Kaley's. Here, the defendant had not been charged as of the time the Government moved the Magistrate Court to issue the seizure warrants. In other words, there had been no grand jury probable cause finding that Teyf and others had committed a crime, much less a probable cause finding connecting the crime and the assets identified in the seizure warrants. The Government's burden of proof under Section 853(e), used in *Kaley*, is different from the burden required for a seizure warrant. If the restraining order is sought post-indictment, Section 853(e)(1), then the Government need only show that there is an indictment and thereafter show the Court that the restrained property would be forfeitable in the event of a conviction. In the case of a seizure warrant, a magistrate judge is required to make probable cause findings for both the commission of a crime and its link to the asset, based upon the evidence provided by the affiant. These affidavits can then be factually and legally challenged by a defendant, particularly in cases such as Teyf's where the probable cause finding was based upon misrepresentations, material omissions, and lack of a legal basis.

The fact that a defendant has been indicted has no bearing upon his right to challenge a seizure warrant. Defendants routinely move for suppression of evidence seized through the use of search warrants, see e.g., *Franks v. Delaware*, and remain entitled to preserve these issues for appeal. Teyf's case is no different. Therefore, the Government's reliance upon *Kaley* to preclude Teyf from challenging the affidavits filed in this case is misplaced and the Court should award it no weight whatsoever.

## **CONCLUSION**

For the foregoing reasons, Defendant objects to the findings of the May 8, 2019 Memorandum & Recommendation and to the Magistrate Judge's conclusion that the District Court should deny Defendant's Motion to Suppress (DE 247, III. at p. 11-12). Defendant

contends that all seized and restrained property must be released to the extent that the Government cannot demonstrate that it is traceable to or was involved in criminal activity.  At the very least, the Court should order a hearing pursuant to *Franks v. Delaware*.[55]

Respectfully submitted, this the 6th day of September, 2019.

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone:  (919) 821-4711
Fax:  (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*

/s/ Robert S. Wolf
Robert S. Wolf
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Ave., 12th Floor
New York, NY 10174-1299
Phone:  (212) 554-7825
Fax:  (212) 554-7700
rwolf@mosessinger.com
*Counsel for Defendant*

---

[55] *See* 438 U.S. at 156 ("if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.").

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2019, I electronically filed the foregoing **OBJECTIONS TO THE MAGISTRATE JUDGE'S MEMORANDUM & RECOMMENDATION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Barbara D. Kocher
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
barb.kocher@usdoj.gov

Jason M. Kellhofer
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
jason.kellhofer@usdoj.gov

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone: (919) 821-4711
Fax: (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*

R1989016

26