# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

### NO. 5:18-CR-00452-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA | **DEFENDANT'S UNOPPOSED MOTION FOR RULE 15 FOREIGN WITNESS DEPOSITIONS** |
| Plaintiff | (and Incorporated Memorandum of Law) |
| v. | |
| LEONID ISAAKOVICH TEYF | |
| Defendant | |

Pursuant to Rule 15, Fed.R.Crim.P, the United States Constitution, and the Court's inherent authority, defendant Leonid Isaakovich Teyf ("Mr. Teyf" or "Defendant") hereby moves the Court for an Order authorizing the taking of depositions of material foreign witnesses, outside the United States and beyond this Court's subpoena power, in order to preserve their testimony for use at trial.

Undersigned counsel has consulted with counsel for the government about this motion, including the list of requested depositions and the basis for the motion. Without having seen the specific language herein, the government consents to the taking of the requested depositions, but reserves the right to object to the admissibility of the deposition testimony. The government requests pursuant to Rule 15(a)(1), Fed.R.Crim.P., that the Court order the deponents to produce at the deposition designated material that is not privileged.

## I.     INTRODUCTION

Undersigned counsel has personally interviewed a number of witnesses, all of whom reside in Russia, whose testimony is expected to:

(1) directly contradict and negate elements of the charged money laundering offenses based on evidence provided by the government's star money-laundering witness – and relied upon by

the government (DE 182 – Officer's Aff. ¶62) and, as a result, by the Court (see, e.g., DE 344 at pp. 3-4, 8-9); and

(2) demonstrate that Mr. Teyf was a very successful, legitimate businessman who accumulated tremendous wealth (well over $40 Million USD) over the course of more than two decades **predating** the supposed Russian bribery scheme alleged by the government's star witness, *compare* DE 344 at p. 8 (**"**The possession or transfer of large sums of money, and the manner in which those funds were acquired are highly relevant in white-collar and fraud investigations" (internal quotation marks and brackets omitted)).

Mr. Teyf moves under Rule 15 of the Federal Rules of Criminal Procedure for the Court to order depositions of foreign unavailable witnesses to be taken in Ukraine or another third party country through informal procedures established between the parties. As discussed below, the Russian witnesses are expected to provide material, exculpatory testimony concerning the money laundering ("ML") charges that cannot be obtained from any other source and is essential to his defense in order to provide Mr. Teyf a fair trial.

As demonstrated in its court filings and discovery, the government has two essential Confidential Human Sources ("CHS's") – one on the ML charges ("CS-1") and one on the murder-for-hire charge ("CS-2"). Counsel has just located and transcribed a recording made by CS-2 of a conversation between him and CS-1 which occurred in February 2017 – produced but not previously transcribed or presented by the government – in which CS-2 presses CS-1 for damaging information about Mr. Teyf. Remarkably, despite being pressured by CS-2 about the need to cooperate to avoid prosecution and/or deportation, CS-1 (the government's star money laundering witness and the basis for multiple orders issued by the Court, including seizure and detention orders) stated the following:

So they will come, and what?  I will say, yes.  I will tell what I know.  **But I don't know anything, damn.**

\*\*\*\*

**And what do I know?  Do I know that he was laundering money? No. Do I have any facts? No.**

CS-1 says **nothing** in this candid conversation about the concocted "bribery-kickback" scheme that now forms the underlying basis for the money laundering charges, and on which this Court has been asked to rely.  *See, e.g.* Order of 11/10/19 (DE 344 at pp. 3-4, 8-9).

Without a doubt, the credibility of CS-1 will be central and very much in question at trial, and, thus, the testimony of material unavailable foreign witnesses who directly contradict key aspects of CS-1's bribery-kickback narrative will be essential for Mr. Teyf to defend himself and receive a fair trial.

## II.    PROCEDURAL BACKGROUND

On November 8, 2018, a first indictment was returned charging Mr. Teyf with conspiracy and substantive money laundering violations for conducting monetary transactions involving the proceeds of alleged theft of Russian public funds.  (Docket Entry ("DE") 1).  The original indictment also contained a forfeiture allegation placing Mr. Teyf on notice of the government's intent to forfeit certain real properties, a firearm, and the contents of several domestic bank accounts.

On or about December 5, 2018, the government obtained eight warrants to seize four vehicles and funds from 22 bank accounts (the "Seizure Warrants").  In support of the applications, the government submitted sworn affidavits signed by Federal Bureau of Investigation and Internal Revenue Service special agents, alleging, in substance that a "reliable, confidential source… ('CS-1')" provided information to investigators about a "bribe/kickback" scheme involving Mr. Teyf, former Russian Defense Minister Anatoliy Serdyukov ("Serdyukov"), and others.  (See Officer's

Aff. (DE182-1) at ¶ 62.).  According to the sworn affidavits, "CS-1 made three (3) deliveries of large amounts of cash to Defense Minister Serdyukov through Serdyukov's son-in-law "Puzikov" and "CS-1 estimated the cash delivered to Puzikov to be  in the amounts of $70 Million (USD), $30 Million (USD), and $50 Million (USD), for a total of $150 Million (USD)."   The affidavits also claim that according to CS-1, the $150 Million paid to Serdyukov accounted for "[m]ost of the kickbacks…with TEYF retaining the next largest share, and the remaining amount to be paid to other coconspirators."   (DE182-1 at ¶ 62.) The affidavits provide no information from CS-1 identifying how much money Mr. Teyf retained as "the next largest share".

The affidavits state that according to CS-1, TEYF also hired Yelena Zelenova (a/k/a Elena Zelenova), an accountant who maintained records of TEYF's companies, including the kickbacks he extorted from subcontractors… and that TEYF instructed CS-1 to meet couriers at various locations around Russia and pickup large sums of cash.  It is alleged that CS-1 never counted it due to the volume… CS-1 took the cash to whichever accountant he was instructed [by TEYF]. Lastly, the affidavits say that the accountants were coordinated by Zelenova although they did not work directly for her.  (DE182-1 at ¶ 62.)

