IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:18-CR-452-1-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | UNITED STATES' |
| | ) | RESPONSE TO DEFENDANT'S |
| LEONID ISAAKOVICH TEYF, | ) | MOTION TO RECONSIDER |
| | ) | SEVERANCE OF COUNTS |
| Defendant. | ) | 27 - 29 FOR SEPARATE TRIAL |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to defendant's motion to reconsider his earlier motion to sever Counts 27 through 29 pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure. The Court did not err, much less clearly err, in its earlier ruling hereon as the charged offenses are of the same or similar character and constitute parts of a common scheme or plan, and defendant's motion for reconsideration should be denied.

I. STATEMENT OF THE LAW

Rule 8, Federal Rules of Criminal Procedure, provides:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a). This rule permits "very broad joinder," and joinder is the "rule, rather than the exception." United States v. Hawkins, 776 F.3d 200, 206 (4th Cir. 2015). Thus, while the Fourth Circuit has found that mere existence of the same defendant amongst charges is insufficient for joinder of those charges, it has

1

emphasized that the second and third alternative prongs of Rule 8 should be interpreted "'flexibly, requiring that the joined offenses have a logical relationship to one another,'" and that, "[j]oined offenses have a logical relationship to one another for Rule 8(a) purposes, 'when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." United States v. McLaurin, 764 F.3d 372, 385 (4th Cir. 2014) (quoting United States v. Cardwell, 433 F.3d 378, 385 (4th Cir.2005) (internal quotation marks omitted)).

## II. ARGUMENT

The defendant asks the Court to reconsider its earlier ruling denying his motion to sever Counts 27 – 29 from the remaining charges. In sum, the defendant argues the Court made three errors-1) relied on *modus operandi* to establish appropriateness of joinder, when "*[m]odus operandi* is <u>not</u> a basis for joinder;" 2) the various counts do not bear a logical resemblance to one another, and the government's argument was a "factually devoid recently created narrative concocted by the Government for the first time" in its filing to the original motion to sever; and, 3) that the erroneous nature of the Court's holding that any risk of prejudice could be cured by jury instruction is demonstrated by the Government's cross examination of one of defendant's witnesses in deposition. None of the defendant's arguments are persuasive under the law or facts, and the motion to reconsider should be denied.

    A. <u>Modus Operandi is an appropriate basis upon which to conclude joinder is proper, and the logical relationship between the counts is strong</u>.

Defendant essentially combines his arguments 1) and 2) as outlined above at pages 4 – 15 of his motion to reconsider. He argues there is no "support in the law

2

for the idea that dissimilar and disconnected charges may be joined for trial because the defendant allegedly carried out the crimes using the same manner, means, or *modus operandi*." D.E.498 at 6.

First, if the Court recalls, the government's claim, while it did include reference to *modus operandi*, also referenced the fact that the evidence for the crimes was inextricably intertwined . . .a fact which takes all evidence outside of Rule 404(b) at the outset. United States v. Lighty, 616 F.3d 321, 352 (4th Cir. 2010). As noted, several witnesses have information about both the financial crimes and the additional crimes. Not only for these witnesses, but especially for these witnesses, the evidence as to both financial and non-financial crimes is integrally related and a natural part of their accounts of the circumstances surrounding the offenses with which Teyf is charged. Lighty 616 F.3d at 352.

Second, the bulk of this Court's reasoning in its earlier denial, as evidenced by the number of times each term appears in the Order, went to the logical relationship shown between the counts, rather than *modus operandi*. D.E. 448. Only once does the Court use the term "*modus operandi*," which defendant appears to capitalize on. D.E. 448 at 7. Setting aside the logical flaw in his argument that there is no "support in the law for the idea that dissimilar and disconnected charges may be joined for trial because the defendant allegedly carried out the crimes using the same manner, means, or *modus operandi*–that is, the very point of *modus operandi*, or "common scheme or plan," or even "logical relationship," is to show similarity and connectedness of acts, no longer as dissimilar and disconnected –the defendant is incorrect. The Fourth Circuit holds that "[i]n cases where the offenses are identical or strikingly similar in the method of operation and occur over a short
3

period of time, it is not an abuse of discretion to deny severance." United States v. Acker, 52 F.3d 509, 514 (4th Cir. 1995), citing United States v. DeBordez, 741 F.2d 182 (8th Cir.), cert. denied, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 707 (1984). "Method of operation" is *modus operandi*.

