EXHIBIT 2

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF NORTH CAROLINA

3    WESTERN DIVISION

4    _____

5    UNITED STATES OF AMERICA,        )
                                      )
6                        Plaintiff,   )
                                      )
7    vs.                              ) Case No.:
                                      ) 5:18-CR-00452-FL-1
8    LEONID ISAAKOVICH TEYF,          )
                                      )
9                        Defendant.   )
     _____ )

10

11

12

13

14    VIDEOTAPED/VIDEOCONFERENCE DEPOSITION OF

15    NICOLAY GRIGOROV

16    TEL AVIV, ISRAEL

17    MONDAY, JANUARY 27, 2020

18    3:20 P.M.

19

20

21

22

23

24

25    REPORTED BY:  BRENDA MATZOV, CA CSR 9243

```
 1              Videotaped/videoconference deposition

 2    of NICOLAY GRIGOROV, taken in the above-entitled

 3    cause pending in the United States District Court,

 4    for the Eastern District of North Carolina, Western

 5    Division, before BRENDA MATZOV, CA CSR 9243, at

 6    Barnea Jaffe Lande, 58 HaRakevet Street, 21st Floor,

 7    Tel Aviv, Israel, and also simultaneously in North

 8    Carolina, on Monday, the 27th day of January, 2020,

 9    at 3:20 p.m.

10

11    APPEARANCES:

12    FOR PLAINTIFF:

13              UNITED STATES DEPARTMENT OF JUSTICE
              By:  JASON KELLHOFER, ESQ.
14                 BARBARA KOCHER, ESQ.
                   (both via videoconference)
15              310 New Bern Avenue
              Suite 800
16              Raleigh, North Carolina 27601
              (919) 856-4530 / Fax (919) 856-4487
17              jason.kellhofer@usdoj.gov
              barb.kocher@usdoj.gov
18

19    FOR DEFENDANT LEONID ISAAKOVICH TEYF:

20              THARRINGTON SMITH, LLP
              By:  F. HILL ALLEN, ESQ.
21                  (in Israel)
              Wells Fargo Capitol Center
22              150 Fayetteville Street
              Suite 1800
23              Raleigh, North Carolina 27601
              (919) 821-4711 / Fax (919) 829-1583
24              hallen@tsmithlaw.com

25
```

```
 1   APPEARANCES (Continued):

 2   FOR DEFENDANT LEONID ISAAKOVICH TEYF:

 3           MOSES & SINGER, LLP
             By:  ROBERT S. WOLF, ESQ.
 4                (in Israel)
             The Chrysler Building
 5           405 Lexington Avenue
             New York, New York 10174-1299
 6           (212) 554-7800 / Fax (212) 554-7700
             rwolf@mosessinger.com
 7

 8   FOR TATYANA TEYF:

 9           POYNER SPRUILL, LLP
             By:  DAVID LONG, ESQ.
10                (via audio link)
             301 Fayetteville Street
11           Suite 1900
             Raleigh, North Carolina 27601
12           (919) 783-6400 / Fax (919) 783-1075
             dlong@poynerspruill.com
13

14   ALSO PRESENT (in Israel):

15           MITCHELL COOPERSMITH, Videographer

16           SOPHIA OSMINKIN / STANISLAV CHERNOBILSKY,
             Russian Interpreters
17
             MICHAEL M. ROSENBERG, ESQ., Moses & Singer
18

19   ALSO PRESENT (via videoconference):

20           SARAH FOSTER, Department of Justice

21           ROBERT B. McFARLANE, ESQ., Moses & Singer

22           PAUL FETKEVICH, Russian Interpreter

23           LEONID ISAAKOVICH TEYF

24

25
```

```
 1                    I N D E X

 2    WITNESS

 3    Nicolay Grigorov

 4

 5    EXAMINATION                              PAGE

 6    By Mr. Allen                              7

 7    By Mr. Kellhofer                         27

 8

 9

10                  E X H I B I T S

11                      (None.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | TEL AVIV, ISRAEL; MONDAY, JANUARY 27, 2020           |
|       | 2  | 3:20 P.M.                                            |
|       | 3  |                                                      |
| 15:20:21 | 4  | THE VIDEOGRAPHER:  This is the                   |
| 15:20:22 | 5  | beginning of Media No. 1 in the videotape        |
| 15:20:25 | 6  | deposition of Nicolay Grigorov, being taken      |
| 15:20:29 | 7  | on January 27th, 2020, at 3:20 p.m., at Barnea   |
| 15:20:38 | 8  | Jaffa Lande, Tel Aviv, Israel, in the matter     |
| 15:20:41 | 9  | of the United States of America versus Leonid    |
| 15:20:45 | 10 | Isaakovich Teyf, being heard in the United       |
| 15:20:48 | 11 | States District Court, for the Eastern District  |
| 15:20:52 | 12 | of North Carolina, Western Division, case number |
| 15:20:55 | 13 | 5:18-CR-00452-FL-1.                              |
| 15:21:04 | 14 | My name is Mitchell Coopersmith.  I'm           |
| 15:21:07 | 15 | the videographer.  And the court reporter is     |
| 15:21:09 | 16 | Brenda Matzov.                                    |
| 15:21:10 | 17 | Would the counsel please state their            |
| 15:21:12 | 18 | appearance.                                       |
| 15:21:14 | 19 | MR. ALLEN:  My name is Hill Allen.              |
| 15:21:15 | 20 | I appear on behalf of Leonid Teyf.              |
| 15:21:21 | 21 | MR. WOLF:  Robert Wolf, also defense           |
| 15:21:24 | 22 | counsel for Leonid Teyf.  And also present with  |
| 15:21:30 | 23 | Mr. Teyf is Robert McFarland, from the law firm  |
| 15:21:35 | 24 | of Moses & Singer, our law firm, and who's present |
| 15:21:39 | 25 | with Mr. Teyf, as well as Paul Fetkevich, the -- |

```
15:21:47   1   an official interpreter as well.

15:21:51   2           THE VIDEOGRAPHER:  Would the court

15:21:53   3   reporter please affirm the witness.

15:21:56   4           THE COURT REPORTER:  The counsel

15:21:56   5   over there.

15:22:06   6           MR. KELLHOFER:  For the government,

15:22:06   7   present is Jason Kellhofer, Assistant United

15:22:09   8   States Attorney, Eastern District, North Carolina,

15:22:11   9   as well as Barbara Kocher, additional Assistant

15:22:15  10   United States Attorney.

15:22:23  11           MR. LONG:  And David -- David Long --

15:22:23  12   David Long is appearing for Tatyana Teyf by

15:22:28  13   audio.

15:22:28  14

15:22:28  15       SOPHIA OSMINKIN / STANISLAV CHERNOBILSKY,

15:22:28  16           the interpreters, were duly sworn

15:22:28  17           to translate from English to Russian

15:22:28  18           and from Russian to English.

15:22:28  19

15:22:28  20               NICOLAY GRIGOROV,

15:22:28  21           called as a witness, being first

15:22:28  22           duly affirmed, was examined and

15:22:28  23           testified as hereinafter set forth.

