EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

**WESTERN DIVISION**

**NO. 5:18-CR-00452-FL(3)**


**UNITED STATES OF AMERICA**

**v.**

**LEONID ISAAKOVICH TEYF**

**TATYANA ANATOLYEVNA TEYF, AKA TATIANA TEYF**

**ALEXEY VLADIMIROVICH TIMOFEEV**

**OLESYA YURYEVNA TIMOFEEVA**

**ALEXEI IZRAILOVICH POLYAKOV, AKA ALEX NORKA**

---

**SUMMARY OF TESTIMONY**

**EXPERT REPORT OF DREW HOLINER**

**9 DECEMBER 2019**

---

## I.   MY QUALIFICATIONS

1.   I, Drew Holiner, have over 20 years of experience in litigation, advocacy and advisory work in Russia and other Member States of the Commonwealth of Independent States ('**CIS**'), with specialist knowledge of Russian and CIS substantive and procedural law and practical experience of its implementation in judicial disputes.

2.   Beginning in 1997, I commenced work full-time in the legal department of a large international NGO with operations in all 12 CIS member states (i.e. current, former and associate members), and conducted legal research and/or litigation to varying degrees in all of them.  In 2002 I obtained a *spetsialist* degree in Russian law with the professional qualification of Jurist (the rough equivalent of an integrated LL.B/LL.M degree in the UK) from the Moscow Humanitarian and Social Academy (now Moscow University for the Humanities).  I was called to the St. Petersburg Bar the same year and since then I have practiced full-time under the professional title of *advokat*.

3.   In 2005, upon completion of the Graduate Diploma in Law and the Bar Vocational Course in London, I was called to the Bar of England and Wales.  Since 2007, I have practiced from a leading set of commercial chambers in London, and I am currently the only barrister in England and Wales that is also a qualified and practicing member of the Russian Bar.  I am also admitted to the bars of the Territory of the Virgin Islands (UK), the State of California (USA) and the Republic of Ireland.

4.   Throughout my 20 years of legal practice, I have retained an almost exclusive focus on disputes involving a Russian or CIS element.  During that period, I have been instructed in proceedings at all levels of court in Russia and have appeared in the courts of approximately a dozen regions of Russia.  I frequently act as an expert advisor or witness on matters of Russian and CIS law in proceedings conducted before foreign courts and arbitral tribunals, and have done so in respect of dozens of proceedings throughout the world, including Armenia, the British Virgin Islands, the Cayman Islands, Cyprus, the Isle of Man, the Netherlands, New Zealand, the United Kingdom and the United States.

2

5. Although English is my native tongue, I am fully fluent in Russian and am equally comfortable working in both languages.

## II.    MY INSTRUCTIONS

6. I have been instructed by the United States Attorney's Office for the Eastern District of North Carolina to provide a summary expert report on certain questions of Russian law arising in connection with the above matter.  For purposes of preparing this report I have been provided with the following PDF files containing documents, summaries and/or translations from the above case:

   a.  97_businesscards.pdf;

   b.  97_new1.pdf;

   c.  97_vapop2.pdf;

   d.  99_Voentorg items from search.pdf;

   e.  100_Russian.pdf;

   f.  1010955.GrishasComputer.GreatewoodUniversalCorpLoanDocuments.pdf;

   g.  110_Leo Work History.pdf;

   h.  10-4-18 – In Re Leonid Teyf – AUSA – Kocher – witness Eclipse.pdf;

   i.  236_HandwrittenNotes.draft   1013442.pdf;

   j.  charts from 236_Finances_WithAnnaNotes-2.pdf;

   k.  DE_215_3rd Superseding Indt_2019-4-4.pdf;

   l.  DE_248_4th Superseding Indt_2019-5-9.pdf;

   m.  Grisha'sComputer.DeltaPlusLiquidation.DRAFT   1010954.pdf;

   n.  HW Pages from 236_Finances_WithAnnaNotes.pdf;

   o.  Leonid Teyf – Internet Search Summaries.DRAFT  883547.pdf;

   p.  Publications.DRAFT    1010767.pdf;

   q.  source of funds description.docx;

   r.  Teyf jail calls11262019194402.pdf.

