IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CR-00452-1-FL

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  Plaintiff<br><br>  v.<br><br>LEONID ISAAKOVICH TEYF,<br><br>  Defendant | **MOTION TO REOPEN<br>DETENTION HEARING AND ORDER<br>PRETRIAL RELEASE** |

Defendant Leonid Isaakovich Teyf ("Mr. Teyf"), through the undersigned counsel, respectfully moves the Court to reopen his detention hearing and to order his pre-trial release from custody on bond pending his trials scheduled for 2021. As a result of significant changed circumstances since the January 23, 2019 detention hearing, there are now conditions or combinations of conditions which can be imposed by the Court pursuant to 18 U.S.C. §3142 that would reasonably assure Mr. Teyf's appearance for next year's trials in this matter. Mr. Teyf has been detained nearly 23 months since he was arrested on December 5, 2018, and is currently housed at Albemarle District Jail. As more fully set forth herein, this motion should be granted for the following reasons:

(1) Evidence disclosed, developed, and testimony presented since the January 23, 2019 detention hearing dramatically shifts the weight of the evidence in Mr. Teyf's favor, seriously undermines the Government's case, and demonstrates the prior basis for restraining $39 Million to be illusory at best.

(2) The weakness of the Government's Money Laundering ("ML") charges, in particular, has been exposed by the uncontested Rule 15 testimony of numerous defense witnesses

establishing the legitimacy of Mr. Teyf's substantial wealth and legitimately earned income to be well in excess of the $39M transferred into the U.S. The return of that money to Mr. Teyf would be forfeited if he were to flee the jurisdiction. Indeed, that situation alone creates a compelling undeniable motive for him **not** to flee and effectively converts the $39M into an otherwise massive secured bond as an additional condition supporting pre-trial release from detention.

(3) The Government's own expert witness further validates the flow of that $39M through offshore companies and accounts in Cyprus and the British Virgin Islands:

> The use of offshore companies as such is not necessarily an indicator of fraudulent activity. Many Russian businesses, including quite substantial and reputable business holdings, are structured to be held offshore, and Cyprus and the British Virgin Islands in particular are often favored by international law firms as they are common law jurisdictions. (Report of Drew Holiner at ¶ 31)

(4) The uncontested Rule 15 testimony from numerous witnesses completely discredited the government's sole ML witness, a paid informant, and the otherwise dubious existence of any bribery/kickback scheme involving the Minister of Defense which purportedly occurred in Russia over eight years ago. Hardly surprising, considering there are no official records of any formal prosecution or any formal investigation of the alleged scheme, which is nothing more than an unsubstantiated fabricated claim of this paid informant.

(5) Mr. Teyf's underlying medical conditions render him extremely vulnerable to COVID infection and accordingly his continued detention in jail is increasingly dangerous to his health during the ever-worsening pandemic; and

(6) The need to assist in the preparation of his defense before and during the two upcoming complex trials, involving voluminous records and massive amounts of documents, compounded by the need to work with counsel through Russian interpreters, which current conditions render very difficult and which detention at Pamlico County during trial will make even more difficult.

Accordingly, Mr. Teyf respectfully requests that he be released from detention on appropriate bond conditions, including home confinement with GPS monitoring. Further, Mr. Teyf is prepared to execute a personal recognizance bond in such amount that the Court deems necessary, effectively secured by the restrained assets.

## ARGUMENT

Under the Bail Reform Act, a detention hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). Separately, "a judicial officer may, by subsequent order, permit the temporary release of the person. . .to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Each statutory provision provides an independent basis for reconsideration of Mr. Teyf's bail conditions and pre-trial release from custody under strict conditions, which will reasonably assure Mr. Teyf's future appearance.. Specifically, Mr. Teyf proposes the following bail conditions: (i) home confinement at 6510 New Market Way, Raleigh, NC, with electronic GPS monitoring, 24 hours a day, 7 days a week; (ii) strict supervision by Pretrial Services, supplemented by operational collaboration with the police and/or U.S. Marshal; (iii) visitors limited to Mr. Teyf's immediate family, counsel, and medical professionals; (iv) travel limited to court and counsel's offices in North Carolina, except upon application to Pretrial Services and the government; and (v) any such other terms as the Court deems appropriate under Section 3142.