Based on the seizure and search warrant affidavits, as well as the discovery provided by the government thus far, it is clear that CS-1 is the government's primary, if not sole, source of information regarding Mr. Teyf's purported involvement in the bribery, misappropriation theft and embezzlement crimes, or specified unlawful activity ("SUA"), which occurred entirely in Russia and generated the proceeds allegedly involved in financial transactions underlying the money laundering charges.

Since then, the government has superseded and amended the indictment an additional four (4) times, the latest of which is dated May 9, 2019.  (DE 248).  The Fourth Superseding Indictment

claims that during his tenure as Defense Minister, Serdyukov granted Voentorg a contract to provide goods and services to the Russian military and that Voentorg, in turn, subcontracted with other companies to comply with its contractual obligations. (¶7). The government claims that between 2010 and 2012, Mr. Teyf devised a scheme to award the Voentorg subcontracts in exchange for an unspecified percentage of the government funds paid upon completion of the work. It is further alleged that Mr. Teyf and others involved in the scheme were paid in cash, that the amounts exceeded $150,000,000 (USD) over an approximate two-year span, and that Mr. Teyf even paid off a prosecutor investigating the purported scheme between Voentorg and the Ministry of Defense. (DE 248).

The Fourth Superseding Indictment also alleges that an undisclosed portion of Mr. Teyf's "cut" for his participation in the scheme was placed in unidentified accounts over which Mr. Teyf exercised some control, and that thereafter, an unidentified portion of the Mr. Teyf's monies were transferred to accounts outside Russia, and ultimately into accounts located in the United States. (¶8). The indictment then alleges that 293 wire transfers totaling $39,415,000 originated from foreign corporations and bank accounts in countries commonly known to be used for money laundering. (¶10). As set forth above, no discovery has been provided and no statements attributed to CS-1 which quantify the amount of money allegedly received by Mr. Teyf from the purported scheme.

Additionally, as previously noted, Defendant has now learned that in a recording of a conversation between the government's two primary CHS's (a recording not previously transcribed by the government), CS-1 admits he does not have any knowledge of Mr. Teyf laundering money and does not know of any facts supporting such a claim. This recorded conversation directly contradicts his later assertions that Mr. Teyf did engage in money laundering, and other aspects of the Russian

5

narrative. In light of that recording, the expected testimony of Russian witnesses contradicting the tale spun by CS-1 takes on added importance.

### III.     FACTUAL SUPPORT FOR THIS REQUEST

On October 28-30, 2019, undersigned counsel traveled to Russia and personally interviewed the following witnesses: (1) Elena Zelenova; (2) Dmitriy Schirii; (3) Nicholay Grigorov; (4) Yevganyi Vechko; (5) Igor Borisov; (6) Nicolay Nogay, and (7) Dmitry Nikolayevich Grishechkin. These interviews demonstrated that these witnesses would provide evidence directly contradicting the allegations made in the pending indictment and affidavits articulating CS-1's factual claims, and would exculpate Mr. Teyf from the money laundering charges and forfeiture allegations made by the government. All of these witnesses live in Russia. Nothwithstanding counsel's good faith offer to make arrangements for travel to the US to testify, four of the seven witnesses have expressly stated that they will not come and the remaining three witnesses are beyond the reach of this Court's subpoena power. Accordingly, they are unavailable for purposes of Rule 15. Nevertheless, although Russia does not permit depositions by private attorneys, these witnesses are willing to voluntarily travel to neighboring Ukraine or another third country and make themselves available for depositions.

For the reasons set forth herein, Mr. Teyf seeks an Order permitting him to obtain the deposition testimony of these foreign witnesses for use at trial in accordance with Rule 15 of the Federal Rules of Criminal Procedure.

### IV.     THE EXPECTED TESTIMONY FROM RUSSIAN WITNESSES

Based upon interviews personally conducted by undersigned counsel, the following witnesses, all of whom live in Russia, are expected to testify as follows:

6

## A.    ELENA ZELENOVA

Highlight:  As set forth above CS-1, the  government's primary, if not only, ML fact witness, specifically claimed that Mr. Teyf "hired Yelena Zelenova (a/k/a Elena Zelenova), an accountant that maintained records of TEYF's companies, including the kickbacks he extorted from subcontractors."  It is also alleged that Mr. Teyf then "instructed CS-1 to meet couriers at various locations around Russia to pick up large sums of cash."  Agents alleged that CS-1 then "took the cash to whichever accountant he was instructed [by TEYF]" and "[t]he accountants were coordinated by Zelenova but didn't work directly for her."  (DE182-1) at ¶ 62.)

Based upon our interview of Ms. Zelenova, it is expected that she would testify that these allegations by CS-1 are completely false and never occurred.   Specifically, Ms. Zelenova will testify that she did not maintain records of any purported kickbacks, has no knowledge of any "kickback" scheme and did not coordinate accountants who allegedly received large sums of cash delivered by CS-1.  In short she will testify that CS-1's allegations about these events and her involvement are pure fabrications.

Summary:  Ms. Zelenova has known Mr. Teyf since about 2004 and is expected to testify about his work, character and reputation in Russia as a very successful, wealthy businessman.

Ms. Zelenova also knew CS-1.   Zelenova is expected to testify regarding CS-1's employment, reputation, and work, including at the Caspian Fish production company.  As noted, her testimony will directly contradict specific details of CS-1's claim regarding the supposed bribery-kickback scheme involving Mr. Teyf.

Zelenova's testimony is essential to Mr. Teyf's defense as she directly refutes CS-1's specific allegations with respect to large sums of cash proceeds of kickbacks being given to and counted by designated accountants, whom she allegedly coordinated, as well as CS-1's claim that

she maintained records of the purported kickbacks. Zelenova's testimony is expected to show that key aspects of CS-1's story are indeed false.