Other courts, too, consider *modus operandi* in the context of Rule 8 severance. See United States v. Jawara, 462 F.3d 1173, 1184–85 (9th Cir. 2006), opinion amended and superseded on denial of reh'g, 474 F.3d 565 (9th Cir. 2007) (we consider it appropriate to consider factors such as the elements of the statutory offenses, the temporal proximity of the acts, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims in assessing whether an indictment meets the "same or similar character" prong of Rule 8(a)); United States v. Taylor, 54 F.3d 967, 973 (1st Cir. 1995) (in determining whether counts are properly combined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred).

There is a host of law in addition to these cases. In considering the phrase, "common scheme or plan" in the context of USSG §4A.2, the Fourth Circuit Court of Appeals has commented, "in formulating the Guidelines the Sentencing Commission was surely familiar with Rule 8(a) and the cases interpreting it and, thus, one could reasonably conclude that the Commission intended the 'common scheme or plan' language in the Guidelines to be similarly interpreted." United States v. Breckenridge, 93 F.3d 132, 139 n.3 (4th Cir. 1996)(internal citation and quotation omitted). At issue in Breckenridge was whether the defendant's prior

4
Case 5:18-cr-00452-FL   Document 511   Filed 03/09/20   Page 4 of 12

burglaries were a common scheme or plan, to count each separately or to combine them as one for application of the career offender guideline. Indeed, in Breckenridge, the Fourth Circuit stated, "the similarity *vel non* of the mode of operation of the various crimes is often critical." Fourth Circuit jurisprudence is replete with cases reviewing *modus operandi* to determine whether a crime was part of a common scheme or plan under the Guidelines.

The defendant argues that *modus operandi* should have no place in the equation, except when identity is at issue. D.E. 498 at 10. The above-cited cases clearly dispel this position, and the cases cited by the defendant do nothing to lessen their strength. D.E. 498 at 10 – 11. Although defendant attempts to lessen Siegel's holding by acknowledging "[t]he Court held that some of the prior act evidence was admissible to prove *modus operandi*, but only because it involved evidence that defendant had committed the exact same crime in the exact same manner," such argument is to no avail. D.E. 498 at 9 – 10. What follows the "but only" in the defendant's statement does not include the word identity-which is required by his own proposition. The Fourth Circuit – in cases previously relied upon by this Court, clearly holds *modus operandi* is an appropriate basis for admission of other crimes evidence. See, e.g., United States v. Siegel, 536 F.3d 306, 318 (4th Cir. 2008); United States v. Tanner, 61 F.3d 231, 237 (4th Cir. 1995).

The defendant argues that the evidence of the money laundering crimes would not be admissible in a separate trial on the murder for hire charges, and that "there would be no overlap in evidence if two trials are ordered." D.E. 498 at 13. As noted in the government's response to the defendant's original motion to sever, the interwoven nature of the underlying conduct – albeit for separate offenses – is such

that it logically presumes one telling and hinders a full understanding when attempted to do so separately. At least four of the government's witnesses would testify in both trials were they to be had separately – persons involved in the murder for hire scheme who also had financial dealings with Teyf and/or persons to whom Teyf made statements about one or both kinds of conduct. The defendant posits that the government's response was hypothetical and speculative, yet just a portion of the basis for the government's belief is set forth in D.E. 472, its notice under Rule 404(b), and that small portion is significant. The government's evidence, in large part, consists of the defendant's own words. The defendant is recorded describing his desire to get A.G. to Russia; the defendant is recorded discussing his desire to murder his wife and get back from her the millions placed in her name; the defendant is recorded trying to get Strogii, the government's "chief witness" on the money laundering counts (D.E. 498 at 2) to have an individual harmed; Strogii is recorded in Russia relaying a message to one whom Teyf had paid a bribe to get out of a criminal investigation.