15:22:28  24   //

15:22:28  25   //
```

```
15:22:28   1              (The following proceedings were conducted
15:22:28   2         through the Russian interpreters, unless
15:22:28   3         otherwise indicated.)
15:22:57   4
15:23:09   5                        EXAMINATION
15:23:09   6    BY MR. ALLEN:
15:23:09   7         Q.   Good afternoon, sir.  Please tell us
15:23:20   8    your name.
15:23:21   9         A.   Grigorov, Nicolay Mikhailovich.
15:23:27  10         Q.   Mr. Grigorov, where do you live?
15:23:36  11         A.   I live in Russia, Volgogradskiy
15:23:37  12    region, the city of Volzhsk.
15:23:43  13         Q.   Have you always lived in Russia?
15:23:48  14         A.   Yes.  Always.
15:23:50  15         Q.   And how old are you?
15:23:54  16         A.   I'm 50 years -- 58 years of age.
15:23:58  17         Q.   Are you married, sir?
15:24:01  18         A.   Yes.
15:24:02  19         Q.   Do you have any kids or grandkids?
15:24:15  20         A.   I have -- my -- my wife's name is
15:24:19  21    Svetlana.  I have two children, a daughter
15:24:22  22    and a son.  And I have three grandchildren,
15:24:25  23    all of them boys.
15:24:29  24         Q.   Please tell us a little bit about
15:24:31  25    your background, educational and work.
```

15:24:49  1        A.   I was born in 1962.  Kindergarten

15:24:52  2    school.  After school, a professional college,

15:24:57  3    sports, then military service.  After the

15:25:14  4    military, I served my motherland in the ranks

15:25:22  5    of the tax police.

15:25:25  6        Q.   Let me back up a little bit.

15:25:32  7             What kind of sports were you involved

15:25:34  8    with?

15:25:42  9        A.   Mainly combat sports.

15:25:45  10       Q.   Martial arts?

15:25:50  11       A.   Martial arts.

15:25:51  12       Q.   Did that factor into your work?

15:26:09  13       A.   Yes.  In the future, it did contribute

15:26:11  14   to my work, because I was quite efficient in

15:26:15  15   martial arts.  When I started my service at

15:26:18  16   the tax police, I was in charge of physical

15:26:22  17   protection.

15:26:24  18       Q.   How long did you serve in the tax

15:26:28  19   police?

15:26:42  20       A.   So if I give you the years, it would

15:26:45  21   be 1993, 1996.

15:26:49  22       Q.   About three years?

15:26:53  23       A.   Yes.

15:26:54  24       Q.   Did you have a rank in the tax police?

15:27:06  25       A.   When I was hired, I had to undergo

15:27:09  1    a special training course for work.  And after

15:27:17  2    that, I was awarded a special rank, lieutenant

15:27:23  3    of the -- of the tax police.

15:27:26  4        Q.   What kind of training did you receive

15:27:31  5    for your work with the tax police?

15:27:42  6        A.   As I was one -- as serviceman in

15:27:46  7    the combat unit, my training comprised special

15:28:03  8    knowledge and skills in apprehension of potential

15:28:07  9    criminals.

15:28:09  10    Q.   Did you retire from the tax police with

15:28:12  11    the rank of lieutenant?

15:28:19  12    A.   Yes.

15:28:20  13    Q.   And what type of work, generally, have

15:28:22  14    you done since leaving the tax police?

15:28:38  15    A.   I graduated from a course for civil

15:28:44  16    guards and continued working in the field of

15:28:54  17    personal protection.

15:29:00  18    Q.   As part of your work in the field

15:29:02  19    of personal protection or personal security,

15:29:06  20    do you have any licenses?

15:29:28  21    A.   I graduated from this civil institution

15:29:31  22    which licensed civil guards.

15:29:36  23    Q.   Turning to the case for which we're

15:29:39  24    here, do you know Leonid Teyf?

15:29:53  25    A.   Yes, I know him.  I worked for him.

15:29:57   1        Q.   So let me ask:  How -- how do you

15:30:00   2   know Mr. Teyf and how long?

15:30:22   3        A.   Our acquaintance is ongoing.  And

15:30:38   4   our acquaintance started approximately in 2005,

15:30:42   5   when I started work as his bodyguard, and then

15:30:48   6   as the security manager.

15:30:52   7        Q.   When you say "security manager," was

15:30:55   8   that for Mr. Teyf?

15:31:12   9        A.   I imply that, for a year and a half,

15:31:15  10   I was employed as his personal bodyguard.  And

15:31:31  11   then I was in charge of -- I was managing the

15:31:35  12   security services.  I was organizing not only

15:31:40  13   physical protection but the protection of the

15:31:43  14   territory of the facilities.

15:31:47  15        Q.   When you say "organizing physical

15:31:49  16   protection," would that include protection

15:31:52  17   for Leonid Teyf and his family?

15:32:04  18        A.   Yes.

15:32:05  19        Q.   How familiar are you with the

15:32:09  20   security for Mr. Teyf and his family over

15:32:12  21   the past decade?

15:32:29  22        A.   I was in charge of setting it up.

15:32:31  23        Q.   Is there anyone who would be more

15:32:33  24   familiar than you with Mr. Teyf's security?

15:32:44  25        A.   No.

15:32:45  1       Q.   While we're talking about security,

15:32:47  2   is it normal or usual for a businessperson like

15:32:56  3   Mr. Teyf to have personal security in Russia?

15:33:19  4       A.   Yes.  To a certain extent, it has to

15:33:23  5   do with image.

15:33:27  6       Q.   During the times that you have provided

15:33:30  7   Mr. Teyf security since 2005, have you always

15:33:34  8   been licensed in that field?

15:33:48  9       A.   Yes, indeed.

15:33:51  10      Q.   Do you know Dmitry Schiriy?

15:33:57  11      A.   Yes.

15:33:58  12      Q.   How do you know Mr. Schiriy?

15:34:14  13      A.   I don't remember how specifically

15:34:18  14  our acquaintance occurred.  But I recommended

15:34:21  15  him as a personal guard.  And I knew him as

15:34:26  16  an athlete.

15:34:29  17      Q.   Has Mr. Schiriy been involved in

15:34:34  18  providing personal protection or security

15:34:37  19  services for Leonid Teyf and his family?

15:34:52  20      A.   Yes.

15:34:52  21      Q.   About how long has Mr. Schiriy

15:34:55  22  done that?

15:35:17  23      A.   I remember until today.  The moment

15:35:22  24  I became a manager of the security services

15:35:26  25  and recommended him as a personal bodyguard,

| | | |
|---|---|---|
| 15:35:28 | 1 | he took this position and has been continuing |
| 15:35:35 | 2 | till today. |
| 15:35:36 | 3 | Q.   Why did you recommend Dmitry Schiriy |
| 15:35:40 | 4 | to serve as security or bodyguard for Leonid |
| 15:35:48 | 5 | Teyf and his family? |
| 15:36:00 | 6 | A.   My experience in this field and also |
| 15:36:16 | 7 | my training tell me that not everyone is fit |
| 15:36:21 | 8 | to do this kind of job in terms of character |
| 15:36:26 | 9 | and reliability.  And I myself have selected |
| 15:36:29 | 10 | him based on these criteria. |
| 15:36:35 | 11 | Q.   Do you know a man named Dmitry |
| 15:36:37 | 12 | Strogii? |
| 15:36:46 | 13 | A.   Yes.  This man worked under me. |
| 15:36:49 | 14 | Q.   When did -- |
| 15:36:49 | 15 | (The following section of colloquy |
| 15:36:49 | 16 | was not translated.) |
| 15:36:49 | 17 | MR. KELLHOFER:  We're going to object |
| 15:36:49 | 18 | at this point to the use of that name.  My |
| 15:36:55 | 19 | understanding is the defense counsel has chosen |
| 15:36:59 | 20 | not to use a pseudonym during these proceedings. |
| 15:37:02 | 21 | So I'll leave a standing objection to the use |
| 15:37:05 | 22 | of that individual's personal name. |
| 15:37:07 | 23 | MR. ALLEN:  Thank you, Mr. Kellhofer. |
| 15:37:11 | 24 | THE INTERPRETER:  Should I translate |
| 15:37:12 | 25 | that to the witness? |

15:37:13  1      MR. ALLEN:  As we have discussed, in

15:37:16  2  order to effectively represent and elicit testimony

15:37:23  3  by the govern -- in relation to the government's

15:37:26  4  witness and his claims, we need to be able to

15:37:30  5  use his names -- his name so that the witnesses

15:37:35  6  that we're examining here know who we're talking

15:37:39  7  about.

15:37:42  8      Q.   BY MR. ALLEN:  When did you meet Dmitry

15:37:44  9  Strogii?

15:37:56  10      A.   If I try to give you years, so that

15:37:58  11  would be 2008.  The name of the enterprise,

15:38:09  12  of the business was a security agency named

15:38:14  13  Alliance, where -- where I was a director.

15:38:23  14      Q.   Did Dmitry Strogii work at Alliance?

15:38:29  15      A.   Yes.  He was a security officer.

15:38:34  16      Q.   Was he assigned to a particular facility?

15:38:52  17      A.   The Alliance enterprise was in charge

15:38:55  18  of security of the tractor plant.  And he was

15:39:03  19  one of the hundred guards that were providing

15:39:08  20  the security.

15:39:13  21      Q.   You mentioned serving as a director.

15:39:16  22      What -- what were you director of

15:39:20  23  and for what company were you a director?

15:39:38  24      A.   Private -- a private security company,

15:39:41  25  Alliance.  A major machine-building Russian

15:39:57  1   company hired this security agency in order

15:40:01  2   to provide security to this specific facility.

15:40:06  3        Q.   You mentioned the word "chop."

15:40:07  4             What does that refer to?

15:40:17  5        A.   Private security company.

15:40:22  6        Q.   What were your duties with the private

15:40:25  7   security company as director?

15:40:43  8        A.   All the -- all the administrative matters,

15:40:48  9   as well of setting up the regime of the security

15:40:52 10   services provided.

15:40:53 11        Q.   During the time you were director and

15:40:58 12   Dmitry Strogii was working for the firm, did you

15:41:08 13   supervise or manage him?

15:41:19 14        A.   Yes.

15:41:20 15        Q.   If I understood you correctly, he was

15:41:24 16   assigned to a facility.  Tell us what that facility

15:41:27 17   was.

15:41:51 18        A.   When any security officer would start

15:41:58 19   a work shift, they were assigned a specific post

15:42:01 20   in the territory of the secured facility.  And

15:42:08 21   these could be gates or the post and internal

15:42:21 22   patrolling of the territory.

15:42:23 23        Q.   What was the name of the facility at

15:42:25 24   which Dmitry Strogii worked?

15:42:36 25        A.   The tractor plant territory.

15:42:40 1      Q.   And did you supervise him at the tractor

15:42:44 2  plant territory?

15:42:59 3      A.   Yes.  He was interviewed, and he was

15:43:01 4  hired as one of the security officers who provided

15:43:06 5  security to the facility.

15:43:09 6      Q.   At the tractor facility, did he provide

15:43:14 7  personal protection services?

15:43:22 8      A.   No.  No, no.

15:43:23 9      Q.   What did you observe about his

15:43:27 10 characteristics or performance at the tractor

15:43:31 11 factory?

15:43:58 12     A.   Well, performance, hard to say,

15:44:00 13 because performance was measured by the

15:44:03 14 apprehended offenders, by the number of

15:44:08 15 apprehended offenders.  And in his case,

15:44:21 16 the attitude was more negative, because he

15:44:24 17 was not trusted enough to be appointed to

15:44:27 18 a more responsible position.

15:44:29 19          I'd like to continue.

15:44:42 20          There was a suspicion that he was

15:44:50 21 cooperating with the people who were stealing.

15:44:53 22          MR. KELLHOFER:  I'm going to object

15:44:55 23 at this point.

15:44:58 24     Q.   BY MR. ALLEN:  And what was he suspected

15:45:00 25 of cooperating -- what type of product was he

15:45:05  1    suspected of cooperating and stealing?

15:45:19  2         A.   Nobody -- nobody caught him.  But

15:45:30  3    there was information that he was providing

15:45:34  4    details of -- that he was providing details

15:45:40  5    of where and how things are located in the

15:45:48  6    plant and he passed these details to those

15:45:54  7    people who were stealing.

15:45:58  8         Q.   Were there any other issues with

15:45:59  9    his job performance at the tractor factory

15:46:04  10   while you supervised him?

15:46:22  11        A.   Well, if -- if I try to characterize

15:46:25  12   this man, I'd say that he was not dependable.

15:46:29  13   He would come to work with the breath of alcohol --

15:46:33  14   with the alcohol on his breath.  Once, we had

15:46:45  15   to send him back home because he was unable

15:46:49  16   to perform his duty.  And he was arrogant and

15:47:00  17   two-faced.  This is a kind of brief -- a brief

15:47:10  18   characteristic.  But, in general, I -- I'd say

15:47:13  19   he's an unpleasant man.

15:47:16  20             He was trying to play his own game.

15:47:25  21   And he -- he -- he would try to sow some kind

15:47:34  22   of argument or collision between other workers.

15:47:37  23   More specifically, as we say it in Russian,

15:47:51  24   I wouldn't -- I wouldn't exactly go to battle

15:47:55  25   with this person.

15:47:56  1        Q.   Did you consider him trustworthy?

15:48:04  2        A.   No.  By no means.

15:48:07  3        Q.   Why didn't you fire him?

15:48:12  4        A.   Well, you have to understand how it

15:48:34  5   worked.  I had a hundred people working under

15:48:38  6   me.  So we knew about their characters.  And

15:48:44  7   I was in charge of making it work functionally.

15:48:49  8   I was not -- I was not into judging him on his

15:48:55  9   character.  That is to say, he was trusted with

15:49:06  10  what he could do.  He was assigned to posts with

15:49:10  11  not much responsibility.

15:49:12  12       Q.   Did you trust him with important

15:49:15  13  responsibilities?

15:49:21  14       A.   No.  No.  Only auxiliary positions

15:49:33  15  where he couldn't do a lot of damage.

15:49:38  16       Q.   After the time when you supervised

15:49:43  17  him at the tractor factory, did you supervise

15:49:47  18  him at any other facility, Dmitry Strogii?

15:50:06  19       A.   Yes.

15:50:08  20       Q.   Where?  What facilities?

15:50:18  21       A.   The city of Astrakhan.  The name

15:50:22  22  of the organization was Delta Plus.  There

15:50:33  23  I was in charge of the control service.  That

15:50:36  24  is to say, the same security service, just

15:50:40  25  a different name.

15:50:42  1        Q.   As -- while you were in charge of

15:50:44  2   the control service at Delta Plus, what type

15:50:51  3   of responsibilities did you have?

15:51:23  4        A.   It was the same duties, organization

15:51:26  5   of the security services and protection of

15:51:28  6   five facilities.  We had five facilities under

15:51:31  7   our care.  And I had 56 persons working under

15:51:35  8   me.  And providing personal protection also

15:51:37  9   was part of my duties.

15:51:45  10       Q.   You mentioned a town called Astrakhan.

15:51:47  11            Is that located in Russia?

15:51:57  12       A.   Yes, it's in Russia.  It's the Astrakhan

15:51:59  13  region near the Caspian Sea.

15:52:06  14       Q.   And is that very near Moscow?

15:52:09  15       A.   No.  It's about 1,500 kilometers from

15:52:14  16  Moscow.

15:52:16  17       Q.   You -- you mentioned the company Delta

15:52:19  18  Plus.

15:52:19  19            What type of business was it?  What

15:52:23  20  did it do?

15:52:43  21       A.   It was a fishing company.  It was

15:52:45  22  both fishing and fish processing, freezing

15:52:51  23  it, distributing it across Russia.  All --

15:52:55  24  everything connected with fish.

15:52:57  25       Q.   And how many facilities did it have

| | | |
|---|---|---|
| 15:52:59 | 1 | in Astrakhan? |
| 15:53:13 | 2 | A.   There were -- there were five facilities |
| 15:53:15 | 3 | in all.  And there was the central facilities -- |
| 15:53:19 | 4 | the -- the central facility.  And others were |
| 15:53:22 | 5 | at a distance of about 80 kilometers from it |
| 15:53:24 | 6 | or 50 kilometers from it.  So it was a pretty |
| 15:53:28 | 7 | large area. |
| 15:53:28 | 8 | Q.   Did you supervise security services |
| 15:53:30 | 9 | for all of those facilities? |
| 15:53:38 | 10 | A.   Yes.  I was -- I was in charge.  I |
| 15:53:46 | 11 | determined the regime of the security services |
| 15:53:49 | 12 | and the amount of people assigned to each facility. |
| 15:53:52 | 13 | Q.   When you speak of "security services," |
| 15:53:54 | 14 | did that involve securing the perimeter of the |
| 15:54:01 | 15 | plants? |
| 15:54:10 | 16 | A.   Including, yes.  That's included. |
| 15:54:11 | 17 | This is the major part of our duties. |
| 15:54:24 | 18 | Also, fish is the raw material from |
| 15:54:27 | 19 | which you get the product and you sell it and |
| 15:54:29 | 20 | you earn money.  So this was Leonid Teyf's |
| 15:54:35 | 21 | business. |
| 15:54:35 | 22 | Q.   And was there a concern about making |
| 15:54:37 | 23 | sure that the facilities at which the fish were |
| 15:54:41 | 24 | processed were secure? |
| 15:55:29 | 25 | A.   There are always concerns, because |

| | | |
|---|---|---|
| 15:55:30 | 1 | there are always drawbacks.  Sometimes equipment |
| 15:55:35 | 2 | is lacking.  Sometimes you need to buy some extra |
| 15:55:38 | 3 | wire and build another fence.  Because you have |