7. In preparing this report, I understand that these proceedings are at an early, pre-trial stage.  Therefore, except where I indicate otherwise, the views expressed herein are based on the facts as pleaded and in the documents provided and, as a

3

consequence, are necessarily provisional and may be subject to revision in light of different or additional facts or pleadings.

8.   In particular, I am informed that in the near future the United States Attorney's Office expects to obtain corporate documents from Cyprus and the British Virgin Islands pursuant to mutual legal assistance requests, which I may be required to review. I am also informed that I may be required to review additional documents that may be produced by the defendants in this case, e.g. I may be asked to review documents originating from Russia for indicators as to whether they are genuine or whether they may have been falsified.

9.   Prior to a discussion of the specific matters I have been asked to comment on in this case, I have provided below a summary of the Russian legal system to help place the legal sources referred to later in this report in context.

## IV.    THE RUSSIAN LEGAL SYSTEM

10.   The Russian system of law belongs to the continental civil law (Romano-Germanic) tradition that it inherited from the former Soviet Union, which recognizes a codified system of legislation as the primary source of law, together with certain additional sources as set out below.

11.   Soviet law.   During the Soviet era, Russia's legal system was comprised of a combination of legislation passed at the federal (USSR) level that had direct effect in the Russian Soviet Federal Socialist Republic, and legislation passed at the republican level, which in almost all major areas of the law (e.g. civil, criminal, procedural law etc.) was developed from framework legislation passed at the Soviet level that allowed the republican government to adapt it to local requirements. Soviet-era legislation continues to regulate a number of areas of the law in Russia to this day, e.g. certain rules on patents, investment, bills of exchange, etc.

12.   Russian legislation.   Legislation is the primary source of law.  The Constitution is the highest source of law and federal laws (adopted by the Federal Assembly, Russia's Parliament) are second in the hierarchy.   Regional legislative bodies also are

empowered to adopt laws and federal, regional, and local executive officials and bodies may issue executive orders and decrees in areas of their own competence as defined in the Constitution, however, this type of legislation is subordinate to the Constitution and federal and regional laws and must comply with them.

13. <u>International law</u>.  The Russian legal system is a monist system, and international treaties entered into by the Russian Federation (and, previously, the Soviet Union) have direct effect in domestic law and take precedence over domestic legislation. This includes the Convention for the Protection of Human Rights and Fundamental Freedoms ('**ECHR**').  Judgments of the European Court of Human Rights are cited as a source of law in judicial practice.

14. <u>Judicial authority</u>.  Three types of judicial acts are regarded as a source of law in the Russian legal system.  First, the Constitutional Court of the Russian Federation ('**Constitutional Court**') may issue binding interpretations of the law and strike down legislation that it finds incompatible with the Constitution.  Second, the Supreme Court is empowered to issue guidance on court practice to the lower courts.  Third, resolutions of the Plenary Supreme Court and the former Plenary Supreme Commercial Court on court practice and judgments of the Presidium of the Supreme Court and the Presidium of the former Supreme Commercial Court in specific cases are considered a source of law for the lower courts when they hear cases with analogous facts.  Such resolutions and judgments may even serve as grounds to re-open a previous judgment in an unrelated case when they are stated to have retroactive effect.

15. Other judgments of the Russian domestic courts are not a source of law, at least in the sense of creating a body of binding judicial precedent that must be followed in future cases involving similar material facts.  Nevertheless, judgments and rulings of the supervisory and cassation courts (i.e. the Supreme Court, the former Supreme Commercial Court, the federal Commercial Circuit courts and the Cassation Court of the courts of general jurisdiction) are a source of persuasive authority.  In particular, if a judgment runs contrary to the courts' uniform interpretation and application of the law, this may provide grounds to overturn the judgment on appeal. Where court practice is not settled, however, judgments of the Supreme Court and the former Supreme Commercial Court are typically given greatest weight, followed

by judgments of the cassation courts (and particularly the cassation court governing the judicial circuit where the case is being heard), although there is no formal rule in this regard. Judgments and rulings of appellate and first instance courts are of more limited value but can give an indication of the courts' approach to a particular issue where there is no published practice of the higher courts on the point.

16. <u>Academic writings</u>. Academic writings are not a source of law and are rarely, if ever, cited in court judgments. They are helpful, however, to arrive at a purposive interpretation of the law by explaining the legal theory underlying a particular statutory provision and how it fits into the overall system of law, or by simply demonstrating how current legal thought perceives the issue.