3

Case 5:18-cr-00452-FL   Document 602   Filed 11/03/20   Page 3 of 15

Under these conditions, Mr. Teyf will have no reasonable ability to flee. Rather, under the present circumstances he has an extremely compelling motive **not** to flee: the approximately $39 Million in restrained assets functions effectively as a massive secured bond. Indeed, as noted, Mr. Teyf is prepared to execute a personal recognizance bond in an amount required by the Court, secured by the restrained assets. The proposed conditions (including a formal secured bond as to the restrained assets) will provide an increasingly necessary measure of protection from the worsening pandemic to a vulnerable individual, and afford him some reasonable ability to meaningfully participate in preparing for and defending his case, all the while reasonably assuring his appearance in court as required under the bail statute.

I.  **EVIDENCE DISCLOSED, DEVELOPED, AND PRESENTED SINCE THE JANUARY 2019 HEARING COMPLETELY DISCREDITS THE GOVERNMENT'S CASE AND SHIFTS CONSIDERATION OF THE WEIGHT OF THE EVIDENCE IN FAVOR OF MR. TEYF.**

There is no presumption for detention in this case. [DE 110 (1/28/19 Order) at 3.] During the January 22, 2019 detention hearing, the Court expressed concern about the weight of the evidence, the nature and circumstances of the offense and the evidence as presented through the Government's testifying case agent.[1] The evidence since disclosed by the government as well as the Rule 15 testimony of numerous defense witnesses is devastating to the government's case, completely discredits CS-1, their sole witness, and renders illusory the basis for restraining $39M at the outset of this case.

The government's ML charges, based upon the belated allegation of underlying "specified unlawful activity" (first identified in the Fourth Superseding Indictment) – an alleged bribery/kickback scheme in Russia over eight years ago, *see* DE 248 at ¶¶ 8-9 (Fourth Superseding

---

[1] Transcript of 1/22/19 hearing at p. 54, lines 12-15. The agent who summarized the government's case at the detention hearing is not on the witness list provided by the government for either trial.

4

Case 5:18-cr-00452-FL   Document 602   Filed 11/03/20   Page 4 of 15

Indictment) – is still based upon the statements of by a single paid informant identified as CS-1. Specifically, the indictment alleges the following about the purported "kickback" scheme: (1) that Anatoliy Serdyukov served as the Russian Minister of Defense between 2007 and 2012, and in this position granted the Russian company Voentorg a contract to provide goods and services to the Russian military; (2) that Mr. Teyf was a Deputy Director of Voentorg between 2010 and 2012; (3) that Voentorg subcontracted with various other companies to provide these goods and services; (4) that Mr. Teyf arranged for subcontractors to fill the various goods and services required by Voentorg's contract; (5) that Mr. Teyf and others devised a scheme in which the subcontractors agreed that a certain percentage of government funds they received for completion of the work on the contract would be paid back as "kickbacks" to Mr. Teyf and others involved in the scheme; (6) that kickbacks were paid in cash over an approximate two-year span between 2010 and 2012; and (7) that most of the kickbacks were paid by Mr. Teyf to the Russian Minister of Defense, Serdyukov, with Teyf retaining the unspecified "next largest share," and the remaining amount paid to other co-conspirators. (*Id.*).

The **only** purported witness to that alleged Russian bribery/kickback scheme was the paid informant, CS-1, whose story remains implausible, contradictory, and objectively absurd. Not surprisingly, there are no official records of any formal prosecution or any formal investigation of the alleged scheme, which is be nothing more than an unsubstantiated fabricated claim of this paid informant.

From the discovery provided since the January 2019 hearing, the government remains unable to trace a single dollar from the alleged criminal activity in Russia to a dollar in the United States. Remarkably, from the evidence provided since January 2019, the government still cannot even identify the amount that Mr. Teyf supposedly made (his purported "cut") from the alleged

5

bribery/kickbacks scheme. (*See* DE 182-1 at ¶ 62, referring only to Teyf getting "the next largest share.")