### B.   DMITRIY SCHIRII

Highlight:  FBI and Department of Homeland Security debriefing reports say that CS-1 also told them that in order to deliver $150 Million in proceeds to Defense Minister Serdyukov, he would first "go to RBE Group offices…located in Moscow" to retrieve the money from three "safes" in their offices accompanied by "a second security person, Dmitry [Schirii].  CS-1 and Schirii "would pick up the money" and then transport it to Serdyukov.  According to CS-1, this occurred in "three shipments [$70 million, $30 million and $50 million]… probably in the 2013 timeframe." (see verbatim debrief/Rept. of Inv. (DE 182-3) at p. 5 of 8)   Mr. Schirii will testify that he, not CS-1, provided personal security for Mr. Teyf, that he never went to RBE Group's offices at any time, and never picked up sums of money with or without CS-1 to deliver to Defense Minister Serdyukov.  Like Ms. Zelenova, Mr. Schirii will testify that all of CS-1's aforesaid factual allegations in this regard are simply manufactured lies.

CS-1 also specifically claimed that he provided security to Mr. Teyf and because of that job position, he overheard conversations between Teyf and subcontractors discussing the supposed "bribery-kickback" scheme, in addition to serving as a go-between and bag-man. (*See* Officer's Aff. (DE182-1) at ¶ 62.a. & c.; DE 344 at pp. 3-4, 8-9).  As indicated, Mr. Schirii will refute CS-1's factual allegations in this regard and testify that he, not CS-1  was Teyf's personal bodyguard, and thus Schirii knows that CS-1 was not in position to have "overheard conversations" any of the purported bribery-kickback discussions with subcontractors or otherwise.

Summary:  Mr. Schirii served as Mr. Teyf's personal bodyguard during the relevant period. He knows that CS-1, by contrast, did not serve as Teyf's bodyguard or "security."  He is expected

to testify about how a bodyguard for Teyf would never be situated close enough to overhear any conversations as claimed by CS-1, would have not been present during meetings attended by Teyf, and that CS-1's job required that he guard the perimeter of a fish factory in Astrakhan, not Teyf. Accordingly, it would have been impossible for CS-1 to have overheard any conversations as claimed. Schirii, who has known CS-1 since the mid-2000s, will testify to what he knows about CS-1 and his employment career and duties, which directly contradicts CS-1's representations. He is also expected to testify that CS-1 regularly came to work intoxicated from alcohol and was generally viewed by most co-workers as a ne'er do well. Mr. Schirii will also testify regarding Mr. Teyf's reputation as a very successful and honest entrepreneur running multiple companies.

### C. NICHOLAY GRIGOROV

Highlight: As noted, the government's star ML witness, CS-1, specifically claimed that he provided security to Mr. Teyf and was in position to overhear conversations between him and subcontractors discussing the supposed "kickback" scheme, in addition to serving as a go-between and bag-man. (*See* Officer's Aff. (DE182-1) at ¶ 62.a. & c.; DE 344 at pp. 3-4, 8-9). Among other matters, Mr. Grigorov expected testimony will contradict CS-1's claims because Grigorov supervised and coordinated Teyf's security and knows that Schirii, not CS-1, was Teyf's personal bodyguard and that CS-1 was not in position to have "overheard conversations" as claimed. Grigorov is expected to testify about CS-1's actual job duties (guarding the perimeter at an Astrakhan fish factory, not Mr. Teyf). Like Zelanova and Schirii, Mr. Grigorov is expected to testify that key aspects of CS-1's tale are false.

Summary: Mr. Grigorov, a former law enforcement officer in Russia, met Mr. Teyf when he headed the security department at Delta Plus' factories in Astrakhan. He too served as Teyf's personal bodyguard at Delta Plus.

Mr. Grigorov met CS-1 when the latter worked at a tractor plant and, subsequently, at Delta Plus in Astrakhan, Russia. Grigorov is expected to testify regarding CS-1's career, limited duties, obligations, place of business and that he frequently showed up for employment intoxicated while both at the tractor plant and Delta Plus. He is expected to testify that CS-1 never provided Teyf personal security or managerial services, as CS-1 has claimed to federal agents (see verbatim debrief/Rept. of Inv. (DE 182-3) at p. 3 of 8; Officer's Aff. (DE 182) at ¶62(a)).

As with Zelenova and Schirii, Mr. Grigorov's testimony directly contradicting CS-1's claims is essential to Mr. Teyf's defense. Grigorov's testimony is expected to show that the basis of CS-1's story (that he was Teyf's security and in position to overhear conversations) is absolutely false.

**D.    YEVGANYI VECHKO**

Highlight: CS-1 specifically claimed that Mr. Teyf awarded contracts to subcontractors of Voentorg, for which he was paid kickbacks, and that Voentorg and/or Teyf were under investigation for this bribery-kickback scheme. (*See* Officer's Aff. (DE182-1) at ¶ 62.b-c., g.; DE 344 at pp. 3-4, 8). Among other matters, Vechko is expected to contradict CS-1's claims because Vechko was Teyf's boss at Voentorg and will testify that Teyf had no clearance or authority to sign or even negotiate contracts, that others vetted and approved subcontractors, that there were no bribes or kickbacks on his watch, and that Voentorg was not under investigation for this bribery-kickback scheme as claimed by CS-1.

Summary: As noted, CS-1 has claimed that Mr. Teyf awarded contracts to subcontractors of Voentorg, for which he was paid kickbacks, and that Voentorg and/or Teyf were under investigation for this kickback scheme. (Id.) Mr. Vechko, the General Director of Voentorg, has known Teyf since well before Mr. Teyf began working at Voentorg. Prior to becoming General

Director of Voentorg, Vechko served as Deputy Director of Russia's federal tax service and was acquainted with and even inspected some of Teyf's businesses, which were major taxpayers. Because of his background, Mr.Vechko can testify regarding the great scale and success of Mr. Teyf's business enterprises and his reputation and ethics as a businessman.