Finally, the defendant again claims there is no temporal relation between the various counts, deigning to define the necessary timeframe as the criminal conduct alleged in Russia-2010 to 2012- and the murder for hire and related counts. The Court decided this issue correctly previously, the appropriate consideration is the timeline of the charged acts themselves, and here the charges are temporally related.

This Court did not err, much less clearly err, in its ruling on the defendant's motion to sever under Rule 8.

B. <u>Any risk of prejudice can be cured by limiting jury instructions, as found by the Court.</u>

The defendant uses the cross examination of a defense witness in deposition to demonstrate the government's "point was to overwhelm [the deponent's] unequivocal testimony refuting the claims of the Government's chief witness . . . " D.E. 498 at 16-17. First, several errors in defendant's assertions need corrected. This deposition witness, Ms. Zelanova, was not, by her own testimony, "Mr. Teyf's CPA." D.E. 498 at 16. According to Ms. Zelanova, she had absolutely nothing to do with any of Teyf's personal finances. D.E. 498 Exhibit 3 at 78. Rather, she was chief financial officer of a company in Russia run by Mr. Teyf - Delta Plus. A significant portion of her direct examination was to establish the great deal of money Teyf had invested in Delta Plus, and, more importantly, to establish that he earned it all back. This is presumably to assist the defendant in refuting the government's claim that the $39 million in funds transferred here was criminally derived –Teyf, the argument would go, had plenty of funds without regard to criminal conduct, and the government would never be able to show the money was from criminal acts. The time the government spent discerning Teyf's income from Delta Plus, an "unrelated entity," and on whether there were any available records from that entity (the answer was no, Ms. Zelanova had no records to support her testimony about the amount of money Teyf either invested or had returned), could not have been more pertinent to the purpose for which Ms. Zelanova was called or more appropriate for cross-examination.

The defendant complains that the government, during its cross-examination of Ms. Zelanova, "asked her to read at length inflammatory recordings of Sviridov

and Teyf." D.E. 498 at 16.  Contrary to the defendant's assertion, the point of the government's questions were not to improperly overwhelm anything but rather to properly show to the jury the extreme bias held by Ms. Zelanova for Mr. Teyf.  Prior to the deposition, the defendant had informed the government and the Court that "Ms. Zelenova has known Mr. Teyf since about 2004 and is expected to testify about his work, character and reputation in Russia as a very successful, wealthy businessman."  D.E. 356 at 7.  Consistent therewith, the government was given a letter prior to the deposition, written by Ms. Zelanova, praising Mr. Teyf.  Among other things, the letter asserted, "None of the employees had ever heard a curse or even a rude word coming from him. If Leonid heard that someone allowed himself to be rude or disrespectful to another person, Leonid would politely stop that. He even felt ashamed and awkward for such a rude person."  See Exhibit 1.

The government's cross examination thus was undertaken to demonstrate that Ms. Zelanova's bias is so strong, she cannot be credible and reliable when it comes to him.  D.E. 498, Exhibit 3 at 144-170.  The government showed Ms. Zelanova several statements from various transcripts, and asked whether the language used therein was consistent with the Mr. Teyf she knew.  Following Mr. Teyf's counsel's lead through speaking objections, Ms. Zelanova claimed no understanding of the context, or the speaker, and despite objections as having been "asked and answered," never committed one way or the other as to whether her Mr. Teyf would use such language.  Here, cross-examination as to the language used by Mr. Teyf was highly appropriate under Fed. R. Evid. 608 as to the witness' bias.  In fact, several recordings of the defendant's calls to government witnesses pertinent to the money laundering counts contain the same type of language that Ms.

8

Zelanova would not herself say aloud in the deposition. See. D.E. 498 Exhibit 3 at 152.

In fact, all depositions were similar in this vein. Each witness thought very highly of Mr. Teyf, yet the bias was so strong or falsehoods so apparent, the government believes they support, not negate, the assertion of continuity, of similarity, of logical relationship and modus operandi. The depositions underscore the government's position that typical of Teyf's *modus operandi*, the witnesses seemed to be bought and paid for, whether through fear, money, work, or some other pressure. Only one of seven witnesses had any records to support their claims. Six of seven witnesses, when given proper and timely request to come to trial, simply refused (several on the grounds that they were afraid the United States would bring false charges against them, as they perceive had been done with Mr. Teyf). All were able to travel internationally, all had valid passports, some had come to the United States previously and none had ever been previously denied entry to the United States. To the government's knowledge, all spent several days in Israel for the purposes of the depositions, and successfully extricated themselves from their businesses and/or families for the length of time their testimony would take here in the United States. All but one understood the expense of their travel would be paid for by others, and would not fall to them. The seventh witness had not even been asked if he would come to the United States until February 2020, way too little time for him to make arrangements to do so.