| 15:55:41 | 4 | to do a lot of work to provide proper security |
| 15:55:45 | 5 | for those facilities. |
| 15:55:47 | 6 | Q.   Now, you mentioned Leonid Teyf's name |
| 15:55:50 | 7 | in relation to Delta Plus? |
| 15:56:03 | 8 | A.   Yes.  This is the company where I was |
| 15:56:05 | 9 | in charge of the control department. |
| 15:56:07 | 10 | Q.   What was Leonid Teyf's connection to |
| 15:56:09 | 11 | Delta Plus? |
| 15:56:18 | 12 | A.   He was the head of this company for |
| 15:56:20 | 13 | a while. |
| 15:56:23 | 14 | Q.   Was -- we've been speaking of Dmitry |
| 15:56:26 | 15 | Strogii. |
| 15:56:26 | 16 | Was he assigned to a facility at Delta |
| 15:56:34 | 17 | Plus while you were in charge of security? |
| 15:57:15 | 18 | A.   There were several facilities in Delta |
| 15:57:17 | 19 | Plus company.  And he was in charge of providing |
| 15:57:22 | 20 | the security personnel with uniform at first. |
| 15:57:25 | 21 | And then he would buy office supplies, |
| 15:57:29 | 22 | like pens and paper, for the facilities.  And -- |
| 15:57:31 | 23 | and he did other -- he would buy logs, et cetera. |
| 15:57:38 | 24 | He did other logistical stuff, because he was |
| 15:57:42 | 25 | not really suitable for working as a guard. |

15:57:46  1       Q.   During the time you supervised him

15:57:48  2   at Delta Plus, did he ever provide personal

15:57:51  3   security or bodyguard services for Leonid

15:57:55  4   Teyf or his family?

15:58:25  5       A.   I don't understand where you could

15:58:25  6   get this information.  Because I was the one

15:58:28  7   in charge of -- in charge of assigning guards

15:58:34  8   to their duties.  And this person's name couldn't

15:58:38  9   be even close to the list of people who were

15:58:41 10   assigned personal guard duties.

15:58:44 11       Q.   Why is that?

15:59:01 12       A.   I knew him since the time when he

15:59:04 13   worked in the tractor factory.  And this is

15:59:08 14   a person who was untrustworthy.  So he was

15:59:13 15   not suitable for the job either physically

15:59:16 16   or in his -- or emotionally or in his character.

15:59:20 17   And that is why his -- his candidacy was not

15:59:25 18   even discussed.

15:59:26 19       Q.   You mentioned the tractor factory.

15:59:27 20            During his time under your supervision

15:59:33 21   at the tractor factory, did he ever provide

15:59:38 22   personal security or bodyguard services for

15:59:41 23   Leonid Teyf or his family?

16:00:26 24       A.   These are two different places, two

16:00:29 25   different jobs, different organizations.

16:00:32  1          While I was the head of security for

16:00:34  2   Leonid Teyf, this job actually allowed me to

16:00:39  3   work in another place as well, to be the head

16:00:42  4   of security at a different place, where I got

16:00:45  5   to know Strogii.  But I was there for about half

16:00:51  6   a year as a -- as a head of security.  And then

16:00:54  7   I continued to work as the head of security for

16:00:57  8   Leonid Teyf.

16:01:00  9          Q.   In your capacity as head of security

16:01:05  10  for Leonid Teyf, can you tell me whether this

16:01:09  11  man about whom we've been speaking ever provided

16:01:13  12  security or bodyguard or any other kind of personal

16:01:18  13  protection services for Leonid Teyf or his family?

16:01:55  14         A.   No.  This is out of the question.  He

16:01:57  15  was never even a candidate for the job because

16:02:00  16  of his personal characteristics.

16:02:03  17         Q.   If this man -- let me pause for a

16:02:07  18  moment.

16:02:07  19         You understand we've been speaking

16:02:10  20  about Dmitry Strogii; correct?

16:02:15  21         A.   Yes.

16:02:18  22         Q.   If this man claims that he provided

16:02:21  23  security for Leonid Teyf, what -- what would

16:02:31  24  you say about that?

16:02:41  25         A.   Dmitry Schiriy or Dmitry Strogii?

| | | |
|---|---|---|
| 16:02:42 | 1 | Q.   Dmitry Strogii. |
| 16:02:48 | 2 | A.   It's a lie.  He's a -- he -- he is |
| 16:03:02 | 3 | a two-faced person, a liar.  And I -- I don't |
| 16:03:05 | 4 | understand why he's doing this, why he's trying |
| 16:03:08 | 5 | to put himself in this light. |
| 16:03:09 | 6 | MR. KELLHOFER:  (Not translated.)  I'm |
| 16:03:09 | 7 | going to object to the characterization. |
| 16:03:16 | 8 | Q.   BY MR. ALLEN:  Would you have trusted |
| 16:03:17 | 9 | him to -- at any point to have provided security |
| 16:03:20 | 10 | for Leonid Teyf or his family? |
| 16:03:31 | 11 | A.   No.  That is out of the question. |
| 16:03:33 | 12 | Q.   Who besides you did provide personal |
| 16:03:38 | 13 | security or bodyguard services for Leonid Teyf |
| 16:03:40 | 14 | and his family? |
| 16:04:40 | 15 | A.   When I got to know Leonid Teyf, I |
| 16:04:44 | 16 | worked in a company called Volga Ros Bezopasnost |
| 16:04:45 | 17 | Schit.  And this is the company that provided |
| 16:04:55 | 18 | security and protection services.  And this |
| 16:05:00 | 19 | is how I started providing personal protection |
| 16:05:05 | 20 | for Leonid Teyf together with Roman Nicolaev. |
| 16:05:09 | 21 | And then later, when I became head of |
| 16:05:13 | 22 | security services for Leonid Teyf, I recommended |
| 16:05:19 | 23 | Dmitry Schiriy to take my place.  And since then, |
| 16:05:21 | 24 | he has taken those duties.  Because a businessman -- |
| 16:05:24 | 25 | a person who can make money should have a bodyguard |

| | | |
|---|---|---|
| 16:05:29 | 1 | beside him. |
| 16:05:30 | 2 | Q. Since 2009, who has primarily provided |
| 16:05:35 | 3 | personal security services for Leonid Teyf and |
| 16:05:37 | 4 | his family? |
| 16:05:50 | 5 | A. Schiriy. |
| 16:05:51 | 6 | Q. Again, back to Dmitry Strogii. |
| 16:05:56 | 7 | Since 2009, when Dmitry Schiriy began |
| 16:06:02 | 8 | providing personal security services for Leonid |
| 16:06:11 | 9 | Teyf and his family, has Dmitry Strogii ever |
| 16:06:19 | 10 | provided such services, personal security or |
| 16:06:22 | 11 | bodyguard services, for Leonid Teyf? |
| 16:06:34 | 12 | A. No. I'm surprised that you repeat |
| 16:06:46 | 13 | this question. Because this man was not ever |
| 16:06:49 | 14 | even considered as a candidate for this job. |
| 16:06:52 | 15 | Q. Did you hire this man, Dmitry Strogii, |
| 16:06:56 | 16 | to work at Delta Plus? |
| 16:07:06 | 17 | A. No. |
| 16:07:07 | 18 | Q. What was your reaction at seeing him |
| 16:07:11 | 19 | or learning him -- learning that he was working |
| 16:07:13 | 20 | at Delta Plus? |
| 16:07:51 | 21 | A. My first reaction was wondering who |
| 16:07:54 | 22 | could bring him to work in this place, who could |
| 16:07:58 | 23 | recommend him. But, of course, I didn't ask him |
| 16:08:01 | 24 | directly. It wouldn't be the right thing to do. |
| 16:08:03 | 25 | So later, during conversations with other people, |

16:08:06 1 I learned how it happened.  But I never asked

16:08:10 2 him a direct question.

16:08:12 3     Q.   Thank you for your time, Mr. Grigorov.

16:08:18 4 Just a couple of final questions.

16:08:26 5     A.   Yes, of course.

16:08:29 6     Q.   There's a trial of Leonid Teyf coming

16:08:31 7 up in the United States.

16:08:34 8          Are you presently willing to come

16:08:41 9 to the United States to testify at that trial?

16:08:55 10     A.   No, I'm not ready.  And I can tell

16:08:57 11 you why.

16:08:58 12     Q.   Why is that?

16:09:24 13     A.    I think that the situation itself

16:09:26 14 is very unfair towards my former employer.

16:09:29 15 And I don't trust the government of the United

16:09:33 16 States not to put me in a similar situation.

16:09:37 17          MR. ALLEN:  Again, thank you,

16:09:40 18 Mr. Grigorov.

16:09:41 19          Counsel -- other counsel may have

16:09:46 20 some questions for you.  Those are all of my

16:09:49 21 questions at this time.

16:09:50 22          THE WITNESS:  Yes, of course.  I'm

16:09:59 23 ready to answer.

16:09:59 24          (The following section of colloquy

16:09:59 25          was not translated.)

16:09:59  1      MR. KELLHOFER:  If I could -- I believe,

16:10:05  2  Mr. Long, you don't have video; correct?

16:10:14  3      MR. LONG:  That's correct.

16:10:14  4      MR. KELLHOFER:  All right.  This

16:10:15  5  program -- I'm a little new to it myself.  But

16:10:18  6  every time a noise is made from an individual,

16:10:20  7  the camera shifts there.  Do you have the ability

16:10:24  8  to maybe mute?  I think on this program, at the

16:10:26  9  bottom left, there's a mute for your side.

16:10:39  10      MR. LONG:  I -- I don't see it.  But

16:10:41  11  I'm going to get my -- one of my IT people to

16:10:43  12  come in.

16:10:45  13      MR. KELLHOFER:  Okay.  I think it's

16:10:46  14  just on the laptop.  If you scroll -- if you

16:10:50  15  just move the mouse down on it, it pops up.

16:10:53  16  And on the far left, there should be a mute

16:10:54  17  button.

16:10:54  18      MR. LONG:  Well, wait a minute.  Wait

16:10:54  19  a minute.  Wait a minute.  I see it.  I see it.

16:10:54  20      THE COURT REPORTER:  Do you want to

16:10:54  21  go off the record for a minute?

16:10:54  22      MR. WOLF:  (Indicating.)

16:10:54  23      THE COURT REPORTER:  No?  Okay.

16:10:54  24      MR. KELLHOFER:  No.  I think we just

16:10:54  25  got it.  Yep.  I was having the same problem

| | | |
|---|---|---|
| 16:10:54 | 1 | myself earlier.  So no problem.  All right. |
| 16:11:07 | 2 | Fantastic.  All right.  We'll begin. |
| 16:11:10 | 3 | |
| 16:11:10 | 4 | EXAMINATION |
| 16:11:10 | 5 | BY MR. KELLHOFER: |
| 16:11:10 | 6 | Q.   Good morning, sir.  Or, I guess, |
| 16:11:12 | 7 | good afternoon for you; correct? |
| 16:11:19 | 8 | A.   Good afternoon. |
| 16:11:22 | 9 | Q.   Now, before I ask a few questions -- |
| 16:11:26 | 10 | before I ask a few questions, I've -- I've |
| 16:11:34 | 11 | got a request of you. |
| 16:11:35 | 12 | You were asked about a Mr. Strogii; |
| 16:11:39 | 13 | correct? |
| 16:11:47 | 14 | A.   Yes.  Exactly. |
| 16:11:50 | 15 | Q.   All right.  Now, I'm going to ask |
| 16:11:53 | 16 | that, when I refer to him, I'm going to use |
| 16:11:57 | 17 | the name "Eclipse." |
| 16:11:57 | 18 | And is that something that you think |
| 16:12:00 | 19 | you could follow? |
| 16:12:21 | 20 | MR. ALLEN:  (Not translated.)  Objection, |
| 16:12:21 | 21 | for the reasons previously stated.  I don't believe |
| 16:12:27 | 22 | it's fair to the witness or to the defendant in |
| 16:12:32 | 23 | the effective representation and presentation |
| 16:12:38 | 24 | of his defense. |
| 16:12:45 | 25 | Q.   BY MR. KELLHOFER:  I'm waiting for |

| | | |
|---|---|---|
| 16:12:46 | 1 | an answer whether or not that's something that |
| 16:12:49 | 2 | Mr. Grigorov understands, if I use the term |
| 16:12:51 | 3 | "Eclipse" to reference Mr. Strogii. |
| 16:13:23 | 4 | A. I would prefer if you used his name. |
| 16:13:26 | 5 | Because Mr. Strogii is somebody I know, somebody |
| 16:13:30 | 6 | I can characterize. And if you use some code |
| 16:13:35 | 7 | name, I may get confused and not understand |
| 16:13:38 | 8 | what you're talking about at first. |
| 16:13:41 | 9 | Q. Okay. So I want to be clear. |
| 16:13:42 | 10 | It's too confusing for you to know |
| 16:13:45 | 11 | that "Eclipse" means Mr. Strogii? That's too |
| 16:13:48 | 12 | confusing for you? |
| 16:13:51 | 13 | MR. ALLEN: (Not translated.) Object |
| 16:13:52 | 14 | to form. |
| 16:14:32 | 15 | THE WITNESS: It will not be too |
| 16:14:34 | 16 | confusing. But still it will make me pause |
| 16:14:38 | 17 | for a while and try to understand what relation |
| 16:14:40 | 18 | this name has to me. Because the name Eclipse |
| 16:14:44 | 19 | doesn't speak to me. It doesn't say anything |
| 16:14:47 | 20 | to me. Whereas, if I use the name of the person, |
| 16:14:50 | 21 | this is a person I know. So I can give you a |
| 16:14:52 | 22 | direct answer. I want everything to be as direct |
| 16:14:54 | 23 | and straight -- straightforward as possible. |
| 16:14:56 | 24 | Q. BY MR. KELLHOFER: Okay. So you can't -- |
| 16:14:58 | 25 | you -- you would be -- I'm just asking, "yes" |

16:15:01  1    or "no," it would be too confusing for you to

16:15:05  2    understand that "Eclipse" means Mr. Strogii?

16:15:07  3              If that's too confusing for you, I'll

16:15:11  4    continue the conversation.

16:15:13  5              (The following section of colloquy

16:15:13  6         was not translated.)

16:15:13  7              MR. ALLEN:  Objection.  Again, the

16:15:14  8    witness has answered your question.

16:15:15  9              MR. KELLHOFER:  It's a "yes" or "no"

16:15:15 10    question.

16:15:17 11              MR. ALLEN:  No.  You're now arguing

16:15:19 12    with him.  He's answered your question.  Again,

16:15:23 13    I think he's explained quite thoroughly his

16:15:27 14    answer about that.

16:15:27 15              THE WITNESS:  I don't think I need

16:15:51 16    to answer it again.

16:15:53 17         Q.  BY MR. KELLHOFER:  Well, I do.  It's

16:15:53 18    a "yes" or "no."  It either is too confusing

16:15:58 19    or it is not.

16:15:59 20              Can you please answer that, sir?

16:16:06 21              MR. ALLEN:  Madam Translator, pause

16:16:07 22    one second so that I may record for the record

16:16:11 23    another objection to this continued line of

16:16:16 24    questioning.

16:16:18 25              You may proceed.

30

| | | |
|---|---|---|
| 16:17:01 | 1 | THE WITNESS: Again, I would like |
| 16:17:01 | 2 | to repeat that I just want everything to be |
| 16:17:04 | 3 | straightforward. There is a name with which |
| 16:17:06 | 4 | I can associate questions and answers. And |
| 16:17:09 | 5 | when you ask me again, it seems to me like |
| 16:17:13 | 6 | you are demanding that I acknowledge I am an |
| 16:17:15 | 7 | idiot who cannot recognize one name as standing |
| 16:17:16 | 8 | for the other. |
| 16:17:16 | 9 | I'm not an idiot. I can understand |
| 16:17:20 | 10 | that one name can stand for the other. But I |
| 16:17:22 | 11 | would like everything to remain straightforward. |
| 16:17:24 | 12 | I would like to call this person by the name |
| 16:17:27 | 13 | I know him, Dmitry Strogii, because this is |
| 16:17:30 | 14 | the name that -- that is related to the story. |
| 16:17:35 | 15 | Q. BY MR. KELLHOFER: Yeah. So great. |
| 16:17:36 | 16 | Perfect, then. I'll use the name "Eclipse," |
| 16:17:39 | 17 | and you use the name "Strogii." Okay? |
| 16:17:42 | 18 | MR. ALLEN: (Not translated.) Same |
| 16:17:42 | 19 | objection. Move to strike. |
| 16:17:52 | 20 | THE WITNESS: Okay. I cannot object |
| 16:17:53 | 21 | to that. |
| 16:17:55 | 22 | Q. BY MR. KELLHOFER: Great. Well, let |
| 16:17:58 | 23 | me ask you, sir. |
| 16:17:59 | 24 | I mean, you've -- you've taken vacations |
| 16:18:04 | 25 | outside of Russia; correct? |

16:18:15   1      A.    No.

16:18:17   2      Q.    You've never been outside of Russia

16:18:19   3   other than today?

16:18:25   4      A.    I have been outside of Russia but not

16:18:27   5   on vacation.

16:18:28   6      Q.    Okay.   So you've been outside of Russia.

16:18:31   7         Was that for work?

16:18:38   8      A.    Yes.   It was connected to work.

16:18:39   9      Q.    Okay.   What kind of -- can you just

16:18:42   10   tell me some of the locations you've been to

16:18:45   11   outside of Russia?

16:18:50   12      A.    Switzerland.

16:18:54   13      Q.    Anywhere else?

16:18:56   14      A.    No.   I haven't been anywhere else.

16:18:58   15      Q.    Okay. All right.   Well, I guess,

16:18:59   16   other than you've -- you've now been to Israel;

16:19:04   17   correct?

16:19:04   18      A.    Yes.   That's right.

16:19:09   19      Q.    Okay. All right.

16:19:11   20      A.    Yes.   It's sad, but it's true.

16:19:13   21      Q.    Okay.   So those are the only two

16:19:16   22   countries you've been to outside of Russia?

16:19:23   23      A.    Yes.

16:19:25   24      Q.    All right.   And how did you get to

16:19:28   25   Israel today?   You're -- you're there, obviously,

16:19:30  1   today.

16:19:30  2            How'd you get there?

16:20:00  3        A.   I came here to give testimony because

16:20:04  4   I was asked to come here by lawyers to testify.

16:20:08  5        Q.   Okay.  That's -- that -- that's why

16:20:10  6   you came.  I'm asking "how"?

16:20:12  7            You -- you -- you -- I imagine you

16:20:15  8   didn't drive.

16:20:25  9        A.   I bought a plane ticket.  I came

16:20:28  10  by plane.  Then from the airport to the hotel.

16:20:30  11  And here I am.

16:20:32  12       Q.   Okay.  So you were -- no problems

16:20:34  13  getting to the airport there in Russia?

16:20:43  14       A.   No problems at all.

16:20:45  15       Q.   Okay.  And when you then flew, did

16:20:48  16  you use a personal identification?

16:21:01  17       A.   Yes.  A passport, of course.

16:21:04  18       Q.   Okay.  So you have a -- you have a

16:21:06  19  passport, and you're able to use it; correct?

16:21:09  20       A.   Yes.

16:21:12  21       Q.   All right.  And does it have your

16:21:14  22  photograph on it, I imagine?

16:21:21  23       A.   Yes.  I can even show it to you.

16:21:23  24       Q.   Okay.  Yeah.  I -- actually, I would

16:21:26  25  ask that -- that that happen.