## V. THE ISSUES

**Interaction of business and the Russian Government**

*-        Generally, how are businesses formed in Russia? Include, but not limit this to things like what paperwork should exist to document the legitimacy of businesses, is proof of identity, etc., required and how does one go about getting such papers to establish businesses?*

17. Generally speaking, business in Russia is conducted in the form of companies, partnerships or sole traders ('individual entrepreneurs'). There are also certain other forms that are used less frequently, such as agricultural and other trade cooperatives, and so-called 'unitary enterprises', a type of state-owned business that does not own its own property.

18. Where business is conducted in the form of a company, the company is set up by a formal meeting of the company's founders (i.e. participant members or shareholders), who enter into an agreement establishing the company that must contain various terms prescribed by the relevant legislation on companies (either the Federal Law on Joint Stock Companies or the Federal Law on Limited Liability Companies), and also adopt its 'charter' or articles of incorporation[1]. Copies of the

---

[1] Articles 89 and 98 of the Civil Code of the Russian Federation (the 'Civil Code').

company's constitutional documents and information about its founding members must then be submitted to the Federal Tax Service of Russia for registration in the Unified State Register of Legal Entities. The person presenting the documents is required to present a government-issued ID or, if the documents are submitted online or through the post, the applicant must use a secure electronic signature or (if on paper) his or her signature must be certified by a notary[2].

19.   A company may have a corporate seal, and if it does this should be indicated in its articles of incorporation[3]. Prior to 7 April 2015, companies were required to have corporate seals and certain documents could be deemed invalid if the company's corporate seal was not affixed to the document. However, this is no longer the case.

-   ***How might businesses contract with the Russian government to provide goods/services?***

20.   Generally, there are no special requirements for a business to contract to provide goods and services to the Russian State, as the Russian State and Russian governmental agencies are entitled, as a matter of civil law, to enter into civil relations directly with private businesses and citizens[4]. Where the Russian State acts as a direct consumer of goods or services, however, it is required to comply with legislation on state procurement[5]. Typically, this requires that the goods or services be procured through procedures ensuring competition and transparency, although in specifically prescribed cases they may be procured from a single supplier. Examples of this include contracts for relatively small amounts, contracts with natural monopolies, and also where the supplier has been determined by executive order of the President or the Russian Government (roughly, the equivalent in Russia of the Cabinet of the United States).

---

[2] Articles 9 and 12 of the Federal Law on State Registration of Legal Entities and Individual Entrepreneurs.
[3] Article 2(7) of the Federal Law on Joint Stock Companies; Article 2(5) of the Federal Law on Limited Liability Companies.
[4] Articles 124, 125(1) of the Civil Code.
[5] Primarily, the Federal Law on the Contractual System for the Purchase of Goods, Works and Services for Securing State and Municipal Needs.

21.   Where such goods are required for purposes of the military, national security and defense, the Russian Government is also required to comply with the Federal Law on State Defense Procurement.

22.   Pursuant to the Federal Law on State Defense Procurement, the Russian Government is tasked with ratifying defense procurement and also the procedure and rules for fixing prices (or maximum prices, where goods and services are procured through a competitive process).

23.   Since 1 July 2015, strict new rules were introduced requiring the use of special, dedicated and monitored bank accounts only at specific State authorized banks for purposes of State defense procurement.

-   ***Specifically, then, turn to the organization of businesses in this case – did it follow the usual process, or was it unusual?  What paperwork did you use to determine the normalcy or abnormalcy of the development of this business?***

24.   In this case, the Russian Government procured the supply of food and toiletries for its Armed Forces from a single supplier, JSC Voentorg (literally, "Joint Stock Company 'Military Trade'").  JSC Voentorg was itself established in the course of a wider restructuring program at the Russian Ministry of Defense that was implemented in 2008 and 2009 through a series of executive orders issued by the President, the Russian Government and the Minister of Defense[6].

25.   In summary, then President Medvedev issued a decree that approximately 300 different businesses and service production units operated directly by the Ministry of Defense were to be placed into a series of newly created companies (i.e. commercial entities) that would be owned by a newly created holding company named 'OJSC Oboronservis' (literally, "Open Joint-Stock Company 'Defense Service'").  OJSC Oboronservis, in turn, was to be wholly owned by the Russian

---

[6] Decree of the President of the Russian Federation dated 15 September 2008 No. 1359 "On Open Joint-Stock Company 'Oboronservis'"; Order of the Government of the Russian Federation dated 22 November 2008 No. 875; Order of the Minister of Defense dated 30 April 2009 No. 312 "On the formation of OJSC Voentorg".