Based on the word of only one supposed eyewitness to criminal activity in Russia, Mr. Teyf's assets continue to be restrained. From matters disclosed since the detention hearing and submitted under seal concerning the government's paid informant witness, the Court is already aware of some of the circumstances that undercut that witness' credibility. Moreover, recordings of their paid informant – which were fully transcribed only after the detention hearing – completely contradict the allegations of the government's case. (*See* transcribed excerpts of recording at DE 370 at p. 3 and DE 370-1.)

Rule 15 testimony from numerous witnesses completely discredits CS-1 and otherwise exposes the weakness of the government's case. Specifically, CS-1 made several direct accusations about the Chief Financial Officer for Mr. Teyf's businesses, Yelena Zelenova, falsely claiming she played a central role in recording kickbacks and coordinating accountants who received cash that he (CS-1) personally delivered. Excerpt from Report of Interview for CS-1 (submitted as Proposed Sealed Ex. 2); DE 182-1 at ¶ 62; *see also* 10/3/18 GJ Testimony, p. 38 (submitted as Proposed Sealed Ex. 3); DE 344, at pp. 4, 8-9 (11/7/19 Order, summarizing Zelenova's alleged role coordinating bribe/kickback proceeds). During her uncontested testimony, Ms. Zelenova flatly denied the existence of any such bribery/kickback scheme and CS-1's claim she recorded kickbacks and coordinated accountants who received related cash payments, describing it as "a complete lie."

Before joining Delta Plus, Ms. Zelenova obtained multiple master's degrees in economics and finance, and studied at various esteemed Russian institutions, including what is known colloquially as the "Harvard of Russia." *See* 1/28/20 Zelenova Depo., pp. 9-17 (Ex. 4). During

her videotaped Rule 15 deposition testimony, under oath, Ms. Zelenova flatly contradicted the claims made by the paid informant. [*See id.*, pp. 41:24 – 42:2 (Ex. 4) (Zelenova stating that no bribes or kickbacks occurred at Delta Plus); p. 42, lines 2-9 (the paid informant never provided cash payments to accountants under her supervision); p. 43, lines 5-8 ("It was impossible" that she kept records of kickback transactions or bribe payments); p. 45, lines 4-12 (Ex. 4) (stating "[i]t is a complete lie" that she coordinated accountants in receiving bags or boxes of cash that were the products of kickback payments)]. Similarly, Dmitry Schiriy – who provided security to Mr. Teyf – completely denied as false CS-1's accusations that Mr. Schiriy helped CS-1 to pick up and deliver cash kickbacks to the Russian Minister of Defense, Serdyukov, or anyone else. *See* Ex. 8 (1/29/20 Depo.), p. 29, lines 3-17 (contrary to CS-1's claims, he never delivered cash to the Russian Minister of Defense, his son-in-law, or any other family member; "Neither with [CS-1] nor on my own have I ever delivered cash. . .to anyone else."), p. 30, lines 21-25 (as to claim that Schiriy helped CS-1 pick up cash to pay as bribes, "No. It's a lie.").

Additionally, Zelenova and other Rule 15 witnesses established some of the tremendous wealth – *exceeding the $39M amount now restrained by the government* – earned by Mr. Teyf through legitimate businesses and investments prior to the 2010-12 period of the alleged bribery scheme. [1/27/20 Depo. of Business Partner, Nogai (Ex. 5); 1/25/20 Depo. of Business Partner, Borisov (Ex. 6); 2/26/20 Depo. of Financial Advisor/Stock Broker, Grishechkin (Ex. 7)]. Those businesses included successful efforts in (i) oil brokering and production, including development and sale of a Siberian oil field [Nogai Depo., Ex. 5, at pp. 26-29 (Teyf's oil business was "extremely successful"); Borisov Depo., Ex. 6, at 32, lines 20-25 (Teyf earned $9 million in oil trading from 1997-2000); *id.* at 49, lines 11-17 ($8 million from sale of ownership in Quantum Oil)], (ii) commercial fishing and caviar [Zelenova Depo., Ex. 4, at 21-22, 29-30 (Teyf received