Importantly, Mr. Vechko will testify about how Voentorg procured and was awarded contracts, competition, pricing and profit margin, its business relationship with Russia's Defense Ministry and Defense Minister Serdyukov, and the absence of kickbacks or bribes. Mr. Vechko will testify that Mr. Teyf did not have contract signing authority. Further, Mr. Teyf played no role in the negotiation or award of subcontracts on behalf of Voentorg or the vetting of the Voentorg subcontractors. In addition, he is expected to testify that the profit margins on the subcontracting work were small, so there was not much competition among subcontractors. And, contrary to the claims of CS-1 and the allegations in the pending indictment, Vechko will testify that Voentorg was never under investigation in Russia by a prosecutorial agency for a bribery or kickback scheme involving Teyf.

### E.    IGOR BORISOV

Highlight: The thrust of the indictment and CS-1's claims are that Mr. Teyf's wealth derives from the alleged bribery-kickback scheme at Voentorg between 2010 and 2012. Contrary to those claims, Teyf's longtime business partner Igor Borisov will confirm that Teyf earned his considerable wealth honestly over two decades of hard work in Siberia and elsewhere and success in oil and gas, trading and a variety of other legitimate businesses.

Summary: Mr. Borisov is expected to testify that he has known Mr. Teyf since the 1980s, when he audited Teyf's trading house for the Russiangovernment and found no violations. Borisov was familiar, and sometimes directly involved, with Mr. Teyf's many businesses and investments.

These businesses included a large trading house, oil and gas concerns trading in large volumes of oil, an oil piping company, real estate, a mill, a grain silo, a tire plant, a brick plant, and even development of the St. Petersburg passenger seaport as well as feeding the workers building the seaport. Borisov is also familiar with Teyf's financial success and estimates that Teyf made tens of millions of dollars from these businesses – all prior to the alleged kickback scheme in 2010. *Compare* 11/7/19 Order (DE 344) at p. 8 (possession or transfer of large sums of money, and the manner in which those funds were acquired "highly relevant" in white-collar and fraud investigations) (quoting *United States v. Srivastava*, 540 F.3d 277, 291 (4th Cir. 2008).

## F.     NICOLAY NOGAY

Highlight:  Like Mr. Borisov, Teyf's longtime business partner Nicholay Nogay will confirm that Teyf earned his wealth over more than two decades of hard work and success in oil and gas, trading and a variety of other legitimate businesses – all prior to the claimed kickback scheme at Voentorg.

Summary: Mr. Nogay is expected to testify that he has known Mr. Teyf since the 1980s and can attest to Mr. Teyf's reputation and financial success. Nogay became acquainted with Teyf in the oil business. Nogay is expected to testify about profitable business opportunities available to him and Teyf in the 1990s and 2000s, his purchase of a piping company from Teyf in the 2000s for millions of dollars, and Teyf's involvement and sale of his interest in Quantum Oil (oil refinery/field), estimated to have been worth tens of millions of dollars – again, all prior to the time of the alleged bribery-kickback scheme at Voentorg.

## G.     DMITRY GRISHECKIN

Highlight:  Like Borisov and Nogay, Russian stockbroker Dmitry Grisheckin is expected to confirm Teyf's considerable wealth prior to 2010 (the time of the alleged Voentorg kickback

scheme). Over the period from 2004 to 2008, Teyf's investment portfolio had a value and trading volumes of tens of millions of dollars.

Summary: Mr. Grisheckin is expected to testify about Teyf's investments in the Russian stock market. Grisheckin has credentials in public accounting and finance. He became familiar with Teyf's investments while he worked at brokerage Intellekt Capital in Russia. Grisheckin is expected to testify that from 2004 to 2008, Teyf's investment portfolio had a value and trading volumes of tens of millions of dollars.

## V.  LEGAL ARGUMENT

### A. RULE 15 DEPOSITIONS SHOULD BE ORDERED IF PROSPECTIVE WITNESSES ARE LIKELY UNAVAILABLE TO TESTIFY AT TRIAL AND THEIR TESTIMONY IS MATERIAL

Rule 15 provides that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. Rule 15(a)(1). The court should allow depositions if  (a) the prospective witness "will be unable to attend or be prevented from attending the trial," (b) the  witness' testimony is "material," and (c) the  witness' testimony is "necessary to prevent a failure of justice." *U.S. v. Jefferson*, 594 F. Supp. 655, 664-665 (E.D. Va. 2009). These three elements inform the meaning of "exceptional circumstances and in the interest of justice." *Id.*; *see also* Advisory Committee Note to Rule 15; *United States v. Rosen*, 240 F.R.D. 204, 208 (E.D.Va. 2007). The Court has broad discretion in determining whether a deposition should be taken under the particular circumstances presented. *United States v. Fuentes–Galindo,* 929 F.2d 1507, 1509 (10th Cir.1991); *Jefferson*, 594 F. Supp. at 664-65.

The Fourth Circuit Court of Appeals has not elucidated its particular approach to Rule 15 motions. However, other courts of appeal are consistent in holding that a party seeking a Rule 15 deposition should establish (1) that the witness will likely be unavailable to testify at trial and (2)

Case 5:18-cr-00452-FL   Document 356   Filed 12/06/19   Page 13 of 28

that the witness's testimony is material. *Jefferson*, 594 F. Supp. at 664-665. Although there is no mechanical rule for determining when depositions should be allowed, materiality and unavailability are the accepted standard of measure. *U.S. v. Stroop*, 121 F.R.D. 269, 271 (E.D.N.C. 1988), citing *U.S. v. Sun Myung Moon*, 93 F.R.D. 558 (S.D.N.Y. 1982).

Rule 15 depositions are appropriate in this case <u>because it is abundantly clear that (1) the prospective witnesses will likely be unavailable to testify at trial and (2) their testimony is material.</u> In addition, the taking of these foreign depositions is necessary to protect Defendant's constitutional rights, to afford him an opportunity for a fair trial, and to prevent a miscarriage of justice.