Each of these witnesses did misrepresent something, whether because of strong bias or some other reason. Nicolay Grigorov, for instance, testified that although he could not remember how they became acquainted, he knew witness

9

Case 5:18-cr-00452-FL   Document 511   Filed 03/09/20   Page 9 of 12

Dmitriy Shirri; he knew Schirri was an athlete, and he recommended Schirii as a personal bodyguard to Mr. Teyf. Exhibit 2, Grigorov deposition at 11-12. Only on cross-examination, through information provided by government witness Strogii, did Grigorov admit that Shirii is married to Grigorov's niece. Exhibit 2 at 76.

Grigorov, moreover, admitted on cross-examination that he visited government witness Strogii's family members located in Russia. And not only did Grigorov visit them, but misrepresented to them the reason for the visit-he told each family member to whom he spoke that he was an assistant to an attorney, seeking clarification regarding Strogii's claim for political asylum (in the United States). Exhibit 2 at 72-74. Grigorov did not know whether this qualified as a lie, as he just says whatever occurs to him in the moment that will help him get the information he wants. Exhibit 2 at 73-74.

Schirri specifically denied any dealings beyond those of a bodyguard for Teyf. Specifically, he denied helping Teyf with any personal matters, and with any matters relating to finances. Exhibit 3, Schirri deposition at 45, 81. Yet, cross-examination revealed that Schirri not only placed a down payment on an apartment for Teyf in Moscow, and he, just the bodyguard, actually signed for the apartment. Exhibit 3 at 82.

The government's cross examination of Zelanova, and indeed all witnesses on deposition, did not portend improper use of information nor likely jury confusion as to what evidence would go to which count. Consistent with the original determination by this Court, "[t]he risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate

10

trials are necessary, but, as we indicated in Richardson v. Marsh, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. See 481 U.S., at 211, 107 S.Ct., at 1709." Zafiro v. United States, 506 U.S. 534, 539 (1993). In this case, any risk of prejudice is sufficiently cured by limiting jury instructions.

### III. CONCLUSION

For all the above-stated reasons, the defendant's motion to reconsider the denial of his earlier motion to sever Counts Twenty-Seven through Twenty-Nine should be denied.

Respectfully submitted this 9th day of March 2020.

          ROBERT J. HIGDON, JR.
          United States Attorney

By:   */s/ Barbara D. Kocher*
      JASON M. KELLHOFER
      BARBARA D. KOCHER
      Assistant U.S. Attorney
      150 Fayetteville St Suite 2100
      Raleigh, NC 27601
      Telephone: 919-856-4530
      Fax: 919-856-4487
      E-mail: jason.kellhofer@usdoj.gov
      OH Bar: 0074736
      E-mail: barb.kocher@usdoj.gov
      NC Bar: 16360

# CERTIFICATE OF SERVICE

This is to certify that I have this 9th day of March 2020, served a copy of the foregoing filing upon counsel for the defendant in this action by electronic communication to:

F. Hill Allen
Tharrington Smith, L.L.P.
P.O. Box 1151
Raleigh, NC 27602

Robert S. Wolf
Moses & Singer, L.L.P.
405 Lexington Ave. 12th Floor
New York., NY 10174-1299

By: */s/ Barbara D. Kocher*
    BARBARA D. KOCHER
    Assistant U.S. Attorney
    310 New Bern Avenue, Suite 800
    Raleigh, NC 27601
    Telephone: 919-856-4530
    Fax: 919-856-4487
    E-mail: barb.kocher@usdoj.gov
    NC Bar: 16360

12
Case 5:18-cr-00452-FL   Document 511   Filed 03/09/20   Page 12 of 12