```
16:21:27   1              (The following section of colloquy
16:21:27   2          was not translated.)
16:21:28   3              MR. ALLEN:  May I ask why it's necessary
16:21:30   4   to see the witness' --
16:21:32   5              MR. KELLHOFER:  I don't --
16:21:32   6              MR. ALLEN:  -- passport?
16:21:32   7              MR. KELLHOFER:  You know, I have no
16:21:35   8   idea who this person is or the ability to verify --
16:21:38   9   or, actually, I'm doing that right now.
16:21:41  10              MR. ALLEN:  Well, I can represent to
16:21:43  11   you that he is who he says he is.  I can also
16:21:48  12   ask the court reporter to verify his identity
16:21:52  13   from his passport, which is the customary --
16:21:54  14              MR. KELLHOFER:  That's what --
16:21:54  15              MR. ALLEN:  -- way to --
16:21:54  16              MR. KELLHOFER:  -- I'm asking for --
16:21:59  17              MR. ALLEN:  -- do this.
16:21:59  18              MR. KELLHOFER:  -- right now.
16:21:59  19              MR. ALLEN:  So --
16:21:59  20              MR. KELLHOFER:  That's --
16:21:59  21              MR. ALLEN:  -- Madam --
16:21:59  22              MR. KELLHOFER:  -- what I'm asking
16:21:59  23   for at the moment.
16:22:01  24              MR. ALLEN:  Madam Court Reporter,
16:22:01  25   would you verify the witness' identity from
```

16:22:06  1  his passport?

16:22:06  2          THE WITNESS:  I'll remove the mike

16:22:24  3  for a minute.

16:22:26  4          THE COURT REPORTER:  One moment.

16:22:26  5          (The witness handed his passport

16:22:26  6      to the court reporter for verification.)

16:22:26  7          THE COURT REPORTER:  (Examining.)

16:22:26  8  Okay.  Yes, the passport matches the person

16:22:26  9  that's sitting in the room with us, Mr. Nicolay

16:22:26 10  Grigorov.

16:22:26 11          (The court reporter returned the

16:22:26 12      passport to the witness.)

16:23:09 13      Q.   BY MR. KELLHOFER:  Thank you so much,

16:23:10 14  sir.

16:23:11 15          Now, when you arrived in Israel there,

16:23:13 16  when was that?

16:23:20 17      A.   On the 24th.

16:23:21 18      Q.   Okay.  So approximately three days ago;

16:23:26 19  correct?

16:23:26 20      A.   Yes, indeed.

16:23:31 21      Q.   All right.  And do you have a return

16:23:34 22  flight, that you're intending to leave at some

16:23:37 23  point?

16:23:41 24      A.   Yes, of course.

16:23:42 25      Q.   Okay.  And when -- and when is that?

16:23:48  1      A.   Tomorrow.

16:23:51  2      Q.   Okay.  So the time frame, then, that

16:23:55  3  you've -- you've -- you've been there and that --

16:23:56  4  that you are there intending to stay -- have you

16:24:00  5  been staying at a hotel?

16:24:12  6      A.   Yes.  At the Hilton.

16:24:19  7      Q.   All right.  And how much did the flight

16:24:21  8  cost?

16:24:34  9      A.   I can't say, because it was booked by

16:24:37  10  another person on my behalf.

16:24:39  11      Q.   Okay.  And -- and who did that on your

16:24:43  12  behalf?

16:24:48  13      A.   A friend of mine.

16:24:50  14      Q.   Okay.

16:24:54  15      A.   I'm not very good at booking via

16:24:59  16  a mobile phone.  So this is how it happened.

16:25:05  17      Q.   I understand.

16:25:13  18           What about the hotel, how much does

16:25:14  19  that cost?

16:25:30  20      A.   I -- I have a paper, and it's written

16:25:34  21  there.  And it's not written in Russian.  So

16:25:36  22  I wouldn't be able to give you a precise figure.

16:25:43  23      Q.   Okay.  Do you know roughly how much?

16:25:54  24      A.   I can verify it.  Anyhow, this is

16:26:03  25  not a financial challenge.  When I was asked

16:26:15　1　to come in, I considered it my duty to be

16:26:23　2　present here.  And that's why I paid for

16:26:25　3　everything.  I have been earning quite well.

16:26:42　4　In addition to my security consultancy, which

16:26:48　5　is a well-paid job, I also am a small business

16:26:54　6　owner.

16:26:59　7　　　　Q.  So when I asked who paid for the

16:27:02　8　flight, you didn't seem to answer.

16:27:07　9　　　　　　But your answer now is that you've

16:27:10　10　paid for everything?

16:27:29　11　　　　A.  I've said that I'm not very good

16:27:31　12　at using the mobile phone.  I use it only to --

16:27:35　13　making telephone calls.  I don't know how to

16:27:38　14　use the Skype, for example.  I only use the

16:27:51　15　mobile for telephone calls or perhaps to take

16:27:54　16　some pictures.

16:27:55　17　　　　　　And all the rest, for example, to

16:27:57　18　book a flight or a hotel room, I am not able

16:28:01　19　to do that.  And that is why I ask my friends

16:28:16　20　to do it on my behalf, to import all the

16:28:20　21　details, to transfer all the money.  And

16:28:22　22　here I am.

16:28:29　23　　　　Q.  Yeah.  Yeah.  Not to be confusing

16:28:31　24　or -- I'm not -- I'm not trying to trick you.

16:28:34　25　　　　　　What I'm asking is:  Whose money is

16:28:37  1  paying for the flight?  Whose money is paying

16:28:39  2  for the lodging?

16:28:54  3      A.   It's my money.  It's my money.  I've

16:29:05  4  been earning well enough.  But, technically,

16:29:09  5  it's difficult -- I'm unable to book either

16:29:17  6  a flight or a hotel room.

16:29:20  7      Q.   Okay.  Is it your understanding that

16:29:26  8  you'll be reimbursed these costs?

16:29:44  9      A.   I don't need to be refunded, because

16:29:47  10  these -- because of helping a person whom I

16:29:52  11  think I need to help.  That is why -- that is

16:30:08  12  why I don't expect any financial compensation.

16:30:12  13  I'm here to help.

16:30:16  14      Q.   So you have -- you have not been told

16:30:19  15  you'll be reimbursed these costs?

16:30:34  16      A.   I don't quite understand your question.

16:30:35  17  I'm a fully independent person.

16:30:38  18          Should I expect somebody to reimburse

16:30:41  19  me my costs if I make a decision to come?  This

16:30:51  20  is my money, and I spend it the way I want to.

16:30:59  21      Q.   My question is just this:  Were you

16:31:01  22  told that you would be reimbursed for these

16:31:06  23  costs by Mr. Teyf or Mr. Teyf's counsel or

16:31:10  24  somebody else from the government?  Anyone?

16:31:46  25      A.   I understood the question.  I just

16:31:48  1    don't understand why are you keeping asking

16:31:50  2    it.  I think I've already answered that I came

16:31:57  3    here to help my former employer and someone --

16:32:01  4    someone I -- I'm considering a friend.

16:32:07  5         Q.   It's a simple question, sir.

16:32:08  6              Were you told -- "yes" or "no" --

16:32:10  7    you would be reimbursed?  That's all I'm

16:32:14  8    asking.

16:32:14  9              MR. ALLEN:  (Not translated.)

16:32:14  10   Objection.  Asked and answered about four

16:32:18  11   times.

16:32:18  12        Q.   BY MR. KELLHOFER:  Waiting for

16:32:18  13   [audio fades] --

16:32:32  14        A.   No.

16:32:34  15        Q.   Thank you.

16:32:35  16             All right.  You presently do work.

16:32:40  17   And, as you said, you are financially sound?

16:32:49  18        A.   Yes.

16:32:51  19        Q.   And you were able to -- did you

16:32:54  20   take time away from work, or is it vacation

16:32:58  21   time, to come to Israel today?

16:33:45  22        A.   At one of my -- one of my capacities --

16:33:48  23   one of my positions when I am -- were I'm a

16:33:51  24   director, since I'm a director, I don't need

16:33:56  25   to draw funds from the company from -- for my

16:34:00  1  trips.  So I just inform that I'll be taking

16:34:03  2  a couple of days for my personal vacation.

16:34:22  3          And my other job is just a hobby.

16:34:26  4  I like making furniture, simple furniture,

16:34:29  5  like kitchen or kitchen tables for private

16:34:33  6  people.  And I don't need to be there.  When

16:34:41  7  I leave, my helpers -- there are people who

16:34:45  8  help me there.  So they continue working.  So

16:34:51  9  that's -- it's -- I'm quite free in my movements.

16:34:59 10      Q.  All right.  And you -- you have some

16:35:02 11  familiarity with the concept of criminal trials;

16:35:07 12  correct?

16:35:09 13          MR. ALLEN:  (Not translated.)  Object

16:35:12 14  to form.

16:35:18 15          THE WITNESS:  No.

16:35:22 16      Q.  BY MR. KELLHOFER:  So in your law

16:35:24 17  enforcement capacity, you had no training as

16:35:27 18  to what's involved in a criminal trial?

16:35:32 19          (The following section of colloquy

16:35:32 20      was not translated.)

16:35:44 21          MR. ALLEN:  Objection.  Do you mean

16:35:45 22  in the United States or Russia?

16:35:48 23          MR. KELLHOFER:  He can answer it as

16:35:51 24  he chooses.

16:35:53 25          MR. ALLEN:  Then object.  It's not

| | | |
|---|---|---|
| 16:35:54 | 1 | clear even to me what your question is asking. |
| 16:36:02 | 2 | MR. KELLHOFER: I'll wait for the |
| 16:36:02 | 3 | witness to answer. |
| 16:36:19 | 4 | THE WITNESS: I -- my background |
| 16:36:30 | 5 | is martial arts. And this is a physical |
| 16:36:36 | 6 | thing. Not physical in the sense of Einstein, |
| 16:36:39 | 7 | but physical in the sense of pushing somebody |
| 16:36:43 | 8 | away or protect somebody with your own chest. |
| 16:36:47 | 9 | So this is what I was trained to do rather |
| 16:36:50 | 10 | than provided information about criminal |
| 16:36:53 | 11 | procedures. |
| 16:36:57 | 12 | Q. BY MR. KELLHOFER: Okay. Do you |
| 16:36:59 | 13 | understand what the term "defendant" means? |
| 16:37:15 | 14 | A. I understand that, if you're asked |
| 16:37:16 | 15 | a question, you need to answer. |
| 16:37:18 | 16 | Q. Okay. Do you understand that people |
| 16:37:22 | 17 | can be charged with crimes by a government? |
| 16:37:35 | 18 | A. Yes, of course. |
| 16:37:38 | 19 | Q. Okay. |
| 16:37:40 | 20 | A. Well, I was connected to a law -- |
| 16:37:41 | 21 | to the law enforcement organization. |
| 16:37:49 | 22 | Q. And that individual charged with |
| 16:37:52 | 23 | an offense is called a "defendant." |
| 16:37:54 | 24 | You understand that? |
| 16:38:08 | 25 | A. When a state does it? |

16:38:10  1          (The following section of colloquy

16:38:10  2       was not translated.)

16:38:10  3          MR. ALLEN:  Again, objection.  Which

16:38:13  4  country are you asking about?

16:38:22  5          MR. KELLHOFER:  Is there -- is there

16:38:22  6  an answer by the -- by the witness?

16:38:26  7          MR. ALLEN:  I believe he did answer.

16:38:27  8     Q.   BY MR. KELLHOFER:  So do you understand

16:38:35  9  that, when a state charges an individual with

16:38:37  10  an offense, that that term of that person is

16:38:41  11  called a "defendant"?

16:38:41  12          Do you understand that?

16:39:00  13     A.   Now I know that.  Now that you've

16:39:02  14  told me, I'll know.

16:39:11  15     Q.   Okay.

16:39:11  16     A.   In general, it didn't have to do

16:39:13  17  anything with my line of work.

16:39:15  18     Q.   Okay.  So do you understand Mr. Teyf

16:39:22  19  is a defendant in the United States because

16:39:25  20  he has been charged with criminal offenses

16:39:27  21  in the United States?

16:39:50  22     A.   I do understand this.  And that

16:39:53  23  is why I'm here.

16:39:57  24     Q.   And you're here because, as you

16:39:59  25  stated, you believe it your duty?

16:40:10  1          A.   Yes.  It's a human -- it's a human

16:40:12  2    duty to demonstrate what I know about the

16:40:21  3    questions I was asked in order to help this

16:40:24  4    person.  And I hope that this will be of help.

16:40:34  5          Q.   All right.  And just to be clear, you

16:40:37  6    have the ability to leave work for a reasonable

16:40:41  7    period of time?

16:40:42  8          A.   Yes.  I -- I'm the one who sets my own

16:41:01  9    work schedule.

16:41:02  10               (Comment in Russian.)

16:41:03  11         Q.   (Not translated.)  And you have access

16:41:07  12   to an international trans -- airport?

16:41:10  13               MR. ALLEN:  (Not translated.)  Pause

16:41:10  14   one second and let the witness finish answering,

16:41:13  15   please.

16:41:14  16               MR. KELLHOFER:  (Not translated.)

16:41:14  17   I -- I didn't -- I'm sorry.  I've got a little

16:41:17  18   bit of a glitch here off and on.  I didn't

16:41:20  19   realize he was continuing on.

16:41:22  20               Please.

16:41:22  21               THE WITNESS:  I'm my own boss, just

16:41:35  22   to make you better understand.

16:41:38  23               (Comment in Russian.)

16:41:42  24         Q.   BY MR. KELLHOFER:  But, sir, maybe

16:41:43  25   I can just stop you there.

16:41:45 1          The -- the question was simply a "yes"

16:41:47 2 or "no."  You have the ability to leave work for

16:41:50 3 a reasonable period of time?

16:41:51 4          I believe the answer is "yes."  Is that

16:41:53 5 correct?

16:41:53 6     A.   Since the question was repeated several

16:42:28 7 times, I just would like to say that not only

16:42:32 8 reasonable, but even for an extended period of

16:42:35 9 time.  I am my own boss.  But I told you that

16:42:39 10 I have a return ticket and I'll be returning

16:42:42 11 home tomorrow.

16:42:47 12     Q.   I understand.  Thank you.

16:42:48 13          You also have access to an international

16:42:51 14 airport; correct?

16:42:51 15     A.   Yes.  Yes.

16:43:02 16          (Comment in Russian.)

16:43:04 17     Q.   All right.  And you -- your passport,

16:43:05 18 you're able to travel on that?

16:43:24 19     A.   I have an internal ID which I need

16:43:28 20 for internal purposes in Russia.  And I have

16:43:31 21 a passport which allows me to both exit and

16:43:37 22 enter Russia back.

16:43:41 23     Q.   And that document is valid through

16:43:44 24 March of 2020?

16:44:02 25     A.   The passport is issued for a period

16:44:05  1   of five years.  And within this period, I can

16:44:25  2   apply for visas and travel to wherever I want.

16:44:29  3   For example, the Schengen visa allows me to

16:44:35  4   visit the Schengen area.  The question is

16:44:38  5   whether I need to.  I can take any trip I

16:44:56  6   want.  Sometimes there are limitation imposed

16:45:00  7   on those persons who have debts, and they

16:45:04  8   cannot leave the country.  I have no debts

16:45:07  9   at all.  So this is not a problem to me.  I

16:45:09  10  can travel freely.

16:45:15  11       Q.   So my question was:  Is your passport

16:45:20  12  valid through March of 2020?

16:45:21  13            Is that a "yes" or a "no," please?

16:45:34  14       A.   Yes.

16:45:39  15       Q.   Have you -- when you were first

16:45:42  16  questioned about traveling to the United

16:45:46  17  States to testify, were you told that your

16:45:51  18  flight costs would be taken care of by the

16:45:56  19  United States government?

16:46:15  20       A.   I wasn't going to go there.

16:46:19  21       Q.   That's not my question.

16:46:22  22       A.   And that is why nobody suggested

16:46:24  23  or nobody proposed me that.

16:46:29  24       Q.   So nobody told you that?  Is that

16:46:31  25  your answer?