State. OJSC Oboronservis has since been renamed JSC Garnizon (literally, "Joint Stock Company 'Garrison'").

26.  The above restructuring was not of itself unusual and follows a trend to transfer certain State assets engaged in activities of an economic (as opposed to administrative) nature into commercial businesses. There can be a variety of reasons for this, including a desire to achieve greater efficiencies, recruitment of management and/or as a step to securing future investment and/or privatization. Nevertheless, the fact that Voentorg has been organized into a joint stock company does not change its essential function as sole supplier of food and toiletries and related services for the Russian Armed Forces, and it remains wholly owned (albeit indirectly) by the Russian State.

27.  Turning to the activities at issue in this case, I understand that Voentorg arranged for subcontractors in Russia to fill the various goods and services required of Voentorg's contract with the Russian Ministry of Defense, and that during 2010 to 2012 one of the defendants in this case, Mr Leonid Teyf, was Deputy Director of Voentorg (Fourth Superseding Indictment, paragraph 8). I also understand that it is alleged that since 2010 Mr Teyf and his associates have received nearly USD 40 million in funds in accounts held in their names from offshore entities incorporated in Belize, the British Virgin Islands, Cyprus, Hong Kong and the Seychelles (Fourth Superseding Indictment, paragraphs 11-13). It appears from Mr Teyf's Employment Book that in the years immediately preceding his work at Voentorg he worked at a fishing cooperative in Astrakhan named 'Delta Plus' and as a civil servant in the local division of the Ministry of Fishing.

28.  By way of example, one of the documents I was asked to review is an undated and unsigned complaint[7] addressed to the 'Military Attorney General' contained in a PDF file entitled '100_Russian.pdf' at pages 5-8. The author of the complaint is described as the manager of Tatneft, Solid & Company. Although the 'manager' is not named, the CEO of Tatneft. Solid & Company, according to publicly available company records in Russia, is the director of Tatneft, Nail Maganov. Mr Maganov is a very

---

[7] Although the copy I have been provided with is undated and unsigned, it is unclear whether it is the full document

prominent businessman in Russia and Tatneft is one of Russia's largest oil companies.

29. The unnamed author of the complaint alleges, among other things, that s/he learned of a scheme developed by Mr Teyf in which 10% of the amount of budget funds designated for acquisition and processing of fish products would be funneled back to officials at the Ministry of Defense. This was concealed, according to the author, in the following way:

   a. A company, OJSC Agroprom[8], which had a state contract to supply fish products to the Russian Army, acting through a subsidiary ('Petropavlovskoye'), subcontracted out certain tasks for the processing and delivery of fish products through a chain of intermediary companies, one of which was 'Delta Plus', where Mr Teyf worked previously.

   b. 'Delta Plus' signed an agency agreement with Petropavlovskoye for this purpose, and in turn further subcontracted out these tasks to various 'one-day' companies[9].

   c. The 'one-day' companies did not, in fact, perform any such tasks, which were instead actually carried out by Petropavlovskoye itself. The 'one-day' companies were only used to transfer funds to officials in the Ministry of Defense.

30. Although the author of the complaint does not state s/he has direct evidence of the payment of funds to Ministry officials, if the description contained in the complaint is correct, this is not a normal way of conducting a lawful business. The use of multiple intermediaries, including so-called 'one-day' companies, that serve no genuine economic purpose, is often a red flag that suggests unlawful forms of tax avoidance, mechanisms to conceal unlawful kickbacks and/or money laundering. Typically, the attraction of using such 'one-day' companies is that they may be easily liquidated and their documents disposed of in short order to cover the tracks of the scheme.

---

[8] OJSC Agroprom is another commercial entity which, like JSC Voentorg, was created in the Ministry of Defense restructuring described above and operated as a subsidiary of OJSC Oboronservis (see Decree of the President of the Russian Federation dated 15 September 2008 No. 1359 "On Open Joint-Stock Company 'Oboronservis'", para. 1(d)).