7

back "$10 million initial investment and working capital" he invested in Delta Plus prior to 2010, in addition to average annual profit compensation totaling $9 million)], and (iii) investment in the emerging Russian stock market following the transition of the Russian economy to capitalism [Grishechkin Depo, Ex. 7, at p. 30, lines 5-11 (in 2008, when he closed his investment account, Teyf withdrew almost $19 Million Dollars, most of which was profit)]. All of that completely discredits, and creates irrefutable doubt about the government's money-laundering case and claim that the restrained assets were "unexplained" and must have come from illegal activity because Teyf has lots of money and he's got ties back to Russia. *See* GJ testimony, p. 32 (Proposed Sealed Ex. 3).

Moreover, the government's own expert on Russian law, Drew Holiner, has refuted a primary justification used by the government to seize Mr. Teyf's assets: that the source of wire transfers into Mr. Teyf's U.S. bank accounts were from "foreign corporations and bank accounts in countries [Cyprus and the British Virgin Islands] commonly known to be used for money laundering." *See Supporting Gov't Affidavit* DE 182-1, at ¶ 31. To the contrary, Holiner stated in his expert report that:

> [T]he use of offshore companies as such **is not necessarily an indicator** of fraudulent activity. Many Russian businesses, including quite substantial and reputable business holdings, are structured to be held offshore, and **Cyprus and the British Virgin Islands in particular are often favored** by international law firms as they are common law jurisdictions. This can be for a variety of reasons, such as tax efficiencies, corporate governance benefits or in order to provide security to a foreign leader. (Report of Drew Holiner, at ¶ 31)

Finally, based on discovery provided more than a year after the January 2019 detention hearing, the government's paid informant, CS-2, in the murder for hire (MFH) related charges was a serious, violent felon, who did not know Mr. Teyf, and targeted him solely because he was a wealthy Russian businessman, CS-2 spent several years as an informant setting Mr. Teyf up, for

8

the sole purpose of artificially inducing conduct to support manufactured circumstances, all for CS-2's financial gain. More specific details concerning the criminal history and motivations of CS-2 have been presented to the Court under seal by the government and will not be further addressed here.

Just as the "weight of the evidence" previously presented at the detention hearing caused the Court concern about risk of flight (1/22/19 Hearing Tr. at p. 54, lines 12-15), the evidence subsequently disclosed, developed and presented by the Rule 15 testimony now dramatically shifts the weight of the evidence in Mr. Teyf's favor.

## II. THE CURRENT CIRCUMSTANCES DEMONSTRATE THAT THERE IS NO ONGOING RISK OF FLIGHT AND CONDITIONS OR COMBINATION OF CONDITIONS CAN BE IMPOSED BY THE COURT THAT WILL "REASONABLY ASSURE" MR. TEYF'S FUTURE APPEARANCE IN ACCORDANCE WITH THE BAIL REFORM ACT.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act provides that a court "shall order the pretrial release" of the defendant, but may impose bail conditions "if such release will not reasonably assure" the defendant's appearance in court. 18 U.S.C. §§ 3142(b), (c). Where conditions are necessary, such release shall be "subject to the least restrictive further condition, or combination of conditions," that the court determines will reasonably assure the defendant's court appearance. *Id.*

At Mr. Teyf's January 22, 2019 detention hearing before the Court, multiple grounds for detention were presented to and adopted by the Court that do not apply today. Given the present changed circumstances, the government cannot establish that no combination of conditions can be imposed that will reasonably assure Mr. Teyf's presence in court.

9

First, the Court noted at the detention hearing that it was "focused on risk of flight," and that the government had "demonstrated [Mr. Teyf's] mobility. He can cross borders. He can go places." DE 103 at 53:13-17. The Court separately stated that "[t]he lack of a passport. . .though certainly is a consideration, is not a determinative factor. It is possible to secrete yourself without resort to a passport." Under the current circumstances, that conjecture does not provide a basis to deny pre-trial release on bond.