### 1. THE WITNESSES ARE UNAVAILABLE FOR PURPOSES OF RULE 15

The seven prospective witnesses listed in Section III., above, were personally interviewed by undersigned counsel in Russia on October 28-30, 2019. Each of these witnesses is a resident of the Russian Federation ("Russia"), and each is beyond the subpoena power of this Court. They are not citizens of the United States, and they do not reside here. As such, they are not amenable to United States subpoenas. See Fed. R .Crim. Pro 17(e)(2); 28 U.S.C. § 1783; *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).

### a. Prospective Witnesses Zelenova, Schirii, Grigorov, and Vechko

During the course of the October 2019 interviews, four of the prospective witnesses (Zelenova, Schirii, Grigorov, and Vechko) stated that they would not travel to the United States to testify in this case, notwithstanding the good faith efforts including that arrangements would be made for their travel and lodging. A witness who is beyond the subpoena power of the Court and has declared his unwillingness to testify in a United States court is clearly unavailable for Rule 15 purposes. *See, e.g,, Korolkov*, 870 F. Supp. at 65; *Jefferson*, 594 F. Supp. at 666; *U.S. v. Ramos*,

45 F.3d 1519, 1523 (11th Cir. 1995). Accordingly, these four witnesses are unavailable for purposes of Rule 15. Based on the October personal interviews with these witnesses, undersigned counsel believe that they would be willing to travel to neighboring Ukraine or perhaps to another third party country to provide deposition testimony.

### b. Prospective Witnesses Grisheckin, Borisov, and Nogay

Three of the prospective witnesses, Grisheckin (Teyf's stockbroker), Borisov and Nogay (longtime business partners/associates), did not refuse to to travel to the United States to testify in the trial of this matter, however they would also not guarantee they would definitely agree to attend Mr. Teyf's trial when needed. This, notwithstanding good faith efforts including that arrangements would be made for their travel and lodging. These witnesses (all Russian citizens) are all beyond the subpoena power of the Court, cannot be compelled to travel here, and may or may not be able or willing to do so at the time of trial.

In the context of this case and under these circumstances, Grisheckin, Borisov, and Nogay are substantially unlikely to travel to the United Sates and must be considered unavailable, and their Rule 15 depositions should be authorized, because (1) should they not commit to travel here, Mr. Teyf would be unable to present their testimony at trial, as they are beyond the subpoena power of the Court; (2) they may not be able to obtain the visas and other travel documents necessary for such a trip; (3) having a deposition that preserves their testimony and makes possible its presentation at trial will be crucial to Mr. Teyf's defense; and (4) the additional expenditure of time and effort that will be required to take three additional depositions is marginal.

As the Eleventh Circuit stated in *United States v. Drogoul*,

A potential witness is unavailable for purposes of Rule 15(a) . . . whenever a substantial likelihood exists that the proposed deponent will not testify at trial. In that situation, justice usually will be served by allowing the moving party to take the deposition, thereby preserving the party's ability to utilize the testimony at

trial, if necessary.

1 F.3d 1546, 1553 (11th Cir. 1993).

In *Drogoul*, the court held that "[e]xceptional circumstances and the interests of justice also warrant allowing the government to take the depositions of the six prospective witnesses who announced they *would* be willing to testify at Drogoul's trial." *Id.* at 1557 (*emphasis added*). The *Drogoul* court reasoned that, while the reason behind allowing the depositions of the willing witnesses was more difficult, and the showing of unavailability was admittedly not as strong:

> [U]navailability is not the focus *per se* of Rule 15(a). Unavailability is required for *use* of the depositions at trial. Fed.R.Crim.P. 15(e). All that is necessary to *take* depositions is a showing that "exceptional circumstances" exist and that justice would be served by preserving the deposition testimony.
> *Id.* at 1557, (emphasis in original).

The court noted that *Drogoul* was not the ordinary case in which a court need not allow the wasteful process of authorizing useless depositions when the witnesses could testify live. The court authorized seven other depositions in the matter, to be taken in Italy, of witnesses who had stated they *would not* testify at the trial in the United States. Consequently, the parties would already be spending substantial time, money and energy to depose seven witnesses; therefore, allowing six additional witness depositions would involve the expenditure of only marginally more time, money, and effort. *Id.* at 1557. And, the court noted, although the additional six had stated they would voluntarily testify at trial, they could always change their minds. *Id.* Because they were also beyond the subpoena power of the court, a change of their minds would be of serious consequence in the case; and their testimony was highly material to a central issue. *Id.* The court noted that before the depositions of these six could be used at trial, their unavailability under Rule 15(e) would have to be established. *Id.* But the court nevertheless found that this scenario amounted to an "exceptional circumstance" and held:

Nevertheless, we believe that three factors together—the significance to the case of the deponents' expected testimony; the fact that the deponents are beyond the reach of any American subpoena, and, *critically,* the fact that the parties already must take depositions in Italy—provide sufficiently exceptional circumstances to satisfy Rule 15(a). The district court should have allowed the depositions of these prospective witnesses as well.

*Id.* at 1557 (citation omitted).

Similarly, in *U.S. v. Des Marteau*, 162 F.R.D. 364 (M.D. Fla. 1995), the court found that exceptional circumstances justified the Rule 15 deposition of a witness who, according to defense counsel, had stated she "may be willing" to travel to the United States to testify at trial, because she was beyond the subpoena power of the court and could potentially later change her mind about traveling to the United States. The *Des Marteau* court found the defendant had made the requisite showing of a "substantial likelihood . . . that the proposed deponent will not testify at trial." *Id.* A movant may use affidavits or other materials to establish unavailability, however Rule 15 does not require affidavits, and representations made by counsel in open court have been held sufficient to establish probable unavailability. *Id.*; *United States v. Farfan-Carreon*, 935 F.2d 678, 679-80 (5th Cir. 1991). *See also U.S. v. Sapse*, 2011 WL 1576898 (D. Nevada, April 26, 2011) (court approved Government's Rule 15 motion for depositions to be taken in Ukraine).