```
16:46:31   1              (The following section of colloquy
16:46:31   2         was not translated.)
16:46:38   3              MR. ALLEN:  Pause.
16:46:38   4              Objection.  Is it now the government's
16:46:43   5    position that it wishes to pay for defense
16:46:48   6    witnesses?
16:46:53   7              MR. KELLHOFER:  My suggestion is
16:46:55   8    whether or not this witness was told that he
16:46:58   9    would not have any costs reimbursed or not is
16:47:00  10    what I'm trying to find out.  What was he told?
16:47:05  11    That's the question.
16:47:06  12              MR. ALLEN:  That's a different question
16:47:08  13    than you asked.  By all means.
16:47:11  14         Q.  BY MR. KELLHOFER:  The question is,
16:47:12  15    sir:  Were you informed whether or not costs
16:47:16  16    for your flight would be paid for by the U.S.
16:47:20  17    government?
16:47:39  18         A.  No.  Nobody told me that.  And this
16:47:42  19    is for the reason that I have my own opinion,
16:47:46  20    and I wasn't going to go there.
16:47:49  21         Q.  Yes, I understand that.  That's
16:47:54  22    not my question.
16:47:55  23              And I appreciate you -- so -- so
16:47:59  24    what I understand is nobody told you the
16:48:02  25    U.S. government would pay for your flight.
```

16:48:05  1          Now, my next question is:  Were

16:48:08  2     you told that the costs would be reimbursed

16:48:10  3     by anyone?

16:48:47  4          A.   Please do understand me correctly.

16:48:49  5     If it wasn't my intention to travel there,

16:48:53  6     so the people around me or anyone else could

16:48:55  7     [sic] propose anything of the kind.

16:49:06  8          Q.   So you were not told that?  That's

16:49:07  9     what I'm asking.

16:49:26  10         A.   No.  It's -- it's clear to me that

16:49:28  11    when people around me understand what my

16:49:30  12    position is from the start -- and my position

16:49:32  13    is that I'm not going to go -- they don't even

16:49:36  14    continue talking about that.  So they don't

16:49:39  15    continue promising or offering me something

16:49:42  16    because, from the start, I said I don't want

16:49:45  17    to go.  And -- and it's clear to me that this

16:49:48  18    is the situation.  So I don't understand why

16:49:50  19    you need to ask me again and again.

16:49:55  20         Q.   So from the very beginning, you

16:49:57  21    made it clear you had no intention of coming

16:50:00  22    to the United States?

16:50:28  23         A.   Well, yes.  That's true.  I watch

16:50:30  24    TV.  I see what the attitude to Russia is.

16:50:33  25    And I don't think it's always right.  But

16:50:37  1  that's for politicians to decide.  So I'm

16:50:39  2  just a simple person and I make my decisions.

16:50:46  3      Q.   And you agree that you have the

16:50:50  4  ability?  You just are choosing not to come

16:50:53  5  to the United States?

16:50:55  6          MR. ALLEN:  (Not translated.)

16:50:55  7  Objection to form.

16:50:56  8          I don't know that he even knows

16:51:00  9  he has the ability.  I have not heard any

16:51:03  10  testimony about a visa.

16:51:48  11          THE WITNESS:  I'm -- I -- it's not

16:51:49  12  just that I decided or chose not to come to

16:51:52  13  the United States.  I'm certain that I shouldn't

16:51:55  14  do that, because I want to avoid an uncomfortable

16:52:01  15  situation where I may be treated unfairly according

16:52:06  16  to some trumped-up charges.

16:52:14  17      Q.   BY MR. KELLHOFER:  So do you believe

16:52:15  18  you have the ability to travel to the United

16:52:17  19  States?

16:52:32  20      A.   Lots of people have the ability.

16:52:33  21  But every person has the right to their own

16:52:37  22  opinion.

16:52:48  23      Q.   The -- who -- who -- who has -- who

16:52:49  24  has threatened to do something against you?

16:52:53  25          MR. ALLEN:  (Not translated.)

| 16:52:53 | 1 | Objection.  He has not testified that anyone |
| 16:52:57 | 2 | has threatened him. |
| 16:52:58 | 3 | THE WITNESS:  Do I look like a person |
| 16:53:05 | 4 | who is afraid of somebody? |
| 16:53:09 | 5 | Q.  BY MR. KELLHOFER:  Have you been |
| 16:53:10 | 6 | threatened in any way regarding your coming |
| 16:53:13 | 7 | to the United States to testify, that -- that |
| 16:53:16 | 8 | somebody would do something against you? |
| 16:54:00 | 9 | A.  No.  It's nothing of the sort.  But |
| 16:54:03 | 10 | all people who know me, they know my attitude. |
| 16:54:07 | 11 | Not towards the people of the United |
| 16:54:08 | 12 | States, but towards the politics and towards |
| 16:54:11 | 13 | the political situation which creates such |
| 16:54:18 | 14 | incidents as the one we're talking about, |
| 16:54:18 | 15 | when my boss is accused of things he didn't |
| 16:54:23 | 16 | do. |
| 16:54:27 | 17 | Q.  Have -- have you been provided |
| 16:54:29 | 18 | evidence by his attorneys? |
| 16:54:33 | 19 | A.  No.  They simply asked me questions. |
| 16:55:09 | 20 | And they wanted answers about my -- my work, |
| 16:55:14 | 21 | what I did.  And they wanted me to give my |
| 16:55:19 | 22 | opinion about certain people.  So that's what |
| 16:55:21 | 23 | they did.  That's the only kind of information |
| 16:55:24 | 24 | that we exchanged. |
| 16:55:29 | 25 | Q.  What charges have Mr. Teyf been -- |

16:55:33   1    what -- what has he been charged with?

16:55:42   2        A.    I can't tell you exactly.

16:55:46   3        Q.    But -- but you said -- but you said

16:55:48   4    they're trumped-up and he did not do them.

16:55:54   5        But you don't know what they are?

16:55:55   6        A.    I don't know what the nature of the

16:56:40   7    accusations against him is exactly.   But since

16:56:43   8    the lawyers invited me to testify and asked me

16:56:48   9    about myself and what I can tell about other

16:56:51   10    people, it means that there are some charges

16:56:54   11    against him.

16:56:54   12        And so that's why I'm here, to give

16:56:57   13    my testimony, to make people understand what

16:56:59   14    the situation really is.   And if I can help

16:57:02   15    in this way, I think I've done my duty.

16:57:04   16        (The following section of colloquy

16:57:04   17      was not translated.)

16:57:06   18        THE VIDEOGRAPHER:   Excuse me, Counsel.

16:57:06   19    We need to change media in five minutes.   Just

16:57:09   20    a warning.

16:57:10   21        MR. KELLHOFER:   I'm sorry.   I --

16:57:17   22    I didn't hear that.

16:57:20   23        THE VIDEOGRAPHER:   This is the

16:57:20   24    videographer.   We need to change media in

16:57:23   25    five minutes.

| | | |
|---|---|---|
| 16:57:25 | 1 | MR. KELLHOFER: Okay. Would it |
| 16:57:25 | 2 | be -- would it be best to do it now? |
| 16:57:30 | 3 | THE VIDEOGRAPHER: If -- if you would |
| 16:57:31 | 4 | like to. We can do it now or in five minutes. |
| 16:57:36 | 5 | MR. KELLHOFER: All right. Well, you |
| 16:57:37 | 6 | just let me know when. |
| 16:57:38 | 7 | Q. BY MR. KELLHOFER: So, sir, the fears |
| 16:57:42 | 8 | you have -- my understanding was you were fearful |
| 16:57:46 | 9 | of having charges brought against you in the |
| 16:57:49 | 10 | United States. |
| 16:57:49 | 11 | Is that correct? |
| 16:57:49 | 12 | A. By the ease with which Leonid Teyf |
| 16:58:27 | 13 | got into this situation, I would say that -- |
| 16:58:29 | 14 | that yes. I watch TV. I see the political |
| 16:58:36 | 15 | interests of our government, so -- which are |
| 16:58:41 | 16 | in conflict. And so, yes, this gives me food |
| 16:58:45 | 17 | for thought. |
| 16:58:45 | 18 | Q. Because of the way Mr. Teyf was charged? |
| 16:59:03 | 19 | A. I don't even know what exactly he is |
| 16:59:05 | 20 | charged with. But I understand that there is |
| 16:59:07 | 21 | a problem. |
| 16:59:08 | 22 | Q. What problem? |
| 16:59:54 | 23 | A. Since there are lawyers here who |
| 16:59:57 | 24 | are asking me questions, I -- I understand |
| 16:59:59 | 25 | that there is -- there is a problem. And |

17:00:03  1   I am an ordinary person.  But I'm already

17:00:06  2   58 years old.  So I have some experience.

17:00:09  3   And I'm very careful.

17:00:11  4           So, figuratively speaking, if I

17:00:13  5   see a fire burning, I will not put my hand

17:00:16  6   into it.  If I put my hand close and I feel

17:00:20  7   that it's warm, I will not try to put it

17:00:23  8   closer and -- I don't want to get burned.

17:00:26  9           Can I add something?  I would like

17:01:29  10  to add something.

17:01:30  11          When people just talk to each other,

17:01:32  12  they understand each other very well.  But I

17:01:35  13  have this sort of second sense that sometimes

17:01:40  14  what I'm saying might not -- might not come

17:01:43  15  across properly because of -- sometimes I

17:01:46  16  like to do certain comparisons or to speak

17:01:53  17  figuratively.  And I'm afraid it is not always

17:01:56  18  clearly understood.  But it's very important

17:02:00  19  for me to actually make you understand my

17:02:04  20  attitude to the situation.

17:02:05  21          So if you ask me questions several

17:02:08  22  times, I get the message that something didn't

17:02:11  23  come across and something was unclear.  And

17:02:16  24  that -- that -- that -- that is a bit of a

17:02:18  25  problem for me.

17:02:19  1               (The following section of colloquy

17:02:19  2          was not translated.)

17:02:20  3               THE VIDEOGRAPHER:  Can we change --

17:02:20  4      can we change media now, take a break?

17:02:26  5               MR. WOLF:  Yes.

17:02:28  6               MR. KELLHOFER:  Yeah.  How long do

17:02:29  7      you expect that to be?

17:02:32  8               THE VIDEOGRAPHER:  Take ten minutes --

17:02:32  9      five-, ten-minute break.

17:02:33  10              MR. WOLF:  We'll take ten --

17:02:33  11              MR. ALLEN:  Okay.

17:02:33  12              MR. WOLF:  -- minutes, Jason.

17:02:33  13              MR. KELLHOFER:  Thank you.

17:02:39  14              THE VIDEOGRAPHER:  Going off the

17:02:39  15      record at 5:02.

17:02:41  16              (Recess from 5:02 p.m. to 5:18 p.m.)

17:18:33  17              THE VIDEOGRAPHER:  The deposition

17:18:34  18      of Nicolay Grigorov.  Going back on the record

17:18:41  19      at 5:18.

17:18:41  20              (The following section of colloquy

17:18:41  21          was not translated.)

17:18:44  22              MR. ALLEN:  Good afternoon.

17:18:44  23              This is Hill Allen.  It is now almost

17:18:47  24      5:20 our time.  I just want to note for the

17:18:52  25      record that, under Rule 15, the manner in which

17:18:55  1    this deposition is to be taken must be -- explicitly

17:19:00  2    must be the same as would be allowed during trial.

17:19:05  3            The -- the cross-examination has now

17:19:10  4    exceeded in length or almost exceeded the direct

17:19:15  5    examination.  There have been very repetitive

17:19:19  6    questions.  It is clear to me that the repetition

17:19:23  7    would not have been allowed during trial.

17:19:24  8            This witness has been presented late

17:19:29  9    in the day here in order to accommodate other

17:19:33  10   counsel, including counsel for the government.

17:19:35  11   Counsel for the government has been going almost

17:19:39  12   an hour, about the same length of time that I

17:19:42  13   went.  So I want to note all that for the record.

17:19:45  14           I do expect that the questions will be

17:19:51  15   conducted and -- and asked in a manner consistent,

17:19:54  16   with the dictates of Rule 15, that the questioning,

17:19:57  17   the examination must be the same as would be allowed

17:20:04  18   during trial.

17:20:04  19           And I would ask, respectfully, counsel

17:20:07  20   for the claimant to -- to proceed according to

17:20:12  21   Rule 15.

17:20:12  22           And certainly we -- we appreciate that

17:20:22  23   very much.  I know the witness, who is here late

17:20:24  24   in the day at your request, would appreciate

17:20:26  25   that very much.  Thank you.