[9] The term 'one-day' company is a Russian slang expression commonly used to describe a company specifically set up or used for a temporary and limited, typically fraudulent purpose such as tax evasion or money laundering. In essence, the company serves no (legitimate) economic purpose other than the transfer of funds.

In some cases, even the directors and shareholders of record of the companies are persons with no knowledge of the their purported operations, and may have only been paid to allow the use of their passport to register the company and to sign documents with no questions asked.

31. I should note that the use of offshore companies as such is not necessarily an indicator of fraudulent activity. Many Russian businesses, including quite substantial and reputable business holdings, are structured to be held offshore, and Cyprus and the British Virgin Islands in particular are often favored by international law firms as they are common law jurisdictions. This can be for a variety of reasons, such as tax efficiencies, corporate governance benefits or in order to provide security to a foreign lender.

32. Nevertheless, certain offshore jurisdictions, such as those that have strict shareholder confidentiality provisions making it almost impossible to identify a company's beneficial owner (e.g. the British Virgin Islands), where companies can be registered or struck off relatively quickly and easily, or where enforcement of reporting and money laundering rules is lax are often favored by fraudsters to be used in a manner similar to that of so-called 'one-day' companies in Russia.

**Criminal offences in Russia**

- ***What criminal offenses potentially exist in Russia that would apply to the conduct set forth in the Indictment***

33. A number of criminal offences potentially apply to the conduct set forth in the indictment. These include both direct offences and accessory liability for participating in or facilitating the crime of another.

34. The relevant provisions governing accessory liability may be found at Article 33 and 34 of the Criminal Code, which read as follows:

*Article 33. Types of co-participation in a crime*

11

*1. An organizer, inciter and an accomplice are co-participants in the crime together with the perpetrator.*

*2. The perpetrator is the person who directly commits the crime or directly participates in committing the crime together with others (co-perpetrators), as well as a person who commits a crime through the use of other persons who are not criminally liable due to their age, lack of capacity or other circumstances prescribed by this Code.*

*3. An organizer is a person who organizes the commission of a crime or directs its commission, as well as a person who creates an organized group or criminal society (criminal organization) or leads it.*

*4. An inciter is a person who incites another person to commit a crime by persuasion, bribery, threats or other means.*

*5. An accomplice is a person who facilitates the commission of a crime through advice, directions, provision of information, means or instruments for, or removes obstacles to, the commission of a crime, as well as a person who promises in advance to conceal a criminal, the means or instruments used to commit a crime, the evidence of a crime or items acquired by criminal means, as well as a person who promises in advance to sell such items.*

*Article 34.*

*4. A person who is not the subject of a crime specifically indicated the relevant article [of this Criminal Code], but who participates in a crime prescribed by that article, shall bear criminal responsibility for the crime as its organizer, inciter or accomplice.*

35.  As for the substantive offences, the following would be engaged based on the matters alleged in the Fourth Superseding Indictment:

36.  <u>Theft and/or Fraud</u> (Articles 158 and 159 of the Criminal Code). Theft is defined at Article 158 of the Criminal Code as the 'secret misappropriation' of another's property. 'Misappropriation' is further defined as "*the unlawful uncompensated removal or conversion of the property of another for the benefit of the guilty person*

12

*or other persons for selfish aims that has caused damage to the title holder or other person in possession of the property.*"

37.     Fraud is defined at Article 159 of the Criminal Code as the "*misappropriation of another's property or the acquisition of rights to another's property through deceit of abuse of trust*".

38.     Here, the unauthorized diversion and/or conversion of funds received from the Russian State, the Ministry of Defense, Oboronservis, Voentorg and/or their subsidiaries without compensation for the personal benefit of selected individuals or government officials that were not entitled to receive those funds would amount to a misappropriation.   If the funds were procured on false pretenses, i.e. without disclosing an existing intent to divert the funds for personal benefit of others, then this would amount to fraud.

39.     As noted above, persons that participated in an unlawful scheme for the misappropriation of funds (e.g. by directing, organizing or facilitating the scheme) but who did not personally perform the acts or deceit or misappropriation would nevertheless bear criminal liability as accessories through Article 33 of the Criminal Code.   The offences of theft and fraud also attract more heavier sentences when carried out pursuant to a criminal conspiracy, using the powers of one's office and/or when significant amounts of money are involved.