The government application seeking to restrain Mr. Teyf's assets that was granted by the Court at the outset of this case has been effectively rendered defective and insufficient. The generalized basis for the "blanket" restraint under the current record simply does not hold water under any standard. Those assets now effectively and appropriately function as a massive, $39 Million secured bond, especially considering the weakness of the Government's ML charges, and the untenable basis for the initial restraint. Additionally, the record is clear that the now-discredited CS-1 never quantified the sum of money that Mr. Teyf allegedly made from the purported bribery/kickback scheme. That such an infirmity in the government's case continues to exist eight years after the supposed scheme occurred is plainly outrageous and legally unacceptable. As discussed above, the evidence disclosed and developed since the January 2019 detention hearing severely exposes the weakness and insufficiency of the government's ML case and any related forfeiture claim. Those assets represent his family's future, and there is no credible basis to conclude that he will flee and leave those assets behind. Further, if that is not enough, Mr. Teyf is prepared to execute a bond in whatever amount the Court deems necessary, secured by the restrained assets.

## III. THE JAIL CONDITIONS CREATED BY COVID-19 WEIGH IN FAVOR OF PRE-TRIAL RELEASE.

Circumstances have radically changed since Mr. Teyf was ordered detained, almost 2 years ago. The risk of Mr. Teyf becoming infected with, and facing serious complications from, COVID-19 while he remains in jail until and during trial is unacceptably high. As the Court has recognized, Mr. Teyf is a Vulnerable Individual pursuant to the Court's June 18, 2020 Standing Order (DE 586), as he has a higher risk of serious complications from COVID-19, given his hypertension, diabetes, chronic gastritis, history of obesity, and gastroesophageal reflux disease. Indeed, Mr. Teyf was diagnosed with pneumonia earlier this year after suffering from severe chest pains. *See* Teyf Medical Records (Proposed Sealed Ex. 1) (indicating diagnosis of pneumonia, and pneumonia antibiotic regimen, after Mr. Teyf reported recurring chest pains). While Mr. Teyf responded favorably to the antibiotic regimen of treatment, his continued detention during the perils of this pandemic poses an increased risk to his health, which can be mitigated by pre-trial release and home confinement.

This escalating danger to his health is a changed circumstance which warrants reconsideration under 18 U.S.C. § 3142(f) and is a "compelling reason" to order his pre-trial release from detention pursuant to 18 U.S.C. § 3142(i). Conditions in jails and prisons create the ideal environment for the transmission of COVID-19.[2] The CDC has recognized that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits…." *Id.*

---

[2] *See Interim Guidance on Management of Coronavirus Disease in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correcitonal-detention.html.

Nearly two years of pretrial imprisonment with no time outdoors, lack of fresh air or diet appropriate for his underlying conditions have also severely impacted Mr. Teyf. Not surprisingly, his health has further deteriorated while detained. As noted, earlier this year, in March, Mr. Teyf was diagnosed with pneumonia after suffering from severe chest pains. *See* Teyf Medical Records, p. 6 (Proposed Sealed Ex. 1). While Mr. Teyf responded favorably to the antibiotic regimen of treatment, his continued detention during the perils of this pandemic poses an increased risk to his health, which can certainly be mitigated by pre-trial release and home confinement.

Additionally, if detained until and during the trial of his matters, Mr. Teyf would be housed at a local detention facility (e.g., the Pamlico County detention center in Bayboro) during several weeks of trial. Detention at that local jail during trial will expose Mr. Teyf to an unacceptably high risk from COVID-19. Being housed at, and being transported to and from, Pamlico County or another local facility for trial will expose Teyf to additional individuals in custody. At Pamlico County detention center, for example, space for counsel to visit and work with a client to prepare for the next day's witnesses is extremely limited, and more limited still where space will also be needed for a translator. This does not even consider the potential impact of COVID distancing requirements. Pamlico County and, upon information and belief, other local facilities do not permit and can support little if any of the technology required by the evidence in this case.