Here, as in *Drogoul* and *Des Marteau*, the Court should authorize Rule 15 depositions of the three willing trial witnesses. The marginal cost and inconvenience of authorizing an additional three depositions is minimal. The Court should, in its discretion, authorize all seven depositions. *See also U.S. v. Sindona*, 636 F.2d 792 (2d Cir. 1980) (court authorized Rule 15 depositions of four witnesses in Italy, two of whom refused to come to the U.S. and two of whom had not obtained the necessary travel documents).

17

## 2. THE EXCULPATORY NATURE OF THE TESTIMONY IS MATERIAL TO MR. TEYF'S CASE AND NECESSARY FOR A FAIR TRIAL

For Rule 15 purposes, "materiality" has the meaning applied in *Brady* and its progeny: "the evidence or testimony must be exculpatory, and not 'corroborative or cumulative of other evidence.'" *Rosen*, 240 F.R.D. at 209; *see also United States v. Hajbeh*, 284 F. Supp.2d 380, 383-85 (E.D.Va. 2003). The Court must, therefore, examine the expected testimony of the prospective witnesses against the elements of the offenses charged to see if the expected testimony is material to an element or if it tends to establish a defense for Mr. Teyf. *Rosen*, 240 F.R.D. at 209. For purposes of a Rule 15 analysis, it is also appropriate to assume that the testimonial proffer is true and that the defendant will exercise his right to remain silent. *Id.* at 210.

The above referenced witnesses will negate the essential elements of both the conspiracy and substantive money laundering charges, establish the legitimacy of the source of the funds in Mr. Teyf's domestic accounts, and ultimately, defeat the forfeiture allegations contained in the Fourth Superseding Indictment. According to Count One of the pending indictment, Mr. Teyf conspired under 18 U.S.C. § 1956(h) to violate §§ 1956(a)(1)(B)(i) or 1957. (DE 248). It is alleged that under § 1956(a)(1)(B)(i), Mr. Teyf conducted and attempted to conduct financial transactions involving the proceeds of bribery of a public official, misappropriation, theft, and embezzlement of public funds by or for the benefit of a public official, knowing the transactions were designed to conceal and disguise the nature, location, ownership, and control of the proceeds. (DE 248). In the alternative, the government contends that Mr. Teyf violated § 1957 when he engaged and attempted to engage in monetary transactions affecting interstate commerce in criminally derived property valued at more than $10,000, and that the property was derived from bribery of a foreign public official, misappropriation, theft, and embezzlement of public funds by or for the benefit of a public official. (DE 248). Counts Two to Twenty-Six consist of substantive money laundering

18

violations wherein Mr. Teyf allegedly aided and abetted others in engaging in monetary transactions that violate § 1957. The success of the pending forfeiture allegations hangs on the government being able to show that the identified assets are forfeitable under the same money laundering theories contained in Counts 1-26.

In order to obtain a conviction for a violation of domestic money laundering, under the concealment theory, § 1956(a)(1)(B)(i), the government must show (1) the defendant conducted a financial transaction affecting interstate commerce, (2) the financial transaction involved the proceeds of a SUA; (3) the defendant did so knowing that the transaction was designed in whole or in part to disguise the nature, the source, the ownership, or the control of the proceeds; and (4) that the defendant knew that the property involved in the transaction was derived from unlawful activity. *United States v. Baker*, 985 F.2d 1248, 1252 (4th Cir. 1993). A money laundering violation under § 1957 requires proof that (1) the defendant knowingly engaged, or attempted to engage, in a monetary transaction in criminally derived property; (2) of a value greater than $10,000; which (3) was derived from a SUA. *United States v. Johnson*, 440 F.3d 1286, 1289 (11th Cir. 2006).

The essential elements of a money laundering conspiracy are: (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under §§ 1956(a) or 1957; (2) that the defendant knew that the money laundering proceeds had been derived from a SUA; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *United States v. Green*, 599 F.3d 300, 371 (4th Cir. 2010); *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008); *United States v. McLean,* 166 F.3d 336 (4th Cir. 1998), citing *United States v. Burgos,* 94 F.3d 849, 860 (4th Cir. 1996) (*en banc).* The "gravamen of the crime of conspiracy is an *agreement," id.,* citing *United States v.*

19

*Laughman,* 618 F.2d 1067, 1074 (4th Cir. 1980), and the agreement in question must be with another person who is not a government agent. *United States v. Lewis,* 53 F.3d 29, 33 (4th Cir. 1995); *United States v. Hayes,* 775 F.2d 1279, 1283 (4th Cir. 1985).

The overt acts in the Fourth Superseding Indictment allege that sometime between 2010 and 2012, Russian Defense Minister Serdyukov awarded Voentorg, not Mr. Teyf, contracts to provide the Russian military certain goods and services. (DE 248 at ¶ 8). It is alleged that since Mr. Teyf was Deputy Director of Voentorg, he arranged for subcontractors to meet their contractual expectations. The indictment states that before awarding the subcontracts, Mr. Teyf and other unidentified individuals required that subcontractors hired by Voentorg pay Mr. Teyf and the other individuals a certain percentage of the government funds they received as payment for the goods and services. (*Id.*). According to the pending indictment, these kickback payments were made in cash and amounted to more than $150,000,000 in U.S. Dollars. Allegedly, Mr. Teyf paid the majority of the kickbacks to Defense Minister Serdyukov. Mr. Teyf supposedly received an undisclosed amount of kickback funds, and an unidentified amount was placed "in various accounts over which [Mr.] Teyf had control" at the direction of his accountant, Elena Zelenova. Thereafter, an unidentified amount of money was transferred to accounts outside of Russia and ultimately to accounts in the United States. (*Id.*) And paragraph 10 asserts, without more, that 293 wire transfers that came into the United States, totaling $39,415,000 originated from "foreign corporations and bank accounts in countries commonly known to be used for money laundering." (DE 248 at ¶ 10).