```
17:20:29   1              MR. KELLHOFER:  Thank you.
17:20:32   2              Are we ready to proceed?
17:20:34   3              I'll take that as a "yes."
17:20:43   4              MR. ALLEN:  Yes.
17:20:45   5       Q.   BY MR. KELLHOFER:  Sir, I appreciate
17:20:48   6   your -- your statement that you feel you may
17:20:51   7   not have been understood.
17:21:08   8       A.   Yes.
17:21:10   9       Q.   So it might be helpful, when I ask
17:21:12  10   you a question and I say, is that a "yes" or
17:21:15  11   a "no"? if you believe you can't answer it
17:21:17  12   with a "yes" or "no," just let me know.
17:21:56  13       A.   Well, that's exactly what I was
17:21:58  14   referring to.  When you expect to have a "yes"
17:22:01  15   or "no" answer, I sometimes want to talk in a
17:22:07  16   more extensive manner.  And I understand that
17:22:13  17   maybe this is not appropriate here, this is
17:22:16  18   not what -- what is needed in this context.
17:22:20  19       Q.   Yes.  And when I'm done asking you
17:22:23  20   questions, Mr. Teyf's counsel sitting there,
17:22:27  21   they'll have the opportunity to follow up.
17:22:28  22   And if they think it appropriate, they'll
17:22:32  23   return to some subjects, and you'll have
17:22:33  24   the opportunity to explore that more.
17:22:58  25       A.   Yes.  I'm ready to do that if --
```

17:23:00  1  if it's needed.

17:23:02  2          Q.   Thank you.

17:23:03  3               Regarding Mr. Teyf, your relationship

17:23:12  4  with him was as an employee of his; correct?

17:23:15  5          A.   Yes.

17:23:23  6          Q.   All right.  And the time frame, the

17:23:27  7  exact years that you worked for him, what are

17:23:31  8  those exact years, sir?

17:23:41  9          A.   Starting with 2005.  And now, when

17:23:58  10  I'm here, it feels as if I'm still his employee

17:24:03  11  even though, of course, I'm just doing this

17:24:05  12  of my own free will.  But it feels like I'm

17:24:08  13  still working for him.

17:24:10  14          Q.   So the years that you were formerly --

17:24:13  15  or, I mean, officially, I suppose, working

17:24:19  16  for him, though, that covered from 2005 till --

17:24:24  17  when was the end of that?

17:24:39  18          A.   Officially, the end was in 2013.

17:24:44  19          Q.   And you had a break in your employment

17:24:47  20  with him; correct?

17:25:01  21          A.   You could say that.  But I could explain

17:25:02  22  it in more detail if you want.

17:25:08  23          Q.   So as your boss, did you work with him

17:25:10  24  on a daily level, a -- was that a daily working

17:25:14  25  relationship with him when -- when you did work

| | | |
|---|---|---|
| 17:25:17 | 1 | for him? |
| 17:25:18 | 2 | A. No. It was not on a daily basis because |
| 17:25:46 | 3 | he lived in the United States. But when he came |
| 17:25:49 | 4 | to visit with his family, that's when I organized |
| 17:25:51 | 5 | his protection. |
| 17:26:02 | 6 | Q. Did you spend any time with him on |
| 17:26:04 | 7 | a social level, or was it solely work? |
| 17:26:34 | 8 | A. There are certain rules of the game |
| 17:26:36 | 9 | in my work. And they are that, if you provide |
| 17:26:40 | 10 | security and protection for a person, you cannot |
| 17:26:42 | 11 | enter any kind of business or personal relationship |
| 17:26:45 | 12 | with him. |
| 17:26:49 | 13 | Q. Now, during that time, you were able |
| 17:26:53 | 14 | to observe, though, Mr. Teyf and the -- the -- |
| 17:26:56 | 15 | the -- his -- his level of wealth; correct? |
| 17:27:00 | 16 | A. Well, yes. Of course. That's clear. |
| 17:27:17 | 17 | Q. And he was quite wealthy? |
| 17:27:31 | 18 | A. In Russia, people who hire security |
| 17:27:33 | 19 | guards or protection are usually wealthy people, |
| 17:27:42 | 20 | because protection isn't cheap. |
| 17:27:45 | 21 | Q. But you're also aware of the homes |
| 17:27:48 | 22 | he owned, the cars he drove, things like that? |
| 17:27:58 | 23 | A. Yes, of course. |
| 17:27:59 | 24 | Q. And he still owns a lot of property |
| 17:28:01 | 25 | and cars and -- and homes and things like |

| | | |
|---|---|---|
| 17:28:03 | 1 | that in Russia? |
| 17:28:11 | 2 | A.  Yes.  That's right. |
| 17:28:14 | 3 | Q.  And from your understanding and |
| 17:28:18 | 4 | interaction with him, he has quite a bit |
| 17:28:21 | 5 | of influence as well? |
| 17:28:28 | 6 | MR. ALLEN:  Objection to the form |
| 17:28:29 | 7 | of that question.  It's not clear what you |
| 17:28:31 | 8 | mean by "influence." |
| 17:28:32 | 9 | THE WITNESS:  (Comment in Russian.) |
| 17:28:32 | 10 | (The following section of colloquy |
| 17:28:32 | 11 | was not translated.) |
| 17:28:35 | 12 | MR. KELLHOFER:  I'm going to at this |
| 17:28:42 | 13 | point -- hold on one second. |
| 17:28:43 | 14 | I'm going to ask that the -- I'm going |
| 17:28:46 | 15 | to ask the interpreter refrain from interpreting |
| 17:28:50 | 16 | the objections to the witness.  My question -- |
| 17:28:59 | 17 | the witness has no reason to hear what the |
| 17:29:03 | 18 | objections are. |
| 17:29:05 | 19 | MR. ALLEN:  This is to be conducted -- |
| 17:29:07 | 20 | THE INTERPRETER:  Can -- can I answer? |
| 17:29:07 | 21 | MR. ALLEN:  -- as a trial. |
| 17:29:08 | 22 | THE INTERPRETER:  Can -- can I answer? |
| 17:29:09 | 23 | I simply said that there was an |
| 17:29:11 | 24 | objection so that the witness would understand |
| 17:29:13 | 25 | that there is an objection.  I didn't explain |