40.     <u>Embezzlement</u> (Article 160 of the Criminal Code).   Embezzlement is defined at Article 160 of the Criminal Code as the misappropriation of property of another that has been entrusted to the guilty person.  The primary difference between the crime of embezzlement and theft or fraud is that the accused did not need obtain the property from another through secret acts or deceit, since the property has already been entrusted to him or her.  Embezzlement occurs where a person entrusted with possession of or lawful authority over the property abuses that opportunity or authority to convert property within his or her lawful possession or authority for the benefit or him- or herself or others.

13

41.   The crime of embezzlement is typically invoked e.g. where a government official, a company director or its authorized agent abuses his or her powers to misappropriate funds or property belong to the relevant government agency or company.

42.   Here, where highly ranked government officials and company directors are alleged to have been involved in the unlawful scheme to divert government funds, the crime of embezzlement would apply to any such official or director involved in misappropriation of the funds of his or her own government agency or company.  As with theft and fraud, persons who knowingly participated in such unlawful acts may also bear accessorial criminal liability under Articles 33 and 34 of the Criminal Code, notwithstanding that they themselves did not hold office in the government agency or company.

43.   Spending Budgetary Funds Contrary to Purpose (Article 285.1 of the Criminal Code).   Article 285.1 of the Criminal Code prescribes criminal liability for the following offence:

> "*The spending of budget funds by the officer of a recipient of budget funds for purposes contrary to the conditions of their receipt as defined by the approved budget, budget list, notification of budget appropriations, estimates of income and expenses or other document that is the basis for receiving the budget funds [is an offence].*"

44.   As can be seen above, it is a crime for the recipient of budget funds to spend those funds contrary to the purpose for which they were received.  Although still a crime, it is a lesser offence than fraud or embezzlement and attracts a less severe punishment.  A person might be charged with this offence if there was insufficient evidence to conclude that the offender intended to misappropriate the funds for a selfish purpose.

45.   Money laundering (Articles 174 and 174.1 of the Criminal Code).  Money laundering is defined at Article 174 of the Criminal Code as

> "*Making financial operations and other transactions with money or other property knowingly acquired by other persons through criminal means with*

14

> *the aim of giving an appearance of lawful possession, use and disposal or*
> *such funds or property".*

46. Article 174.1 of the Criminal Code sets out an analogous offence where the offender seeks to launder money or property acquired through one's own criminal acts (as opposed to property acquired through the crimes of others).

47. Here, actions such as those described above in the alleged scheme involving the misappropriation of funds designated for purposes of supplying the Russian Armed Forces, to purported 'subcontractors' under sham contracts falsely stating that they were engaged in processing and delivery of fish products, would amount to money laundering under Article 174 and/or 174.1 of the Criminal Code, as would subsequent operations with those funds designed to conceal their misappropriation.

48. <u>Abuse of office</u> (Articles 201 and 285 of the Criminal Code). Article 201 of the Criminal Code prescribes criminal liability for abuse of one's office in a company:

> "*[It is an offence] for a person performing management functions in a*
> *commercial or other organization to use one's powers contrary to the legal*
> *interests of that organization with the aim or extracting a benefit or*
> *advantage for oneself or others or to inflict harm on other persons, if that*
> *act has caused substantial harm to the rights and legal interests of others*
> *or the legally protected interests of society or the State.*"

49. Article 285 of the Criminal Code prescribes an analogous offence where the accused is a government official (as opposed to a company officer). In 2015, the definition of '[government] official' for purposes of Article 285 of the Criminal Code was expanded to include the management in companies in which the Russian State owns a controlling share. Further, in 2017, a new offence was introduced at Article 285.4 of the Criminal Code specifically singling out abuses of office committed in the course of defense procurement for harsher sentencing. Since these amendments postdate the events described in the Indictment, I do not discuss them further here.

50. Abuse of office may be charged together with charges of theft, fraud or embezzlement, or separately if the abuse of office did not involve the

misappropriation of funds. Since I understand Mr Teyf was not a government official but a company officer at the relevant time (and the expanded definition of '[government] official' did not come into force until 2017), he could only be charged with the 'abuse of office' offence under Article 201 of the Criminal Code for acts committed in his capacity as a Deputy Director of Voentorg. As for the offence under Article 285 of the Criminal Code, he could only be charged as an accessory to extent that he may have participated in the crime of abuse of office committed by a government official. Thus, the allegation that he conspired with officials at the Ministry of Defense to develop a scheme to divert budget funds to ministry officials could give cause to charge him as an accessory under Article 285 of the Criminal Code through the application of Articles 33 and 34 of the Criminal Code.