Since the pandemic began, courts around the country have granted requests for home confinement, acknowledging both the risk of extreme personal health consequences and the risk to others should a prisoner contract COVID-19. *See, e.g., United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting pre-trial motion for reconsideration of prior detention order where COVID-19 was a "changed circumstance" under 18 U.S.C. § 3142(f)); *United States v. Bush*, No. 19-cr-00151 (S.D. Ind. May 15, 2020) (granting pre-trial motion for

reconsideration where 40 year old "has the type of medical issues that put him at an increased risk for COVID-19"); *United States v. Price*, No. 13-cr-598 (D. Md. Apr. 28, 2020) ("Defendant has demonstrated that the changed circumstances created by the COVID-19 crisis sufficiently tips the scales of detention to reverse the earlier decisions by the Court."); *United States v. Copeland,* No. 05-cr-00135 (D.S.C. Mar. 24, 2020) (granting a sentence reduction to time served to defendant serving life sentence for drug trafficking and firearm possession where defendants' "tenuous health condition" put him at "even higher risk for severe illness and possible death" from COVID-19); *Woodard v. United States*, No. 12-cr-105, 2020 WL 3528413 (E.D. Va. June 26, 2020) (granting motion for compassionate release).

The worsening COVID-19 pandemic[3] is a changed circumstance and a compelling reason for pre-trial release under 18 U.S.C. § 3142. Pre-trial release is also necessary for the preparation of Mr. Teyf's defense under 18 U.S.C. § 3142(f) and the Fifth Amendment. Home confinement with GPS monitoring will reasonably assure that Mr. Teyf does not flee while allowing him to access the recording and other voluminous evidence and meaningfully participate in his own defense of two complex trials. GPS monitoring at a designated New Bern lodging during the trial will further assure his appearance in court for each day of trial.

Ultimately, under the current circumstances, clearly there are conditions or combinations of conditions that will "reasonably assure" his presence in court. After almost two years of pretrial detention, Mr. Teyf's pre-trial release on bond is justified and compelled by the increasing threat

---

[3] The number of cases in North Carolina exceeds 250,000 and continues to rise daily. *See* NC DHHS Covid-19 Response, https://covid19.ncdhhs.gov/ (last visited November 3, 2020). Only recently, North Carolina set a record for one-day increase of new cases. *See* NC DHHS Covid-19 Response, https://covid19.ncdhhs.gov/ (last visited November 3, 2020). Just today, North Carolina reported the highest number of coronavirus deaths since the start of the pandemic. *See* https://www.newsobserver.com/news/coronavirus/article246908287.html. "With North Carolina's COVID-19 trends moving in the wrong direction," NC DHHS and the Department of Public Safety recently sent a letter to Craven County and other counties with the highest infection rates, urging the need for additional, local precautions. *See* https://www.ncdhhs.gov/news/press-releases/ncdhhs-and-ncdps-ask-local-leaders-take-action-slow-spread-covid-19 (last visited November 3, 2020).

to his health, the dramatic shift of the weight of evidence in his favor, his compelling financial motive to appear (threatened forfeiture of up to $39 Million) and the need to meaningfully work with the evidence and counsel to prepare for two complex trials under reasonably safe conditions. As Mr. Teyf's proposed conditions far exceed the "least restrictive" set of conditions or combination of conditions that will reasonably assure Mr. Teyf's future appearance in court, the Court should order his pre-trial release from detention accordingly.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court order his pre-trial release on bond pursuant to the proposed conditions or combination of conditions or such others as the Court deems appropriate.

Respectfully submitted, this the 3rd day of November, 2020.

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone: (919) 821-4711
Fax: (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*

/s/ Robert S. Wolf
Robert S. Wolf
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Ave., 12th Floor
New York, NY 10174-1299
Phone: (212) 554-7825
Fax: (212) 554-7700
rwolf@mosessinger.com
*Counsel for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2020, I electronically filed the foregoing **MOTION TO REOPEN DETENTION HEARING AND ORDER PRE-TRIAL RELEASE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ F. Hill Allen
F. Hill Allen
THARRINGTON SMITH, L.L.P.
P.O. Box 1151
Raleigh, NC 27602
Phone: (919) 821-4711
Fax: (919) 829-1583
hallen@tharringtonsmith.com
N.C. State Bar No. 18884
*Counsel for Defendant*