By law, a financial or monetary transaction does not violate the money laundering statutes unless it involves the proceeds of a SUA. *See generally* 18 U.S.C. §§1956 and 1957. The government claims that transactions in this case involved the proceeds of "an offense against a

20

foreign nation (Russia) involving bribery of a public official and the misappropriation, theft and embezzlement of public funds." (DE 248, Ct. 1) Yet, the government has yet to produce a single piece of evidence identifying the amounts of funds originating from the accounts of the Russian Defense Ministry or the Russian Ministry of Finance itself, or suggesting that the funds allegedly paid to Defense Minister Serdyukov found their way into Mr. Teyf's accounts in the United States. In other words, the government has yet to produce any financial statements, analysis, treasury filings, invoices, ledgers, wire transfer, etc. identifying, at a minimum, that the allegedly misappropriated funds did in fact originate from the Russian government and then found their way to the United States.

The anticipated testimony of Ms. Zelenova, Mr. Vechko, Mr. Borisov, Mr. Nogay, and Mr. Grisheckin will show that there was nothing unusual in Mr. Teyf's multi-million dollar transactions. These witnesses will also establish that the transactions made to and from Mr. Teyf's accounts involved the proceeds of his successful business ventures over more than two decades pre-dating the supposed kickback scheme, during which he brought in tens of millions of dollars. Thus, the transactions listed in the Fourth Superseding Indictment were not transactions involving government funds or Serdyukov's bribery proceeds.

Another essential element of the money laundering charges is Mr. Teyf's knowledge that the funds involved in the criminal transactions originated from a SUA. *See generally* 18 U.S.C. §§1956 and 1957. Knowledge regarding the source of the funds is generally established by proof that the defendant was a participant in the underlying SUA. *United States v. Chon*, 713 F.3d 812, 820 (5th Cir. 2013). The money laundering charges pending against Mr. Teyf are based upon facts asserted by a single cooperating witness – CS-1. His claims regarding Mr. Teyf's involvement in a bribery and government theft scheme are uncorroborated. The government concedes in its

indictment that the Russian Defense Ministry awarded the contracts for goods and services to Voentorg, not Mr. Teyf. Thereafter, the government has not produced a single recording between Mr. Teyf, CS-1, and any public officials and/or private individuals in Russia supporting CS-1's story. Despite claiming that both the funds involved in the money laundering transactions and the assets identified in the forfeiture allegations originated from bribe payments or the misappropriation, theft and embezzlement of Russian government property, the prosecution has yet to produce a single piece of evidence evincing the disbursement of government funds, contracts, invoices or receipts from the Russian Ministry of Defense to Voentorg or to Mr. Teyf. Moreover, the government has yet to produce a single contract, invoice, ledger, or receipt between Voentorg, Mr. Teyf and the alleged subcontractors. In fact, after hearing the testimony of defense witnesses Ms. Zelenova, Mr. Vechko, Mr. Schirri, Mr. Grigorov, and Mr. Borisov, no jury would reasonably conclude that CS-1 is telling the truth and that Mr. Teyf actually bribed the Russian Minister of Defense.

The government also makes a giant leap by assuming Mr. Teyf's culpability of the money laundering offenses by virtue of his title as Voentorg's Deputy Director. (DE 248 at ¶ 8). To date it has provided no employment or contractual paperwork between Voentorg and Mr. Teyf identifying his duties and obligations. Mr. Vechko, who was Mr. Teyf's boss at Voentorg, and is familiar with his duties and obligations there, is expected to contradict the government's claim.

The pending further indictment alleges that Mr. Teyf paid off a prosecutor in order to put an investigation to rest. However, Mr. Vechko, a member of Voentorg's management, will squarely contradict the claim by testifying that Voentorg was never under investigation.

The government has alleged that the financial transactions which ultimately made their way to the United States must have been the proceeds of bribe payments. As previously stated,

the government has provided no bank account statements, deposit/withdrawal slips, or wire transfers for any accounts in Russia. The discovery provided thus far also does not contain copies of the bank account statements and wire transfers of the foreign corporations with accounts in "countries commonly known to be used for money laundering" from which it is alleged funds were ultimately wired into Mr. Teyf's international and domestic accounts. (DE 248 at ¶ 10). The government has also failed to produce any discovery showing a connection between those foreign corporations and foreign accounts and the alleged international SUAs. Several of these witnesses – Ms. Zelenova, Mr. Borisov, Mr. Nogay, and Mr. Grisheckin – are all expected to testify that Mr. Teyf was a successful and wealthy businessman and entrepreneur, who invested and earned tens of millions of dollars through successful business ventures, not some kickback scheme. *Compare* 11/7/19 Order (DE 344) at p. 8 (possession or transfer of large sums of money, and the manner in which those funds were acquired "highly relevant" in white-collar and fraud investigations) (quoting *United States v. Srivastava*, 540 F.3d 277, 291 (4th Cir. 2008). A jury could (and should) readily conclude that it was these funds Mr. Teyf transferred to the United States when he decided to move to the United States with his family. In the absence of this evidence, a jury might instead conclude that unexplained wealth supports the allegations of unlawful activity.

Unlike the government's case and the evidence provided by CS-1, the contacts between these witnesses and Mr. Teyf were entirely voluntary, cordial and consistent. The testimony of these individuals is crucial to Mr. Teyf's defense. In contrast to uncorroborated representations made by CS-1 to law enforcement agents, these witnesses including Mr. Grigorov, Mr. Schirii, and Mr. Vechko are expected to testify regarding CS-1's lack of candor and credibility, as well as his reputation within the community. It is expected that they will negate CS-1's purported role as Mr. Teyf's bodyguard, contradict CS-1's claim that he overheard or witnessed meetings regarding

the alleged kickback/bribery scheme, and/or picked up and delivered cash bribe payments concealed inside bags.