```
17:29:15   1   what it was.

17:29:16   2            MR. KELLHOFER:  Okay.  Great.  Thank

17:29:17   3   you.

17:29:18   4            MR. ALLEN:  But that -- that said,

17:29:20   5   Jason, this, under Rule 15, is to be conducted

17:29:23   6   in the same manner as a trial.  In every trial

17:29:28   7   I've ever been in, the witness hears what's

17:29:29   8   being said.  The fact that this man is

17:29:30   9   appearing by translator changes nothing.

17:29:37  10            MR. KELLHOFER:  These are speaking

17:29:38  11   objections.  If you want to say "objection,"

17:29:40  12   fine.  We would have a speaking objection

17:29:43  13   up with the judge.

17:29:45  14            MR. ALLEN:  So --

17:29:46  15            MR. KELLHOFER:  If you'd like to

17:29:47  16   say "objection," as I did per Rule 15, please

17:29:50  17   do so.

17:29:51  18            MR. ALLEN:  Under Rule 15 --

17:29:52  19            MR. KELLHOFER:  So I'll continue

17:29:53  20   my question.

17:29:54  21            MR. ALLEN:  Under Rule 15(g):

17:29:55  22            "Objections."

17:29:56  23            Quote:

17:29:56  24            "A party objecting to deposition

17:30:01  25   testimony or evidence must state the grounds
```

17:30:03  1  for the objection during the deposition."

17:30:05  2          I have not made speaking objections.

17:30:08  3  I have attempted to state the grounds.

17:30:11  4          Please proceed.

17:30:12  5      Q.  BY MR. KELLHOFER:  Sir, my question

17:30:12  6  was whether or not you believe that Mr. Teyf

17:30:12  7  has influence in Russia?

17:30:20  8          MR. ALLEN:  Same objection.

17:30:33  9          THE WITNESS:  I can definitely --

17:31:27  10  I can definitely tell you that, at work,

17:31:30  11  he was a very influential person.  He had

17:31:34  12  a lot of influence over the employees.  He

17:31:36  13  was a man with authority.  Whatever he told,

17:31:39  14  people did, whatever he told them.  Whether

17:31:45  15  he had any influence elsewhere, I don't know

17:31:48  16  exactly know.

17:31:49  17          Well, he must have had some influence

17:31:51  18  on his family, wife, and children.  But as he

17:31:54  19  was a businessman, of course he talked to many

17:31:57  20  people.  And I suppose he must have some influence

17:32:00  21  on them as part of his business activity.

17:32:06  22      Q.  BY MR. KELLHOFER:  And as a personal

17:32:07  23  bodyguard, you would know who these people that

17:32:10  24  he meets with are?

17:32:16  25      A.  No.

17:32:18　1　　　　Q.　So you had no idea who he was meeting

17:32:21　2　with when you provided personal security?

17:32:40　3　　　　A.　Sometimes I did know it, especially

17:32:42　4　if it was a -- a repeat meeting, if it was a

17:32:45　5　second meeting or something.　But my job was

17:32:48　6　to provide protection and security and not to

17:32:51　7　gather information.

17:32:56　8　　　　Q.　Now, you stated that you worked at

17:32:59　9　a few different businesses with the individual

17:33:02　10　I told you I'm going to refer to as "Eclipse."

17:33:06　11　　　　　Is that correct?

17:33:06　12　　　　A.　You mean with Strogii?

17:33:25　13　　　　Q.　Yes.

17:33:25　14　　　　A.　In two places.

17:33:27　15　　　　Q.　Okay.　And your testimony was that

17:33:37　16　he worked essentially as a security guard at

17:33:40　17　a post for the tractor factory, I believe?

17:33:44　18　　　　A.　Yes.

17:33:56　19　　　　Q.　And he was one of a hundred or so

17:34:01　20　similar-type security personnel?

17:34:12　21　　　　A.　Yes.　That's right.　Yes.　You

17:34:16　22　understand me correctly.

17:34:19　23　　　　Q.　And security personnel, it can be

17:34:23　24　a dangerous job?

17:35:41　25　　　　A.　Well, I don't know if you understand

17:35:43  1   completely what I'm going to say now.  If you

17:35:46  2   work honestly, if you follow the instructions,

17:35:48  3   if you know where to look, where to stand, if

17:35:52  4   you know the time frame of your work, it's not

17:35:54  5   dangerous because you are a working unit in

17:35:57  6   a specific period of time in a specific area.

17:36:01  7        But with a person like Strogii, if

17:36:04  8   it's a person like that, if he works together

17:36:07  9   with some suspicious elements, with some fraud,

17:36:11  10  then it can be dangerous, because there is

17:36:14  11  the danger of being caught red-handed.  And

17:36:17  12  that's dangerous.  On the other hand, there

17:36:19  13  is the danger of not fulfilling the task that

17:36:23  14  was given to you by the criminals.  And that's

17:36:25  15  also dangerous.  So you may be caught between

17:36:29  16  two fires, and that's the danger.

17:36:33  17     Q.   So all that is to say, yes, it can

17:36:35  18  be a dangerous position?

17:36:37  19       (The following section of colloquy

17:36:37  20     was not translated.)

17:36:43  21       MR. ALLEN:  Object to form.

17:36:44  22  Argumentative and mischaracterizes.

17:36:45  23       THE WITNESS:  (Comment in Russian.)

17:36:45  24       MR. KELLHOFER:  All right.  So let's --

17:36:45  25       THE WITNESS:  (Comment in Russian.)

| | | |
|---|---|---|
| 17:36:45 | 1 | MR. KELLHOFER:  Let's do it this way. |
| 17:36:54 | 2 | THE COURT REPORTER:  One moment. |
| 17:36:54 | 3 | MR. ALLEN:  The witness, sir, is -- |
| 17:36:54 | 4 | is answering.  Do you want him to answer? |
| 17:37:16 | 5 | MR. KELLHOFER:  I'll rephrase the |
| 17:37:16 | 6 | question. |
| 17:37:16 | 7 | THE COURT REPORTER:  We don't have -- |
| 17:37:16 | 8 | MR. KELLHOFER:  Yes or -- |
| 17:37:16 | 9 | THE COURT REPORTER:  -- a translation |
| 17:37:16 | 10 | yet. |
| 17:37:16 | 11 | MR. WOLF:  He's going to ask a new |
| 17:37:16 | 12 | question. |
| 17:37:16 | 13 | THE INTERPRETER:  Okay. |
| 17:37:16 | 14 | MR. WOLF:  There's nothing to translate. |
| 17:37:16 | 15 | Wait for the question. |
| 17:37:16 | 16 | THE INTERPRETER:  Okay. |
| 17:37:16 | 17 | THE WITNESS:  Okay. |
| 17:37:16 | 18 | MR. KELLHOFER:  Madam Translator, |
| 17:37:16 | 19 | are you prepared? |
| 17:37:16 | 20 | THE INTERPRETER:  Yes. |
| 17:37:16 | 21 | Q.  BY MR. KELLHOFER:  "Yes" or "no," |
| 17:37:16 | 22 | that position can put one in physical danger? |
| 17:37:43 | 23 | A.  Yes. |
| 17:37:43 | 24 | Q.  Okay.  And you are -- you were |
| 17:37:47 | 25 | responsible for hiring those people? |

17:37:54    1        A.    Yes.

17:37:54    2        Q.    And you oversaw their work?

17:38:05    3        A.    It was part of my duties.

17:38:09    4        Q.    And in your -- you stated previously,

17:38:11    5   in terms of Mr. Strogii, who I am referring to

17:38:18    6   as "Eclipse," you found him to be physically

17:38:24    7   and mentally deficient?

17:39:30    8        A.    I -- I distinguish between two types

17:39:32    9   of security work.  There is physical, personal

17:39:35   10   protection.  And there is the job of guarding

17:39:38   11   the perimeter or the area of the -- of some

17:39:43   12   facility, a factory or some property.  For

17:39:45   13   example, it could be an office or a factory.

17:39:49   14        So if we are talking about personal

17:39:51   15   protection, that is, the physical protection

17:39:53   16   of a person or a family, this is the kind of

17:39:56   17   job I wouldn't entrust to Strogii.

17:39:58   18        Q.    Okay.  So you were concerned, then,

17:40:02   19   also about his ability to be at the post, the --

17:40:05   20   for perimeter security?

17:41:11   21        A.    Well, every facility -- let's say

17:41:15   22   a factory -- has a face, that is, the gates

17:41:17   23   where people come through.  And it has the

17:41:18   24   back, which is a relatively empty space with

17:41:24   25   a fence and nothing else there.

17:41:26  1      So the person that you don't completely
17:41:29  2  trust, you can put him either to be very visible,
17:41:32  3  very clearly seen so that he couldn't do anything
17:41:37  4  on the side, so to speak.  Or you could do the
17:41:40  5  opposite, and you could put them in this distant
17:41:43  6  place where he could do no damage, where he doesn't
17:41:45  7  bear great responsibility.
17:41:46  8      So that was part of the tactical decisions
17:41:50  9  that I had to make and part of the methods that I
17:41:53  10  used to put people into certain positions during
17:41:56  11  their work.
17:41:56  12      Q.   And you had the ability to hire additional
17:42:03  13  people; correct?
17:42:11  14      A.   Yes.
17:42:13  15      Q.   Was there some special reason that you
17:42:16  16  wanted to keep Eclipse as an employee?
17:43:18  17      A.   In my understanding of my position --
17:43:20  18  and maybe it is a Russian understanding of
17:43:22  19  the matter -- I have some, let's say, hundred
17:43:26  20  employees.  And each of them could have their
17:43:29  21  own problems, personal or otherwise -- for
17:43:32  22  example, in the family, but -- or some kind
17:43:36  23  of disturbance.  But, in my case, they were
17:43:40  24  just working units.
17:43:42  25      And my duty, my responsibility was

17:43:44   1    to organize them properly.  If somebody was

17:43:50   2    found wanting, there was needed some additional

17:43:54   3    supervision over this person.  But the entire

17:43:59   4    structure worked.  And this is what I was there

17:44:01   5    to guarantee.

17:44:04   6       Q.   So when you went, then, to the next

17:44:09   7    business, the -- the fishing business, and you

17:44:11   8    worked with Eclipse there, you were in control

17:44:16   9    as a supervisor over him at that point as well;

17:44:24  10    correct?

17:44:45  11       A.   Yes.  When I took this position, I

17:44:47  12    became his manager.  And to control whatever

17:44:53  13    the employees do, yes, it was a part of my

17:44:57  14    responsibility.

17:44:57  15       Q.   And --

17:45:01  16       A.   You should -- you should assign a

17:45:04  17    task and you follow it through.

17:45:11  18       Q.   And so he was the same type of problem

17:45:14  19    for you at that business as well?

17:45:39  20       A.   If you give an assessment to a person,

17:45:41  21    it means it's almost forever.  He can't correct

17:45:46  22    himself in five -- in five minutes, can he?  And,

17:46:00  23    in essence, he didn't change.  And in Delta, the

17:46:05  24    scope of his responsibilities was just logistics.

17:46:11  25       Q.   And so, when you were at Delta, having

17:46:18  1    experience with him from your last company, you

17:46:21  2    kept strict oversight of him at Delta, then?

17:46:40  3        A.   Yes, of course.

17:47:06  4             Well, I just -- to be more precise

17:47:08  5    regarding the time frame, I became a manager --

17:47:12  6    security manager at Delta starting 2005.  And

17:47:18  7    at the same time, at the same period for six

17:47:22  8    months, I was in charge of the security at the

17:47:28  9    tractor -- tractor plant, where I acquainted

17:47:32  10   this person.  So this was a continuous period

17:47:36  11   of time, so to speak.

17:47:40  12       Q.   Okay.

17:47:44  13       A.   (Comment in Russian.)

17:47:44  14       Q.   And at Delta, how many levels of

17:47:48  15   management were between Eclipse and Mr. Teyf?

17:48:11  16       A.   I don't quite understand what you

17:48:12  17   mean by "levels of management."

17:48:16  18       Q.   Well, I imagine that he had a direct

17:48:21  19   supervisor.

17:48:22  20            Correct?

17:48:28  21       A.   Myself.  Correct.

17:48:29  22       Q.   Okay.  And that's you.  So that's

17:48:32  23   one level.

17:48:32  24            And then between you and Mr. Teyf,

17:48:39  25   were there -- was there anybody else?

17:48:47 1      A.   No.  I was in charge of the way the

17:48:50 2   security worked.

17:48:53 3      Q.   Okay.  So any interaction that would

17:48:59 4   take place between Eclipse and Mr. Teyf would

17:49:03 5   go through you?

17:49:04 6           MR. ALLEN:  (Not translated.)  Object

17:49:13 7   to form.

17:49:13 8           THE WITNESS:  The very possibility

17:49:28 9   of intermediate interaction between a simple

17:49:35 10  security worker and the CEO of the company

17:49:37 11  is quite meager.

17:49:46 12     Q.   BY MR. KELLHOFER:  So would Eclipse,

17:49:50 13  as the back perimeter guard, be spending time

17:49:57 14  with Mr. Teyf?

17:49:59 15          MR. ALLEN:  (Not translated.)  Object

17:50:09 16  to form.  When are you asking?

17:50:39 17          THE WITNESS:  No.  I, as security

17:50:42 18  manager, having assessed Strogii once, wouldn't

17:50:48 19  allow any interaction -- any other kind of

17:50:52 20  interaction.  I knew this person.  And I

17:50:54 21  could understand what kind of scope of

17:50:58 22  responsibility he could be entrusted with.

17:51:04 23     Q.   BY MR. KELLHOFER:  And you still

17:51:14 24  do work for -- for Mr. Teyf?

17:51:44 25     A.   Metaphorically -- metaphorically

17:51:44  1    speaking, yes.  My -- my very presence here

17:51:53  2    and the decision to come to his help means

17:51:59  3    that, as his former personal bodyguard, I'm

17:52:04  4    still there, ready to help him.

17:52:08  5         Q.   Well, let me ask you:  In the last

17:52:11  6    six months, have you had any telephone contact

17:52:15  7    with Mr. Teyf?

17:52:17  8         A.   No.  To tell you the truth, no.  No.

17:52:36  9              There was -- there was a telephone

17:52:40 10    ring once.  And he was looking for his son.

17:52:42 11    And I connected him to his son.

17:52:51 12         Q.   And he has had people like his son,

17:52:53 13    Grisha, relaying messages to you; correct?

17:53:00 14              MR. ALLEN:  (Not translated.)  Objection.

17:53:06 15    Speculative.  Argumentative.  Calls for hearsay.

17:53:19 16              THE WITNESS:  No.

17:53:30 17         Q.   BY MR. KELLHOFER:  So Eclipse has a

17:53:31 18    number of ex-wives located in Russia; correct?

17:53:37 19         A.   Yes.  I know about it.

17:53:45 20         Q.   And you've contacted his ex-wife,

17:53:50 21    Tatyana?

17:53:57 22         A.   Yes.  It did happen.

17:54:04 23         Q.   And when you did that, you were

17:54:07 24    asking about information about Eclipse?

17:54:18 25         A.   Yes, a little.

17:54:23  1      Q.  And you claimed to be an attorney

17:54:26  2  working for Eclipse?

17:54:29  3      A.  No.  I introduced myself, stating

17:54:44  4  my name, patronymic and surname.  Then I said

17:54:59  5  that I'm assisting to a lawyer and that I'd

17:55:02  6  like to clarify certain matters.

17:55:15  7           In view of Dmitry's refugee application

17:55:22  8  in the U.S. -- this is according to information

17:55:24  9  that I had -- I wanted to understand the nature