51. <u>Bribery</u> (Articles 290, 291 and 204 of the Criminal Code). Articles 290 and 291 of the Criminal Code (as in force in 2010-2012) defined the offences of receipt or payment of a bribe as follows:

> *"Article 290. Receipt of a bribe*
>
> *1. [It is an offence for] an official, personally or through an intermediary, to receive a bribe in the form of money, securities, other property or benefits of a proprietary nature for actions or inaction for the benefit of the person giving the bribe or the persons he represents, if such actions or inaction come within the official's official powers or, by virtue of his office he may facilitate such actions or inaction, as well as general patronage or indulgence in one's office. […]*
>
> *Article 291. Giving a bribe*
>
> *1. [It is an offence to] give a bribe to an official personally or through an intermediary[.]" […]"*

52. The 2017 Commentary to the Criminal Code of the Russian Federation[10], which is an authoritative commentary edited by the current Chairman of the Supreme Court and authored by numerous Supreme Court judges and leading academics, helpfully

---

[10] *Commentary to the Criminal Code of the Russian Federation. Specific Provisions. Sections X – XII in Four Volumes. (Article by Article)* / A.V. Brilliantov, A.V. Galakhova, V.A. Davydov and others; head editor V.M. Lebedev. Moscow: Yurayt, 2017. Volume 4. 278 pages.

explains these three types of official conduct, which complete the offence of bribery when performed in exchange for a material benefit:

53. *Performing actions (or refraining from taking actions) that fall within one's official powers.* This is described as referring to a situation where the actual acts or inaction that the official performs in exchange for the reward actually fall within his official powers or duties. Matters that fall outside such powers or duties do not fall within this category.

54. *Facilitating the actions or inaction of others through the use of one's office.* This is described as referring to a situation where "*the importance and authority of the office and other possibilities of the office [allows one] to exercise influence over other officials with the aim of procuring that they perform the actions (inaction) of their office. Such influence consists of inducing the other official to perform the relevant actions (inaction) by persuasion, promises, coercion, etc. At the same time an official's use of only personal contacts and relationships, if they are not connected to his office, cannot be viewed as use of one's office*".

55. *Providing general patronage or indulgence of office.* This is described as follows: "*General patronage in one's office assumes the unwarranted creation of various favorable conditions for the bribe giver or his or her representative for the subordinates of one's office: undeserved rewards, promotions or other actions that do not arise from official necessity. General indulgence is where the person fails to take measures in response to omissions or violations in the service of the bribe giver or his or her representatives or failure to react to his or her illegal actions. Specific acts or omissions expected of the official as general patronage or indulgence need not be agreed in advance, but they definitely must be supposed to be probable or possible in the future. Acts or omissions amounting to general patronage or indulgence of office may be performed by the official both for the benefit of subordinates and other person over whom his supervisory or other functions as a representative of the state, as well as his executive functions*".

56. In sum, if the person to whom payment is made is a state official, the key question is whether what the official was being asked or expected to do was something that

fell within his official duties or powers or which he was able to procure from other officials by wielding the influence of his office over them.

57.     Article 204 of the Criminal Code ('Commercial bribery') proscribes analogous conduct where the illicit bribe is paid to or received by a company officer with management powers in the company in exchange for performing acts (or omitting to act) in respect of matters that fall within his or her powers of office.

58.     Here, there are aspects of the alleged scheme that have indicia of bribery.  Although the original decision to use Oboronservis and Voentorg as dedicated military suppliers may not have involved the payment of bribes (these companies were specifically created for this purpose in the course of a wider Ministry of Defence reorganization using Ministry units and assets), if, as is alleged, Mr Teyf and Ministry of Defense officials conspired to divert budget funds and share in the ill-gotten proceeds, those payments would have been at least in part in exchange for Ministry officials turning a blind eye to Mr Teyf's own alleged illicit activities, when he should have otherwise been dismissed and held liable for his actions by the relevant Ministry officials, and/or his activities reported to law enforcement.  This would fall within the third category of 'benefit' described above, i.e. 'general patronage or indulgence of office'.