The testimony from the prospective witnesses also negates the pending conspiracy charge. Their testimony, for example that of Mr. Vechko, exculpates Mr. Teyf's purported role in the alleged SUA during the course of his employment at Voentorg. These witnesses will show that Mr. Teyf had neither the authorization, nor the access, or the wherewithal, to control or interfere with the corporation's subcontracting.

The testimony proffered herein is not cumulative of other existing and available government evidence. To the contrary, it is anticipated that this testimony will be offered in juxtaposition to the government's evidence regarding Mr. Teyf's involvement in the SUAs and in all illicit money laundering transactions.

### 3. DENYING MR. TEYF'S REQUEST FOR RULE 15 DEPOSITIONS WOULD RESULT IN A MISCARRIAGE OF JUSTICE

The absence of a particular witness's testimony causes an injustice if that testimony would be "material" to the case. *Des Marteau*, 162 F.R.D. at 368; *Drogoul*, 1 F.3d at 1552. Materiality is a term of art that means *material to the party moving to depose. Ramos,* 45 F.3d at 1523 (emphasis in original). For the reasons set forth above, the expected testimony of the prospective witnesses here is highly material to the government's most central and important allegations against Mr. Teyf.

Defense counsel have already interviewed the prospective witnesses in this case. The Rule 15 deposition process will not be used to conduct discovery, but rather, to obtain the testimony of Russian witnesses for use at trial. The witnesses are believed to be agreeable to appearing in a third-party setting in neighboring Ukraine or another third party country to be deposed. To deny

Mr. Teyf's request to obtain the testimony would constitute a miscarriage of justice and a denial of Mr. Teyf's constitutional rights.

### 4. THE SHOWING REQUIRED BY RULE 15 MAY BE MADE BY A VARIETY OF MEANS

A Rule 15 movant must make known to the court the thrust or substance of the evidence that the depositions are expected to product. *Ramos*, 45 F.3d at 1523. A movant may use affidavits or other materials to establish unavailability; however, Rule 15 does not require affidavits, and representations made by counsel in open court have been held sufficient to establish probable unavailability. *Id.*; *Farfan-Carreon*, 935 F.2d at 679-80. By the proffer in this Motion and incorporated Memorandum of Law, counsel for Mr. Teyf have "alert[ed] the district court to the substance of the evidence that is at peril of being excluded." *United States v. Sheffield*, 992 F.2d 1164, 1169 (11th Cir. 1993).

### 5. OTHER FACTORS FAVORING THE REQUESTED DEPOSITIONS

Here, the timing of this petition weighs in Mr. Teyf's favor. This is not a request on the eve of trial. Mr. Teyf's defense team has worked diligently to decipher the government's theory which has evolved across five (5) indictments. It has also reviewed the volumes of discovery materials provided by the government and requested any outstanding supplemental discovery. After identifying potential witnesses, counsel made the necessary arrangements to travel to Russia and interview witnesses with highly relevant information.

As previously shown, the testimony of the seven witnesses identified herein is not cumulative of any other evidence in the government's possession or that it intends to introduce at trial. All of the anticipated testimony will contradict and dispose of one or more elements of the charged money laundering offenses, and ultimately should result in the return of millions of dollars in assets seized by the government. While this Court retains the discretion to authorize depositions

pursuant to Rule 15, denying the request will foreclose Mr. Teyf's opportunity to introduce critical exculpatory and non-cumulative evidence through any other means and effectively abridge his right to present a defense The end result would be a miscarriage of justice.

### B. PROCEDURAL MATTERS.

Undersigned counsel understands that the Russian Federation does not allow the taking of depositions by private attorneys. Defendant proposes that the Rule 15 depositions be taken in Ukraine or another third party country, in January, 2020, on dates when the witnesses are available and with reasonable notice to and coordination with the government. The witnesses are willing to appear and be deposed in Ukraine or a third party country; therefore, Defendant does not anticipate, at this time, any need for the Court to issue Letters Rogatory. See *U.S. v. Sapse*, 2011 WL 1576898 (D. Nevada, April 26, 2011) (court approved Government's Rule 15 motion for depositions to be taken in Ukraine). Defendant will arrange for a stenographer, videographer, and translator through an international deposition agency.

Defendant waives his right to be physically present at these depositions pursuant to Rule 15(c)(1)(A), Fed. R. Crim. P., since his counsel will be present and the depositions will be transcribed and videotaped and arrangements can be made for him to observe the testimony while remaining in custody through live video feed ordered by the Court. The Government may participate in person or by video-conferencing or telephonic means. *See Sapse,* at p. 4 (if conditions of defendant's release could not be modified to allow defendant to attend, defendant could participate by two way video-conferencing).

### VI.   CONCLUSION

After interviewing these witnesses in person, the undersigned defense counsel is convinced that the information they will attest to is exculpatory, will negate the elements of the charged

money laundering offenses, and should result in the release of Mr. Teyf's property. Therefore, Mr. Teyf moves the Court to authorize the requested depositions under Rule 15 and issue any further authorization or assurances to the witnesses necessary to facilitate the depositions for use at trial. A proposed Order is submitted with this motion.

Respectfully submitted, this the 6th day of December, 2019.

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone: (919) 821-4711
Fax: (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*

/s/ Robert S. Wolf
Robert S. Wolf
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Ave., 12th Floor
New York, NY 10174-1299
Phone: (212) 554-7825
Fax: (212) 554-7700
rwolf@mosessinger.com
*Counsel for Defendant*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2019, I electronically filed the foregoing **DEFENDANT LEONID TEYF'S MOTION FOR RULE 15 FOREIGN WITNESS DEPOSITIONS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone: (919) 821-4711
Fax: (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*