17:55:30 10  of their relationship, their personal relationship.

17:55:35 11      Q.  You were just curious?

17:55:37 12      A.  "Da."

17:55:48 13      Q.  Was there an answer?

17:55:49 14      THE INTERPRETER:  "Yes."

17:55:55 15      Q.  BY MR. KELLHOFER:  So it's possible

17:55:56 16  that she just misunderstood you and believed

17:56:00 17  that -- she mistakenly believed you said you

17:56:06 18  were an attorney?

17:56:11 19      A.  Yes.  Most probably, yes.  I remember

17:56:19 20  telling that I was assistant -- I was telling

17:56:23 21  her that I was assisting to a lawyer and

17:56:25 22  that I'd like to clarify the nature of your

17:56:28 23  relationship.

17:56:34 24      Q.  And she refused to assist you?

17:56:45 25      A.  No.  We talk -- we talked quite

17:56:48  1  normally, like two regular people.  I, for

17:57:06  2  example, asked whether he was paying her --

17:57:08  3  her alimony for the child.  And she didn't

17:57:12  4  refuse to answer.  She said:  Well, sometimes

17:57:14  5  he does, sometimes he doesn't.

17:57:27  6      I got an impression that she had

17:57:29  7  some claims towards him but she wasn't prepared

17:57:34  8  to throw dirt at him -- to her ex-husband.

17:57:39  9  So this was a good, though non-consequential,

17:57:50  10  conversation.

17:58:02  11      Q.  And that happened roughly a month

17:58:04  12  ago?

17:58:10  13      A.  Yeah.  Probably around a month.

17:58:15  14      Q.  Was that before or after you

17:58:18  15  contacted his other ex-wife, Olesya?

17:58:31  16      A.  On the same day.

17:58:33  17      Q.  (Not translated.)  Okay.  And do

17:58:37  18  you know why she is also confused that you

17:58:41  19  said you were a lawyer --

17:58:44  20      MR. ALLEN:  Object to --

17:58:44  21      Q.  BY MR. KELLHOFER:  (Not translated.)

17:58:44  22  -- working for Eclipse?

17:58:46  23      MR. ALLEN:  (Not translated.)

17:58:46  24  Object to form.  Argumentative.  Hearsay.

17:58:47  25  And assumes she was confused.

| | | |
|---|---|---|
| 17:58:52 | 1 | MR. WOLF:  You have to translate |
| 17:58:56 | 2 | the objections like we're in court. |
| 17:58:57 | 3 | THE INTERPRETER:  Do -- do I or |
| 17:58:57 | 4 | don't I? |
| 17:58:57 | 5 | MR. WOLF:  Yes.  In court, if the |
| 17:58:57 | 6 | witness spoke English, the witness would |
| 17:58:59 | 7 | hear the objection.  And this is to be done |
| 17:59:03 | 8 | like a trial.  And he shouldn't be treated |
| 17:59:05 | 9 | any differently than a witness at a trial. |
| 17:59:05 | 10 | So -- and a witness in a trial who spoke |
| 17:59:08 | 11 | English would hear the objection and hear |
| 17:59:10 | 12 | the -- what the lawyers say.  And you |
| 17:59:12 | 13 | shouldn't be editing the record. |
| 17:59:14 | 14 | THE INTERPRETER:  Okay. |
| 17:59:14 | 15 | MR. WOLF:  That could be for |
| 17:59:14 | 16 | a judge later.  But for now, every word |
| 17:59:16 | 17 | that's said by every lawyer needs to be |
| 17:59:17 | 18 | in the record.  And if it has to be |
| 17:59:19 | 19 | translated, it needs to be translated. |
| 17:59:21 | 20 | THE INTERPRETER:  Okay. |
| 17:59:21 | 21 | MR. WOLF:  Please.  Thank you. |
| 17:59:21 | 22 | (Pending question and last section |
| 17:59:21 | 23 | of colloquy translated.) |
| 18:00:27 | 24 | THE WITNESS:  I spoke to all the |
| 18:00:28 | 25 | ex-wives.  And I introduced myself similarly |

| | | |
|---|---|---|
| 18:00:33 | 1 | to all -- all of them and asked the same |
| 18:00:37 | 2 | questions. |
| 18:00:37 | 3 | As regards to Olesya, she said |
| 18:00:56 | 4 | that she needed no intervention from anyone |
| 18:01:00 | 5 | else, that she'll be able to sort out the |
| 18:01:04 | 6 | matters with Dima. And the way she perceived |
| 18:01:10 | 7 | what I said, I had no way of knowing. |
| 18:01:16 | 8 | Q. BY MR. KELLHOFER: So you were |
| 18:01:17 | 9 | trying to help them? |
| 18:01:18 | 10 | A. Doing this, I just wanted to get |
| 18:01:51 | 11 | some information to get a better understanding |
| 18:01:53 | 12 | of the situation. In my line of work, having |
| 18:01:58 | 13 | information is important. And although I wasn't |
| 18:02:01 | 14 | working when doing it, I was guided by the same |
| 18:02:06 | 15 | principle. I just wanted to understand where |
| 18:02:09 | 16 | they stood. |
| 18:02:13 | 17 | Q. So you were not working for an attorney |
| 18:02:15 | 18 | to do that? |
| 18:02:50 | 19 | A. Well, in all the cases, I introduced |
| 18:02:53 | 20 | myself in the same form. I -- I gave my name, |
| 18:02:58 | 21 | my patronymic and my surname. And I said that |
| 18:03:03 | 22 | I was assisting to a lawyer and would like |
| 18:03:06 | 23 | to clarify the matter in view of Dmitry's |
| 18:03:12 | 24 | application for political asylum. |
| 18:03:14 | 25 | And I understand that they perhaps |

| | | |
|---|---|---|
| 18:03:18 | 1 | could be confused.  But I followed the same |
| 18:03:21 | 2 | formula with all of them.  And how they |
| 18:03:24 | 3 | perceived was of less interest to me. |
| 18:03:28 | 4 | Q.   What lawyer? |
| 18:03:34 | 5 | A.   To myself. |
| 18:03:49 | 6 | When there appeared information |
| 18:03:51 | 7 | that Leonid Isaakovich has a problem and |
| 18:03:54 | 8 | that Strogii also is somehow involved, so |
| 18:04:09 | 9 | my natural -- my immediate response, as a |
| 18:04:12 | 10 | person who was his manager for several years, |
| 18:04:16 | 11 | was to try and to get some more precise and |
| 18:04:20 | 12 | more accurate information, what was happening. |
| 18:04:23 | 13 | And I didn't get that information. |
| 18:04:36 | 14 | I just heard that, as a husband, he was not |
| 18:04:40 | 15 | always perfect.  Sometimes he would pay money |
| 18:04:43 | 16 | for his children.  But none of -- none of |
| 18:04:51 | 17 | these women would throw dirt at him. |
| 18:04:57 | 18 | Q.   Perhaps you didn't hear my question. |
| 18:04:58 | 19 | My question was:  What was the name |
| 18:04:59 | 20 | of the attorney you said you were assisting? |
| 18:05:00 | 21 | Or was that just a lie, there was no attorney? |
| 18:05:09 | 22 | MR. ALLEN:  (Not translated.) |
| 18:05:09 | 23 | Objection.  Argumentative. |
| 18:05:56 | 24 | THE WITNESS:  I don't know whether |
| 18:05:57 | 25 | you can call it a lie.  You know, as a person, |

18:05:59  1    I know that he has three ex-wives.  I want

18:06:03  2    to get some information.

18:06:04  3         I come to them, and I need -- I

18:06:10  4    need to introduce myself.  So whatever occurs

18:06:13  5    to me in that moment that would be needed to

18:06:15  6    break the ice and to be more open with me,

18:06:20  7    so this is what I've said.  So to me, this

18:06:31  8    is a normal approach.  I didn't -- I didn't

18:06:34  9    represent any threat to anyone.  My goal was

18:06:41  10   gathering information only.

18:06:47  11      Q.   BY MR. KELLHOFER:  (Not translated.)

18:06:47  12   And if they -- if they say that they're afraid

18:06:54  13   that, if they don't come up with a false document

18:06:58  14   giving dirt on Eclipse, that they'll be harmed,

18:07:01  15   do you know why they would -- why they would

18:07:04  16   say that, then?

18:07:05  17         (The following section of colloquy

18:07:05  18      was not translated.)

18:07:05  19         MR. ALLEN:  Pause.

18:07:05  20         Objection.  Argumentative.  Introducing

18:07:11  21   matters that have never come to my attention

18:07:14  22   and there's no basis for it.

18:07:17  23         So, you know, if you're asking him

18:07:20  24   to speculate about what these witnesses think

18:07:23  25   or telling him they're saying something, we

| | | |
|---|---|---|
| 18:07:27 | 1 | need to do that in a different way.  This is |
| 18:07:27 | 2 | a deposition, which is to be taken consistent |
| 18:07:31 | 3 | with the manner in which it would be done at |
| 18:07:35 | 4 | trial. |
| 18:07:38 | 5 |                 MR. KELLHOFER:  Yes. |
| 18:07:38 | 6 |                 MR. ALLEN:  Clear -- |
| 18:07:38 | 7 |         Q.   BY MR. KELLHOFER:  So what's -- |
| 18:07:38 | 8 |                 MR. ALLEN:  Clearly -- |
| 18:07:38 | 9 |         Q.   BY MR. KELLHOFER:  -- the answer to |
| 18:07:39 | 10 | that -- |
| 18:07:39 | 11 |                 MR. ALLEN:  -- that's an objectionable -- |
| 18:07:39 | 12 |         Q.   BY MR. KELLHOFER:  -- if you know, |
| 18:07:41 | 13 | sir? |
| 18:07:41 | 14 |                 MR. ALLEN:  -- question. |
| 18:07:43 | 15 |                 MR. KELLHOFER:  Okay.  Objection |
| 18:07:43 | 16 | noted. |
| 18:07:43 | 17 |         Q.   BY MR. KELLHOFER:  If you know the |
| 18:07:45 | 18 | answer to that, sir, do you know why these |
| 18:07:48 | 19 | women would believe that, if they don't provide |
| 18:07:52 | 20 | false information, that they -- they -- they |
| 18:07:54 | 21 | might be in fear, why they would be harmed |
| 18:07:58 | 22 | or something? |
| 18:08:00 | 23 |                 MR. ALLEN:  (Not translated.) |
| 18:08:00 | 24 | Objection.  There's been no testimony that |
| 18:08:05 | 25 | they are in fear or that anyone has said that. |

18:10:13  1          THE WITNESS:  You're looking at me.

18:10:14  2      And do I look like a dangerous man?  And with

18:10:18  3      these women, these are regular women.  And it

18:10:22  4      was some regular communication.  And whatever

18:10:28  5      they feel at the moment during this three-

18:10:32  6      or five- or ten-minute conversation, they

18:10:35  7      tell you what they feel.

18:10:42  8          Q.   BY MR. KELLHOFER:  Sir, are you,

18:10:43  9      either by fam -- some familial -- by blood

18:10:48  10     or marriage, related to Mr. Dmitry Schiriy?

18:11:04  11         A.   By marriage probably.  My niece

18:11:13  12     married him.

18:11:17  13         Q.   Your testimony today, it's -- you --

18:11:20  14     you understand it's being video-recorded;

18:11:22  15     right?

18:11:22  16         A.   Yes.  I'm ready to work.  Of course.

18:11:44  17         Q.   And you understand that's because

18:11:46  18     you are -- you're not actually at a trial

18:11:49  19     today; right?  Obviously.

18:12:03  20         A.   I understand that this recording

18:12:05  21     will represent me and my attitude toward

18:12:08  22     the matter.

18:12:10  23         Q.   And it's a recording because you --

18:12:12  24     you refuse to come to the United States;

18:12:15  25     right?

| | | |
|---|---|---|
| 18:12:19 | 1 | MR. ALLEN:  Objection.  Asked and |
| 18:12:19 | 2 | answered and argumentative. |
| 18:12:36 | 3 | THE WITNESS:  I've nothing to add. |
| 18:12:40 | 4 | Q.   BY MR. KELLHOFER:  And you understand |
| 18:12:40 | 5 | that, at the beginning of today, you took an |
| 18:12:46 | 6 | oath to tell the truth; correct? |
| 18:12:47 | 7 | A.   Yes. |
| 18:12:58 | 8 | Q.   And you understand that, in the United |
| 18:13:00 | 9 | States, lying under oath is a criminal offense? |
| 18:13:15 | 10 | MR. ALLEN:  Objection.  That's clearly |
| 18:13:17 | 11 | not a proper question.  Again, we're taking this |
| 18:13:19 | 12 | in the same manner it would occur at trial. |
| 18:13:35 | 13 | THE WITNESS:  Could you please repeat |
| 18:13:36 | 14 | the question? |
| 18:13:40 | 15 | Q.   BY MR. KELLHOFER:  That, in the United |
| 18:13:41 | 16 | States, lying under oath in a criminal trial |
| 18:13:47 | 17 | is itself a criminal offense? |
| 18:14:04 | 18 | A.   Yes.  It is clear to me.  And the |
| 18:14:08 | 19 | situation is the same in Russia. |
| 18:14:12 | 20 | Q.   And you are not in the United States, |
| 18:14:19 | 21 | though; correct? |
| 18:14:19 | 22 | A.   Yes.  I'm in Russia.  Oh, sorry.  No. |
| 18:14:29 | 23 | I'm in Israel. |
| 18:14:30 | 24 | Q.   Yeah. |
| 18:14:35 | 25 | MR. KELLHOFER:  All right.  I have |

| | | |
|---|---|---|
| 18:14:37 | 1 | no further questions.  Thank you, sir. |
| 18:14:43 | 2 | THE WITNESS:  Thank you.  If it is |
| 18:14:46 | 3 | of any help, I'll be happy. |
| 18:14:49 | 4 | MR. ALLEN:  Let's take a five-minute |
| 18:14:50 | 5 | break, unless David Long would prefer to proceed. |
| 18:14:53 | 6 | Let's take a five-minute break. |
| 18:14:57 | 7 | THE VIDEOGRAPHER:  Going off the record |
| 18:14:59 | 8 | at 6:14. |
| 18:15:01 | 9 | (Recess from 6:14 p.m. to 6:22 p.m.) |
| 18:22:42 | 10 | THE VIDEOGRAPHER:  Going back on record |
| 18:22:44 | 11 | at 6:22. |
| 18:22:49 | 12 | MR. ALLEN:  I think Mr. Long is up. |
| 18:22:54 | 13 | MR. LONG:  No questions for Tatyana |
| 18:22:58 | 14 | Teyf. |
| 18:23:00 | 15 | MR. ALLEN:  Mr. Grigorov, thank you. |
| 18:23:01 | 16 | I don't have any further questions. |
| 18:23:04 | 17 | THE WITNESS:  Thank -- thanks to you. |
| 18:23:15 | 18 | I told you everything I knew.  And I see you |
| 18:23:19 | 19 | have understood it. |
| 18:23:22 | 20 | MR. ALLEN:  Have a good evening. |
| 18:23:23 | 21 | THE WITNESS:  Can I go? |
| 18:23:23 | 22 | THE COURT REPORTER:  One second. |
| 18:23:29 | 23 | THE VIDEOGRAPHER:  That concludes the |
| 18:23:30 | 24 | videotape deposition of Nicolay Grigorov at 6:23. |
| | 25 | (The deposition concluded at 6:23 p.m.) |

1          CERTIFICATE OF REPORTER

2

3          I, BRENDA MATZOV, CA CSR 9243, do hereby

4    certify:

5          That, prior to being examined, the witness

6    named in the foregoing deposition was duly sworn

7    or affirmed by me to testify the truth, the whole

8    truth, and nothing but the truth;

9          That the foregoing deposition was taken

10   before me at the time and place herein set forth,

11   at which time the aforesaid proceedings were

12   stenographically recorded by me and thereafter

13   transcribed by me;

14         That the foregoing transcript, as typed,

15   is a true record of the said proceedings;

16         And I further certify that I am not

17   interested in the action.

18

19         Dated this 27th day of January, 2020.

20

21   _____

22   BRENDA MATZOV, CA CSR 9243

23

24

25

1     CERTIFICATE OF WITNESS

2

3          I, NICOLAY GRIGOROV, witness herein, do

4    hereby certify and declare the within and foregoing

5    transcription to be my examination under oath in

6    the said action taken on January 27, 2020, with

7    the exception of the changes listed on the errata

8    sheet, if any;

9          That I have read, corrected, and do hereby

10   affix my signature under penalty of perjury to said

11   examination under oath.

12

13

14

15

16   _____   _____

17        NICOLAY GRIGOROV, Witness            Date

18

19

20

21

22

23

24

25

JANUARY 27, 2020 - NICOLAY GRIGOROV

ERRATA SHEET

Case:     UNITED STATES OF AMERICA vs.

          LEONID ISAAKOVICH TEYF

Date:     JANUARY 27, 2020

Witness:  NICOLAY GRIGOROV


Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

Page _____ Line _____ Change _____

Reason _____

_____   _____
    NICOLAY GRIGOROV, Witness              Date