-           *Is this type of conduct common; if so, is it nonetheless criminal?*

59.     The types of activities described above are certainly criminal in nature under the listed provisions of the Criminal Code, and in my experience they are regrettably frequent.  Throughout my career practicing Russian law, which has spanned 20 years, I have acted as expert, counsel or arbitrator in numerous proceedings involving credible and well-supported allegations of fraud and embezzlement deploying similar schemes.  For example, over the past few years I have been instructed in a number of similar, but unrelated cases heard in London's High Court involving lawsuits against shareholders and officers of various large Russian banks who are alleged to have brazenly misappropriated billions of dollars of bank assets using complicated schemes involving sham transactions, offshore companies with opaque ownership structures.  In a number of those cases, the defendants have been shown to enjoy expensive lifestyles in London or other European capitals and

have had their assets frozen by the court. The phenomenon is not limited to Russia, but can be found throughout the former Soviet Union, and I have also been instructed in similar cases originating from Kazakhstan and Ukraine.

60. My experience is of course anecdotal; however, I would also note that Russia suffers from a well-publicized culture of corruption and kleptocracy. Russia is consistently ranked in the bottom quartile of countries in Transparency International's annual 'Corruption Perceptions Index'. That is not to say, however, that this type of corruption is regarded as 'normal' or acceptable within Russia, and there has been an increasing effort by the government to strengthen Russia's anti-corruption legislation. Regrettably, however, the problem persists.

- ***How would illicit funds be transmitted from Russia to U.S.***

61. Although I cannot speak to the entire arsenal of tools available to potential money launderers, in my professional experience gleaned from cases I have acted in over the years, persons seeking to transfer funds illicitly obtained in Russia to the West have used companies registered in offshore jurisdictions with lax money laundering or regulatory controls and/or lacking public registers of companies' beneficial owners, and the transactions are papered over with sham agreements designed to create an appearance of a legitimate basis for transferring large sums of money, although frequently these are rather unpersuasive on closer examination. Examples are large, unsecured loans that one would be unable to otherwise obtain on the lending market, fictitious sales of property and the like. In many such cases the agreements are relatively short and simple notwithstanding the value of the transaction, and appear to have been hastily prepared without the assistance of a reputable law firm, although the nature of the transaction would normally prompt such parties to seek the assistance of outside counsel to ensure their interests have been properly secured.

- ***Assuming the conduct constitutes criminal conduct in Russia, who would investigate/prosecute such conduct***

19

62. In Russia the body that would normally investigate criminal conduct of the nature described above would be the Investigative Committee of Russia or its relevant subdivision (the Chief Military Investigative Directorate). The decision on whether to prosecute would be taken by the Office of the Prosecutor General or its relevant subdivision (the Chief Military Prosecutor's Office).

- **Would paying such persons to not pursue an investigation/prosecution be a crime?**

63. Yes. Such an action would constitute bribery of a government official as described above. It would also constitute the crime of obstruction of justice set out in Article 295(2) of the Criminal Code ('Obstruction of Justice and Preliminary Investigations'), which reads as follows:

> *"2. Interference of any form in the activity of a prosecutor, investigator, or a person conducting a [criminal] enquiry with the aim of obstructing a full, complete and objective investigation of the case [is an offence]."*

- **Do such things (payoff for non-pursuit of an investigation) happen there, and in what contexts? (Perhaps provide some anecdotal examples known to you)**

64. I have never been involved in a case where I have known a party to bribe an investigator or prosecutor to drop a criminal investigation. However, and without revealing any details of specific cases that might be construed as a waiver of privilege, I have had several cases in which clients have informed me that they have been approached by intermediaries offering to terminate or commence a criminal case in exchange for a bribe. I would also say that in my experience with clients originating from Russia and other former Soviet countries, among them there is a common perception that law enforcement bodies and officials are deeply corrupt and it is possible to terminate a criminal investigation for the right price absent overriding political considerations. There is also a common perception that it is possible to 'hire' law enforcement to investigate or prosecute a political or business rival, and I have been involved in several cases where parties have agreed or

20

attempting to negotiate contractual terms with their business rival requiring the termination of a criminal case.

Drew Holiner

9 December 2019